# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.Z.<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd. Suite 800<br>Chicago, Illinois, 60604<br><br>R.M.<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd. Suite 800<br>Chicago, Illinois, 60604<br><br>Y.P.<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd. Suite 800<br>Chicago, Illinois, 60604<br><br>M.C.<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd. Suite 800<br>Chicago, Illinois, 60604<br><br>H.A.<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd. Suite 800<br>Chicago, Illinois, 60604<br><br>Luis Felipe Estrada Trejo<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd. Suite 800<br>Chicago, Illinois, 60604<br><br>and all others similarly situated,<br><br>    *Plaintiffs*,\*<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY<br>2707 Martin Luther King Jr. Ave SE<br>Washington, D.C. 20528;<br><br>UNITED STATES CITIZENSHIP AND<br>IMMIGRATION SERVICES<br>5900 Capital Gateway Drive | Case No. 26-1510 |

Camp Springs, MD 20746;

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT
500 12th St SW
Washington, D.C.  20536;

MARKWAYNE MULLIN, in his official
capacity as Secretary of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528;

JOSEPH B. EDLOW, in his official capacity
as the Director of USCIS
5900 Capital Gateway Drive
Camp Springs, MD 20746;

TODD LYONS, in his official capacity as
Senior Official Performing the Duties of
Director of Immigration and Customs
Enforcement
500 12th St SW
Washington, D.C.  20536,

　　　　*Defendants*.

**CLASS ACTION COMPLAINT**

\* With the exception of Luis Felipe Estrada Trejo, Plaintiffs have concurrently filed a motion to
proceed under pseudonym.

**INTRODUCTION**

1.    The United States immigration laws create several paths to lawful immigration status and other protections for noncitizens who need them—including survivors of human trafficking and other serious crimes; abused, abandoned, or neglected children; refugees and their families; and the spouses and children of U.S. citizens. Plaintiffs are noncitizens detained by the Department of Homeland Security ("DHS"), who qualify for such relief and have applied to United States Citizenship and Immigration Services ("USCIS") to pursue it.

2.    Yet because of DHS's new Biometrics Policy, which Plaintiffs challenge here, USCIS will deny their applications without considering them. On December 5, 2025, DHS announced that it will no longer collect biometrics information (i.e. fingerprints, photographs, and signatures) for detained people who seek relief before USCIS, even though USCIS rejects applications submitted without this information. Because the immigration courts do not have jurisdiction to grant the relief Plaintiffs seek, they are left with no way to pursue it.

3.    The Biometrics Policy thus closes the door to remedies that are, for many people, their only chance to avoid deportation—remedies that Congress entitled eligible noncitizens to seek. The policy prevents Plaintiffs and others like them from accessing these remedies no matter how long their application has been pending, how much money they paid to have it considered, what relief they seek, or how strongly their case merits relief. The policy forecloses such relief even when USCIS would have granted it if it fulfilled its obligation to consider the application.

4.    DHS' new Biometrics Policy violates the law many times over. It is contrary to the Immigration and Nationality Act ("INA") and its implementing regulations, which entitle eligible noncitizens to pursue immigration relief from USCIS. It flouts the Fifth Amendment's guarantee of due process. And because DHS failed to provide any reasoned explanation for the change, it fails to meet the Administrative Procedure Act ("APA")'s basic standards for agency action.

1

5.      Plaintiffs seek relief on behalf of the class of people affected by the Policy: noncitizens (i) who are or will be in DHS custody; (ii) who have or will have pending applications for immigration relief within USCIS's exclusive or initial jurisdiction; and (iii) for whom USCIS has not accepted biometrics.

6.      Without this Court's intervention, Plaintiffs and the class will face irreparable harm. They will lose their right to pursue lawful immigration status before being deported, and some will face prolonged detention when relief would have otherwise led to their release. Many will be separated from their family and face abuse or persecution in their countries of origin. In short, they will face the very harms that Congress designed these paths to immigration relief to prevent.

7.      The Court should vacate the Biometrics Policy and enjoin its enforcement.

## JURISDICTION AND VENUE

8.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the APA, 5 U.S.C. §§ 551 et seq.

9.      This case arises under the Due Process Clause of the Fifth Amendment to the United States Constitution; the APA, 5 U.S.C. § 701 *et seq.*; the INA, 8 U.S.C. § 1101 *et seq.*; and the INA's implementing regulations.

10.      Venue is proper under 28 U.S.C. § 1391(c)(1) because DHS is headquartered, and most of the federal officer defendants perform their official duties, in this district.

## THE PARTIES

11.      **Plaintiff J.Z.** is 19 years old and a citizen of Venezuela. He has been detained by Immigration and Customs Enforcement ("ICE") since February 2025, and he is currently detained in Kentucky. J.Z. has applied for Special Immigrant Juvenile Status ("SIJS"), which he is eligible to seek because he was abused and abandoned by his father in Venezuela. If DHS's new Biometrics Policy remains in place, J.Z. will not be able to pursue SIJS because immigration judges do not

2

have authority to adjudicate these applications. If J.Z. is unable to pursue SIJS, he will lose access to the benefits that status provides, including consideration for deferred action with work authorization and eligibility for lawful permanent residency when a visa becomes available.

12.    **Plaintiff R.M.** is a 22-year-old man from Mexico. He has been detained by ICE since July 2025, and he is currently detained in New Mexico. R.M. has applied for T nonimmigrant status (a "T Visa") because he is a survivor of human trafficking. After R.M.'s father brought him to the United States, he forced R.M. to work on a commercial farm from age 8 to 19. If DHS's new Biometrics Policy remains in place, he will not be able to pursue a T Visa because immigration judges do not have authority to adjudicate T Visas. If R.M. is removed without resolution of his application for a T Visa, he will lose his opportunity to seek the lawful immigration status, work authorization, and other benefits the visa affords.

13.    **Plaintiff Y.P.** is 49 years old and a citizen of Cuba. Y.P. has been detained by ICE since November 2025, and he is currently detained in Mississippi. Y.P. has applied for adjustment of status under the Cuban Adjustment Act, for which he qualifies because he was born in Cuba, was inspected and paroled into the United States, has been in the United States for more than one year, and is admissible. If DHS's new Biometrics Policy remains in place, however, Y.P. will not be able to pursue adjustment because immigration judges do not have authority to adjudicate applications for adjustment of status for someone deemed an "arriving alien" under the INA's regulations, a category that includes Y.P. because he was paroled into the United States. If Y.P. cannot pursue adjustment of status, he will lose this opportunity to obtain lawful permanent residency in the United States and may be removed to Cuba where he fears for his safety.

14.    **Plaintiff M.C.** is 43 years old and a citizen of Mexico. She has been detained by ICE since May 2025, and she is currently detained in Kentucky. M.C. has applied for U Nonimmigrant Status (a "U Visa"), for which she qualifies because she was a victim of domestic

3

violence and stalking perpetrated by her former partner and the father of her children and because she has cooperated with law enforcement in their investigation of these crimes. If DHS's new Biometrics Policy remains in place, M.C. will not be able to pursue a U Visa from within the United States because immigration judges do not have authority to adjudicate these applications. If M.C. is unable to move forward with her application for a U Visa, she faces removal from the United States and separation from her children.

15.    **Plaintiff H.A.** is 40 years old and a citizen of Iran. H.A. has been detained by ICE since January 2025, and he is currently detained in Texas. H.A.'s spouse has submitted a petition for him to receive derivative asylum as the immediate relative of an asylee, for which he qualifies because his spouse was granted asylum within the last two years. If DHS's new Biometrics Policy remains in place, H.A. will not be able to obtain derivative asylee status without being deported because immigration judges do not have authority to adjudicate asylee relative petitions unless the applicant's case was considered concurrently with their family member's application, which was not the case for H.A. If H.A. is unable to have his petition adjudicated, he will lose this opportunity to become a derivative asylee and eventually obtain lawful permanent residency in the United States, and he will face deportation to a country where he fears for his life.

16.    **Plaintiff Luis Felipe Estrada Trejo** is 45 years old and a citizen of Mexico. He has been detained by ICE since March 2026, and he is currently detained in Kentucky. Mr. Estrada Trejo has applied for Adjustment of Status (otherwise known as permanent residency), for which he qualifies based on his marriage to his wife, who is a U.S. citizen. If DHS's new Biometrics Policy remains in place, Mr. Estrada Trejo will not be able to pursue permanent residency because immigration judges do not have authority to adjudicate applications for adjustment of status in cases like his, where the noncitizen is classified as an "arriving alien." If Mr. Estrada Trejo is unable to pursue adjustment, he will lose this opportunity to become a lawful permanent resident

4

in the United States, and he faces likely separation from his U.S.-citizen wife.

17.    **Defendant DHS** is an executive agency of the United States headquartered in Washington, D.C. DHS and its components, including ICE and USCIS, are the agencies principally charged with implementing and enforcing the immigration laws and policies of the United States.

18.    **Defendant USCIS** is the sub-agency within DHS responsible for, among other things, processing applications for benefits under the immigration laws. USCIS is headquartered in Camp Springs, Maryland.

19.    **Defendant ICE** is the sub-agency within DHS responsible for carrying out immigration enforcement and detention in the interior of the United States and for representing DHS in proceedings before the immigration courts. ICE is headquartered in Washington, D.C.

20.    **Defendant Markwayne Mullin** is sued in his official capacity as the Secretary of Homeland Security. In this capacity, he directs DHS and each of the component agencies, including ICE and USCIS. In his official capacity, Defendant Mullin is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

21.    **Defendant Todd Lyons** is sued in his official capacity as Senior Official Performing the Duties of the Director of ICE.

22.    **Defendant Joseph B. Edlow** is sued in his official capacity as the Director of USCIS.

## BACKGROUND

### I.    Congress charged USCIS with adjudicating immigration benefits

23.    Federal law charges USCIS with adjudicating affirmative requests for immigration benefits. *See* 6 U.S.C. § 271(b); USCIS, *Policy Manual*, vol. 1, pt. B, Ch. 1,

5

https://perma.cc/MD88-HCTR.[1] When a noncitizen is in removal proceedings, they must pursue certain relief before the Executive Office for Immigration Review ("EOIR"), which houses immigration courts.[2] But even then, several forms of relief remain within the exclusive jurisdiction of USCIS. Accordingly, when a person in removal proceedings qualifies for a remedy that is within USCIS's exclusive jurisdiction, they must pursue that application with USCIS while their removal case remains pending before the immigration court.

24.     If USCIS grants relief to a person in removal proceedings, the person may qualify for termination or administrative closure of their removal proceedings, allowing them to remain in the United States. But if USCIS does not consider the application, or summarily denies it, the applicant may be ordered removed or deported—even when USCIS would have granted lawful status or other protection if it had considered the merits of the application.

25.     As a necessary step in an application for immigration benefits, applicants must submit biometrics information (including fingerprints, photographs, and signatures) to ensure that the applicant is not disqualified from receiving the relief (by virtue of, for example, a criminal conviction). 8 C.F.R. § 103.2(b)(9); USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 1, https://perma.cc/TJ83-Q647. Many applications adjudicated by USCIS require the applicant to pay a separate fee for biometrics processing. 8 C.F.R. § 103.2(b)(9).

---

[1] The USCIS Policy Manual "is the agency's centralized online repository for USCIS' immigration policies." USCIS, *Policy Manual*, https://perma.cc/2DN4-EHUW. It "contains the official policies of USCIS and assists immigration officers in rendering decisions. The Policy Manual is to be followed by all USCIS officers in the performance of their duties but it does not remove their discretion in making adjudicatory decisions." *Id.*

[2] In removal proceedings, EOIR has jurisdiction over, for example, applications based on a fear of return to a noncitizen's home country (such as asylum, withholding of removal, and protection under the United Nations Convention Against Torture), cancellation of removal, and adjustment of status for applicants who are not "arriving aliens" under the INA's regulations. *See* 8 U.S.C. §§ 1158, 1229b, 1231(b)(3), 1255; 8 CFR §§ 1208.13-1208.13.14, 1208.16-1208.18, 1245.1.

26.    When someone files an application, USCIS schedules a biometric services appointment for the applicant at a USCIS office. USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/9AEJ-2TRJ. By regulation, if a person does not appear for a required biometrics capture, their benefit request "shall be considered abandoned and denied" unless USCIS received a timely change of address or rescheduling request that the agency concludes warrants excusing the failure to appear. 8 C.F.R. § 103.2(b)(13)(ii); *see also* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/9AEJ-2TRJ. And "USCIS does not approve requests to reschedule a biometrics appointment for reason of detention or incarceration." USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/9AEJ-2TRJ.

27.    Under federal regulations, "DHS is responsible for obtaining biometrics and other biographical information [for any noncitizen] in detention," 8 C.F.R. § 1003.47(d), when needed for "any application for immigration relief." *Id.* § 1003.47(a).

## II.    Overview of immigration benefits in USCIS's exclusive or initial jurisdiction

28.    USCIS has exclusive jurisdiction over numerous categories of immigration benefits. For example, USCIS is the only agency that may grant applications for adjustment of status (*i.e.*, permanent residency) for noncitizens who are labeled as "arriving aliens," 8 C.F.R. § 245.2(a)(1), a term that includes noncitizens paroled into the United States, 8 C.F.R. § 1.2.

29.    USCIS also has exclusive jurisdiction over applications for Special Immigrant Juvenile Status ("SIJS") for abused, abandoned, and neglected children; T Visas for survivors of human trafficking; and U Visas for survivors of other serious crimes. *See* 8 C.F.R. § 204.11(g)(1) (SJIS); *id.* § 214.204(a), (b)(1)(i) (T Visas); *id.* § 214.14(c) (U Visas). USCIS also has exclusive jurisdiction over asylee refugee petitions when the asylee relative was not included in the principal asylee's original application for asylum. *See* 8 C.F.R. § 208. In addition, USCIS has initial

7

jurisdiction over requests for asylum by unaccompanied minors. *See* 8 U.S.C. § 1158(b)(3)(C). [3]

30.    Federal statutes and regulations entitle eligible noncitizens to pursue these benefits and require USCIS to make individualized determinations on their applications.

**A.  Adjustment of Status under INA § 245 and the Cuban Adjustment Act**

31.    Under Section 245 of the INA, eligible noncitizens who have been "inspected and admitted or paroled into the United States" may seek lawful permanent residence through a process called "adjustment of status," without leaving the United States. 8 U.S.C. § 1255(a). Certain people—including the immediate family members of United States citizens, certain Cuban nationals, and certain survivors of domestic violence—may apply for adjustment even if they do not have lawful immigration status. 8 U.S.C. §§ 1154(a)(1)(iii)-(iv), (B)(ii)-(iii), 1255(c); Cuban Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966); *see* 8 C.F.R. §§ 204.2(c), 245.1.

32.    Eligible noncitizens are entitled to an adjudication of a properly filed application for adjustment of status, and the agency's discretion over the merits of the application does not relieve it of its obligation to receive and adjudicate applications. *See*, *e.g.*, *Geneme v. Holder*, 935 F. Supp. 2d 184, 192 (D.D.C. 2013); *Beshir v. Holder*, 853 F. Supp. 2d 1, 8 (D.D.C. 2011); *Kalilu v. Mukasey*, 548 F.3d 1215, 1218 (9th Cir. 2008); *Succar v. Ashcroft*, 394 F.3d 8, 29 n.28 (1st Cir. 2005); *Scheerer v. Attorney General*, 445 F. 3d 1311, 1318-22 (11th Cir. 2006); *Zheng v. Gonzales*, 422 F.3d 98, 111-20 (3d Cir. 2005); *Ceta v. Mukasey*, 535 F.3d 639, 646-47 (7th Cir. 2008).

33.    USCIS generally requires a biometrics collection to pursue an application for adjustment of status. *See*, *e.g.*, USCIS, *Form I-485: Instructions for Application to Register Permanent Residence or Adjust Status*, 4 (Jan. 20, 2025), https://perma.cc/MG8E-RQFN ("If you

---

[3] USCIS also has exclusive jurisdiction to adjudicate other applications for temporary status, including renewals for people who have been granted deferred action under the Deferred Action for Childhood Arrivals ("DACA") program and other forms of deferred action. 8 C.F.R. § 236.22. USCIS likewise has exclusive jurisdiction over applications for work authorization. *Id.* § 274a.13

8

do not attend your biometric services appointment, we may deny your application.").

## B. Adjustment of Status for Refugees and Asylees

34.     Refugees who have been admitted to the United States and asylees may also apply to adjust their status to lawful permanent residence. 8 U.S.C. §§ 1159(a), (b); 8 C.F.R. §§ 209.1, 209.2.[4] Congress allowed those groups to pursue permanent residence to promote the resettlement of "refugees of special humanitarian concern to the United States" and to advance "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980).

35.     Adjustment of status for refugees is mandatory: USCIS must approve the application if the petitioner is eligible. *See* 8 U.S.C. § 1159(a)(2) (providing that refugees who have been inspected and deemed admissible for permanent residence "*shall*. . . be regarded as lawfully admitted to the United States for permanent residence" as of their date of arrival into the country (emphasis added)).  "If the applicant is found to be admissible for permanent residence," "USCIS *will* approve the application, admit the applicant for lawful permanent residence as of the date of the [noncitizen's] arrival in the United States, and issue proof of such status." 8 C.F.R. § 209.1(e) (emphasis added).

36.     Although USCIS has discretion regarding whether to grant adjustment to asylees, it must adjudicate the application. The regulations provide that "USCIS *will* notify the applicant in writing of the decision on his or her application," confirming that USCIS will in fact make a "decision" on the application. *Id.* § 209.2(f) (emphasis added).

---

[4] Under the INA, a "refugee" includes any person "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of," their country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Noncitizens may be admitted to the United States as refugees under 8 U.S.C. § 1157. An asylee is someone who has been granted asylum *See* 8 U.S.C. § 1158.

37.     Before USCIS will consider the application, the applicant generally must submit to a biometrics collection. *See* 8 C.F.R. § 209.1(b); USCIS, *Form I-485: Instructions for Application to Register Permanent Residence or Adjust Status*, 4 (Jan. 20, 2025), https://perma.cc/MG8E-RQFN.

## C. T and U Nonimmigrant Status

38.     The INA also provides lawful status for survivors of human trafficking and violent crime—called T and U nonimmigrant status, or T and U Visas. *See* 8 U.S.C. § 1101(a)(15)(T) & (U); 8 C.F.R. §§ 214.204, 214.14. T and U Visas aim to "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking . . . and other crimes . . . while offering protection" to noncitizens who report crimes and cooperate with law enforcement. Violence Against Women Act of 2000, Pub L. No. 106-386, § 1513(a)(2)(A), 114 Stat. 1464, 1533 (codified at 8 U.S.C. § 1101); Trafficking Victims Protection Act of 2000, Pub L. No. 106-386, § 102, 114 Stat. 1464, 1466 (codified at 22 U.S.C. § 7101).

39.     Applicants for T and U Visas can obtain interim relief even before their applications are approved. Trafficking survivors who submit applications for T nonimmigration status which are found to be bona fide may receive work authorization and an automatic stay of any final order of deportation while their applications are pending. 8 C.F.R. §§ 214.204(b), 214.205(c), (e). [5] Similarly, survivors of serious crimes who submit U Visa applications found to be bona fide may qualify for two types of interim relief that provide deferred action (temporary protection from removal and immigration status-based arrests) and work authorization. *See* 8 U.S.C. § 1184(p)(6); 8 C.F.R. § 214.14(d)(2); USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 5, https://perma.cc/89TU-MCUW.

---

[5] USCIS determines a petition is bona fide based on whether the application and background checks are complete. USCIS Policy Manual, vol. 3, part C, ch. 5; *see also* vol. 3, part B, ch. 6.

40.     When USCIS adjudicates the petition and grants T or U nonimmigrant status, the recipient may work in the United States and, after three years, pursue lawful permanent residence. 8 C.F.R. § 214.204(o)(3); 8 C.F.R. § 214.14(c)(7); 8 U.S.C. §§ 1255(l), (m); 8 U.S.C. § 1184(p).

41.     The regulations that govern both T and U Visas require USCIS to adjudicate the application and grant relief if the applicant is eligible, subject to an annual cap.

42.     A petitioner for T nonimmigrant status "must submit" an application to USCIS. 8 C.F.R. § 214.204(a). Once the petition is submitted, USCIS "*will* . . . determine if the application is bona fide." *Id*. § 214.205(a) (emphasis added). If it is, any "final order of removal…*will* be automatically stayed, and the stay will remain in effect until a final decision is made" on the application. *Id.* § 214.204(b)(2)(iii) (emphasis added). After USCIS completes its review of a T Visa petition, the regulations require that USCIS "*will* issue a decision approving or denying the application." *Id.* § 214.204(n) (emphasis added). If USCIS determines the applicant is eligible, USCIS must "approve the application and grant" T nonimmigrant status subject to an annual cap. *Id.* § 214.204(o).

43.     USCIS has a "nondiscretionary duty to adjudicate [U Visa] applications," as well. *Uranga v. USCIS*, 490 F. Supp. 3d 86, 102 (D.D.C. 2020) (citation omitted). U Visa applicants must also file a petition on the form prescribed by USCIS. 8 C.F.R. § 214.14(c)(1). After review, USCIS "will issue a written decision approving or denying" the petition. *Id.* § 214.14(c)(5). "If USCIS determines that the petitioner has met the requirements for U-1 nonimmigrant status, USCIS will approve" the petition. *Id.* § 214.14(c)(5)(i). If USCIS is prevented from approving the application "due solely to the [annual] cap," it "must" place the applicant "on a waiting list," "must" grant that applicant deferred action, and may grant work authorization. *Id.* § 214.14(d)(2).

44.     Applicants for T and U nonimmigrant status must submit biometrics as part of their applications. 8 C.F.R. §§ 214.204(k); 214.14(c)(3); *see also* USCIS, *Form I-914: Instructions for*

11

*Application for T Nonimmigrant Status*, 14 (Jan. 20, 2025), https://perma.cc/3AEP-AP3Q ("USCIS may require you to provide your biometrics to verify your identity and/or update background and security checks."); USCIS, *Form I-918: Instructions for Petition for U Nonimmigrant Status and Supplement A, Petition for Qualifying Family Member of U-1 Recipient*, 2 (Jan. 20, 2025), https://perma.cc/J9ZZ-7SY2 ("If you do not attend your biometric services appointment, we may deny your petition.").

### D. Special Immigrant Juvenile Status

45.    Congress also provided a pathway, called Special Immigrant Juvenile Status ("SIJS"), for children who have been abused, abandoned, or neglected by one or both parents "to remain safely in the country with a means to apply" for lawful permanent residence. *Osorio-Martinez v. Attorney General*, 893 F.3d 153, 168 (3d Cir. 2018) (citation omitted). A child is eligible for SIJS only if a juvenile court declares the child dependent on the court or places the child in the custody of a designated caregiver, determines that return to the child's country of nationality would be against the child's best interests, and finds that reunification with one of the child's parents is not viable due to abuse, neglect, or abandonment. *See* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.

46.    If USCIS grants a SIJS petition, the child becomes eligible to apply for lawful permanent residence, free from certain statutory bars, once an immigrant visa number becomes available. 8 U.S.C. § 1255(h). SIJS also grants "a variety of other statutory benefits," including "access to federally funded educational programming" and "preferential status when seeking employment-based visas." *Osorio-Martinez*, 893 F.3d at 163.

47.    Until recently, moreover, USCIS automatically considered whether a person with SIJS should receive deferred action and become eligible for work authorization, if an immigrant visa was not yet available when their petition was granted. *See A.C.R. v. Noem*, 809 F. Supp. 3d

12

103, 110-13 (E.D.N.Y. 2025), *reconsideration denied,* No. 25-cv-3962, 2026 WL 102611 (E.D.N.Y Jan. 14, 2026). That policy is still in effect for plaintiff J.Z. and others like him, who filed SIJS applications before USCIS changed this policy on April 10, 2026.[6] People with deferred action may seek termination of their removal proceedings. 8 C.F.R. § 1003.18(d)(1)(ii)(C) (2025).

48.     Applicants for SIJS also have a right to an adjudication of their petitions. Congress has provided that USCIS "shall . . . adjudicate" SJIS applications "not later than 180 days after the . . . application is filed." 8 U.S.C. § 1232(d)(2); *accord* 8 C.F.R. § 204.11(g)(1), (h).

49.     USCIS may require biometrics to pursue SIJS. When it does, the applicant has no option to challenge USCIS's decision to require biometrics. In the instructions for Form I-360, which is used for SIJS applications, USCIS warns, "If you do not attend your biometric services appointment, we may deny your petition." USCIS, *Form I-360: Instructions for Petition for Amerasian, Widow(er), or Special Immigrant*, 11 (Jan. 20, 2025), https://perma.cc/F3SH-R6LR.

### E.  Asylum for Spouses and Children Following to Join Asylees

50.     Federal law also gives noncitizens "physically present in the United States" the right to apply for asylum. 8 U.S.C. §§ 1158(a)(1), (a)(2)(B). A noncitizen may receive asylum if they meet the statutory definition of "refugee" because they have "well-founded fear of persecution account of race, religion, nationality, membership in a particular social group, or political opinion" in their home country. *Id.* §§ 1158(b)(1)(A), 1101(a)(42); 8 C.F.R. § 208.14.  The spouse or child (under age 21) of an asylee also qualifies for asylum "if accompanying, or following to join," the principal asylee. 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.21(a).

---

[6] *See* Policy Memorandum from USCIS, *PM-602-0198*: *Special Immigrant Juvenile Classification and Deferred Action* (Apr. 10, 2026), https://perma.cc/TG5V-GFAV (rescinding 2022 policy that automatically considered SIJS beneficiaries for deferred action and access to work authorization to SIJS recipients). The guidance is effective 30 days after April 10, 2026, and applies to SIJS petitions filed on or after that date. *Id*. at 9.

51.    When an asylee's spouse or children are not granted asylum when the principal asylee's application is approved, regulations allow asylees to file a separate application with USCIS for spouse and children who are "accompanying" or "following to join" the asylee in the United States. 8 C.F.R. § 208.21(c); *see* USCIS, *Form I-730: Refugee/Asylee Relative Petition,* 2 (Jan. 20, 2025), https://perma.cc/8AWL-5Y9R. USCIS also has sole jurisdiction over these follow-to-join petitions for asylum for the spouses and children of principal asylees. 8 C.F.R. § 208.21(c).

52.    Asylees may lawfully live and work in the United States, and they become eligible seek lawful permanent residence through adjustment of status after one year. 8 U.S.C. §§ 1158(c), 1159.

53.    USCIS routinely denies petitions for asylum for failure to submit biometrics. *See* USCIS, *Form I-730: Refugee/Asylee Relative Petition,* 2 (Jan. 20, 2025), https://perma.cc/8AWL-5Y9R (stating that derivative beneficiaries in the United States at the time of the application are subject to the collection of biometrics data, and any "unexcused failure" to provide the required data "may result in the dismissal of the petition" (citing 8 C.F.R. § 103.2(b)(13)); *accord id.* at 5. [7]

### III.    DHS increases detention of noncitizens, including applicants for benefits

54.    Since January 2025, DHS has embarked on a campaign to deport more than 1,000,000 noncitizens per year. As part of its efforts to do so, it has taken unprecedented steps to detain an increasing number of noncitizens. Immigration arrests quadrupled in the first nine

---

[7] Using the same form, the spouses and children of refugees may also apply to USCIS for derivative "refugee" status. 8 U.S.C. § 1157(c)(2)(A). When the spouse or child meets the eligibility requirements, USCIS "shall" grant the petition. 8 C.F.R. § 207.7(a). In addition, to accommodate the specialized needs of unaccompanied children, the Trafficking Victims Protection Reauthorization Act, § 235, gives DHS initial jurisdiction over their asylum applications, which it exercises through USCIS. *See* Pub. L. No. 110-457, 122 Stat. 5044, 5082 (codified at 8 U.S.C.§ 1159(b)(3)(C)). Based on that legislation, "unaccompanied alien children have a statutory right to initial consideration of an asylum application by the DHS . . . ." *Matter of J-A-B- & I-J-V-A-,* 27 I. & N. Dec. 168, 169 n.2 (BIA 2017).

14

months of the Trump-Vance Administration, including a sevenfold increase for people without criminal convictions. Graeme Blair & David Hausman, *Immigration Enforcement in the First Nine Months of the Second Trump Administration* 2 (Jan. 27, 2026), https://perma.cc/8V84-HDCG; Am. Immigr. Council, *Immigration Detention Expansion in Trump's Second Term* 11-17 (Jan. 2026), https://perma.cc/S2YP-AD9N.

55.     As of March 2026, there were more than 61,000 people detained by DHS, and DHS exceeded that number for each of the first six months of the fiscal year. USCIS, *Detention FY 2026 YTD, Alternatives to Detention FY 2026 YTD and Facilities FY 2026, Footnotes*, "Detention FY 2026" tab (Apr. 9, 2026), https://perma.cc/HE5T-HFVY. In January 2025, the number of people in ICE detention exceeded 75,000. *Id.* at "ICLOS and Detainees" tab. To put that number in perspective, in fiscal year 2024, an average of fewer than 38,000 people were detained on a given day. USCIS, *FY 2024 Detention Statistics*, "Detention FY24" tab. And in fiscal year 2019—the last year of President Trump's first term unaffected by COVID-19—the annual average daily detained population was 50,165. USCIS, *FY 2019 Detention Statistics*, "Detention FY2019" tab (Apr. 9, 2026), https://perma.cc/77E5-LCMY.

56.     Beginning in January 2025, ICE changed policies to expand the population subject to arrest and implemented daily arrest quotas, instructing agents to detain any noncitizen who they believed was removable. *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 44 (D.D.C. 2025); *Immigration Detention Expansion in Trump's Second Term*, *supra*, at 14. ICE later increased those quotas. *See Escobar Molina*, 811 F. Supp. 3d at 44. Notably, these quotas did not contain exceptions for people with applications for relief pending before USCIS, even when adjudication of that application would render the applicant unremovable.

57.     Since July 2025, ICE has taken the position that all applicants for admission (noncitizens who are present in the United States without having been admitted or paroled) are

15

subject to mandatory immigration detention and are therefore ineligible for release on bond, no matter how long they have lived in the United States. Memorandum from USCIS to All ICE Employees, *Interim Guidance Regarding Detention Authority for Applicants for Admission* (July 8, 2025), https://perma.cc/KRN5-BJ83. The BIA agreed with this determination in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (2025).

58.    Although the United States Court of Appeals for the Second Circuit and most district courts have rejected ICE's new position on mandatory detention, it has been adopted by the U.S. Court of Appeals for the Fifth and Eighth Circuits. *Compare Cunha v. Freden*, No. 25-3141-PR, 2026 WL 1146044 (2d Cir. Apr. 28, 2026) *with Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026) *and Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026); s*ee* Kyle Cheney, *Our running list of judges who have ruled on ICE's mass detention policy*, POLITICO (Feb. 18, 2026), https://perma.cc/3L2N-9ZSS.

59.    Due to ICE's detention policies, most detained noncitizens remain detained throughout their removal proceedings, unless they can obtain release through a writ of habeas corpus. *See Immigration Enforcement in the First Nine Months of the Second Trump Administration*, *supra*, at 7-8; *Immigration Detention Expansion in Trump's Second Term*, *supra*, at 18-23.

60.    An increasing number of noncitizens detained by ICE are people who were previously released by ICE and/or who are pursuing immigration relief, including with USCIS. *See, e.g., Garro-Pinchi v. Noem*, 813 F. Supp. 3d 973, 995-96, 1019-21 (N.D. Cal. 2025) (identifying a re-detention policy beginning in May 2025 in which ICE "began re-detaining released noncitizens on a large scale" without any determination of changed circumstances); *Garcia Ramirez v. ICE*, 812 F. Supp. 3d 86, 109 (D.D.C. 2025), *pending appeal,* No. 26-5053 (D.C. Cir. Feb. 11, 2026) (acknowledging 2025 ICE practice of "re-arresting and detaining"

16

unaccompanied children who had previously been released from Office of Refugee Resettlement custody upon reaching 18); Albinson Linares, *Immigrants who are crime victims and waiting for visas now face deportation*, NBC News (Aug 7, 2025), https://perma.cc/QV4Z-BPE7 (describing detention of people pursuing U Visas); Andra González Ramírez, *They survived human trafficking, then ICE detained them*, The Cut (Apr. 14, 2026), https://www.thecut.com/article/sex-trafficking-survivors-ice-detentions-deportations.html (describing detention of human trafficking survivors).

**IV.    DHS ceases biometrics collections for people in detention**

61.    Until recently, DHS regularly collected biometrics from noncitizens in DHS custody who had pending applications with USCIS. ICE took detained noncitizens' biometrics under an "intradepartmental agreement" with USCIS. *See* Ex. A, Press Release, USCIS, *USCIS Updates Policy on Biometrics for Detainees* (Dec. 5, 2025), https://perma.cc/6DUE-CUS3.

62.    On December 5, 2025, however, DHS announced that it will no longer collect biometrics from detained noncitizens who have pending benefits requests with USCIS (the "Biometrics Policy"). *See* Ex. A. The policy announcement stated:

> We are updating USCIS Policy Manual Volume 1, Part C to deter the filing of frivolous claims and provide operational consistency. This update clarifies that the Department of Homeland Security generally will not take biometrics of detained [noncitizens] unless they are in removal proceedings and have a pending application or petition filed with the Executive Office for Immigration Review. This guidance is effective immediately and applies to requests pending or filed on or after the publication date.

Ex. A; *see* Ex. B, Policy Alert from USCIS, *PA-2025-28*: *Biometrics Collection for Aliens in Custody* (Dec. 5, 2025), https://perma.cc/86NT-RUNZ; Ex. C USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/ZZ5R-J3AA.

63.    In updating its policy, DHS said that it "has no obligation to collect biometrics from [noncitizens] in detention unless they are in removal proceedings and have an application or petition" before the immigration courts. Ex. B. DHS added "that USCIS does not collect biometrics

17

from [noncitizens] or other persons who are detained or incarcerated in any jail, prison, or similar DHS or non-DHS detention facilities and have a pending immigration petition or application with USCIS." *Id.* DHS also announced that it rescinded the previous "intradepartmental agreement" by which ICE collected those biometrics. *Id.*; *accord* Ex. A.

64.     DHS further confirmed that, even though USCIS now refuses to collect biometrics from noncitizens in DHS custody, and even though detained people cannot attend biometrics appointments at USCIS offices, "USCIS will generally continue to deny immigration benefit requests based on abandonment for [noncitizens] who fail to attend" their biometrics appointments. Ex. A. According to the USCIS Policy Manual, USCIS "does not approve requests to reschedule a biometrics appointment for reason of detention or incarceration." Ex. C.

## V.     The Biometrics Policy threatens irreparable harm

65.     The Biometrics Policy threatens irreparable harm to the Plaintiffs and other similarly situated class members, who need relief from USCIS to avoid deportation, separation from their families, and violence and persecution in their countries of origin.

### A.  Plaintiff J.Z.

66.     J.Z. needs SIJS because he was physically abused and abandoned by his father in Venezuela, as well as by members of the police force there.

67.     When he was 17 years old, J.Z. fled to the United States because he did not feel safe in Venezuela.

68.     J.Z.'s journey to the United States was difficult. He experienced a sexual assault in Mexico. When he finally reached the United States, he had a psychological episode and was hospitalized for two weeks. He eventually reunited with his mother, who had come to the United States years earlier and lives in Illinois.

69.     J.Z. was initially released into the United States and set for immigration check-ins.

18

He was detained by ICE at a check-in in February 2025.

70.    An Illinois judge found that John was abused, abandoned, or neglected by his father in Venezuela and appointed his mother as his sole guardian.

71.    In June 2025, John applied for SIJS. In December 2025, USCIS denied his SIJS application because it did not have his biometrics information.

72.    J.Z. submitted a new SIJS application in January 2026, after USCIS announced its new Biometrics Policy. He is waiting for a biometrics appointment notice. If the Biometrics Policy remains in place, J.Z.'s SIJS application will be denied for a second time because, under the Biometrics Policy, DHS will not collect his biometrics while J.Z. is detained.

73.    J.Z. has tried to secure his release from custody, filing a habeas petition and receiving a favorable outcome from a district court judge. *J.Z.S. v. Fields*, No. 26-cv-80-DLB, 2026 WL 1031320 (E.D. Ky. Apr. 16, 2026). But J.Z. remains detained notwithstanding this habeas petition because an immigration judge has denied him bond.

74.    J.Z., who is already enduring prolonged detention, risks removal to Venezuela or a third country where he has never lived if his SJIS application is not granted. If J.Z. is removed to Venezuela, he will be exposed to harm both by his father and members of the government.

**B.  Plaintiff R.M.**

75.    R.M. is a survivor of human trafficking and forced labor that began when he was just 8 years old and that continued for more than a decade. He needs a T Visa to remain in the United States, the only country that he knows.

76.    R.M.'s father brought him to the United State from Mexico when he was a baby. Starting when R.M. was about 8 years old, his father forced him to work on a commercial farm without pay, under threats of violence and withholding of food. R.M.'s father beat him and prevented him from talking to family members if he refused to work. When R.M. was 10, he lost

19

his finger in a tractor accident while working. When his father finally took him to a clinic, he made R.M. lie to the doctors about how he injured his hand. The forced labor and abuse continued for over ten years, until R.M. ran away at 19 years old.

77.    Despite these challenges, R.M. graduated from high school with strong grades. He hopes to go to college one day. Until recently, he lived with his mother and young siblings.

78.    In July 2025, ICE detained R.M. at work. His mother was also detained, and his young siblings were sent to live with relatives.

79.    R.M. applied for a T Visa in November 2025.

80.    USCIS scheduled a biometrics appointment in December 2025, after the Biometrics Policy was in effect, but ICE did not take him to the appointment.

81.    Because immigration judges do not have jurisdiction over T Visas, R.M. could not seek this protection with the judge, and on April 16, 2026, the judge ordered his removal. R.M. plans to appeal that decision. He will likely remain detained while that appeal is pending.

82.    If the Biometrics Policy remains in place, DHS will not collect R.M.'s biometrics, and he will not be able to pursue his application for T nonimmigrant status.

83.    A T Visa is R.M.'s most realistic path to immigration status in the United States. But T Visas cannot be adjudicated from abroad or awarded to a person outside of the United States, so if R.M. is removed, he will lose this opportunity completely.

84.    R.M. is terrified to be sent to Mexico. He grew up in the United States, speaks English as a first language, and does not know any country except the United States. And if deported, R.M. would be separated from his family, who all live in the United States.

### C.  Plaintiff Y.P

85.    Plaintiff Y.P. fled his native country Cuba with his 74-year-old mother because he faced persecution there based on his political opinions. Y.P. has applied for permanent residence

under the Cuban Adjustment Act.

86.    Y.P. was paroled into the United States in August 2024. In November 2025, however, ICE detained him outside an immigration court when he appeared for a scheduled hearing. Y.P. was denied various forms of protection by an immigration judge and ordered removed. He appealed that decision to the BIA.

87.    Y.P. applied for adjustment of status under the Cuban Adjustment Act in March 2026. USCIS scheduled a biometrics appointment for April 17, 2026, but ICE would not transport him to the appointment, and USCIS would not reschedule it.

88.    Y.P. cannot apply for adjustment through the immigration court, which lacks jurisdiction over his application. If the Biometrics Policy remains in place, DHS will not collect Y.P.'s biometrics, USCIS will deny Y.P.'s adjustment application, and he will likely be deported back to Cuba or a third country. Adjustment of Status under the Cuban Adjustment Act cannot be adjudicated from abroad or granted to someone from outside the United States. There, he will face further persecution and be unable to support his elderly mother, who depends on him.

**D.    Plaintiff M.C.**

89.    Plaintiff M.C. is a survivor of domestic violence who has applied for a U Visa based on attempted rape, stalking, and other domestic violence that she endured at the hands of her partner, who is the father of her four U.S.-citizen children.

90.    M.C. fears being removed to her native Mexico because members of a powerful cartel in that country has targeted her family for more than a decade. The cartel kidnapped and tortured her brother in 2011, which prompted M.C. to flee Mexico. The family's problems with the cartel did not end there, though. In 2023, the cartel killed that same brother and threatened to kill M.C. and her other brother.

91.    USCIS scheduled biometrics appointments for M.C.'s U Visa application for

February 9, February 27, and March 20, 2026, but M.C. could not attend because she is detained.

92.     M.C.'s U Visa application is her only avenue to sustained legal status in the United States.[8] But if M.C. cannot have her biometrics information collected, she will not be able to proceed with her U Visa. Even though U Visas can be pursued from abroad, USCIS may deem her application abandoned and denied while she is detained. And if M.C. is deported while her application is pending, she will have to wait many years in the country where she fears for her life for it to be processed. She would also face additional barriers to reentry because of her removal, including a 20-year bar to applying for admission to the United States. 8 U.S.C. 1182(a)(9)(A)(ii).

**E.     Plaintiff H.A.**

93.     Plaintiff H.A. is a 40-year-old man from Iran. H.A. is applying for asylum, as the spouse of an asylee, to avoid deportation to Iran, where he will face extrajudicial violence, imprisonment, and potential execution because he is gay.

94.     When the Iranian police learned that H.A. was gay, they beat and interrogated him. H.A. and his family fled to Turkey in 2021 to escape potential execution.

95.     H.A. and his family later fled Turkey and, in January 2025, they were detained at the U.S.-Mexico border. H.A. has been incarcerated since then.

96.     H.A. applied for asylum, withholding, and protection under the Convention Against Torture, but he did not have a lawyer at his hearing, and his applications were denied. His spouse, who was in proceedings before a different immigration and did find a lawyer, was granted asylum.

97.     H.A.'s spouse has applied for H.A. to receive asylum as the spouse of a person

---

[8] Although M.C. has applied for withholding of removal and related protections under the Convention Against Torture, those forms of relief would not prevent a removal order—they would only prevent her return to Mexico—and DHS would remain free to pursue removal to a third country, even if M.C. were granted protection. *See, e.g., Johnson v. Guzman Chavez*, 594 U.S. 523, 536-37 (2021); *D.V.D. v. DHS*, 778 F. Supp. 3d 355, 367 (D. Mass. 2025).

granted asylum, an application for which USCIS has exclusive jurisdiction. USCIS scheduled a biometrics appointment for March 6, 2026, but H.A. could not attend because he is detained. If the Biometrics Policy remains in place, USCIS will deny H.A.'s application, and DHS will likely deport him to Iran, where he will be in grave danger.

### F.    Plaintiff Luis Felipe Estrada Trejo

98.    Plaintiff Luis Felipe Estrada Trejo is a 45-year-old Mexico national who is married to a U.S. citizen. He is seeking adjustment of status based on his marriage. Because Mr. Estrada Trejo was paroled into the United States and is therefore designated as an "arriving alien," only USCIS (and not an immigration judge) can consider his application. On March 26, 2026, Mr. Estrada Trejo was detained at a check-in with ICE. He has been in detention ever since.

99.    Because he is detained, DHS will not collect Mr. Estrada Trejo's biometrics. USCIS scheduled a biometrics appointment for March 30, then rescheduled it for April 14, 2026. But Mr. Estrada Trejo was unable to attend either appointment because he is in detention.

100.    If the Biometrics Policy remains in place, Mr. Estrada Trejo will face deportation to Mexico and likely separation from his wife without the chance to apply for adjustment.

## CLASS ACTION ALLEGATIONS

101.    Named Plaintiffs seek to represent a class of individuals who have been or will be subjected to the Biometrics Policy that this lawsuit challenges.

102.    Plaintiffs seek to represent the following class under Federal Rule Civil Procedure 23(b)(2): all noncitizens (i) who are or will be in DHS custody; (ii) who have or will have pending applications for immigration relief within USCIS's exclusive or initial jurisdiction; and (iii) for whom USCIS has not accepted biometrics.

103.    The proposed Class satisfies Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. On information and belief, there are hundreds, if not

23

thousands, of people within the class definition. In addition, the proposed Class presents non-numerical considerations that make joinder impracticable, including the fluidity of DHS custody, the dispersion of class members across the country, and class members' limited resources.

104. The proposed Class satisfies Rule 23(a)(2) because there are multiple questions of law and fact common to all members of the proposed class, including: (a) whether the Biometrics Policy violates the INA and its regulations because it deprives class members of their rights to pursue immigration relief; (b) whether it violates the regulation that requires DHS to collect detained noncitizens' biometrics; (c) whether it violates the Fifth Amendment to the U.S. Constitution; (d) whether it violates the APA because it is contrary to law and arbitrary or capricious; (e) whether the policy should be declared unlawful, vacated, and/or enjoined.

105. The proposed Class satisfies Rule 23(a)(3) because Plaintiffs' claims are typical of the claims of the class. Each class member's claims arise from the Biometrics Policy, each class member has experienced or will experience the same injury—denial of the opportunity to seek immigration relief from USCIS—and each have similar legal arguments against the policy.

106. The proposed Class satisfies Rule 23(a)(4) because Plaintiffs are committed to fairly and adequately defending the rights of all class members. Plaintiffs seek the same relief as all members of the class, and their interests do not conflict with the interests of the class. They have obtained counsel who have substantial experience litigating class action lawsuits, APA cases involving the immigration laws, and other complex federal litigation on behalf of noncitizens.

107. The proposed Class also satisfies Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the class so that the injunctive or corresponding declaratory relief is appropriate with respect to the class as a whole.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the APA, 5 U.S.C. § 706(2)(A) and (B)**
**Contrary to Law and Constitutional Right**

108.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

109.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," or "contrary to constitutional right." 5 U.S.C. § 706(2)(A), (B).

110.    The Biometrics Policy is final agency action under the APA. 5 U.S.C. § 704.

111.    *Adjustment of Status*. The Biometrics Policy violates the statutes and regulations that govern adjustment of status, 8 U.S.C. § 1255(a), 8 U.S.C. §§ 1159(a), (b), 8 C.F.R. § 245.1, and 8 C.F.R. §§ 209.1, 209.2, because it precludes detained noncitizens who must apply for adjustment with USCIS from pursuing an adjudication on the merits of their petition and, therefore, denies them the opportunity to become lawful permanent residents.

112.    *Special Immigrant Juvenile Status*. The Biometrics Policy violates the statutes and regulations governing SIJS, 8 U.S.C. § 1232(d)(2), 8 C.F.R. § 204.11, because it prevents detained applicants from pursuing an adjudication on the merits of their petition. The policy thus deprives those noncitizens from accessing "an array of statutory and regulatory rights and safeguards, such as eligibility for application for adjustment of status to that of lawful permanent residents (LPR), exemption from various grounds of inadmissibility, and robust procedural protections to ensure their status is not revoked without good cause." *Osorio-Martinez*, 893 F.3d at 158.

113.    *T and U Nonimmigrant Status*. The Biometrics Policy violates the statutes and regulations governing T and U nonimmigrant status, 8 U.S.C. § 1101(a)(15)(T), (U), 8 C.F.R. §§ 214.204(n), (o), 214.205(a), 214.14(c)(5), because it prevents eligible detained applicants from pursuing a determination on the merits on their applications and from receiving relief.

114.    *Asylum*. The Biometrics Policy violates the statutes and regulations governing

25

asylum.  It deprives detained spouses and children of asylees the right to seek asylum through a I-730 petition based on their relationship with the asylee, over which USCIS has exclusive jurisdiction. 8 U.S.C. § 1158(a), (b)(3)(C); 8 C.F.R. § 208.14. It also deprives applicants who qualify as unaccompanied minors of their "statutory right to initial consideration of an asylum application by the DHS . . . ." *Matter of J-A-B- & I-J-V-A-*, 27 I. & N. Dec. at 169 n.2.

115.    ***Biometrics Regulation***. The Biometrics Policy violates the regulatory requirement that "DHS is responsible for obtaining biometrics and other biographical information with respect to any [noncitizen] in detention." 8 C.F.R. § 1003.47(d).

116.    ***Fifth Amendment Due Process***. The Biometrics Policy deprives noncitizens of due process of law because it subjects them to removal from the United States without the opportunity to pursue relief guaranteed by the above federal statutes and regulations.

117.    Because the Biometrics Policy is "not in accordance with law" and "contrary to constitutional right," it must be set aside under 5 U.S.C. § 706(2)(A), (B).

## COUNT II

### Violation of the APA, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

118.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

119.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious," or an "abuse of discretion." 5 U.S.C. § 706(2)(A).

120.    The Biometrics Policy is final agency action under the APA. 5 U.S.C. § 704.

121.    The Biometrics Policy is arbitrary and capricious because Defendants have failed to articulate a reasoned explanation for their decision to stop collecting biometrics from detained people for applications pending with USCIS; failed to consider important aspects of the problem, including the effects on applicants who may deserve relief; offered an explanation (if any) for their

26

decision that runs counter to the evidence before the agency; failed to consider reasonable alternatives; and failed to consider reliance interests, including the interests of applicants who had already filed applications and paid fees. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

122.    Therefore, the Biometrics Policy must be set aside under 5 U.S.C. § 706(2)(A).

**COUNT III**

**Violation of the APA, 5 U.S.C. § 706(1)**
**Agency Action Unlawfully Withheld**

123.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

124.    The APA provides that a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

125.    The INA and its regulations require DHS to collect the biometric information of "any" detained noncitizen for "any" application for immigration relief. 8 C.F.R. § 1003.47(a), (d).

126.    The INA and its regulations also direct DHS, through USCIS, to adjudicate applications for adjustment of status, T and U Visas, asylum, and SJIS, among other relief, for eligible applicants on an individualized basis and not based on categorical bars.

127.    The Biometrics Policy unlawfully withholds the collection of biometrics and individualized adjudication of Plaintiffs and Class members' applications for relief.

**COUNT IV**

**Violation of the APA, 5 U.S.C. § 553, 706(2)(D)**
**Without Observance of Procedure Required by Law**

128.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

129.    A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

27

130.    The APA, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. § 553(b), (c).

131.    The APA also requires that any substantive rule must be published at least 30 days prior to its effective date. *See* 5 U.S.C. § 553(d).

132.    The Biometrics Policy is a legislative rule within the meaning of the APA.

133.    DHS did not comply with the APA's procedural requirements when it made the Biometrics Policy immediately effective without providing any opportunity for the public to submit comments.

134.    No exception to notice-and-comment procedures applies to the Biometrics Policy.

135.    Defendants' failure to provide for notice and comment violates 5 U.S.C. § 553(b) and (c) and renders the Biometrics Policy invalid.

136.    Defendants' failure to publish the Biometrics Policy 30 days before its effective date violates 5 U.S.C. § 553(d) and renders the Policy invalid.

## COUNT V

### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

137.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

138.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ." U.S. Const. amend V. It protects the "liberty" and property of "all 'persons' within the United States," "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

139.    Plaintiffs live in the United States and have an interest in remaining that is protected by the Due Process Clause. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212

28

(1953); *accord A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025). Deportation "visits a great hardship" on them "and deprives [them] of the right to stay and live and work" here. *Bridges v. Wixon*, 326 U.S. 135, 154 (1945); *Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *21 (D.C. Cir. Nov. 22, 2025) ("Removal . . . may result in loss of both property and life, or of all that makes life worth living," as well as "poverty, persecution and even death." (citation modified)).

140.    As explained above, the statutes and regulations governing adjustment of status, SIJS, T and U nonimmigrant status, and asylum grant eligible noncitizens the right to an adjudication of their applications and, in the case of T and U Visas, the right to the relief itself. These laws therefore create a "legitimate claim of entitlement" protected under the Due Process Clause. *Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

141.    The Biometrics Policy violates the Due Process Clause because it deprives noncitizens of the opportunity to pursue this relief, to which the INA and its regulations entitle them, and because it subjects them to removal from the United States without "th[e] due process required by the regulations." *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that the Biometrics Policy violates the INA, the Fifth Amendment, and federal regulations, was issued without the required procedures, and is arbitrary and capricious.

2.    Stay the Biometrics Policy under 5 U.S.C. § 705 during the pendency of this case;

3.    Vacate the Biometrics Policy pursuant to 5 U.S.C. § 706;

4.    Compel DHS to collect class members' biometric information during the pendency of this case to the extent required for a decision on the merits of their applications;

5.    Enter a permanent injunction compelling DHS to collect class members' biometric information to the extent required for a decision on the merits of their applications;

29

6.      Certify the Class, appoint Plaintiffs as class representatives, and appoint undersigned counsel as class counsel;

7.      Award Plaintiffs' counsel attorney's fees and costs for this action; and

8.      Award such other and further relief that the Court may deem just, equitable, and proper.


Dated: April 30, 2026

/s/ Elena Goldstein
Sean Ouellette (DC Bar 1741535)
Alethea Anne Swift (DC Bar No. 1644929)
Jennie L. Kneedler (DC Bar No. 500261)
Paul R.Q. Wolfson (DC Bar No. 414759)
Elena Goldstein (DC Bar No. 90034087)
**DEMOCRACY FORWARD**
**FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 322-1959
souellette@democracyforward.org
jkneedler@democracyforward.org
aswift@democracyforward.org
pwolfson@democracyforward.org
egoldstein@democracyforward.org

Mary Georgevich*
Keren Zwick (D.D.C. Bar No. IL0055)
Richard Caldarone (DC Bar No. 989575)
Gerardo Romo*
Nicole May*
**NATIONAL IMMIGRANT JUSTICE**
**CENTER**
111 W. Jackson Blvd. Suite 800
Chicago, IL 60604
Phone: (312) 660-1364 (Zwick)
mgeorgevich@immigrantjustice.org
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
gromo@immigrantjustice.org
nmay@immigrantjustice.org

30

Michelle N. Mendez*
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: 410-929-4720
michelle@nipnlg.org

*Counsel for All Plaintiffs*

\* Motion to appear *pro hac vice* forthcoming