**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| J.Z., *et al*.,<br><br>        *Plaintiffs*,<br><br>v.<br><br><br>DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br>        *Defendants*. | Case No. 1:26-cv-1510 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
A STAY UNDER 5 U.S.C. § 705 AND
A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    I.      Federal law charges USCIS with adjudicating applications for immigration benefits ... 3

    II.     The Biometrics Policy closes these paths to relief for noncitizens in detention............ 9

    III.    The Biometrics Policy prevents Plaintiffs from pursuing immigration relief ............. 11

ARGUMENT ........................................................................................................................15

    I.      Plaintiffs are likely to succeed on the merits ................................................. 16

        A.    The policy violates the INA and regulations that govern immigration relief .......... 16

           1.   Adjustment of status under § 1255 ........................................................ 16

           2.   Asylum for spouses and children of asylees ............................................ 21

           3.   Special immigrant status for abused, abandoned, or neglected children .................. 22

           4.   T nonimmigrant status for survivors of trafficking.................................... 23

           5.   U nonimmigrant status for survivors of serious crimes ........................................... 24

        B.    The policy violates the specific regulation requiring that DHS take biometrics for "any" noncitizen in detention....................................................................... 26

        C.    The policy violates the Fifth Amendment Due Process Clause ................................ 28

        D.    The policy is arbitrary and capricious ...................................................... 31

    II.     The policy irreparably harms the detained plaintiffs ..................................... 36

    III.    The balance of equities and public interest favor relief................................ 40

    IV.    The Court should stay the Biometrics Policy and preliminarily enjoin Defendants from refusing to collect class members' biometrics .............................................. 41

CONCLUSION.....................................................................................................................43

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.A.R.P. v. Trump,*
605 U.S. 91 (2025).................................................................................................. 29, 42

*A.C.R. v. Noem,*
809 F. Supp. 3d 103 (E.D.N.Y. 2025) ........................................................................ 8, 37

*A.O. v. Cuccinelli,*
457 F. Supp. 3d 777 (N.D. Cal. 2020) ............................................................................ 37

*Ali v. Fed. Bureau of Prisons,*
552 U.S. 214 (2008)............................................................................................... 26, 28

*Am. Radio Relay League, Inc. v. FCC,*
524 F.3d 227 (D.C. Cir. 2008) ...................................................................................... 34

*Amica Ctr. for Immigrant Rts. v. Exec. Off. for Immigr. Rev.,*
No. 26-cv-696, 2026 WL 662494 (D.D.C. Mar. 8, 2026) ................................................ 16

*Arevalo v. Ashcroft,*
344 F.3d 1 (1st Cir. 2003)............................................................................................. 30

*Ayala Chapa v. Bondi,*
132 F.4th 796 (5th Cir. 2025) ....................................................................................... 29

*Barrios Garcia v. U.S. Dep't of Homeland Sec.,*
25 F.4th 430 (6th Cir. 2022) ......................................................................................... 25

*Bell v. Hood,*
327 U.S. 678 (1946)..................................................................................................... 42

*Beshir v. Holder,*
853 F. Supp. 2d 1 (D.D.C. 2011)................................................................................... 20

*Bona v. Gonzales,*
425 F.3d 663 (9th Cir. 2005) ........................................................................................ 17

*Bowser v. Noem,*
No. 26-cv-10382, 2026 WL 555624 (D. Mass. Feb. 27, 2026)......................................... 33

*Bridges v. Wixon,*
326 U.S. 135 (1945)................................................................................................. 28, 29

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
    403 F.3d 771 (D.C. Cir. 2005) ............................................................................. 33

*Byrne v. Noem,*
    No. 25-cv-1077, 2025 WL 2414159 (E.D. Pa. Aug. 20, 2025) ................................. 23, 24

*Calderon v. Sessions*,
    330 F. Supp. 3d 944 (S.D.N.Y. 2018) .................................................................. 31

*Calderon-Rosas v. Att'y Gen. United States*,
    957 F.3d 378 (3d Cir. 2020) ................................................................................ 31

*Casa Libre/Freedom House v. Mayorkas,*
    No. 22-cv-01510, 2023 WL 4872892 (C.D. Cal. July 31, 2023) .............................. 23

*Castaneira v. Noem*,
    138 F.4th 540 (D.C. Cir. 2025) ........................................................................... 21

*Ceta v. Mukasey*,
    535 F.3d 639 (7th Cir. 2008) ........................................................................... 9, 17

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) ........................................................................................... 27

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) ....................................................................... 30

*D.V.D. v. DHS*,
    778 F. Supp. 3d 355 (D. Mass. 2025) .................................................................. 15

*Dada v. Mukasey*,
    554 U.S. 1 (2008) ............................................................................................... 19

*De La Torre Molina v. USCIS,*
    No. 25-cv-594, 2026 WL 681748 (N.D. Ind. Mar. 10, 2026) .................................. 24, 25

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    591 U.S. 1 (2020) ........................................................................... 2, 32, 33, 34, 35

*Doe v. Trump,*
    No. 25-cv-13946, 2026 WL 1170971 (D. Mass. Apr. 30, 2026) ............................... 20

*Dong v. Chertoff*,
    513 F. Supp. 2d 1158 (N.D. Cal. 2007) ................................................................ 20

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ....................................................................... 19

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016).................................................................................... 33

*Env't Health Tr. v. FCC*,
   9 F.4th 893 (D.C. Cir. 2021)....................................................................... 34

*Fatty v. Nielsen*,
   No. 17-cv-1535, 2018 WL 3491278 (W.D. Wash. July 20, 2018)................... 30

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)............................................................................. 32, 36

*Fort Stewart Schools v. FLRA*,
   495 U.S. 641 (1990).................................................................................... 28

*Francisco v. USCIS*,
   No. 26-cv-1843, 2026 WL 810068 (S.D. Cal. Mar. 24, 2026) ........................ 24

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010).................................................................................... 42

*Galvez v. Jaddou*,
   52 F.4th 821 (9th Cir. 2022) ....................................................................... 23

*Gazeli v. Session*,
   856 F.3d 1101 (6th Cir. 2017) ..................................................................... 16

*Geneme v. Holder*,
   935 F. Supp. 2d 184 (D.D.C. 2013) .............................................................. 19

*Glossip v. Gross*,
   576 U.S. 863 (2015).................................................................................... 16

*Goncalves v. Reno*,
   144 F.3d 110 (1st Cir. 1998)........................................................................ 18

*Haitian Refugee Ctr. v. Smith*,
   676 F.2d 1023 (5th Cir. 1982) ..................................................................... 31

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) ................................................................ 18, 37

*Huisha-Huisha v. Mayorkas*,
　　560 F. Supp. 3d 146 (D.D.C. 2021) ................................................................. 36

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
　　409 F. Supp. 3d 367 (D. Md. 2019) ................................................................... 6

*Jacinto-Castanon de Nolasco v. ICE*,
　　319 F. Supp. 3d 491 (D.D.C. 2018) ................................................................. 37

*Jimenez v. Nielsen*,
　　334 F. Supp. 3d 370 (D. Mass. 2018) ....................................................... 19, 31

*Johnson v. Guzman Chavez*,
　　594 U.S. 523 (2021) ........................................................................................ 15

*Judulang v. Holder*,
　　565 U.S. 42 (2011) ..................................................................................... 32, 34

*Kalilu v. Mukasey*,
　　548 F.3d 1215 (9th Cir. 2008) ....................................................... 16, 17, 38, 39

*Kimone G. v. United States,*
　　No. 22-cv-1688, 2023 WL 7115115 (D. Minn. Oct. 27, 2023) ....................... 38

*Ky. Dept. of Corr. v. Thompson*,
　　490 U.S. 454 (1989) ........................................................................................ 30

*L.G.M.L. v. Noem*,
　　800 F. Supp. 3d 100 (D.D.C. 2025) ........................................................... 36, 43

*Lara Santiago v. Mayorkas*,
　　554 F. Supp. 3d 1340 (N.D. Ga. 2021) ........................................................... 25

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
　　No. 25-cv-0946, 2026 WL 252420 (D.D.C. Jan. 30, 2026) ............................. 42

*League of Women Voters of United States v. Newby,*
　　838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 40

*Leiva-Perez v. Holder*,
　　640 F.3d 962 (9th Cir. 2011) ........................................................................... 37

*Lopez v. Trump,*
　　No. 25-cv-4826, 2025 WL 3274224 (S.D.N.Y. July 10, 2025) ....................... 39

v

*Lovo v. Miller,*
        107 F.4th 199 (4th Cir. 2024) ........................................................................... 20

*M.J.L. v. McAleenan,*
        420 F. Supp. 3d 588 (W.D. Tex. 2019) ............................................................. 24

*Make the Rd. N.Y. v. Noem,*
        No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .................... 15, 16, 29, 40, 41

*Matter of J-A-B- & I-J-V-A-,*
        27 I. & N. Dec. 168 (BIA 2017) ..................................................................... 6, 22

*Michigan v. E.P.A.,*
        576 U.S. 743 (2015) ........................................................................................ 33

*Milligan v. Pompeo,*
        502 F. Supp. 3d 302 (D.D.C. 2020) ................................................................. 37

*Miot v. Trump,*
        No. 25-cv-02471, 2026 WL 266413 (D.D.C. Feb. 2, 2026) ............................ 37

*Moreno Galvez v. Cuccinelli,*
        492 F. Supp. 3d 1169 (W.D. Wash. 2020) ........................................................ 23

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v.*
        *State Farm Mut. Auto. Ins. Co.,*
        463 U.S. 29 (1983) ................................................................................... 2, 31, 32

*Nat. Res. Def. Council, Inc. v. James R. Perry,*
        940 F.3d 1072 (9th Cir. 2019) ......................................................................... 24

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
        145 F.3d 1399 (D.C. Cir. 1998) ....................................................................... 42

*Ng Fung Ho v. White,*
        259 U.S. 276 (1922) ........................................................................................ 29

*Nken v. Holder,*
        556 U.S. 418 (2009) .............................................................................. 36, 40, 41

*Ohio v. EPA,*
        603 U.S. 279 (2024) ................................................................................... 16, 31

*Osorio-Martinez v. Attorney General,*
        893 F.3d 153 (3d Cir. 2018) ...................................................................... 8, 23, 37

*Nixon v. Missouri Mun. League,*
    541 U.S. 125 (2004).................................................................................... 19

*Pub. Utilities Comm'n of State of Cal. v. FERC,*
    143 F.3d 610 (D.C. Cir. 1998) .................................................................... 21

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin,*
    No. 25-5243, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026)................. 2, 18, 20, 21, 22, 42

*S.N.C. v. Sessions,*
    No. 18-cv-7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018)....................................... 30

Saghafi v. Edlow,
    No. 26-cv-100, 2026 WL 1127468 (D. Md. Apr. 24, 2026)....................................... 19, 33

*SAS Inst., Inc. v. Iancu,*
    584 U.S. 357 (2018)................................................................................ 2, 26

*Scheerer v. Att'y Gen.,*
    445 F.3d 1311 (11th Cir. 2006) .................................................................... 17

*Sergio S.E. v. Rodriguez,*
    No. 20-cv-6751, 2020 WL 5494682 (D.N.J. Sept. 11, 2020)........................................ 24

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953)................................................................................ 29

*Succar v. Ashcroft,*
    394 F.3d 8 (1st Cir. 2005)........................................................... 17, 18, 31, 39

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ....................................................................... 16

*Torres v. Garland,*
    No. 22-60293, 2023 WL 3300969 (5th Cir. May 8, 2023)....................................... 30, 31

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025)........................................................................ 15, 41, 43

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954)........................................................... 2, 20, 21, 28, 29, 30

*United States v. Gonzales,*
    520 U.S. 1 (1997)................................................................................. 26

*United States v. Verdugo-Urquidez,*
        494 U.S. 259 (1990) .................................................................................................. 29

*Uranga v. USCIS,*
        490 F. Supp. 3d 86 (D.D.C. 2020) ........................................................................... 24

*Varniab v. Edlow,*
        No. 25-cv-10602, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026) ................................ 20

*Walter A. v. Easterwood,*
        No. 26-cv-1393, 2026 WL 836428 (D. Minn. Mar. 26, 2026) ............................... 8, 11

*Wilkinson v. Austin,*
        545 U.S. 209 (2005) .................................................................................................. 28

*Xol-Maas v. Francis,*
        No. 26-cv-00025, 2026 WL 457005 (S.D.N.Y. Feb. 18, 2026) ................................... 8

*Yu v. Brown,*
        36 F. Supp. 2d 922 (D.N.M. 1999) ........................................................................... 20

*Zadvydas v. Davis,*
        533 U.S. 678 (2001) .................................................................................................. 28

*Zheng v. Gonzales,*
        422 F.3d 98 (3d Cir. 2005) ....................................................................................... 17

## STATUTES

5 U.S.C. § 703 .............................................................................................................. 43

5 U.S.C. § 705 ...................................................................................... 3, 15, 16, 41, 43

5 U.S.C. § 706 ............................................................................................... 3, 16, 31

6 U.S.C. § 271 ................................................................................................................ 3

6 U.S.C. § 279 ................................................................................................................ 6

8 U.S.C. § 1101 ................................................................... 4, 6, 7, 8, 16, 36, 38

8 U.S.C. § 1158 ................................................................... 3, 5, 6, 20, 21, 22, 36

8 U.S.C. § 1159 ........................................................................................................ 4, 6

8 U.S.C. § 1182 ................................................................................... 36, 37, 38, 39

8 U.S.C. § 1184 .................................................................................................... 7, 25, 39

8 U.S.C. § 1229b ............................................................................................................ 3

8 U.S.C. § 1231 ......................................................................................................... 3, 39

8 U.S.C. § 1232 ......................................................................................................... 6, 22

8 U.S.C. § 1255 ....................................................... 3, 4, 5, 7, 8, 16, 17, 21, 36

8 U.S.C. § 1427 ............................................................................................................. 4

Cuban Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966) ................................. 4

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ...................................... 5

Trafficking Victims Protection Act of 2000, Pub L. No. 106-386, 114 Stat. 1464
      (2000) ................................................................................................................. 7, 24

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386,
      114 Stat. 1464 (2000) .............................................................................................. 5

Violence Against Women Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000) ................... 7

## REGULATIONS

8 C.F.R. § 1.2 ............................................................................................................ 5, 8

8 C.F.R. § 103.2 ..................................................................................................... 3, 9, 20

8 C.F.R. § 103.16 ......................................................................................................... 9

8 C.F.R. § 204.11 ..................................................................................................... 4, 8, 23

8 C.F.R. § 208.2 ........................................................................................................... 39

8 C.F.R. § 208.14 ....................................................................................................... 3, 6

8 C.F.R. § 208.21 ....................................................................................................... 4, 6

8 C.F.R. § 209.1 ......................................................................................................... 4, 5

8 C.F.R. § 214.14 ................................................................................................. 4, 7, 9, 25,

8 C.F.R. § 214.202 ................................................................................................. 7

8 C.F.R. § 214.204 ................................................................ 4, 7, 9, 23, 24, 38

8 C.F.R. § 214.205 .......................................................................................... 7, 23

8 C.F.R. § 245.1 ....................................................................................... 3, 4, 18, 36

8 C.F.R. § 245.2 ................................................................................................ 5, 19

C.F.R. § 274a.12 ............................................................................................... 4, 38

8 C.F.R. § 1003.8 ................................................................................................... 38

8 C.F.R. § 1003.18 ................................................................................... 9, 37, 38, 39

8 C.F.R. § 1003.47 ............................................................... 1, 2, 10, 26, 27, 35

8 C.F.R. § 1208.13 ................................................................................................... 3

8 C.F.R. § 1208.16 ................................................................................................... 3

8 C.F.R. § 1208.21 ................................................................................................. 22

8 C.F.R. § 1245.2 ........................................................................................... 4, 5, 18

## OTHER AUTHORITIES

William B. Rubenstein,
  *Newberg and Rubenstein on Class Actions* (June 2025 Update) ..................................... 44

H.R. Rep. No. 82–1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653 ......................................... 5

H.R. Rep. No. 89-1978 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3792 ......................................... 5

Policy Memorandum from USCIS,
  PM-602-0198: Special Immigrant Juvenile Classification and Deferred Action
  (Apr. 10, 2026), https://perma.cc/TG5V-GFAV .............................................................. 8

Press Release,
  USCIS, USCIS Updates Policy on Biometrics for Detainees (Dec. 5, 2025) ................... 10

Thomas W. Merrill, The Accardi Principle, 74 Geo. Wash. L. Rev. 569, 611 (2006)................. 30

Trump Administration. *See* American Immigration Counci*l*, *Fact Sheet: Third-Country Removals in United States Immigration Policy* (Dec. 2025), https://perma.cc/2V2Q-AYQY ...................................................................... 39

USCIS, Policy Alert, USCIS, PA-2025-29: Photograph Reuse for Identity Documents (Dec. 12, 2025), https://perma.cc/MC8V-T9JA ................................................ 9

USCIS, *Policy Manual*, vol. 1, pt. B, Ch. 1, https://perma.cc/4XG3-F9FY ................................... 3

USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 1, https://perma.cc/TJ83-Q647 ............................... 9, 34

USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/9AEJ-2TRJ ................................... 9

USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2 (Nov. 27, 2025), https://perma.cc/C326-K7K6 ............................................................................... 10

USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2 (Oct. 7, 2020), https://perma.cc/N7V8-7LLP................................................................... 10, 27, 41

USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/ZZ5R-J3AA ................................. 10

USCIS, *Policy Manual*, vol. 3, pt. B, Ch. 7, https://perma.cc/Y3VH-GK5E ............................... 24

USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 5, https://perma.cc/YS5R-MUYX ............................. 25

USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 6, https://perma.cc/WH6U-9MXK ............................ 25

USCIS, *Policy Manual*, vol. 7, pt. A, Ch. 1, https://perma.cc/Q7U8-3F9E ................................. 4

**INTRODUCTION**

The Immigration and Nationality Act ("INA") provides several paths to lawful immigration status for noncitizens in the United States who could suffer hardship if removed. Congress designed those paths to serve longstanding humanitarian objectives: preserving the family unit, protecting victims of human trafficking and violent crime, and providing safe harbor to refugees fleeing persecution, among others. To pursue many of these forms of relief, noncitizens must apply to U.S. Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS"). As a step in the process, DHS requires applicants to submit their "biometrics"—their fingerprints and other personal data—for background checks. When a person is detained in DHS custody, DHS "is responsible for obtaining [their] biometrics." 8 C.F.R. § 1003.47(d). If DHS does not take an applicant's biometrics when USCIS requires the applicant to submit them, the person cannot pursue relief from USCIS.

In December 2025, DHS announced that it would no longer collect biometrics from detained noncitizens who seek benefits from USCIS, cutting off their path to relief the law entitles them to pursue. This new Biometrics Policy ensures that USCIS will no longer consider detained people's applications, no matter how long they have been pending, how much they paid to have their application considered, or how strongly their cases call for relief. And because the immigration courts lack jurisdiction to grant the detained Plaintiffs' applications, they are left with no other way to pursue that relief. The Biometrics Policy exposes Plaintiffs and others like them to deportation, separation from their families, and violence and persecution in their countries of origin: the very harms that Congress created paths to immigration relief to prevent.

The Biometrics Policy violates federal law many times over.

1

*First*, it violates the INA and its regulations, which entitle eligible noncitizens "to apply and be considered for" the relief Plaintiffs seek. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, No. 25-5243, 2026 WL 1110616, at *2 (D.C. Cir. Apr. 24, 2026) ("*RAICES*") (discussing asylum); *see infra* pp. 16–25 (discussing adjustment of status, asylum, T visas, U visas, and Special Immigrant Juvenile Status). Although DHS has discretion to grant or deny some of these forms of relief, DHS cannot "cut off" the path to those protections "wholesale" with no consideration of whether an applicant should receive them. *RAICES,* 2026 WL 1110616, at *15.

*Second*, the policy violates the requirement that DHS must collect the biometrics of "*any* [noncitizen] in detention," 8 C.F.R. § 1003.47(d) (emphasis added), for "*any* application for immigration relief" that requires a background check, *id.* § 1003.47(a) (emphasis added). USCIS acknowledges that DHS must collect biometrics when a detained person applies for relief within the jurisdiction of the immigration courts. But, contrary to DHS's position, the regulatory obligation is "not limited to" those applications. *Id.* § 1003.47(b). "In this context, as in so many others, 'any' means 'every.'" *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 359-60 (2018).

*Third*, the policy violates the Fifth Amendment because it deprives Plaintiffs of the "due process required by the regulations" that entitle them to seek relief that would allow them to remain in the United States. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

*Fourth*, the policy fails the basic standard for reasoned decision-making under the Administrative Procedure Act ("APA"). When DHS changes an immigration policy that affects noncitizens, it must provide "reasoned analysis" to explain the change. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983)). Yet DHS provided no such analysis. It did not consider the policy's grave impacts on the many people who need the

relief the Biometrics Policy forecloses. It did not provide any justification for refusing to collect biometrics for noncitizens who have applications with same agency that holds them in custody (DHS) while it continues to collect them from people with applications before a different agency (the immigration court). And it did not consider the serious reliance interests the policy upsets.

For each of these reasons, Plaintiffs are likely to succeed on the merits of their claims that the policy is "not in accordance with law," "contrary to constitutional right," and "arbitrary" or "capricious" under the APA. 5 U.S.C. § 706(2)(A)–(B). Without judicial relief, they face grave irreparable harm. And the government would shoulder no significant burden if it returned to the status quo the law requires and that DHS maintained for years. The Court should therefore stay the policy under 5 U.S.C. § 705 and preliminarily enjoin DHS from refusing to collect the biometric information necessary to process Plaintiffs' and other class members' applications.

**BACKGROUND**

**I.      Federal law charges USCIS with adjudicating applications for immigration benefits**

Federal law gives USCIS the responsibility to adjudicate affirmative requests for lawful immigration status and other relief for noncitizens in the United States. 6 U.S.C. § 271(b); 8 C.F.R. § 103.2; USCIS, *Policy Manual*, vol. 1, pt. B, Ch. 1, https://perma.cc/4XG3-F9FY. When someone is in removal proceedings, they must pursue certain forms of relief with the Executive Office of Immigration Review ("EOIR"), which houses the immigration courts.[1] Even when a noncitizen is in removal proceedings, however, USCIS retains sole jurisdiction over several paths to relief. Those include (1) adjustment of status to permanent residence for people labeled "arriving aliens"

---

[1] In removal proceedings, with some exceptions, EOIR has jurisdiction over applications based on a fear of return to a noncitizen's home country (such as asylum, withholding of removal, and protection under the United Nations Convention Against Torture), cancellation of removal, and adjustment of status for applicants who are not "arriving aliens" under the regulations. *See* 8 U.S.C. §§ 1158, 1229b, 1231(b)(3), 1255; 8 C.F.R. §§ 1208.13–1208.14, 1208.16–1208.18, 1245.1.

3

under the regulations; (2) derivative asylum for asylees' spouses and children whose petitions were not adjudicated with the principal asylee's; (3) "T" and "U" visas for survivors of human trafficking and other serious crimes; and (4) Special Immigrant Juvenile Status ("SIJS") for abused, abandoned, or neglected children. 8 C.F.R. § 1245.2(a)(1) (adjustment); *id.* § 208.21(c) (asylee relatives); *id.* § 214.204(a) (T visas); *id.* § 214.14(c)(1) (U visas); *id.* § 204.11(SIJS).

Most of these forms of relief grant lawful status, and all of them may stop deportation.

1. *Adjustment of Status*. Through a process called "adjustment of status," noncitizens who have been "inspected and admitted or paroled into the United States" and meet other requirements may seek lawful permanent residence (i.e., a green card) without leaving the United States. 8 U.S.C. § 1255(a). Congress created the adjustment process to allow certain noncitizens "physically present in the United States to become [permanent residents] without incurring the expense and inconvenience of traveling abroad to obtain an immigrant visa." USCIS, *Policy Manual*, vol. 7, pt. A, Ch. 1, https://perma.cc/Q7U8-3F9E. Certain special classes—including immediate family of U.S. citizens and certain survivors of domestic violence—may apply for adjustment even if they do not have lawful immigration status. *See* 8 U.S.C. § 1255(c); 8 C.F.R. § 245.1(b). The Cuban Adjustment Act allows Cuban nationals living in the United States to do the same. *See* Pub. L. No. 89–732, 80 Stat. 1161 (1966) (providing that the status of any "native or citizen of Cuba who has been inspected and admitted or paroled into the United States" may be adjusted "notwithstanding" the restrictions in 8 U.S.C. § 1255(c)). Refugees and asylees may apply to adjust their status to lawful permanent residence as well. 8 U.S.C. §§ 1159(a), (b); 8 C.F.R. § 209.1. Once granted, lawful permanent residence gives a person the right to live and work in the United States and a path to U.S. citizenship. 8 U.S.C. § 1101(a)(20); 8 C.F.R. § 274a.12(a)(1); 8 U.S.C. § 1427(a).

4

In making these classes eligible for permanent residence, the adjustment provisions serve humanitarian goals. The special pathway for immediate family members "implements the underlying intention of our immigration laws regarding the preservation of the family unit." H.R. Rep. No. 82–1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680. The provisions for domestic violence survivors aim "to remove immigration laws as a barrier that kept battered immigrant women and children locked in abusive relationships" by providing "protection against deportation" and allowing them to seek help without fearing that their abuser will use their lack of immigration status to retaliate. Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, § 1502, 114 Stat. 1464, 1518 (2000). And the provisions for refugees and asylees advance "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102 (1980). The Cuban Adjustment Act serves a similar goal—to promote the resettlement of Cubans fleeing dictatorship in Cuba. *See* H.R. Rep. No. 89-1978 at 3794–95 (1966).

USCIS is the only agency that may grant adjustment of status for noncitizens who are labeled as "arriving aliens," a term that includes people paroled into the United States. *See* 8 C.F.R. §§ 245.2(a)(1), 1245.2(a)(1) (providing that USCIS retains jurisdiction over adjustment for "arriving aliens" in removal proceedings); *id.* § 1.2 (definition of "arriving alien"); *see also* 8 U.S.C. § 1255(a) (specifically authorizing adjustment for people "paroled into the United States"). USCIS also has initial jurisdiction over adjustment of status for refugees. 8 C.F.R. § 209.1.

2. *Asylum.* Federal law also gives noncitizens "physically present in the United States" the right to apply for asylum. 8 U.S.C. § 1158(a)(1). A noncitizen may receive asylum if they meet the definition of "refugee": that is, if they have a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in their

home country. *Id.* §§ 1158(b)(1)(A), 1101(a)(42); 8 C.F.R. § 208.14. The spouse or child of a person granted asylum (an "asylee") also qualifies for asylum "if accompanying, or following to join," the asylee. 8 U.S.C. § 1158(b)(3)(A); *accord* 8 C.F.R. § 208.21(a) (qualifying spouse or child "also may be granted asylum"). Importantly, spouses and children of asylees may qualify for derivative asylum even if they cannot independently establish their own eligibility as refugees. 8 U.S.C. § 1158(b)(3)(A). Asylees may lawfully live and work in the United States and apply for lawful permanent residence. *See* 8 U.S.C. §§ 1158(c)(1), 1159.

If the immigration court or USCIS grants an asylum petition without deciding whether the asylee's spouse or child also qualify for asylum based on their family relationship, the spouse or child must apply to USCIS to pursue asylum based on that relationship. *See* 8 C.F.R. § 208.21(c).

Unaccompanied children also "have a statutory right to initial consideration of an asylum application by the DHS" instead of the immigration courts. *Matter of J-A-B- & I-J-V-A-*, 27 I. & N. Dec. 168, 169 n.2 (BIA 2017); *see* 8 U.S.C. § 1158(b)(3)(C); *see also* 6 U.S.C. § 279(g) (defining unaccompanied child). Congress intended for unaccompanied child refugees to have access to asylum procedures that "take into account the specialized needs of unaccompanied [noncitizen] children . . . ." 8 U.S.C. § 1232(d)(8). "The USCIS asylum process is a less adversarial system more sensitive to the special needs of children who do not know how to navigate an immigration system designed for adults, and who likely sought safety in the United States without understanding their legal options." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 373 (D. Md. 2019). "Instead of having to be cross-examined in an adversarial courtroom," "unaccompanied children engage with USCIS officers trained to conduct non-adversarial interviews and to apply child-sensitive and trauma-informed interview techniques." *Id.*

3. ***T and U nonimmigrant status***. Congress also created paths to lawful status for survivors of human trafficking and violent crime. Noncitizens qualify for T nonimmigrant status, or a "T visa," if they are or have been a victim of human trafficking and would suffer "extreme hardship" if removed from the United States, among other eligibility requirements. 8 U.S.C. § 1101(a)(15)(T); 8 C.F.R. § 214.202. Noncitizens qualify for U nonimmigrant status, or a "U visa," if they "suffered substantial physical or mental abuse" because of a crime listed in the statute and helped or likely will help law enforcement investigate or prosecute the crime. 8 U.S.C. § 1101(a)(15)(U); 8 C.F.R. § 214.14. T and U visas aim to "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking," and other crimes "while offering protection" to their victims. Violence Against Women Act of 2000, Pub L. No. 106–386, § 1513(a)(2)(A), 114 Stat. 1464, 1533; Trafficking Victims Protection Act of 2000, Pub L. No. 106–386, § 102, 114 Stat. at 1466.

Applicants for T and U visas are entitled to various benefits even before their applications are granted. Trafficking survivors who submit T visa applications deemed "bona fide" receive an automatic stay of any final order of deportation while their applications are pending. 8 C.F.R. § 214.204(b)(2)(iii). They may also receive deferred action (temporary protection from removal) and work authorization. *See id.* §§ 214.205(c), (e). U visa applicants who submit bona fide applications are also eligible for deferred action and work authorization. *See* 8 U.S.C. § 1184(p)(6); USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 5, https://perma.cc/89TU-MCUW. People who receive T or U status may work in the United States and pursue lawful permanent residence. 8 C.F.R. § 214.204(o)(3); 8 C.F.R. § 214.14(c)(7); 8 U.S.C. §§ 1255(l), (m).

4. ***Special Immigrant Juvenile Status***. Congress also provided a pathway, called Special Immigrant Juvenile Status ("SIJS"), for children who have been abused, abandoned, or neglected

by a parent "to remain safely in the country with a means to apply" for lawful permanent residence. *Osorio-Martinez v. Attorney General*, 893 F.3d 153, 168 (3d Cir. 2018) (citation omitted). A child is eligible if a juvenile court declares the child dependent on the court or places the child in the custody of a designated caregiver, determines that return to the child's country of nationality would be against the child's best interests, and finds that reunification with one of the child's parents is not viable due to abuse, neglect, or abandonment. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.

SIJS gives recipients "an array of statutory and regulatory rights and safeguards," including the right to apply for lawful permanent residence, "exemption from various grounds of inadmissibility, and robust procedural protections to ensure their status is not revoked without good cause." *Osorio-Martinez*, 893 F.3d at 158; *see* 8 U.S.C. § 1255(h). Under DHS policy, Special Immigrant Juveniles who applied before May 10, 2026, like Plaintiff J.Z., receive automatic consideration for deferred action and work authorization. *See A.C.R. v. Noem*, 809 F. Supp. 3d 103, 110–13 (E.D.N.Y. 2025).[2] In any event, courts have held that DHS may not deport a person who has been designated a Special Immigrant Juvenile without complying with the procedures necessary to revoke that status. *See, e.g., Walter A. v. Easterwood*, No. 26-cv-1393, 2026 WL 836428, at *20 (D. Minn. Mar. 26, 2026) (collecting cases); *Xol-Maas v. Francis*, No. 26-cv-00025, 2026 WL 457005, at *8 (S.D.N.Y. Feb. 18, 2026).

***Effect on removal proceedings***. A grant of immigration benefits from USCIS, and sometimes even a pending application, can stop removal proceedings and prevent deportation. When USCIS grants permanent residence, a T or U visa, or asylum, the immigration court must

---

[2] Although USCIS has rescinded the prior policy that entitled Special Immigrant Juveniles to automatic consideration for deferred action and work authorization, that policy change does not apply to applications filed within thirty days of April 10, 2026: *i.e.*, before May 10, 2026. Policy Memorandum from USCIS, PM-602-0198: Special Immigrant Juvenile Classification and Deferred Action (Apr. 10, 2026), https://perma.cc/TG5V-GFAV.

8

terminate removal proceedings. 8 C.F.R. § 1003.18(d)(1)(i)(D). When USCIS grants SIJS and deferred action, the court may also terminate removal proceedings. *See id.* § 1003.18(d)(1)(ii)(C). The immigration court may also administratively close or continue removal proceedings when a USCIS application is pending. *See id.* §§ 1003.18(c), 1003.18(d)(1)(ii)(B). Indeed, the court may abuse its discretion if it fails to continue a case to allow USCIS to adjudicate an application. *See*, *e.g.*, *Ceta v. Mukasey*, 535 F.3d 639, 646–47 (7th Cir. 2008).

## II.    The Biometrics Policy closes these paths to relief for noncitizens in detention

To pursue immigration benefits, USCIS requires applicants to submit "biometrics": fingerprints, photographs, and signatures. *See* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 1, https://perma.cc/TJ83-Q647; Policy Alert, USCIS, PA-2025-29: Photograph Reuse for Identity Documents (Dec. 12, 2025), https://perma.cc/MC8V-T9JA (providing that applications for adjustment of status "require the collection of new biometrics, including a new photograph"); 8 C.F.R. § 214.204(k) ("All applicants for T-1 nonimmigrant status must submit biometrics in accordance with 8 C.F.R. § 103.16"); *id.* § 214.14(c)(3) (same for U visas). After a noncitizen applies for a benefit, USCIS schedules a biometrics appointment at a local USCIS office. *See* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/9AEJ-2TRJ; Ex. D, Declaration of J.Z. ("J.Z. Decl.") ¶ 2; Ex. E, Declaration of R.M. ("R.M. Decl.") ¶ 2; Ex. F, Declaration of Luis Felipe Estrada Trejo ("Estrada Trejo Decl.") ¶ 6; Ex. G, Declaration of Y.P. ("Y.P. Decl.") ¶ 6; Ex. H, Declaration of H.A. ("H.A. Decl.") ¶ 6; Ex. I, Declaration of M.C. ("M.C. Decl.") ¶¶ 9–10.

With one inapplicable exception, "if USCIS requires an individual to appear for biometrics capture" and "the person does not appear, the benefit request shall be considered abandoned and denied unless by the appointment time USCIS has received a change of address or rescheduling request that the agency concludes warrants excusing the failure to appear." 8 C.F.R. § 103.2(b)(13)(ii); *see* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/9AEJ-2TRJ.

9

A federal regulation requires DHS to collect biometrics from "any [noncitizen] in detention," 8 C.F.R. § 1003.47(d), for "any application for immigration relief" that requires a background check, *id.* § 1003.47(a). Consistent with that obligation, DHS historically collected biometrics and ran the necessary security checks for all noncitizens in DHS custody applying for immigration benefits. "Per intradepartmental agreement," U.S. Immigration and Customs Enforcement ("ICE"), the component of DHS that detains noncitizens pending removal proceedings, was "responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS." Ex. J at 4, USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2 (Nov. 27, 2025), https://perma.cc/C326-K7K6; *see also* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2 (Oct. 7, 2020), https://perma.cc/N7V8-7LLP (same).

On December 5, 2025, however, DHS announced that it will no longer take biometrics from detained people who have applications for immigration relief with USCIS. *See* Ex. A, Press Release, USCIS, USCIS Updates Policy on Biometrics for Detainees (Dec. 5, 2025) ("Release") ("[T]he Department of Homeland Security generally will not take biometrics of detained aliens unless they are in removal proceedings and have a pending application or petition filed with the Executive Office for Immigration Review."); Ex. B, Policy Alert, USCIS, PA-2025-28: Biometrics Collection for Aliens in Custody (Dec. 5, 2025) ("Policy Alert"); Ex. C, USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2, https://perma.cc/ZZ5R-J3AA (Dec. 5, 2025) (Exhibits A–C collectively, the "Biometrics Policy"). DHS rescinded the previous "intradepartmental agreement" by which ICE was responsible for collecting those biometrics and conducting security checks. Ex. A at 1; Ex. B at 1–2. In doing so, it "remove[d]" the prior requirement that "place[d] the burden on ICE to collect biometrics of aliens in custody . . . ." Ex. B at 1. And it reiterated that USCIS will not travel to detention centers to collect biometrics from detained noncitizens. *Id.* The policy was "effective

10

immediately and applies to requests pending or filed on or after [its] publication date." *Id.*

Even as DHS refuses to collect biometrics or conduct the necessary background checks for detained noncitizens who seek relief from USCIS, the USCIS Policy Manual directs that USCIS officers must continue to schedule biometrics appointments for detained applicants "whose appearance is required for biometrics collection." Ex. C. But ICE does not transport detained people to those appointments. *See* Ex. E, R.M. Decl. ¶ 2; Ex. G, Y.P. Decl. ¶ 6. And even if ICE did transport the applicant to the appointment, the Biometrics Policy would prohibit USCIS from taking their biometrics. Indeed, in one case, when a court ordered ICE to transport an applicant to his appointment, USCIS still refused to collect his biometrics. *Walter A.*, 2026 WL 836428, at \*14. A USCIS supervisor testified that, under the policy, USCIS staff are "not permitted to process biometrics appointments for persons in custody." *Id.*

When the applicant inevitably does not submit biometric information because DHS refuses to collect it, USCIS summarily denies their application as "abandon[ed]." Ex. A.

DHS claimed that it made the change in policy "to deter the filing of frivolous claims and provide operational consistency." Ex. A. It did not elaborate.

## III.    The Biometrics Policy prevents Plaintiffs from pursuing immigration relief

Plaintiffs are detained noncitizens in removal proceedings who have pending applications for immigration relief with USCIS. Because DHS will not collect their biometrics, each faces deportation with no opportunity for the relief the law entitles them to pursue.

***J.Z. (SIJS)***. J.Z. fled Venezuela to escape violent abuse by his father and to reunite with his mother in Illinois. Ex. D, J.Z. Decl. ¶¶ 5–8. His father and his father's girlfriend both beat him. *Id.* ¶¶ 5–6. When J.Z. tried to defend himself, his father called the police, who struck J.Z. in the head and later harassed him on the street, sometimes pointing their guns at him. *Id.* ¶¶ 6–7. In 2023, at 17 years old, J.Z. left Venezuela to escape the abuse. *Id.* ¶ 8. His journey to the United

States was difficult. On his way, J.Z. was sexually assaulted in Mexico. *Id.* When he finally reached the United States, J.Z. had a psychological episode and was hospitalized for two weeks. *Id.* Eventually, J.Z. reached his mother in Chicago. *Id.* ¶ 10. But in February 2025, ICE detained him when he reported for a regular check-in. *Id.* J.Z. has been in ICE custody ever since. *Id.* ¶¶ 1, 10.

J.Z. applied for SIJS in June 2025, before the Biometrics Policy took effect. *Id.* ¶ 2. On December 1, 2025, USCIS denied his application for lack of biometrics. *Id.* ¶ 3. DHS announced the Biometrics Policy days later. Exs. A & B. In November 2025, an Illinois Judge appointed J.Z's mother his sole legal guardian and found that it would be against J.Z.'s interest to return to Venezuela based on his father's treatment and because, if sent back, J.Z. could not access the care he needs for his intellectual disability, ADHD. J.Z. Decl. ¶ 11. J.Z. submitted a new SIJS application on January 26, 2026, and paid the $250 filing fee. *Id.* ¶¶ 4, 11. USCIS sent J.Z. a notice that required him to appear for a biometrics appointment on May 6, 2026, but he could not attend the appointment because of his detention. Ex. K. If the Biometrics Policy remains in place, DHS will not take J.Z.'s biometrics, and he will not be able to pursue SIJS. J.Z. Decl. ¶ 4.

*R.M. (T visa).* R.M. is a 22-year-old human trafficking survivor who was brought to the United States from Mexico as a child. Ex. E, R.M. Decl. ¶¶ 1–2, 4. Starting when R.M. turned eight years old, his father forced him to work in a commercial farm without pay. *Id.* ¶ 5. If R.M. refused to work, his father would beat him, withhold food, and cut him off from family members. *Id.* When R.M. was 10 years old, he lost a finger in a machinery accident. *Id.* ¶ 6. When his father finally brought him to a clinic, he forced R.M. to lie to the doctor about how he hurt the hand to cover up the forced child labor. *Id.* The forced labor continued until R.M. was 19 years old, when he ran away to live with other family members. *Id.* ¶¶ 5, 7. In July 2025, however, ICE detained R.M. at his new job, separating him from his family. *Id.* ¶¶ 1, 8.

12

In November 2025, R.M. applied for a T visa, for which he qualifies based on the human trafficking. *Id.* ¶ 2. USCIS scheduled a biometrics appointment, but ICE would not transport R.M. to the appointment. *Id.* On April 16, 2026, an immigration judge ordered R.M. removed. *Id.* ¶ 3. R.M. will appeal that decision, *id.*, but a T visa is his only viable option to remain in the United States. *Id.* ¶ 9. And DHS will not process his application without biometrics. *See id.* ¶ 2.

**Luis Felipe Estrada Trejo (family-based adjustment)**. Luis Felipe Estrada Trejo is a 45-year-old man from Mexico who has been married to a U.S. citizen for three years. Ex. F, Estrada Trejo Decl. ¶¶ 1, 4. He has been detained by ICE since March 2026. *Id.* ¶¶ 1, 3. Mr. Estrada Trejo has applied for adjustment of status, for which he qualifies based on his marriage. *Id.* ¶ 4. USCIS scheduled a biometrics appointment for March 30, 2026, and later rescheduled it to April 14, but Mr. Estrada Trejo could not attend either appointment because of his detention. *Id.* ¶¶ 5–7. If DHS's new Biometrics Policy remains in place, DHS will not collect his biometrics, and he will likely be deported, which would separate him from his wife and two children. *Id.* ¶¶ 4–5.

**Y.P. (Cuban adjustment)**. Y.P. fled Cuba with his 74-year-old mother because he faced persecution there based on his political opinions: He was repeatedly arrested while protesting the government. Ex. G, Y.P. Decl. ¶ 2. He presented himself at the border and was paroled into the United States. *Id.* In November 2025, however, ICE detained him outside an immigration court when he appeared for a scheduled hearing. *Id.* ¶ 3. Y.P.'s application for asylum was later denied by an immigration judge, and he was ordered removed. *Id.* ¶ 5. He has appealed this decision to the BIA. *Id.*

In March 2026, Y.P. applied for adjustment of status under the Cuban Adjustment Act. *Id.* ¶ 4. USCIS scheduled a biometrics appointment for April 17, 2026, but ICE would not transport

13

him to the appointment, and USCIS would not reschedule it. *Id.* ¶ 6. If the Biometrics Policy remains in place, Y.P.'s adjustment application will be denied. *Id.*

*H.A. (asylum)*. H.A. is a 40-year-old man from Iran. Ex. H, H.A. Decl. ¶ 1. When the Iranian police learned that he was gay, they beat and interrogated him. *Id.* ¶ 3. In 2021, H.A. and his family fled Iran to escape potential execution. *Id*. H.A. has been detained by ICE since January 2025, when he and his family crossed the U.S.-Mexico border. *Id*. ¶¶ 1, 4.

H.A. applied for relief based on the threat to his life if he returned to Iran, but he did not have a lawyer, and his applications were denied. *Id.* ¶ 4. H.A.'s spouse, who did have a lawyer, was granted asylum. *Id*. ¶ 4. H.A. is thus eligible for asylum as a derivative asylee, based on his relationship with his spouse. *Id*. ¶ 5. H.A.'s spouse filed the application (Form I-730) with USCIS on H.A.'s behalf, and H.A. had a biometrics appointment scheduled for March 6, 2026. *Id*. ¶¶ 5–6. But because he was detained, H.A. could not attend the appointment. *Id*. ¶ 6.

With the help of his counsel, H.A. filed a petition for habeas corpus and, on May 12, 2026, a federal district judge ordered his release from detention. If the government detains him again before he can attend his biometrics appointment, however, he could still lose his opportunity to receive asylum, be separated from his family, and face imprisonment and execution in Iran. *Id.*

*M.C. (U visa)*. M.C. is a 43-year-old woman from Mexico who has been detained since May 2025. Ex. I, M.C. Decl. ¶ 1. M.C. fled to the United States in 2011 after a powerful cartel kidnapped and tortured one of her brothers. *Id*. ¶ 2. Since she fled, the same cartel murdered her brother and have threatened to kill M.C. and her other brother. *Id*. ¶ 6.

M.C. has four U.S. citizen children ranging in age from 3 to 12 years old. *Id*. ¶ 3. The father of M.C.'s children physically abused and stalked her over a period of ten years. *Id*. In June 2022, M.C.'s ex-partner became angry with her because she did not want to have sex with him, and he

shoved M.C., causing bleeding and swelling to M.C.'s eye and face. *Id.* M.C.'s daughter called the police. *Id.* M.C. reported her ex-partner to the police three times, and each time he was arrested and charged with domestic battery. *Id.* ¶ 4. M.C. has a protective order against him. *Id.*

ICE detained M.C. in May 2025. *Id.* ¶ 5. After an interview with an asylum officer, M.C. was referred to withholding-only proceedings before an immigration judge, in which she is seeking withholding of removal and protection under the Convention Against Torture. *Id.* ¶ 6.

In July 2025, M.C. applied for a U visa based on her cooperation with the police in the investigation of domestic violence and stalking perpetrated by her former partner. *Id.* ¶ 7. A U visa would provide M.C. with legal status, work authorization, and eligibility for lawful permanent residence. *Id.* ¶ 8. USCIS scheduled a biometrics appointment for M.C. on February 9, 2026, which was rescheduled twice. *Id.* ¶ 10. But M.C. could not attend the appointments because she is detained. *Id.* If DHS does not collect her biometrics, M.C. will not be able to pursue her U visa— her most realistic path to lawful status in the United States. *See id.*[3]

## ARGUMENT

Section 705 of the APA authorizes courts "to postpone the effective date of an agency action" while a case proceeds to final judgment. 5 U.S.C. § 705. A Section 705 stay is "a temporary form of vacatur," the final remedy for unlawful agency action authorized under Section 706, which requires courts to "set aside" such unlawful action. *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (citation modified). Under Section 705, a court may "*preliminarily* 'set aside' a new agency rule." *Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025)

---

[3] Although M.C. has applied for withholding of removal and related protections under the Convention Against Torture ("CAT"), those forms of relief would not prevent a removal order— they would only prevent her return to Mexico—and DHS would remain free to pursue removal to a third country, even if M.C. were granted protection. *See, e.g.*, *Johnson v. Guzman Chavez*, 594 U.S. 523, 536–37 (2021); *D.V.D. v. DHS*, 778 F. Supp. 3d 355, 367 (D. Mass. 2025).

(Kavanaugh, J., concurring) (emphasis added). Here, a stay would "re-establish the status quo" prior to the Biometrics Policy, under which DHS took biometrics and ran the necessary security checks for all detained applicants for immigration relief. *Make the Rd.*, 2025 WL 3563313, at *17 (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)).

A court should grant a Section 705 stay if the plaintiff is (1) "likely to succeed on the merits" and (2) "likely to suffer irreparable harm" absent preliminary relief, (3) "the balance of equities tips in [their] favor," and (4) a stay "is in the public interest." *Amica Ctr. for Immigrant Rts. v. Exec. Off. for Immigr. Rev.*, No. 26-cv-696, 2026 WL 662494, at *11 (D.D.C. Mar. 8, 2026) (quoting *Glossip v. Gross*, 576 U.S. 863, 876 (2015)). The same factors govern the grant of a preliminary injunction. *See id.* Plaintiffs satisfy all four factors here.

## I.      Plaintiffs are likely to succeed on the merits

The Biometrics Policy likely violates the INA and the regulations that entitle noncitizens to pursue immigration relief, as well as the Due Process Clause of the Fifth Amendment. As a result, the policy is likely contrary to law, in violation of the APA. 5 U.S.C. § 706(2)(A), (B). The policy is also likely arbitrary and capricious, in violation of the APA, because it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted).

### A.  The policy violates the INA and regulations that govern immigration relief

First, the Biometrics Policy is inconsistent with statutes and regulations that grant eligible noncitizens the right to apply and be considered for immigration relief.

#### 1.  Adjustment of status under 8 U.S.C. § 1255

As "multiple circuits have held," "arriving aliens in removal proceedings must be permitted to seek adjustment" of status. *Gazeli v. Session*, 856 F.3d 1101, 1108 (6th Cir. 2017); *accord Kalilu v. Mukasey*, 548 F.3d 1215, 1218 (9th Cir. 2008) (collecting cases "holding that the Attorney General must provide an opportunity for arriving aliens in removal proceedings to apply for

16

adjustment [of status] on the basis of a valid immigrant visa petition"). The Biometrics Policy violates that right because it denies an entire class of eligible people—detained noncitizens labeled "arriving aliens" under federal regulations—the opportunity to seek adjustment.

That conclusion flows from both the statute and its implementing regulations.

1. Section 1255 of Title 8 makes all noncitizens "admitted or paroled into the United States" eligible for permanent residence subject only to specifically enumerated exceptions. *Succar v. Ashcroft*, 394 F.3d 8, 24 (1st Cir. 2005) (discussing the structure of 8 U.S.C. § 1255). That detailed statutory scheme "reserved for [Congress] the determination of whether a non-citizen should be able to apply" for adjustment. *Id.* As a result, DHS "cannot categorically refuse to exercise discretion favorably for classes deemed eligible" for adjustment. *Id.* at 29 n.28. Thus, when a new regulation deemed all "arriving aliens" in removal proceedings ineligible to adjust their status, four courts of appeals held that the regulation violated the INA because it denied eligible noncitizens their statutory right to seek adjustment. *Kalilu*, 548 F.3d at 1218; *see Succar*, 394 F.3d at 29–30; *Scheerer v. Att'y Gen.*, 445 F.3d 1311, 1318–22 (11th Cir. 2006); *Bona v. Gonzales*, 425 F.3d 663, 667-70 (9th Cir. 2005); *Zheng v. Gonzales*, 422 F.3d 98, 111–20 (3d Cir. 2005); *see also Ceta v. Mukasey*, 535 F.3d 639, 646–47 (7th Cir. 2008) (reversing immigration court's denial of motion for continuance that was necessary to pursue adjustment, holding that the denial would unlawfully "operate[] to nullify [the] statutory right to apply for adjustment of status" (citation modified)); *Kalilu*, 548 F.3d at 1218 (reversing denial of motion to reopen on similar grounds).

The Biometrics Policy violates the INA for the same reason. It precludes the nearly same class of eligible applicants—detained people labeled "arriving aliens" (including parolees)—from pursuing their adjustment applications, even though the statute "explicitly" makes people "paroled" into the United States eligible for adjustment if they otherwise meet the statutory

requirements. *Succar*, 394 F.3d at 24–25; *see* 8 C.F.R. § 1245.2(a)(1)(ii) (noting that "arriving aliens" must pursue adjustment through USCIS); 8 C.F.R. § 1.2 ("arriving aliens" include parolees). In doing so, DHS is "categorically refus[ing] to exercise discretion" for an entire class of people "deemed eligible" for adjustment. *Succar*, 394 F.3d at 29 n.28. Indeed, even worse than the regulation invalidated in *Succar*, *Bona*, *Sheerer*, and *Zheng*—in which the Attorney General at least made a judgment that people labeled "arriving aliens" should not receive adjustment-of-status relief—the Biometrics Policy does not even mention adjustment of status, let alone address whether affected noncitizens should receive that relief. *See* Ex. A. The refusal to make that judgment frustrates Congress's intent and violates the INA. *See Goncalves v. Reno*, 144 F.3d 110, 125 (1st Cir. 1998) (holding that, when Congress "make[s] certain [noncitizens] eligible for discretionary relief, Congress intend[s] the Attorney General or her designated subordinates to make a judgment," and "[a] refusal to make that judgment would frustrate Congress' intent").

2. Indeed, the existing regulations give applicants the right to pursue an adjudication on the merits of their adjustment applications. They provide that eligible noncitizens "may apply for adjustment of status to that of a lawful permanent resident." 8 C.F.R. § 245.1(a). When a law grants the right to apply for relief, it confers more than just the right to submit a piece of paper. Less than a month ago, the D.C. Circuit reaffirmed that identical language in the asylum statute—that noncitizens in the United States "may apply" for asylum—gave those people a "statutory right" both to file an application and, if eligible, to "be[] considered to receive" asylum. *RAICES*, 2026 WL 1110616, at *14. Thus, the Executive could not impose a "categorical, *ex ante* denial of asylum with no consideration of" whether individual applicants should receive that relief. *Id.* at 15; *accord Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730–31 (D.C. Cir. 2022) (explaining that, absent declared emergency, "the Executive violates [the asylum statute] when it expels [noncitizens]

18

before allowing them an opportunity to apply for asylum"). Similarly, the Supreme Court has held that a statute providing that someone "may file one motion to reopen" conferred "the right to *pursue* a motion to reopen" through disposition. *Dada v. Mukasey*, 554 U.S. 1, 14, 21 (2008) (emphasis added) (holding where the applicant's departure from the United States would terminate their pending motion to reopen, the applicant must be permitted to withdraw their request for voluntary departure so they can pursue a decision on their motion to reopen).

As courts have recognized, without the right to pursue an adjudication on the merits, the right to apply for relief would be an illusion. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669–70 (9th Cir. 2021) (holding that policy "summarily denying" asylum applications from people who entered outside of a port of entry violated the statutory right to "apply" for asylum irrespective of their manner of entry; rejecting argument that the rule complied with the statute because noncitizens could still file "futile asylum applications"); *Jimenez v. Nielsen*, 334 F. Supp. 3d 370, 386–87 (D. Mass. 2018) (holding that where regulation provided that eligible noncitizens "may apply" for relief, DHS could not take action that would prevent them from pursuing it); *see also Nixon v. Missouri Mun. League*, 541 U.S. 125, 138 (2004) (explaining that a court should not construe a statute in a manner that would lead to "futile" results (citation omitted))

3. The regulations governing adjustment reinforce that DHS must make a reasoned individualized decision on each application. They direct that DHS "shall" "notif[y]" the applicant of "the decision" on the application and, "if the application is denied, the reasons for the denial." 8 C.F.R. § 245.2(a)(5)(i). "[B]ased on § 245.2(a)(5)(i)'s mandatory notification requirement," courts have held that "the duty to adjudicate [an adjustment application] is non-discretionary." *Saghafi v. Edlow*, No. 26-cv-100, 2026 WL 1127468, at *5 (D. Md. Apr. 24, 2026) (collecting cases) (citation omitted); *see Geneme v. Holder*, 935 F. Supp. 2d 184, 192 (D.D.C. 2013) (DHS

19

has "a non-discretionary duty" to adjudicate adjustment applications); *accord Doe v. Trump*, No. 25-cv-13946, 2026 WL 1170971, at *14 (D. Mass. Apr. 30, 2026); *Yu v. Brown*, 36 F. Supp. 2d 922, 931 (D.N.M. 1999); *see also Lovo v. Miller*, 107 F.4th 199, 214 (4th Cir. 2024) ("[L]anguage mandating notification of an agency's ultimate decision can create a requirement to adjudicate."); *accord id.* at 221 (Diaz, J., dissenting) (discussing the adjustment regulation). And DHS may only "withhold[] adjudication" of a benefits request in specified circumstances that are not present here. 8 C.F.R. § 103.2(b)(18); *see Beshir v. Holder*, 853 F. Supp. 2d 1, 8 (D.D.C. 2011) (USCIS may not "withhold a decision indefinitely"); *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1167 (N.D. Cal. 2007) (DHS has "a non-discretionary duty to comply with 8 C.F.R. § 103.2(b)(18) in order to lawfully withhold adjudication"); *id.* at 1163 n.7 (collecting cases); *Varniab v. Edlow*, No. 25-cv-10602, 2026 WL 485490, at *8–11 (N.D. Cal. Feb. 20, 2026) (same).

When, as here, a regulation requires a case-by-case adjudication, the adjudicator must make a considered "judgment" concerning each application; it cannot refuse to consider applications or summarily deny them based on preconceived categorical bars. *Accardi*, 347 U.S. at 264, 266–67 (holding that, when regulations required individualized adjudications by the Board of Immigration Appeals, the Board could not categorically deny discretionary relief to all individuals on a list of people the Attorney General had "prejudg[ed]" to be denied); *RAICES*, 2026 WL 1110616, at *16 (holding that regulations requiring adjudication of asylum applications require "individualized" consideration and preclude "upfront, categorical asylum denials"). Thus, DHS cannot comply with its duty to adjudicate eligible noncitizens' adjustment applications by deeming them "abandoned" because the applicant failed to submit information that DHS categorically bars them from submitting. Otherwise, DHS could withhold the forms needed to complete an application, then deny relief because the applicant failed to submit the proper forms. Agencies cannot shirk their

20

obligations so easily. *See Pub. Utilities Comm'n of State of Cal. v. FERC*, 143 F.3d 610, 616 (D.C. Cir. 1998) (explaining that an agency cannot do "indirectly what it could not do directly").

In short, by cutting off access to a critical step in the adjustment process for an entire class of applicants, the Biometrics Policy unlawfully prevents eligible applicants from "applying for" and "being considered to receive" adjustment of status. *RAICES*, 2026 WL 1110616, at *14. In doing so, the policy violates 8 U.S.C. § 1255 and its implementing regulations. *See Castaneira v. Noem*, 138 F.4th 540, 550–51 (D.C. Cir. 2025) (reaffirming that an agency must follow its "own 'existing valid regulations'" (quoting *Accardi*, 347 U.S. at 268)).

4. Finally, even if DHS could categorically bar detained noncitizens from seeking adjustment of status, DHS would need to promulgate that rule by "regulation." 8 U.S.C. § 1255(a) (providing that the Attorney General may adjust the status of eligible noncitizens "under such *regulations* as he may prescribe" (emphasis added)). As the D.C. Circuit recently held, "by regulation" means "through notice and comment rulemaking." *RAICES*, 2026 WL 1110616, at *18. Because the Biometrics Policy did not go through that process, DHS cannot use it to prevent eligible noncitizens from pursuing adjustment of status. *See id.* (holding that, based on similar language, the Executive could not "foreclose asylum" to a class of noncitizens through a presidential proclamation and agency guidance that did not go through notice-and-comment).

## 2. Asylum for spouses and children of asylees

For similar reasons, the Biometrics Policy violates the rights of asylees' spouses and children "to apply and be considered for asylum." *RAICES*, 2026 WL 1110616, at *2, 14. By statute, noncitizens in the United States "may apply for asylum in accordance with this section." 8 U.S.C. § 1158(a)(1). The statute further provides, in "conditions for granting asylum," that the spouse and children of a noncitizen "granted asylum" qualify for "the same status" if "accompanying, or following to join," the asylee. *Id.* § 1158(b)(3)(A). In other words, the spouse

21

or child of an asylee also may be granted "asylum." 8 C.F.R. § 1208.21(a). The regulations confirm that if a spouse or child was not included in their asylee relative's application, the asylee "may request" asylum for their qualifying spouse or child by filing a Form I-730 petition with USCIS, "regardless" of the spouse or child's immigration status. *Id.* § 1208.21(c).

Accordingly, the government may not refuse to consider or summarily deny an asylee relative's petition for asylum based on a blanket rule that applies to all detained applicants. As the D.C. Circuit held in *RAICES*, the "discretionary authority to deny asylum must be exercised on an 'individualized' basis," after consideration of the facts of each case. 2026 WL 1110616, at *15-16. "[B]arring foreign individuals who are physically present in the United States from applying for asylum and, if they make the statutory showing that they are eligible, from being considered to receive it cannot be squared with the statute." *RAICES*, 2026 WL 1110616, at *14.

But that is just what the Biometrics Policy does. By precluding detained noncitizens from submitting biometrics, the policy prevents asylee relatives who must seek asylum from USCIS from showing that "they are eligible" for asylum under § 1158(b)(3)(A) and from "being considered to receive it" if they are. *RAICES*, 2026 WL 1110616, at *14. It also deprives unaccompanied children of their "statutory right to initial consideration of an asylum application by the DHS." *Matter of J-A-B- & I-J-V-A-*, 27 I. & N. Dec. at 169 n.2. And it does both without going through "notice and comment rulemaking," as the asylum statute requires. *RAICES*, 2026 WL 1110616, at *18. The policy therefore violates Section 1158 and its implementing regulations.

### 3. Special immigrant status for abused, abandoned or neglected children

Applicants for Special Immigrant Juvenile Status also have a right to an individualized adjudication. By statute, Congress has required that USCIS "shall . . . adjudicate[]" SIJS applications "not later than 180 days" after the application is filed. 8 U.S.C. § 1232(d)(2). In that provision, "Congress issued a 'plain directive' . . . that USCIS adjudicate SIJS petitions" within

22

180 days. *Casa Libre/Freedom House v. Mayorkas*, No. 22-cv-01510, 2023 WL 4872892, at *7 (C.D. Cal. July 31, 2023) (quoting *Galvez v. Jaddou*, 52 F.4th 821, 839 (9th Cir. 2022)); *accord Moreno Galvez v. Cuccinelli*, 492 F. Supp. 3d 1169, 1179-80 (W.D. Wash. 2020) (holding that delayed consideration of SIJS petitions beyond 180 days was unlawful and enjoining USCIS to comply with the deadline), *aff'd in relevant part by Galvez*, 52 F.4th at 834-35. The regulations mirror this directive. *See* 8 C.F.R. § 204.11(g)(1) (180 days); *see also id.* § 204.11(h) ("USCIS will notify the petitioner of the decision made on the petition . . . .").

A child who files a SIJS petition is thus entitled to a prompt decision on that petition. As explained above, DHS cannot satisfy that duty through summary denials based on a categorical bar to relief that DHS has not even promulgated by regulation. *See supra* pp. 19–20. By making it impossible for detained applicants to obtain biometrics, the policy unlawfully deprives eligible noncitizens of an individualized decision and, therefore, of access to the "array of statutory and regulatory rights and safeguards" that SIJS affords. *Osorio-Martinez*, 893 F.3d at 158.

### 4. T nonimmigrant status for survivors of trafficking

The same principles apply with even greater force to trafficking victims seeking T nonimmigrant status. Like the adjustment, asylum, and SIJS provisions, the regulations governing T nonimmigrant status require an adjudication. The regulations provide that once the application is submitted, USCIS "*will* . . . determine if the application is bona fide." 8 C.F.R. § 214.205(a) (emphasis added). If it is, any "final order of removal … *will* be automatically stayed, and the stay *will* remain in effect until a final decision is made" on the application. *Id.* § 214.204(b)(2)(iii) (emphasis added). After USCIS completes its review, USCIS "*will* issue a decision approving or denying the application . . . ." *Id.* § 214.204(n) (emphasis added). Noncitizens thus have "a right to a decision in a reasonable amount of time" on an application for T nonimmigrant status. *Byrne*

23

*v. Noem*, No. 25-cv-1077, 2025 WL 2414159, at *8 (E.D. Pa. Aug. 20, 2025); *accord Francisco v. USCIS*, No. 26-cv-1834, 2026 WL 810068, at *2 (S.D. Cal. Mar. 24, 2026).

T nonimmigrant status is mandatory, not discretionary. USCIS *must* approve the application if the noncitizen is eligible, subject to an annual cap. *See* 8 C.F.R. § 214.204(o) (providing that if USCIS determines that the applicant is eligible for T nonimmigrant status, USCIS "will approve the application and grant" the status subject to an annual cap). If USCIS cannot issue a T visa due to the annual cap, it "will" place the applicant on a waitlist, and the applicant's removal remains stayed. *Id.* § 214.210(b). Because "the regulation uses the mandatory 'will' rather than the permissive 'may,'" USCIS "does not" have "discretion to deny" a T visa to an eligible applicant. *Sergio S.E. v. Rodriguez*, No. 20-cv-6751, 2020 WL 5494682, at *7 (D.N.J. Sept. 11, 2020); *see also Nat. Res. Def. Council, Inc. v. James R. Perry*, 940 F.3d 1072, 1079 (9th Cir. 2019) (holding that a regulation's "use of the word 'will' unambiguously imposes a mandatory duty . . . ."); USCIS, *Policy Manual*, vol. 3, pt. B, Ch. 7, https://perma.cc/Y3VH-GK5E ("If USCIS determines the applicant is eligible for T-1 nonimmigrant status, USCIS approves the application and grants T-1 nonimmigrant status, subject to the annual limitation.").

Yet the Biometrics Policy makes it impossible for eligible applicants in detention to obtain or even pursue relief even if they meet all eligibility requirements. That conflicts with the text of the regulation, 8 C.F.R. § 214.204, and purpose of the T visa statute: to "protect[] [trafficking victims] against deportation." Trafficking Victims Protection Act of 2000, Pub L. No. 106-386, § 1502(a)(2), 114 Stat. 1464.

### 5.  U nonimmigrant status for survivors of serious crime

Similarly, USCIS has a "nondiscretionary duty to adjudicate [U visa] applications." *Uranga v. USCIS*, 490 F. Supp. 3d 86, 102 (D.D.C. 2020) (quoting *M.J.L. v. McAleenan*, 420 F. Supp. 3d 588, 596 (W.D. Tex. 2019)); *accord De La Torre Molina v. USCIS*, No. 25-cv-594, 2026

24

WL 681748, at \*4 (N.D. Ind. Mar. 10, 2026); *Lara Santiago v. Mayorkas*, 554 F. Supp. 3d 1340, 1348 (N.D. Ga. 2021). First, USCIS "must determine" whether a filed application is "bona fide," then decide whether to grant the person deferred action and work authorization. *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 444 (6th Cir. 2022); 8 U.S.C. § 1184(p)(6). To be "bona fide," an application must be complete and properly filed, and USCIS must have "received the result of the principal petitioner's background and security checks based upon biometrics." USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 5, https://perma.cc/YS5R-MUYX. Then, "USCIS shall conduct a de novo review of all evidence submitted in connection" with the petition and "will issue a written decision approving or denying" the petition. 8 C.F.R. § 214.14(c)(4), (5). "The regulation" thus "requires USCIS to issue a written decision either approving or denying the petition*." De La Torre Molina*, 2026 WL 681748, at \*4.

Like the T visa regulation, the U visa regulation requires relief for eligible applicants. USCIS must approve a U visa if the applicant is eligible and the annual cap is not met. *See* 8 C.F.R. § 214.14(c)(5)(i) ("If USCIS determines that the petitioner has met the requirements for U-1 nonimmigrant status" and the petitioner is in the United States, "USCIS *will* approve Form I-918" and "grant U-1 nonimmigrant status, subject to the annual limitation" (emphasis added)). If USCIS denies an application "due solely to the [annual] cap," it "must" place the applicant "on a waiting list," "must" grant that applicant deferred action, and may grant work authorization. *Id.* § 214.14(d)(2); *see Barrios Garcia*, 25 F.4th at 446 ("[P]lacing principal petitioners who are eligible for U-visas on the waitlist is nondiscretionary."); USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 6, https://perma.cc/WH6U-9MXK (confirming that, by regulation, when the annual cap is met, "USCIS places remaining petitioners eligible for U nonimmigrant status on the waiting list," where they "are eligible for employment authorization and receive a grant of deferred action").

In denying eligible applicants that relief, the Biometrics Policy violates those duties, too.

**B. The policy violates the specific regulation requiring that DHS take biometrics for "any" noncitizen in detention**

DHS's refusal to collect biometrics for noncitizens in detention also violates the express requirement that "DHS is responsible for obtaining biometrics and other biographical information with respect to *any* [noncitizen] in detention." 8 C.F.R. § 1003.47(d) (emphasis added).

In the Biometrics Policy, DHS claims that it does not need to collect detainees' biometrics for applications pending before USCIS because, in its view, "DHS is only responsible for obtaining biometrics needed for identity and background checks when [a noncitizen] is in detention, in removal proceedings, and the benefit requested is within the jurisdiction of the Executive Office for Immigration Review" (i.e., the immigration courts). Ex. C at 8 n.23. In other words, DHS has taken the odd position that it must collect biometrics when *another agency* (EOIR, a component of the Department of Justice) has jurisdiction to grant the requested relief, but not when *DHS itself* (through USCIS) has jurisdiction over the application. But that contradicts the plain text of the regulation, which requires DHS to collect biometrics from "any" detained noncitizen, regardless of which agency has jurisdiction over the application. 8 C.F.R. § 1003.47(d). "In this context, as in so many others, 'any' means 'every.'" *SAS Inst., Inc.*, 584 U.S. at 359; *see id.* at 362 ("When used (as here) with a singular noun in affirmative contexts, the word 'any' ordinarily refers to a member of a particular group or class without distinction or limitation and in this way implies *every* member of the class or group." (citation modified)); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting *United States v. Gonzales*, 520 U.S. 1, 4 (1997)).

The regulation's other provisions confirm that the biometrics requirement applies to all noncitizens with pending applications for immigration relief that require a background check.

26

Paragraph (a) provides that the regulation applies "to *any* application for immigration relief . . . that is subject to the conduct of identity, law enforcement, or security investigations or examinations as described in paragraph (b) of this section, in order to ensure that DHS has completed the appropriate identity, law enforcement, or security investigations or examinations before the adjudication of the application." 8 C.F.R. § 1003.47(a) (emphasis added). And paragraph (b) confirms that the "requirements . . . apply to the granting of *any form* of immigration relief in immigration proceedings which permits the [noncitizen] to reside in the United States, including *but not limited to*" certain forms of relief that are "within the authority of an immigration judge or the [BIA] to grant." *Id.* § 1003.47(b) (emphases added).

Although paragraph (b) does make doubly clear that its scope also "include[s]" applications for relief "within the authority of an immigration judge or the [BIA] to grant," its plain terms direct that the regulation's requirements are "not limited to" applications before the immigration courts. *Id.*; *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (explaining that the use of the word "'includes' instead of 'means' . . . makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive"). Thus, the most natural—and most reasonable—reading of the requirement is that it also covers applications before USCIS. Indeed, as DHS policy has long recognized, there would be no reason for DHS to collect biometrics and run the necessary security checks for noncitizens when they apply for relief with another agency (EOIR) but not when they apply for relief with another component of DHS itself (USCIS). *See* Ex. J at 4 (recognizing that DHS was "responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS"); *see also* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2 (Oct. 7, 2020), https://perma.cc/N7V8-7LLP (same).

27

The regulation's repeated use of the word "any" reinforces that conclusion—as decisions of the Supreme Court make clear. Thus, when an exception to the Federal Tort Claims Act covered claims against "any" law enforcement officer, the fact that Congress *also* specified that the exemption applied to specific types of law enforcement officers ("officer[s] of customs or excise") did not limit its "expansive" reach. *Ali*, 552 U.S. at 226 (emphasis added). As the Supreme Court explained, laws often include such specific examples to "remove any doubt" that a general provision applies to those examples, but they ordinarily do not limit their reach to those examples. *See id.*; *see also Fort Stewart Schools v. FLRA,* 495 U.S. 641, 646 (1990) (explaining that "technically unnecessary" examples may be "inserted out of an abundance of caution"). If the agency had meant to direct that DHS *only* collect biometrics from detained noncitizens with applications for relief before EOIR, it could have easily written as much. *See Ali*, 552 U.S. at 227 ("Had Congress intended to limit § 2680(c)'s reach as petitioner contends, it easily could have written 'any other law enforcement officer acting in a customs or excise capacity.'").

### C.  The policy violates the Fifth Amendment Due Process Clause

The Due Process Clause of the Fifth Amendment protects the liberty and property of "all 'persons' within the United States," "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by [other] laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). When the government deprives someone of such an interest, it must follow the statutes and regulations designed to protect that interest. *See Accardi*, 347 U.S. at 268 (Attorney General had to provide the "due process required by the regulations" in adjudication concerning discretionary suspension of deportation); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (when

28

"liberty" interest in avoiding deportation was at stake, due process required the government to follow "procedural requirements prescribed for the protection" of the noncitizen); *Ayala Chapa v. Bondi*, 132 F.4th 796, 799 n.3 (5th Cir. 2025) ("While it is a long-settled principle of administrative law that agencies must follow their own regulations, particularly where the rights of individuals are affected, the proper vehicle for such claims is the Due Process Clause." (citation modified)).

The Biometrics Policy deprives noncitizens of due process of law for two reasons. First, noncitizens who live in the United States have a liberty interest in not being deported. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (Noncitizens "who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."); *see also A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) ("The Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings." (citation omitted)). When someone has "come within the territory of the United States and developed substantial connections with this country," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), deporting them inflicts a "great hardship" on them, *Bridges*, 326 U.S. at 154. "Removal . . . may result in 'loss of both property and life, or of all that makes life worth living.'" *Make the Rd.*, 2025 WL 3563313, at *21 (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)). It "may result in poverty, persecution and even death[.]" *Id.* (quoting *Bridges*, 326 U.S. at 164 (Murphy, J., concurring)).

Given the liberty interests at stake, the Due Process Clause protects a noncitizen's statutory and regulatory rights to pursue relief that would allow them to remain in the country, even when they have no right to the relief itself. *See Accardi*, 347 U.S. at 268; *see also Bridges*, 326 U.S. at 154. Yet, the Biometrics Policy subjects noncitizens to deportation without the opportunity to pursue various forms of relief guaranteed by the INA and its regulations. *See supra* Part I.A & B.

29

If the policy remains in place, it will therefore deprive many people of liberty without "th[e] due process required by the regulations." *Accardi*, 347 U.S. at 268; *see also D.A.M. v. Barr*, 474 F. Supp. 3d 45, 66 (D.D.C. 2020) ("*Accardi* is . . . rooted . . . in notions of *procedural* due process"); *accord Torres v. Garland*, No. 22-60293, 2023 WL 3300969, at *8 (5th Cir. May 8, 2023) (Dennis, J., concurring) (explaining that, because "deportation affects a liberty interest," "even if the [noncitizen] is not entitled to discretionary relief, he or she is still entitled to a fair hearing to avoid deportation by presenting [his or her] application[] for [discretionary] relief"); Thomas W. Merrill, *The Accardi Principle*, 74 Geo. Wash. L. Rev. 569, 611 (2006) (when the government is "threatening to deprive the individual of a protected interest in life, liberty, or property . . . an agency's violation of its own legislative procedural regulations is a violation of due process").

Second, the applicable statutes and regulations create a "legitimate claim of entitlement." *Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). For T and U visas, the regulations entitle eligible noncitizens to the relief itself. *See supra* pp. 23–25. So DHS must afford applicants a fair process before it denies those entitlements, and DHS certainly cannot cut off access to them without providing an opportunity for the applicant to be heard on the merits of their claims. *See S.N.C. v. Sessions*, No. 18-cv-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (holding that applicant had due process right to a "meaningful determination on his T visa application"); *Fatty v. Nielsen*, No. 17-cv-1535, 2018 WL 3491278, at *2 (W.D. Wash. July 20, 2018) (same).

For adjustment of status, asylum, and SJIS, the regulations entitle applicants to apply for relief. *See supra* Part I.A. That the ultimate relief may be "discretionary" does not change the analysis: The INA and its regulations confer a "substantive right" to "the opportunity to seek [that relief]," and "[a] right to seek relief is analytically separate and distinct from a right to the relief itself." *Arevalo v. Ashcroft*, 344 F.3d 1, 14–15 (1st Cir. 2003). So even though petitioners have

"no constitutionally protected right" to the relief itself, they have a basic due process "right to submit and the opportunity to substantiate" their claims. *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1037–39 (5th Cir. 1982) (holding that the asylum statute and regulations created a "constitutionally protected right to petition our government for political asylum"); *accord Torres*, 2023 WL 3300969, at *8 (Dennis, J., concurring); *see also Calderon-Rosas v. Att'y Gen. United States*, 957 F.3d 378, 384 (3d Cir. 2020) (holding that applicants for "discretionary" immigration relief, including asylum, must "receive a full and fair hearing that allows them a reasonable opportunity to present evidence on their behalf, and a decision on the merits of their claim by a neutral and impartial arbiter" (citation omitted)); *Jimenez*, 334 F. Supp. 3d at 386–87 (holding that due process prohibits actions that would "preclude [a noncitizen] from even applying for [discretionary] relief" that he or she is entitled to pursue by statute or regulation (quoting *Succar*, 394 F.3d at 19–20)); *Calderon v. Sessions*, 330 F. Supp. 3d 944, 957–58 (S.D.N.Y. 2018) (same).

Because the Biometrics Policy deprives Plaintiffs of the opportunity to seek the relief that federal statutes and regulations entitle them to pursue, it deprives them of due process of law.

### D. The policy is arbitrary and capricious

Even if DHS could deny detained noncitizens access to biometrics collection without violating the INA, the regulations, or the Constitution, the policy would still be unlawful under the APA because it is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if it is "not reasonable and reasonably explained." *Ohio*, 603 U.S. at 292 (citation modified). To satisfy that standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation modified). An agency's explanation is not sufficiently reasoned if it "failed to consider an important aspect of the problem." *Id.* In immigration matters, no less, the court must ensure that the agency's decision was "based on a

31

consideration of the relevant factors" and not a "clear error in judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (quoting *State Farm*, 463 U.S. at 43).

When an agency changes a policy, it must both "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And it must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. Among other things, the agency must assess "whether" the prior policy engendered "reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33.

The Biometrics Policy fails that standard: In deciding not to take biometrics or run background checks for detained people who seek relief from USCIS, DHS ignored multiple "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, ignored significant reliance interests, and failed to provide any reasoned explanation for the decision.

First, the policy does not display any awareness that it precludes eligible noncitizens from pursuing multiple forms of immigration relief, let alone explain why they should be denied that relief on a classwide basis. *See* Ex. A. When the government denies discretionary immigration relief, its decision "must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang*, 565 U.S. at 55. "A method for disfavoring deportable [noncitizens] that bears no relation to these matters—that neither focuses on nor relates to [a noncitizen's] fitness to remain in the country—is arbitrary and capricious." *Id.* The Biometrics Policy considers none of the purposes that underlie the paths to relief it forecloses. It does not even discuss adjustment of status, T and U nonimmigrant status, SIJS, or asylum. And it neither "focuses on nor relates" to any noncitizen's "fitness to remain in the country." *Id.*

32

Instead, it entirely ignores the human "costs" of DHS's "decision." *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (holding that failing to consider costs was arbitrary and capricious).

Second, DHS failed to consider the unwarranted disparity the policy creates between applicants who must seek relief from USCIS as opposed to those who must seek relief from the immigration courts. "An agency must provide an adequate explanation to justify treating similarly situated parties differently." *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005). The Biometrics Policy acknowledges that DHS will continue to collect biometrics and conduct the necessary security checks when the immigration courts have jurisdiction over the detainee's application. Ex. A. Yet the limited explanation DHS offered for the Biometrics Policy does not explain why DHS should deny biometrics collections to some applicants, but not others, based on the agency with jurisdiction to grant their applications. *See* Exs. A & B. This "unexplained inconsistency" also makes the policy "arbitrary and capricious." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation modified).

Third, the Biometrics Policy fails to consider "whether" its predecessor engendered "reliance interests," determine whether those interests were "significant," or "weigh" them against competing concerns. *Regents*, 591 U.S. at 33. Many people have "organized their lives"—and made choices about "marriage, employment, insurance, family planning, savings," and work— based on the understanding that they were eligible for lawful immigration status. *Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624, at *8 (D. Mass. Feb. 27, 2026) (holding that indefinite pause on the processing of certain immigration benefits was arbitrary and capricious in part because it failed to consider such reliance interests); *see also Saghafi v. Edlow*, No. 26-cv-100, 2026 WL 1127468, at *9 (D. Md. Apr. 24, 2026) (same). The Biometrics Policy does not discuss those reliance interests at all, let alone weigh them. To make matters worse, because the Policy "applies

33

to requests pending or filed on or after the publication date," it applies to noncitizens who filed their applications and paid the applicable fees before the policy took effect. Ex. A. Those people may not have prepared those applications or paid that money if they knew that DHS would prevent them from completing the application process. Many may not have remained in the United States, and subjected themselves to detention, if that process was unavailable. It was "arbitrary and capricious" to ignore the extent to which the policy upsets these reliance interests by cutting off the relief so many believed they could pursue. *Regents*, 591 U.S. at 33.

Instead of addressing these problems, the policy contains only one line that offers any reason for it: DHS claims that the new policy will "deter the filing of frivolous claims and provide operational consistency." Ex. A. But it does not explain how the policy will achieve those goals. DHS's bare conclusions do not supply the "reasoning" the APA requires, "for they provide neither assurance that [DHS] considered the relevant factors nor . . . a discernable [analytical] path to which the court may defer.'" *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008)).

Nor do those bare assertions make any sense. Biometrics themselves guard against frivolous claims: they "verify [an applicant's] identity," "facilitate required criminal and national security background checks," and "ensur[e] that USCIS only grants benefits to eligible requestors." USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 1, https://perma.cc/TJ83-Q647. Perhaps DHS means that, by denying *all* claims from detained noncitizens, the agency will save the time and money it spends to process the (unidentified) portion of those claims that are frivolous. But "[c]heapness alone cannot save" a policy that denies lawful immigration status to eligible people without considering their "fitness to reside in this country." *Judulang*, 565 U.S. at 53, 64. And DHS did not identify any evidence of how many frivolous claims it receives. Nor did DHS explain

34

how it believes it achieves "operational consistency" by treating detainees *inconsistently* based on which agency has jurisdiction over their claims for relief. Ex. A.[4]

As explained above, DHS contends that 8 C.F.R. § 1003.47(d) only "obligat[es]" it to collect biometrics from detainees seeking relief from EOIR. Ex. B; Ex. C at 8 n.23. That is incorrect. *Supra* Part I.B. But even if the regulations permitted DHS to refuse to collect detainees' biometrics for USCIS applications, that would not justify its change in policy. "Because we can" is not a reasoned explanation for agency action. *See*, *e.g.*, *Regents*, 591 U.S. at 30 (holding that DHS's decision to rescind the Deferred Action for Childhood Arrivals program was arbitrary because DHS did not supply a "reasoned analysis" for abandoning its policy of enforcement forbearance, even though no one suggested the INA required that forbearance).

Finally, in issuing the new policy, DHS also stated that "there is no controlling intradepartmental agreement between USCIS and [ICE] regarding the collection of biometrics for [noncitizens] in custody with pending USCIS benefit requests." Ex. A; Ex. B at 2. Such an agreement existed before. Ex. J at 4 ("Per intradepartmental agreement, [ICE] is responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS."); Ex. B at 1 (confirming that the prior policy "place[d] the burden on ICE to collect biometrics of [noncitizens] in custody"). But DHS has not explained why it rescinded that agreement. And none of DHS's public statements provide any reasoning that would justify that decision. *See* Exs. A & B. Nor has DHS explained why two arms of the same agency would need an agreement for ICE to collect the necessary biometrics in the first place.

---

[4] Even to the extent that the Biometrics Policy serves any discernible purpose, DHS failed to consider any alternative to achieve that goal short of withholding relief from all detained immigrants with USCIS applications. *See Regents*, 591 U.S. at 28–29 (DACA rescission arbitrary and capricious where the Secretary failed to consider obvious alternatives to full rescission).

Because DHS provided no "good reason" for its reversal in policy and ignored the grave costs of that decision, the Biometrics Policy violates the APA. *Fox*, 556 U.S. at 515.

## IV.    The policy irreparably harms the detained plaintiffs

The Biometrics Policy inflicts irreparable harm. It delays or denies outright the detained Plaintiffs' access to immigration benefits and exposes them to deportation with no path to the relief that federal law entitles them to pursue. Congress and DHS designed the adjustment, T visa, SIJS, and asylum processes so that noncitizens could pursue them *within* the United States.[5] Deportation will effectively foreclose the detained Plaintiffs from obtaining those remedies. *See infra* n. 5 (collecting provisions requiring presence in the United States to be eligible). And even if Plaintiffs could apply for relief from abroad, as is the case for U visa applicants, their deportation would bar their reentry for many years. *See* 8 U.S.C. § 1182(a)(9)(A) (providing that noncitizens removed from the United States are barred from readmission for at least 5 years). In doing so, it would separate them from their families and expose them to potential violence abroad.

All of these harms are irreparable. *See*, *e.g.*, *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 130-32 (D.D.C. 2025) (holding that the "loss of . . . statutory procedures" designed to "kick in *before*" removal was "enough to show irreparable harm" when plaintiffs could not receive "'effective relief by facilitation of [their] return'" after being deported (quoting and distinguishing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021)

---

[5] *See* 8 U.S.C. § 1255(a) (noncitizens "inspected and admitted or paroled into the United States" eligible for adjustment of status); 8 C.F.R. § 245.1 (adjustment available only to noncitizens "physically present in the United States"); USCIS Policy Manual vol. 7, pt. A, Ch. 1 (Congress created adjustment of status "to enable certain [noncitizens] physically present in the United States to become [permanent residents] without incurring the expense and inconvenience of traveling abroad to obtain an immigrant"); 8 U.S.C. § 1101(a)(15)(T)(i)(II) (T visa available only to trafficking survivors "physically present in the United States"); *id.* § 1158(a) (allowing noncitizens "physically present in the United States" to apply for asylum); *id.* § 1101(a)(27)(J) (limiting SIJS eligibility to noncitizen children "present in the United States").

36

("the prospect of expulsion without any opportunity to apply for asylum," after which "a judicial remedy may be unavailable," threatens irreparable harm), *aff'd in relevant part* 27 F.4th 718, 733–34 (D.C. Cir. 2022); *Miot v. Trump*, No. 25-cv-02471, 2026 WL 266413, at \*35 (D.D.C. Feb. 2, 2026) (family "separations would inflict great and lasting harm on both Plaintiffs and their U.S.-based family members—harm that cannot be remedied by a later favorable ruling"), *cert. granted, Trump v. Miot*, No. 25-1084, 2026 WL 731087 (March 16, 2026); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 321 (D.D.C. 2020) ("'separation from family members' is an 'important irreparable harm factor'" (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011)); *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) (family "[s]eparation irreparably harms" a person "every minute it persists").

    ***J.Z.* (SIJS)**. Without SIJS, J.Z. will face deportation and separation from his mother, his sole guardian. J.Z. Decl. ¶¶ 11, 12. And he will face more abuse from his father in Venezuela. *See id.* ¶¶ 5–8. Indeed, a juvenile court has already found that a return to Venezuela would harm J.Z.'s best interests. *Id.* ¶¶ 11, 12. Each day DHS does not collect J.Z.'s biometrics delays his access to the benefits that SIJS provides, including the opportunity to be considered for deferred action and employment authorization, *see A.C.R.*, 809 F. Supp. 3d at 110-13, and thus "to remain safely in the country with a means to apply" for lawful permanent residence. *Osorio-Martinez*, 893 F.3d at 168. Deferred action provides a ground to terminate removal proceedings, which would entitle J.Z. to release. 8 CFR 1003.18(d)(1)(ii)(C). If deported, on the other hand, he will lose the opportunity to pursue SIJS altogether and be barred from readmission for many years. *See* 8 U.S.C. § 1182(a)(9); *A.O. v. Cuccinelli*, 457 F. Supp. 3d 777, 794-95 (N.D. Cal. 2020) ("'[L]osing eligibility for SIJ status and the benefits that go along with that status' constitutes irreparable harm." (quoting *Moreno Galvez v. Cuccinelli*, 387 F. Supp. 3d 1208, 1218 (W.D. Wash. 2019)).

37

***R.M.* (T visa)**. Similarly, R.M.'s application for a T visa is his only hope to remain in the United States and avoid deportation to Mexico, a country he does not remember, and to avoid separation from his young siblings who live in the United States. R.M. is "terrified to go to Mexico." R.M. Decl. ¶ 10. If DHS collected R.M.'s biometrics and completed his security check, he would receive an automatic stay of his removal order and be considered for deferred action, which could lead to the termination of his removal proceedings and his release from detention. *See* 8 C.F.R. §§ 214.204(b)(2)(iii), 1003.18(d)(1)(ii)(C). And if R.M. received a T visa, it would terminate his removal proceedings and entitle him to release. *See id.* § 1003.18(d)(1)(i)(D)(4). But because DHS will not collect his biometrics or run the security checks needed for his application to move forward, R.M. cannot receive that relief. And once deported, R.M. will lose access to it entirely. *See Kimone G. v. United States*, No. 22-cv-1688, 2023 WL 7115115, at *1 (D. Minn. Oct. 27, 2023) (finding that deportation would inflict irreparable harm on T visa applicant because "she would no longer be eligible" for a T visa once removed).

***Y.P.* (adjustment)**. Y.P. faces deportation to Cuba, where he faces danger due to his political opinions and separation from his elderly mother, who depends on him. Y.P. Decl. ¶¶ 2, 6. Adjustment of status would entitle him to lawful permanent residence, termination of his removal proceedings, release from detention, and work authorization. *See* 8 C.F.R. § 1003.8(d)(1)(i)(D)(1) (termination); 8 U.S.C. § 1101(a)(20) (lawful residence); 8 C.F.R. § 274a.12(a)(1) (work authorization). But, if deported, he will lose the right to apply for adjustment of status and be barred from re-entering the country for at least 5 years. 8 U.S.C. § 1182(a)(9)(A)(i), (iii); *see Kalilu*, 548 F.3d at 1218 ("If [a noncitizen] is removed, his adjustment application is deemed abandoned," and he "cannot reapply for adjustment of status until he has reentered the United States, which he is barred from doing for ten years"). "Denying paroled [noncitizens] in

38

removal proceedings the ability to adjust status within the United States thus creates a significant hardship on these individuals and their families." *Succar*, 394 F.3d at 19.

*Luis Felipe Estrada Trejo* **(adjustment).** Similarly, adjustment of status is Mr. Estrada Trejo's only viable chance to remain in the United States with his wife and family. Estrada Trejo Decl. ¶ 4. If deported, he, too, will be separated from his family, lose his path to permanent residence, and be barred from reentering the United States for years. *See Kalilu*, 548 F.3d at 1218.

*M.C.* **(U visa).** Without a U visa, M.C. also lacks a path to stable, permanent status in the United States and faces separation from her U.S. citizen children.[6] And her life will be in danger if she returns to Mexico, as a powerful cartel murdered one of her brothers and threatened her. M.C. Decl. ¶ 2. If DHS collected M.C.'s biometrics and completed her security check, she would be considered for deferred action, which could lead to the termination of her removal proceedings and her release from detention. *See* USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 5, https://perma.cc/89TU-MCUW (deferred action); 8 C.F.R. § 1003.18(d)(1)(ii)(C) (termination of removal proceedings); 8 U.S.C. § 1184(p)(6) (work authorization). If deported, though, M.C. would lose access to those benefits. Even though noncitizens can normally pursue U visas from abroad, the INA would bar M.C.'s admission for many years if she were removed. *See* 8 U.S.C. § 1182(a)(9)(A)(ii) (imposing 10-year bar to readmission for noncitizens removed once and "20 years in the case of a second or subsequent removal"); *see Lopez v. Trump*, No. 25-cv-4826, 2025 WL 3274224, at *13 (S.D.N.Y. July 10, 2025) (holding that U visa applicant would suffer

---

[6] Because M.C. re-entered the United States after being removed, the only applications she could file before the immigration judge were for withholding of removal and protection under the Convention Against Torture. 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 208.2(c)(2)(i). But even if she were granted either withholding or CAT protection, M.C. could still be removed to a country other than Mexico. 8 U.S.C. § 1231(b)(2). Third-country removals are becoming increasingly common in the Trump Administration. *See* American Immigration Counci*l*, *Fact Sheet: Third-Country Removals in United States Immigration Policy* (Dec. 2025), https://perma.cc/2V2Q-AYQY.

irreparable harm if removed because a statutory bar would render her unable to return to the country for many years). And she would have to wait in a country where a powerful criminal organization has already threatened her life. *See* M.C. Decl. ¶ 6.

The detained Plaintiffs thus face grave irreparable harm if the policy remains in place.

## II.    The balance of equities and public interest favor relief

Preliminary relief would also advance the public interest. The policy exposes detained people across the country to deportation, separation from their families, and persecution abroad because they cannot pursue the relief that would allow them to remain in the United States, as Congress intended. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (quotation marks omitted). And "there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.

On the other hand, the government will suffer no significant harm from having to return to its prior practice of collecting biometrics for detained immigrants with applications for relief before USCIS—a policy that DHS followed for years before it abruptly changed course. *See* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2 (Oct. 7, 2020), https://perma.cc/N7V8-7LLP (providing that ICE was responsible for taking biometrics for detained USCIS applicants); *Make the Rd.*, 2025 WL 3563313, at *32 (rejecting argument that stay order harmed government because the order only "maintain[ed] the status quo that . . . existed for decades" before the challenged action). The Biometrics Policy points to no administrative costs the prior practice entailed. And the interests of eligible noncitizens in pursuing immigration relief, and avoiding the irreparable harms Congress designed that relief to prevent, would outweigh any burden on DHS.

40

### III.    The Court should stay the Biometrics Policy and preliminarily enjoin Defendants from refusing to collect class members' biometrics

Because Plaintiffs satisfy the requirements for an APA § 705 stay, the court should enter the relief that section contemplates: It should "preliminarily set aside" the Biometrics Policy. *CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) (quotation marks omitted). Unlike an injunction, a Section 705 stay "does not direct individuals to act or not to act"; a stay temporarily "suspend[s]" the legal effect of an agency action. *Make the Rd.*, 2025 WL 3563313, at *16 (quoting *Nken v. Holder*, 556 U.S. 418, 429 (2009)). Because a stay operates "directly" on the agency's action, it is not a "party-specific" remedy. *Id.* at *16, 36 (rejecting "argument that Section 705 stays must be confined to the plaintiffs before the court"). A stay would preserve the status quo before DHS issued the Biometrics Policy, by which DHS collected biometrics and conducted background and security checks as necessary to adjudicate detained noncitizen's applications for relief pending with USCIS. *See* Ex. J at 4; Ex. B at 1 (explaining that the prior, now rescinded policy "place[d] the burden on ICE to collect biometrics of [noncitizens] in custody . . . .").

Although the Supreme Court has held that federal courts lack "the equitable authority to issue universal injunctions" under the "Judiciary Act of 1989," *CASA*, 606 U.S. at 837, "*CASA* does not control the scope of relief available under Section 705." *Make the Rd.*, 2025 WL 3563313, at *34; *see CASA, Inc.*, 606 U.S. at 847 n.10; *id.* at 869 (Kavanaugh, J., concurring). Unlike the Judiciary Act, the APA expressly authorizes courts to "postpone the effect of date of an agency action." 5 U.S.C. § 705. "If a court orders that an agency action shall not apply against certain individuals, but that the agency can apply that action against everyone else, *the* effective date of the action has not been postponed." *Make the Rd.*, 2025 WL 3563313, at *35. Indeed, "[i]n recent years the Supreme Court has twice stayed agency actions *in toto* pending judicial review without narrowing its relief to the parties at hand." *Id.* at *36. Stays, after all, are a "temporary form of

41

vacatur," a final remedy that sets aside an agency rule as a whole and not just as to the plaintiffs. *Id.* at \*16; *see Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (citation omitted).

Here, a stay is the appropriate remedy to preserve the status quo while the Court decides whether to permanently vacate the policy, avoid the disparate treatment of detained people with applications for immigration relief, and forestall irreparable harm to the class. Without preliminary relief, countless people will likely be ordered removed and deported—separating many from their families and exposing them to persecution, abuse, and displacement in other countries—without the chance to pursue the relief that INA and its regulations contemplate.

The Court should also enter a preliminary injunction prohibiting DHS from refusing to take biometrics from noncitizens in DHS custody to the extent necessary to adjudicate the merits of their applications for relief from USCIS.[7] The APA authorizes "writs of prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. As the D.C. Circuit recently reaffirmed, courts may enter "nationwide injunctive relief" to protect the rights of a certified class. *RAICES*, 2026 WL 1110616, at \*24. To be sure, the Court need not certify the Class before issuing classwide relief: "courts may issue temporary relief to a *putative* class" pending certification. *A.A.R.P.*, 605 U.S. at 98 (emphasis added) (granting injunction pending appeal to protect members of uncertified

---

[7] The Court could enjoin the policy's enforcement to protect the Class's due process rights even if the APA did not apply. Federal courts have the equitable authority "to issue injunctions to protect rights safeguarded by the Constitution." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). And to obtain an injunction against a constitutional violation, a plaintiff need not "satisf[y] the strictures that apply to *ultra vires* review of statutory claims." *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-0946, 2026 WL 252420, at \*25 (D.D.C. Jan. 30, 2026).

class); *see CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) (courts may "award preliminary classwide relief that may . . . be statewide, regionwide, or even nationwide"). Still, "to tread the safest ground," courts in this district have often granted provisional certification along with class-wide preliminary relief. *L.G.M.L.*, 800 F. Supp. 3d at 117 & n.3 (quoting 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:30 (June 2025 Update)).

## CONCLUSION

For the foregoing reasons, the Court should stay the Biometrics Policy under Section 705 of the APA and grant a preliminary injunction as set forth in the attached proposed order.

43

Dated: May 12, 2026

/s/ Jennie L. Kneedler
Sean Ouellette (DC Bar 1741535)*
Alethea Anne Swift (DC Bar No. 1644929)
Jennie L. Kneedler (DC Bar No. 500261)
Paul R.Q. Wolfson (DC Bar No. 414759)
Elena Goldstein (DC Bar No. 90034087)
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 322-1959
souellette@democracyforward.org
jkneedler@democracyforward.org
aswift@democracyforward.org
pwolfson@democracyforward.org
egoldstein@democracyforward.org

Mary Georgevich
Keren Zwick (D.D.C. Bar No. IL0055)
Richard Caldarone (DC Bar No. 989575)
Gerardo Romo
Nicole May
**NATIONAL IMMIGRANT JUSTICE
CENTER**
111 W. Jackson Blvd. Suite 800
Chicago, IL 60604
Phone: (312) 660-1364 (Zwick)
mgeorgevich@immigrantjustice.org
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
gromo@immigrantjustice.org
nmay@immigrantjustice.org

Michelle N. Mendez
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: 410-929-4720
michelle@nipnlg.org

*Counsel for Plaintiffs*

\* Motion for admission *pro hac vice* pending

44