BRETT A. SHUMATE
*Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
SAMUEL P. GO
*Assistant Director*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov
MALCOLM MCDERMOND
JAMES A. HURLEY
*Trial Attorneys*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| J.Z., *et al.*,            ) <br>            ) <br>       Plaintiffs,     ) <br>            ) <br> v.                    ) <br>            ) <br> U.S. Department of Homeland ) <br> Security, *et al.*,        ) <br>            ) <br>       Defendants.    ) <br>            ) | Civil Action No. 1:26-cv-01510-UNA |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

   I.    Legal Background................................................................................................ 2

   II.    Background Concerning Biometrics Collection ................................................. 6

   III.    This Lawsuit......................................................................................................... 9

LEGAL STANDARDS .....................................................................................................11

ARGUMENT.....................................................................................................................12

   I.    Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds. ............................ 12

       A.    Plaintiffs Do Not Establish Injury Traceable to the Challenged Policy. ...........12

       B.    The Biometrics Policy is Not Final Agency Action. .........................................17

       C.    The APA Does Not Permit Plaintiffs to Challenge a Combination of Regulations and Policies. ...............................................................................20

       D.    Section 1252(a)(2)(B) Precludes Plaintiffs' Challenge to Application of the Policy to Adjustment Applications and Derivative Asylum Applications. ...............22

   II.    Plaintiffs' Claims Are Unlikely to Succeed on the Merits. ............................................. 25

       A.    The Biometrics Policy Comports with the Law................................................25

       B.    The USCIS Biometrics Policy is Not Arbitrary and Capricious........................34

       C.    Plaintiffs Cannot Obtain Relief to Compel Agency Action Because Their Claims Do Not Support this Relief. ...............................................................37

   III.    Plaintiffs Have Not Demonstrated a Likelihood of Imminent Irreparable Harm............. 37

   IV.    The Balance of the Equities Favors the Government. ..................................................... 40

   V.    Any Relief Must be Sharply Limited. ................................................................. 40

CONCLUSION..................................................................................................................44

**INTRODUCTION**

The Court should reject Plaintiffs' request to enjoin or stay an alleged policy "by which," they say, the Department of Homeland Security [DHS] "does not collect biometric information" from detained aliens who are subject to removal but who have filed applications for various immigration benefits with U.S. Citizenship and Immigration Services (USCIS). Doc. 14-13.

Plaintiffs, however, fail to identify a DHS policy that precludes biometrics collection, and thus the claims on which they base their request for preliminary relief are not justiciable or reviewable. The USCIS documents that Plaintiffs point to as announcing the "Biometrics Policy" of the Department of Homeland Security (DHS) do not set forth a universal policy of refusing to take biometrics from Plaintiffs or other detainees with requests for immigration benefits pending with USCIS. Although these documents set forth USCIS's guidance on its view of the Department's obligations and its own practices with respect to collecting biometrics by means of appointments with USCIS application support centers, they do not contain any actionable directive refusing to allow biometrics to be taken from detained applicants for immigration benefits, they do not bind the agency overseeing immigration detention (U.S. Immigration and Customs Enforcement (ICE)), and  they do not necessarily represent a substantive change in USCIS practice. Plaintiffs are really attacking variety of different agency actions or decisions that interact in different ways to *potentially* result in injury in any individual case. For these reasons, Plaintiffs lack an Article III injury fairly traceable to the "Biometrics Policy" and similarly fail to identify a discrete and final agency action as necessary to bring their Administrative Procedure Act (APA) claims.

Essentially what Plaintiffs seek is not to stay or enjoin a "policy" but instead to compel the taking of biometrics. Yet Plaintiffs do not in this Motion advance a claim to compel agency action under 5 U.S.C. § 706(1).  Nor could they, as they do not identify a requisite mandatory duty that can be compelled under this section.

1

Although the Court need not reach the merits of Plaintiffs' claims, Plaintiffs likewise cannot demonstrate that the "Biometrics Policy" is contrary to law or constitutional right or is arbitrary and capricious. Nor can they satisfy the remainder of the requisite injunctive-relief factors. They cannot show imminent irreparable injury resulting from the failure to take biometrics in Plaintiffs' individual cases, nor as to the putative class—as underscored by the fact that Plaintiffs waited approximately five months to challenge the USCIS policy. Accordingly, the balance of the equities weighs against interfering in the Executive Branch's management of the process for adjudicating immigration applications and petitions and of immigration detention. If, however, the Court is inclined to grant a stay or injunction, such relief should be limited to the named Plaintiffs, as Plaintiffs have not (and cannot) show that a class can be certified on their claims.

## BACKGROUND

### I.    Legal Background

Under the Immigration and Nationality Act (INA), aliens who are present in the United States without admission or who otherwise lack documentation sufficient to permit admission to the United States are inadmissible and subject to removal proceedings. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(a)(7), 1225(b)(2)(A), 1229a(a)(2). As relevant here, such aliens may be placed in removal proceedings under 8 U.S.C. § 1229a and detained pending those immigration proceedings. *See* 8 U.S.C. §§ 1225(b)(2)(A), 1226(a), (c). U.S. Immigration and Customs Enforcement (ICE) is responsible for immigration detention. 6 U.S.C. §§ 251, 252.

The lower immigration courts and Board of Immigration Appeals (BIA), which are housed in the Executive Office for Immigration Review (EOIR), may consider applications for relief from removal and certain applications for adjustment of status. 8 U.S.C. § 1229a(c)(4); *see* Pls.' Memorandum, Doc. 14-1 ("Mem.") at 3 n.1 (citing regulations). However, certain requests for immigrant or nonimmigrant status or other immigration benefits may only be filed with USCIS. The APA may permit review of USCIS's ultimate decision on those requests, unless the INA

2

otherwise precludes review or the action is committed to agency discretion by law. *See* 5 U.S.C. §§ 701(a), 702. The immigration benefit requests at issue here are as follows.

*Special Immigrant Juvenile Classification.* The Special Immigrant Juvenile (SIJ) classification is available to aliens under the age of 21 who have been declared dependent on a juvenile court or legally committed to or placed into the custody of an entity or individual, and whose reunification with at least one parent is not viable, if DHS "consents" to the classification. 8 U.S.C. § 1101(a)(27)(J). An alien whose SIJ classification is approved (an "SIJ") is still subject to arrest, detention, and removal from the United States if a final order of removal is entered. *See United States v. Granados-Alvarado*, 350 F. Supp. 3d 355, 357 (D. Md. 2018) ("[A]n SIJ designation does not strip the U.S. government of all removal powers."). "Noncitizens without lawful status who have an approved SIJ petition remain subject to removal" because "SIJ classification does not render a noncitizen lawfully present, does not confer lawful status, and does not result in eligibility to apply for employment authorization." Defs.' Ex. 1. USCIS may consider SIJs for deferred action. *See id.*; Defs.' Ex. 2 (announcing USCIS would no longer "automatically consider" SIJs for deferred action). Deferred action is "an act of administrative convenience to the government which gives some cases lower priority" for removal. 8 C.F.R. § 274a.12(c)(14); *see also Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483-84 (1999). Deferred action does not confer lawful status and may be terminated at DHS's discretion. *See DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 61 (2020) (Thomas, J., concurring in part).

*Derivative Asylum.* Asylum is a discretionary status that provides relief from removal and a pathway to lawful permanent residence; it is potentially available to certain aliens who are present in the United States and who can demonstrate they meet the definition of "refugee" in 8 U.S.C. § 1101(a)(42)(A). *See generally* 8 U.S.C. §§ 1158, 1159. A detained alien in removal proceedings may seek asylum in those proceedings. *See, e.g.*, 8 U.S.C. §§ 1158(a)(1); 8 C.F.R.

§ 1208.2(b) (providing immigration judges exclusive jurisdiction over asylum applications filed by aliens in certain immigration-court proceedings, including § 1229a removal proceedings). However, if someone who has been granted asylum seeks discretionary derivative asylum on behalf of an eligible spouse or child under 8 U.S.C. § 1158(b)(3), they would submit an I-730 petition to USCIS. *See* 8 C.F.R. § 208.21(a), (c) ("When a spouse or child of an alien granted asylum is in the United States, but was not included in the asylee's benefit request, the asylee may request accompanying or following-to-join benefits for his or her spouse or child, by filing for each qualifying family member a Request for Refugee/Asylee Relative . . . ."); Defs.' Ex. 3. Asylees may also pursue derivative asylum status for spouses and children located outside the United States. *See* 8 C.F.R. § 208.21(d); Defs.' Ex. 3 ("If the beneficiary is located outside of the United States, USCIS sends the petition through the DOS National Visa Center (NVC) to a USCIS international field office or a DOS embassy or consulate" or to USCIS international field office.). "Granting derivative asylum rests entirely within the discretion of [] USCIS." *Farag v. U.S. Citizenship & Immigr. Servs.*, 531 F. Supp. 2d 602, 608 (S.D.N.Y. 2008); *see also Miljkovic v. Ashcroft*, 366 F.3d 580, 582 (7th Cir. 2004).

*Adjustment of Status for Arriving Aliens.* DHS[1] may, "in [its] discretion and under such regulations as [it] may prescribe," adjust the status of an alien who was admitted or paroled into the United States that of a lawful permanent resident under 8 U.S.C. § 1255(a), if there is an available visa for which the alien has qualified. *See* 8 U.S.C. § 1255(a). The Cuban Adjustment Act (CAA) similarly give the Executive branch the discretion, "under such regulations as [it] may prescribe," to adjust the status of a "native or citizen of Cuba . . . who has been inspected and admitted or paroled into the United States and has been physically present in the United States

---

[1] The statute's reference to "Attorney General," is deemed to refer to the Secretary of Homeland Security with respect to functions transferred to the Secretary by the Homeland Security Act. *See* 6 U.S.C. § 557.

for at least one year." *See* 8 U.S.C. § 1255 note; CAA, Pub. L. No. 89-732, § 1 (1966), *as amended by* Pub. L. No. 96-212 (1980). Although immigration judges generally have jurisdiction to adjudicate applications for adjustment of status of aliens in removal proceedings, they do not "have jurisdiction to adjudicate any application for adjustment of status filed by [an] arriving alien" (defined in 8 C.F.R. § 1001.1(q) as an applicant for admission who enters the United States at a port of entry) except in certain limited circumstances. *See* 8 C.F.R. § 1245.2(a)(1).

*T Nonimmigrant Status.* In 2000, Congress amended the INA to create the T nonimmigrant classification (or T Visa), which may provide temporary nonimmigrant status to certain victims of a severe form of trafficking in persons who have assisted with law-enforcement investigations of trafficking and who "would suffer extreme hardship involving unusual and severe harm" if removed from the United States. *See* Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386 § 107(e)(1); 8 U.S.C. § 1101(a)(15)(T)(i). Congress bestowed DHS (and thus USCIS) with the authority to decide applications for T nonimmigrant status. 8 U.S.C. § 1101(a)(15)(T)(i); 8 C.F.R. § 214.204. "The filing of an Application for T Nonimmigrant Status has *no effect* on DHS authority or discretion to execute a final order of removal," although the applicant may request an administrative stay of removal. 8 C.F.R. § 214.204(b)(2)(i) (emphasis added). The INA provides that stays of removal are discretionary, 8 U.S.C. § 1227(d)(1), but by regulation, T status applicants who demonstrate a bona fide application will receive a stay of removal, 8 C.F.R. § 214.204(b)(2)(iii). USCIS may also, in its discretion, grant deferred action to aliens with pending, bona fide T status applications. 8 U.S.C. § 204.205(e).

*U Nonimmigrant Status.* Congress also created the U nonimmigrant status (or U Visa) for certain aliens who "suffered substantial physical or mental abuse" due to being victims of qualifying crimes and who provided assistance to law enforcement. Violence Against Women Act of 2000, Pub. L. No. 106-386, § 1513(a)(2), (b)(3). As with T status, Congress specifically gave DHS—not EOIR—the authority to decide petitions for U status. 8 U.S.C. § 1101(a)(15)(U). U

status applicants who are determined to have bona fide applications may receive deferred action. 8 U.S.C. § 1184(p)(6). However, aliens who depart or are removed from the United States can pursue U status from outside the United States and provide biometrics at designated locations abroad. *See* 8 C.F.R. § 214.14(c)(5)(i)(B) (indicating USCIS will notify petitioners residing outside of the United States of approval); New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed. Reg. 53014-01, 53021 (Sept. 17, 2007) ("USCIS has determined that the statutory framework for U nonimmigrant status permits alien victims of qualifying criminal activity to apply for U nonimmigrant status classification from either inside or outside the United States."); 8 C.F.R. § 103.16(b).

## II.     Background Concerning Biometrics Collection

USCIS's collection of biometrics for immigration applications is crucial, as it:

> allows USCIS to verify a person's identity, produce secure documents, and facilitate required criminal and national security background checks to protect national security and public safety, as well as to ensure that the person is eligible for the benefit sought. Biometrics collection and security checks enhance national security and protect the integrity of the immigration process by ensuring that USCIS only grants benefits to eligible requestors.

Defs.' Ex. 4; *see* 8 C.F.R. § 103.16. By regulation, if an applicant fails to appear for a required biometrics appointment, "the benefit request shall be considered abandoned and denied unless by the appointment time USCIS has received a change of address or rescheduling request that the agency concludes warrants excusing the failure to appear." 8 C.F.R. § 103.2(b)(13)(ii).

On December 5, 2025, USCIS issued several documents relating to clarifying revisions to the Biometrics Collection section of the USCIS Policy Manual.[2] It issued a Policy Alert (PA-2025-28) titled "Biometrics Collection for Aliens in Custody." Doc. 14-3 at 2 (Pls.' Ex. B) (the "Policy Alert"). That Policy Alert explained that USCIS was revising the part of the "Mobile

---

[2] The USCIS Policy Manual, which "contains the official policies of USCIS," expressly states that it "does not create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." Defs. Ex. 5.

Biometrics Collection" section of its Policy Manual that is titled "Persons in Custody" to "clarify USCIS policy on obtaining biometrics for detained aliens in custody with pending benefit requests with USCIS." *Id.* at 2 ("Purpose"), 3 ("Summary of Changes").

The Policy Alert provided background on biometrics collection, explaining that USCIS may require an applicant for an immigration benefit "to attend an Application Support Center (ASC) biometric services appointment for identity verification and to provide biometrics needed to conduct security and background checks," and that, under pre-existing regulations, a failure to attend the ASC appointment could result in USCIS deeming the application, petition, or request abandoned. *See id.* at 2 (citing 8 C.F.R. § 103.2(b)(13)(ii)). The background section also explained that USCIS does not allow USCIS contractors or staff to travel to jails, prisons, or non-DHS detention facilities to collect biometrics, and that "there is no current agreement between USCIS and [ICE] under which ICE has agreed to collect biometrics from individuals with an immigration benefit pending with USCIS." *Id.*  Thus, the Policy Manual update, the Policy Alert explained, "removes outdated guidance that places the burden on ICE to collect biometrics of aliens in custody and clarifies guidance on USCIS' biometrics collection for detained aliens in custody in both DHS and non-DHS facilities." *Id.*

The Policy Alert highlighted that the Policy Manual revisions: (1) provide that USCIS does not collect biometrics from aliens or other persons who are detained or incarcerated in any DHS or non-DHS detention facilities; (2) removes obsolete guidance to clarify that there is no agreement between USCIS and ICE regarding the collection of biometrics for aliens in custody with pending requests for benefits with USCIS; and (3) clarifies that "DHS has no obligation to collect biometrics from aliens in detention, unless they are in removal proceedings and have an application for petition in front of" EOIR. *See id.* at 3.

As announced in the Policy Alert, USCIS also revised its Policy Manual's "Mobile Biometrics Collection" section with respect to "Persons in Custody." Those revisions are as

follows, with new language italicized and underlined, and deleted language struck through:

> USCIS does not grant requests to collect biometrics from aliens or other persons in custody at correctional institutions *for immigration petitions or applications under USCIS' exclusive or concurrent jurisdiction. [FN 23: By regulation, DHS is only responsible for obtaining biometrics needed for identity and background checks when an alien is in detention, in removal proceedings, and the benefit requested is within the jurisdiction of the Executive Office for Immigration Review. See 8 CFR 1003.47(d).] This includes requests from unaccompanied alien children, who have a pending asylum application while in removal proceedings, as USCIS has initial jurisdiction over such cases. [FN 24: See INA 208(b)(3)(C).]* USCIS officers and contract staff therefore do not travel to jails, prisons, or similar non-DHS *or DHS* detention facilities to perform biometric collections for any detained or incarcerated aliens or other persons (including applicants, petitioners, beneficiaries, derivatives, sponsors, or other requestors, regardless of their immigration status or country of citizenship). ~~In the case of an incarcerated person,~~ *However,* USCIS officers must continue to follow all applicable regulations and procedures in issuing ASC notices to those whose appearance is required for biometrics collection. ~~Per intradepartmental agreement, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations is responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS.~~

> USCIS does not approve requests to reschedule a biometrics appointment for reason of detention or incarceration. The person must follow the procedures listed in the biometrics appointment notice to request his or her appointment be rescheduled. [FN 25: If the person is no longer in custody, and has changed his or her address, he or she must also submit a change of address request on an Alien's Change of Address Card (Form AR-11) for the appointment to be rescheduled at the new address.]

*Compare* Doc. 14-4 at 5 (Pls.' Ex. C) *with* Doc. 14-11 at 5 (Pls.' Ex. J).

USCIS also issued a press release on December 5, 2025, regarding this update to the Policy Manual. *See* Doc. 14-2 at 2 (Pls.' Ex. A) ("Press Release"). The Press Release characterizes the Policy Manual updates as clarifying that DHS "generally will not take biometrics of detained aliens unless they are in removal proceedings and have a pending application or petition filed with" EOIR. *See id.*

On March 24, 2026, USCIS updated its internal operating procedures for ASCs to make clear that there are options for processing detainees in ICE custody for biometrics collection,

including the detainee's appearance at an ASC. Declaration of Ian Brown, Defs.' Ex. 6, ¶¶ 5-10.

### III.    This Lawsuit

Plaintiffs are six aliens who, at the time of this filing, are in various stages of removal or post-removal-order proceedings and are in immigration custody. No Plaintiff alleges he or she was admissible to the United States at the time he or she entered the country. All Plaintiffs allege that, *after* they were placed in immigration custody, they applied for some form of immigration benefit with USCIS.  Doc. 1 (Compl.) ¶¶ 11-16; Docs. 14-5–14-10. As relevant here, Plaintiffs challenge the so-called "Biometrics Policy," which Plaintiffs define as the December 5, 2025, revisions to the Policy Manual regarding biometrics collection for persons in custody and the accompanying Policy Alert and Press Release. *See* Mem. at 10 (defining the challenged policy as comprising these documents). Plaintiffs characterize these documents as setting forth a policy "by which DHS does not collect biometric information from detained noncitizens who have applications for immigration relief pending before [USCIS]." Doc. 14; Doc. 14-13; *see also* Compl. ¶ 62.

Plaintiff J.Z., a 19-year-old citizen of Venezuela, came to the United States at the age of 17 and initially resided with his mother in Chicago. Compl. ¶ 67; Doc. 14-5 ¶¶ 1,8. J.Z. relocated to Florida in October 2024. Doc. 14-5 ¶ 9. J.Z. served three months in jail in Florida "after pleading guilty to nonviolent resisting arrest," Doc. 14-5 ¶ 9, returned to Chicago, and was subsequently detained at an ICE check-in in February 2025. Doc. 14-5 ¶ 10.  While detained, J.Z. filed an initial SIJ application in August 2025, but his application was denied on December 1, 2025, allegedly for failure to appear at a biometrics appointment. Doc. No. 14-5 ¶ 3. J.Z. has been in removal proceedings since 2023 and was ordered removed by the Immigration Judge on May 11, 2026. *See* Defs.' Ex. 7.[3]

Plaintiff R.M., a 22-year-old citizen of Mexico, alleges his father brought him to the United

---

[3] Defendants submit redacted information from EOIR's automated case information system for certain Plaintiffs; should the Court require, Defendants can file unredacted versions under seal.

States as a child. Doc. 14-6 ¶ 1. R.M. was detained by ICE in June 2025. Doc. 14-6 ¶ 8. R.M. did not apply for a T visa until November 2025. Doc. 14-6 ¶ 9. An Immigration Judge denied R.M's application to terminate his removal proceedings and ordered him removed on April 16, 2026. Doc. 14-6 ¶ 3.

Plaintiff Estrada Trejo, a 45-year-old citizen of Mexico, was paroled into the United States in 2018. Doc. 14-7 ¶¶ 1-2.  He married a U.S. citizen in April 2024. Doc. 14-7 ¶ 4. Estrada Trejo's removal proceedings commenced in 2020 and remain pending. *See* Defs.' Ex. 8. On March 2, 2026, Estrada Trejo was detained at an ICE check-in. Doc. 14-7 ¶ 3. He filed an application for adjustment of status in March 2026. *See* Doc. 14-7 ¶ 4.

Plaintiff Y.P., a 49-year-old citizen of Cuba, was paroled into the United States after entering at a port of entry in August 2024 and placed in removal proceedings. Doc. 14-8 ¶¶ 2-3; Defs.' Ex. 9. He was detained in November 2025. Doc. 14-8 ¶¶ 1, 3. An Immigration Judge denied Y.P.'s applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") on February 18, 2026, and Y.P. appealed to the BIA. Doc. 14-8 ¶ 5; Defs.' Ex. 9. In March 2026, Y.P. also filed an application for adjustment of status under the Cuban Adjustment Act with USCIS. Doc. 14-8 ¶ 4.

Plaintiff H.A., a 40-year-old citizen of Iran, was detained at the U.S.-Mexico border in January 2025. Doc. 14-9 ¶ 4. At that time, H.A. was traveling with his male partner and his female spouse, to whom he remains legally married. Doc. 14-9 ¶¶ 2-4. H.A. filed his own applications for asylum and protection from removal in his removal proceedings, but an Immigration Judge denied those applications in May 2025. Doc. 14-9 ¶ 4. H.A.'s spouse, however, filed her own asylum application, which was granted in November 2025. Doc. 14-9 ¶ 4. H.A.'s motion to reopen his removal proceedings was denied on December 5, 2025, and H.A.'s appeal to the BIA is pending. *See* Defs.' Ex. 10. H.A.'s wife filed a Form I-730 petition on H.A.'s behalf on January 27, 2026. Doc. 14-9 ¶ 5.

Plaintiff M.C., a 43-year-old citizen of Mexico, initially came to the United States in about 2011, was removed, and (presumably illegally) re-entered. *See* Doc. 14-10 ¶¶ 1-2 (asserting it took M.C. "multiple tries to get into the country"); Mem. at 39 n.6. Aliens in this situation are generally subject to reinstatement of their removal order without further review and are ineligible for most forms of relief from removal. *See* 8 U.S.C. § 1231(a)(5).[4] After being detained again in May 2025, M.C. was placed in "withholding only" proceedings before the immigration court. Doc. 14-10 ¶¶ 5-6. In July 2025, M.C. applied for a U Visa, and, although she did not attend her biometrics appointment for that application, an officer at the detention facility told her that "he had to take [her] fingerprints." Doc. 14-10 ¶¶ 7, 10. On December 8, 2025, the Immigration Judge denied M.C.'s applications for protection from removal. Doc. 14-10 ¶ 6.

### LEGAL STANDARDS

A "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), available only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must show that: (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) the proposed injunction is in the public interest. *Id.* at 20.

Under the APA, at 5 U.S.C. § 705, a "reviewing court ... may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," but only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "[A] stay under § 705 should be imposed for one—and only

---

[4] "If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5).

one—reason: to maintain the status quo in order to allow judicial review of the underlying regulation to proceed in a 'just' manner." *Bauer v. DeVo*s, 325 F. Supp. 3d 74, 106-07 (D.D.C. 2018). To obtain a stay under § 705, a plaintiff must satisfy the four preliminary-injunction factors. *See D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

## ARGUMENT

Plaintiffs ask the Court to stay the "Biometrics Policy" under the APA, 5 U.S.C. § 705, and to preliminarily enjoin Defendants from "refusing to take biometrics from any noncitizen in DHS custody to the extent that such a biometrics collection is necessary to adjudicate the merits of a pending application for relief from USCIS." Doc. 14. Plaintiffs base their claim for preliminary injunctive relief on their APA claims under 5 U.S.C. § 706(2). Mem. at 3; Compl. ¶¶ 108-122. Those claims seek to set aside the "Biometrics Policy" as contrary to law, regulation or constitutional right and as arbitrary and capricious. *See* Mem. at 10. Plaintiffs are not likely to succeed on any of these claims because the claims fail at the threshold and are meritless, nor can they satisfy the remaining injunctive-relief factors.

### I.    Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds.

### A.    Plaintiffs Do Not Establish Injury Traceable to the Challenged Policy.

Plaintiffs lack Article III standing to bring their claims. "To satisfy the requirements of Article III standing in a case challenging government action, a party must allege an injury in fact that is fairly traceable to the challenged government action, and it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Doc Society v. Rubio*, 141 F.4th 1273, 1276 (D.C. Cir. 2025) (quotations and citations omitted). At the preliminary injunction stage, a party "must show a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015) (internal quotations omitted). Plaintiffs assert they are injured by the Biometrics Policy because it bars them and others from pursuing

collateral immigration relief with USCIS that would prevent their deportation. Compl. ¶¶ 2, 3, 6; Mem. at 16. Plaintiffs contend that the Policy means DHS will not collect their biometrics and thus they need an order from the Court requiring the collection of biometrics. Compl. ¶¶ 72, 80, 82, 87-88, 91-92, 97, 99-100; *id.* at 29 (Prayer for Relief).

Plaintiffs' claimed "injury" relies on a misreading of USCIS's Policy Manual and unsupported assumptions about DHS's and ICE's actions writ large. Because Plaintiffs' assumptions are unfounded, they lack an injury fairly traceable to the challenged policy. The updated Policy Manual clarifies that USCIS officers and contractors have no regulatory duty to collect biometrics for detained applicants, and that USCIS employees will not go into detention facilities to do so. Doc. 14-4 at 5; *see also* Doc. 14-3. It clarifies USCIS's view that 8 C.F.R. § 1003.47 only governs DHS's obligations to collect biometrics in relation to requests for immigration benefits before the immigration courts. *See* Doc. 14-4 at 9. What the Policy Manual *does not state* is that DHS is prohibited from collecting biometrics for detained individuals—that is, the Policy Manual does not preclude USCIS from taking biometrics for detainees who appear for ASC appointments, and it does not preclude ICE from collecting biometrics or transporting detainees to their biometrics appointments. *Id.* Plaintiffs "misunderstand the agency statements at issue." *Delaware Valley Reg'l Ctr., LLC v. United States Dep't of Homeland Sec.*, 106 F.4th 1195, 1203 (D.C. Cir. 2024). Any injury Plaintiffs claim to suffer does not arise directly from the USCIS Biometrics Policy, because the Policy Manual's terms do not prohibit DHS from taking biometrics for detained aliens.

Plaintiffs must cite to more to establish injury-in-fact and traceability. Plaintiffs attempt to do so by repeatedly making the conclusory claim that DHS is now uniformly refusing to collect biometrics for detained aliens seeking relief with USCIS. Compl. ¶ 62; Mem. at 10-11. To support this claim, Plaintiffs cite to the USCIS Press Release. Compl. ¶ 62; *see also* Doc. 14-2. The Press Release states that DHS "generally will not take biometrics of detained aliens unless they are in

removal proceedings and have a pending application or petition filed with the Executive Office for Immigration Review." Doc. 14-2. While purporting to articulate DHS's position, the announcement is from USCIS's website and purports to explain updates to USCIS's Policy Manual. *See id.* Importantly, the Press Release lacks any mention that this is ICE's position, nor does it contain an endorsement of any ICE official of this articulation of "DHS's position." *See id.* Nor does USCIS purport to have authority over ICE's ability to facilitate biometrics collection, including through facilitating attendance at biometrics appointments if necessary. Because neither ICE—nor any other DHS subcomponent—has endorsed USCIS's statement here, Plaintiffs cannot jump to the conclusion that USCIS's "ad hoc statement" in a press release "reflect[s] the [entire Department's] views." *Kisor v. Wilkie*, 588 U.S. 558, 577 (2019); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 31 (D.D.C. 2020).

Moreover, the language in the Press Release and Policy Alert is not a blanket prohibition on taking biometrics from detained aliens; it is a general statement setting forth USCIS's view of DHS's obligations under existing regulations. *See Generally* Merriam-Websters Dictionary, https://www.merriam-webster.com/dictionary/generally ("as a rule **: USUALLY**") (emphasis in original) (last visited May 16, 2026). Because the challenged Policy does not bar the collection of biometrics, vacating or enjoining this policy would not redress Plaintiffs' alleged injuries. Vacating a policy that does not bar biometrics collection would not ensure DHS collects detained aliens' biometrics. *See California v. Texas*, 593 U.S. 659, 671-72 (2021) (finding no redressability where relief the Court granted had no practical effect); *see also Doc Society*, 141 F.4th at 1277 (explaining that relief sought must "alleviate the particularized injury alleged by the plaintiff"). And to the extent an injunction compelling DHS to collect biometrics would ensure DHS collected biometrics of detained aliens, the logical prerequisite that DHS's policy is to not do so cannot be assumed from the actual language of the Policy Manual at issue—thus the remedy is in search of

14

an injury. *See Doc Society*, 141 F.4th at 1277 (explaining that relief sought must "alleviate the particularized injury alleged by the plaintiff").

Plaintiffs also cite the declarations of two named Plaintiffs that ICE did not transport them to their biometrics appointments as evidence of a DHS-wide policy barring the collection of biometrics. Mem. at 11 (citing declaration of R.M., Doc. 14-6, ¶ 2, and Y.P., Doc. 14-8, ¶ 6). But M.C., one of the named Plaintiffs, states that an officer took her fingerprints while detained. Doc. 14-10, ¶ 10. Even among the named Plaintiffs' declarations, there is an inconsistent picture of whether ICE is collecting biometrics or facilitating their collection. Plaintiffs also cite a district court case where USCIS ASC staff declined to take biometrics of a detained alien transported to the center by ICE. Mem. at 11 (citing *Walter A. v. Easterwood*, No. 26-cv-1393, 2026 WL 836428, at *14 (D. Minn. Mar. 26, 2026)). But USCIS has clarified its procedures in this regard. *See* Defs.' Ex. 6. The case also indicates that ICE collected the detainee's fingerprints and provided them to USCIS. *See Walter A.*, 2026 WL 836428, at *8, 24. Plaintiffs thus fail to allege a cohesive, actionable DHS prohibition on collecting biometrics for detained aliens with pending applications before USCIS because the USCIS Policy Manual only clarifies that USCIS has no responsibility to collect biometrics for detained individuals unless the application is within EOIR's jurisdiction.

Even assuming the policy were a DHS-wide prohibition, not every Plaintiff has standing to challenge it. Plaintiffs claim they are injured because the Policy bars them and others from pursuing collateral immigration relief with USCIS that would prevent their removal. Compl. ¶¶ 2, 3, 6; Mem. at 16. Courts have long held that aliens have no right to adjudication of pending applications for collateral immigration benefits that might prevent removal before a removal order is entered. *See Armstrong v. I.N.S.*, 445 F.2d 1395, 1396 (9th Cir.1971) (holding that a pending visa application does not entitle an alien to a stay of deportation to await the issuance of a visa); *also Bowes v. I.N.S.*, 443 F.2d 30, 31 (9th Cir.1971) (holding that the pendency of an application does not entitle an alien to a delay in deportation proceedings); *Manantan v. Immigr. &*

15

*Naturalization Serv.*, 425 F.2d 693, 694 (7th Cir. 1970) ("We find no basis in the wording of the [INA] nor in its policy to delay as a matter of right the commencement and completion of adjudication of an alien's deportability while the alien makes application for (and attempts at reconsideration of a denial of) collateral administrative relief from the Act's dictates."); *Mudric v. Att'y General of U.S.*, 469 F.3d 94, 99 (3d Cir. 2006) (finding that alien had no right to adjudication of collateral immigration benefits on a timeline that would provide him relief from removal); *Olivares-Guerrero v. Gonzales*, No. 07-cv-0050-JLRMAT, 2007 WL 484787, at *2 (W.D. Wash. Feb. 9, 2007) (While removal proceedings may "be deferred or canceled to enable an alien to qualify for some collateral immigration benefits, an alien has no absolute right to such dispensation.") (quoting 6 Gordon, Mailman & Yale-Loehr, Immigration Law and Procedure § 72 .03[2][e] (rev. ed. 2000)).

Further, at least two Plaintiffs, if removed, would still be able to pursue the immigration benefits they allege the Policy bars them from pursuing. U-visa applicants like Plaintiff M.C. can continue to pursue U-visas from outside the United States and provide biometrics at DHS designated locations abroad *See* Doc. 14-10, ¶ 7; *supra* at 5-6. Because M.C., and all other U-visa applicants, can continue to pursue U-nonimmigrant status from abroad, the Policy does not bar her from pursuing her application and, thus, she lacks standing to challenge it. Similarly, H.A., who seeks derivative asylee status, lacks standing because his spouse's petition can be adjudicated while he is abroad. *See* 8 C.F.R. § 208.21(d) (establishing process for applications for asylee's spouse or child outside United States); Defs.' Ex. 3 at 4. H.A. and all other derivative asylum applicants could thus still pursue and receive this benefit from abroad. Accordingly, M.C. and H.A. lack standing because their alleged injury of being barred from applying for the immigration benefits by the Policy is, factually, not correct. While Plaintiffs M.C. and H.A. might want adjudications of their applications before they are removed, as noted above, applicants have no right to an adjudication of their applications before removal. *See, e.g.*, *Mudric*, 469 F.3d at 99.

16

### B.    The Biometrics Policy is Not Final Agency Action.

The APA claims on which Plaintiffs base their request for relief all require reviewable "final" agency action. *See* 5 U.S.C. § 704; *Delaware Valley Reg'l Ctr.,* 106 F.4th at 1203. Agency action is "final" under the APA only if it both "consummate[es] the agency's decisionmaking process" *and* is an action by which "rights or obligations have been determined" or which creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The challenged "policy" here is not final as to Plaintiffs because the "Biometrics Policy"—USCIS's announcements regarding it and DHS's obligations regarding collection of biometrics in detention facilities—do not produce "direct" legal consequences for Plaintiffs or determine their rights or obligations. *See id.* at 177-78; *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (finding agency action final because it "ha[d] an immediate and direct effect on the parties"). Nor does the Policy itself consummate the agency's decisionmaking process as to Plaintiffs' (or anyone's) requests for immigration benefits. Instead, the relevant consequences and final agency action as to each applicant would occur only if and when there is a denial of his or her application.

The Policy Manual revisions and related documents serve to clarify USCIS's view of DHS's obligations regarding the collection of biometrics as set forth in existing regulations. And when an agency action "merely clarifies ... existing duties" under a statute or regulation, it does not impose binding duties—and therefore causes no "legal consequences." *See Delaware Valley Regional Ctr.*, 106 F.4th at 1204 (quoting *Catawba Cnty v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009)). Specifically, the revised Policy Manual section: (1) clarifies USCIS's position that the existing regulation at 8 C.F.R. § 1003.47 only obligates DHS to conduct biometrics collection for detained applicants whose applications are within the jurisdiction of EOIR, *see* Doc. 14-4 at 5, 9; (2) removes reference to an agreement between ICE and USCIS for ICE's collection of biometrics, *see* Docs. 14-2, 14-3; and (3) continues to provide that USCIS will follow applicable regulations regarding the scheduling of biometrics appointments, *see* Doc. 14-4 at 5.

17

The first revision to the Policy Manual is at most an "interpretative" statement about the meaning of the pre-existing regulations, which in this context does not establish a binding norm to give rise to final agency action. *See Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013); *Delaware Valley Regional Ctr.*, 106 F.4th at 1204. There is no evidence in the Policy Manual and related documents, and Plaintiffs cite no other evidence, that USCIS previously espoused a different view of the scope of the particular regulation. *See Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 428 (D.C. Cir. 2004) (letter not final agency action where it restated interpretation and "tread no new ground"); *Leon Alcazar v. Cantu*, 2025 WL 2548698, at *1, 7 (D. Ariz. June 5, 2025) (noting habeas petitioner's inability to attend biometrics appointments from detention in 2024, as well as the government's position that 8 C.F.R. § 1003.47 did not govern applications outside of removal proceedings). And, as explained above, to the extent USCIS's Policy Manual sets out USCIS's view of DHS's obligations, that view is not binding on other agencies like ICE over subjects on which ICE has authority, which means it cannot be final agency action with respect to those entities on those subjects. *See supra* at 14; *Am. Tort Reform Ass'n,* 738 F.3d at 393 (holding agency statement was not final agency action where agency lacked legal authority on the subject of statement); *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1270 (D.C. Cir. 2018) (holding Federal Trade Commission staff letter advising on scope of regulation was not final agency action because it "cannot constrain the Commission's future enforcement authority"). This clarification itself does not create "direct and appreciable legal consequences," *see U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016), for Plaintiffs or other detainees who have sought immigration benefits from USCIS.

The second revision to the Policy Manual does not purport to have any legal effect—it merely removes the Manual's reference to an obsolete or non-existent agreement with ICE about biometrics collection. To the extent there *were* any separate decisions made regarding ICE's roles

18

or responsibilities concerning biometrics collection, any such decisions would be distinct from USCIS's revisions to its policy manual. *See infra* § I.C (discussing the APA's requirement of "discrete" agency action).

And the third issue is not a revision at all: USCIS merely reiterated existing practice regarding USCIS's collection of biometrics through ASC appointments and the consequences of a failure to appear for that appointment. *Compare* Doc. 14-4 *with* Doc. 14-11. Continuations of agency practice do not constitute agency action from which "legal consequences will flow." *See Bennett*, 520 U.S. at 178.

It is evident from context that the "Policy" identified does not create the potential consequences of which Plaintiffs complain: USCIS's claimed failure to consider their applications on the merits. The Policy itself does not preclude DHS from collecting biometrics from detained aliens—for example, it does not preclude ICE from transporting detainees to scheduled biometrics appointments nor does it preclude ICE from taking biometrics. *See Covarrubias-Ramirez v. Noem*, No. 26-cv-01230, 2026 WL 1256111, at *2 (D. Ariz. May 7, 2026) (noting that ICE had taken the biometrics of detainee with parole benefit request pending with USCIS). Thus, the "Biometrics Policy" does not end Plaintiffs' or others' application process. Instead, certain events must occur in the application or petition process for the detainee's request for an immigration benefit to be denied for abandonment. It is that (potential) denial that would impose legal consequences as to the Plaintiff's ability to pursue his or her application and constitute the culmination of the agency's decisionmaking process with respect to Plaintiffs' and other detainees' requests for immigration benefits from USCIS—not the Policy Manual revisions or related documents. *See, e.g.*, *MediNatura, Inc. v. Food & Drug Admin.*, 496 F. Supp. 3d 416, 452 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021) (finding no final agency action where the listing of products on import alert did not reflect culmination of agency's decisionmaking process). And, if a denial occurs, the Plaintiff may challenge the denial if reviewable under the APA. *See Calif. Communities Against*

19

*Toxics v. EPA*, 934 F.3d 627, 638-39 (2019) (emphasizing that eventual consequences of an agency's statement of law are not sufficient to render statement final, as plaintiffs could obtain review of that eventual action).[5] Thus, just as the statements about investor visas considered by the D.C. Circuit in *Delaware Valley Regional Center* did not constitute final agency action as to the plaintiffs' ability to obtain an investor visa, the agency statements set forth in the Policy Manual and accompanying documents do not constitute a final agency action as to detained individuals' ability to pursue applications for immigration relief with USCIS. *See* 106 F.4th at 1205-06.

But even assuming the Biometrics Policy could be viewed as final agency action, Plaintiffs' abstract challenge is premature and not "fit for judicial decision" because "the impact" on Plaintiffs is not "sufficiently direct and immediate as to render the issue appropriate for judicial review." *Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012); *see also Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 375 (D.C. Cir. 2026). Judicial intervention at this stage would "inappropriately interfere with further administrative action" in each individual case of each individual applicant. *Marcum*, 694 F.3d at 129. Indeed, each application could eventually be denied for other reasons, or the Plaintiff or other applicant could be independently released from detention, which would mean the purported Biometrics Policy did not impact that particular applicant at all.

For these reasons, the "Biometrics Policy" does not constitute final agency action and Plaintiffs' challenge to that policy is not ripe for judicial review.

### C. The APA Does Not Permit Plaintiffs to Challenge a Combination of Regulations and Policies.

Relatedly, the APA does not permit Plaintiffs' claims to the extent they challenge a variety

---

[5] To be reviewable, however, the action must not be precluded from judicial review by statute or committed to agency discretion by law. *See* 5 U.S.C. § 701(a). As discussed herein, *infra* § I.D, denials of adjustment of status under 8 U.S.C. § 1255 are not reviewable under 8 U.S.C. § 1252(a)(2)(B)(i) and (ii), and denials of derivative asylum status are not reviewable under § 1252(a)(2)(B)(ii).

of different policies, actions, and regulations. An APA plaintiff must identify and challenge a "circumscribed, discrete agency action[]." *Norton v. So. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013). An "entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892–93 (1990). Plaintiffs cannot amalgamate disagreements with overarching immigration policies or different agency actions and challenge them all in "one fell swoop" but must instead "identify a particular action ... to challenge under the APA." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011–12 (9th Cir. 2021); *accord Florida v. United States*, 660 F. Supp. 3d 1239, 1270 (N.D. Fla. 2023); *Brnovich v. Biden*, 630 F.Supp.3d 1157, 1173 (D. Ariz. 2022). To the extent otherwise reviewable, each agency action must be evaluated independently.

Here, Plaintiffs do claim to identify a particular action—the so-called "Biometrics Policy." But as explained, their claim of injury from this Policy is based on the policy's interaction with a number of *other* agency actions that they claim will result in USCIS not considering their application for relief and eventually denying the application for abandonment. *See* Compl. ¶ 2 (alleging "because of DHS's new Biometrics Policy . . . USCIS will deny their applications without considering them"); Mem. at 36 (claiming the Policy "delays or denies outright the detained Plaintiffs' access to immigration benefits"). The Policy itself does not require collection of biometrics, nor does it dictate the denial of applications filed with USCIS by detained aliens who fail to appear for biometric appointments. Those requirements, to the extent they exist, arise from other regulations, policies, and procedures, including the preexisting USCIS regulation regarding appearance for biometrics appointments, 8 C.F.R. § 103.2(b)(13)(ii) (providing that USCIS shall consider an application abandoned if the applicant fails to appear at a biometrics appointment); USCIS's practice of collecting biometrics through ASC appointments, *see* Docs. 14-4 at 2-4, 14-

11 at 2-4; and the regulations and other policies governing whether biometrics are to be collected for particular cases, *see, e.g.*, Mem. at 9 (citing Policy Alert PA-2025-29 (providing that applications for adjustment of status require the collection of new biometrics); 8 C.F.R. § 214.204(k) (providing that applicants for T status submit biometrics in accordance with 8 C.F.R. § 103.16); *id.* § 214.14(c)(3) (providing the same for applicants for U status). Further, to the extent Plaintiffs allege that the absence of an agreement setting forth ICE's role or obligations with respect to biometrics collection causes their injury, that is yet another, different agency action or inaction that is not governed by the USCIS Policy Manual revisions and related documents, even if its absence is reflected therein.

In other words, Plaintiffs are really challenging not just USCIS's position that DHS has no obligation to collect biometrics from detained individuals for purposes of applications filed with USCIS, but a variety of different agency actions and decisions implemented at various different times, including agency actions that are particular to individual aliens' applications. This Plaintiffs cannot do. Moreover, this only underscores that the Biometrics Policy itself is not final agency action or ripe for challenge in this context because the Policy does not give rise to *direct* legal consequences for an applicant; instead, consequences may arise based on the interaction of a variety of different agency actions and circumstances unless or until various different agency actions interact in a manner that results in the denial of their application for abandonment.

**D.    Section 1252(a)(2)(B) Precludes Plaintiffs' Challenge to Application of the Policy to Adjustment Applications and Derivative Asylum Applications.**

Further, the INA precludes review of Plaintiffs' claims to the extent they seek to enjoin or stay any action relating to applications for adjustment of status under 8 U.S.C. § 1255 (like Plaintiff Trejo Estrada's) or derivative asylum (like Plaintiff H.A.'s). The INA provides: "[N]otwithstanding any other provision of law … no court shall have jurisdiction to review—(i) any judgment regarding the granting of relief under section … 1255 …, or (ii) any other decision

or action … the authority for which is specified under this subchapter to be in the discretion of the [Secretary], other than the granting of relief under section 1158(a)." 8 U.S.C. § 1252(a)(2)(B).

First, section 1252(a)(2)(B)(i) bars judicial review of "any judgment regarding the granting of" adjustment of status under § 1255. *Id.*; *Abuzeid v. Mayorkas*, 62 F.4th 578, 583 (D.C. Cir. 2023). In *Patel v. Garland*, the Supreme Court decided that § 1252(a)(2)(B)(i) "does not restrict itself to certain kinds of decisions. Rather, it prohibits review of *any* judgment *regarding* the granting of relief under § 1255." 596 U.S. 328, 338 (2022) (emphasis in original). "*Patel* [thus] precludes review of all kinds of agency decisions that result in the denial of relief — whether they be discretionary or nondiscretionary, legal or factual." *Abuzeid*, 62 F.4th at 584; *see also Abualala v. United States*, No. 21-cv-2986, 2023 WL 10511381, at *1 (D.D.C., May 8, 2023); *Leitner-Wise v. Mayorkas*, No. 22-cv-1136, 2024 WL 4345852, at *5 (D.D.C., Sept. 30, 2024). And while Plaintiff Estrada Trejo fails to demonstrate final agency action as to his or others' adjustment of status applications, Plaintiffs challenge what they presume to be the ultimate impact of the Biometrics Policy on those adjustment applications. Accordingly, while their applications have not yet been adjudicated and they cannot establish injury, judicial review of a denial of a § 1255 adjustment application on any basis, including for lack of biometrics, would be foreclosed under § 1252(a)(2)(B)(i). *See* 8 C.F.R. 103.2(b)(13)(ii) (USCIS may deny a benefit request where an individual has failed to appear for biometrics capture). Plaintiffs cannot preemptively challenge the potential for adjustment of status applications to be denied, nor seek any other relief as to "any judgment regarding the granting" of adjustment of status applications based on their speculations concerning the impact of the Biometrics Policy. *Abuzeid*, 62 F.4th at 581, 583.[6]

Additionally, § 1252(a)(2)(B)(ii) precludes review of "any other decision or action . . . the

---

[6]It does not matter whether Plaintiffs raise a constitutional claim or a question of law; 8 U.S.C. § 1252(a)(2)(D)'s limited carve out for such claims applies only on review of removal orders. *See Leitner-Wise*, No. 22-cv-1136, 2024 WL 4345852, at *4; *Uru v. Rubio*, No. 25-02524, 2026 WL 523153, at *4 (D.D.C., Feb. 25, 2026).

authority for which is specified under this subchapter to be in the discretion of the [Secretary]." Decisions whether to adjust status under § 1255(a) are specified to be within the discretion of the Secretary "under such regulations" as he "may prescribe." 8 U.S.C. § 1255(a). And, although the Policy Manual revisions and related announcements only clarify USCIS's biometrics collection protocols, a denial of an adjustment of status application under § 1255 for abandonment or lack of biometrics would indeed fall within the jurisdictional bar in 8 U.S.C. § 1252(a)(2)(B)(ii). This is because USCIS may require biometrics as a preliminary adjudicative step for adjustment applications and USCIS may deny adjustment of status for lack of biometrics. 8 C.F.R. § 103.2(b)(9); 8 C.F.R. § 103.2(b)(13)(ii). Ultimately, any biometrics decisions, as practically applied, are subsumed within the adjustment adjudication process and ultimate decision that are committed to the Secretary's discretion under § 1255(a). *See Fofana v. Noem*, 163 F.4th 1135, 1139 (8th Cir. 2026) (holding scope of § 1252(a)(2)(B)(ii) is not narrower than § 1252(a)(2)(B)(i)); *Shaiban v. Jaddou,* 97 F.4th 263, 266-67 (4th Cir. 2024) (finding threshold determination within the scope of the bar to review of discretionary decision), *cert. denied*, 145 S. Ct. 1046 (2025); *Morina v. Mayorkas*, 22-cv-02994, 2023 WL 22617, at *10 (S.D.N.Y. Jan. 3, 2023) (finding preliminary ineligibility determination unreviewable under § 1252(a)(2)(B)(ii) where ultimate decision was discretionary). Indeed, because biometrics are required for adjustment of status, and because USCIS may generally decide how to prioritize and allocate its resources and has allegedly done so here under the Biometrics Policy, this case is akin to other cases involving the agency's prioritization and adjudication policies as they affect decisions committed to the Secretary's discretion. *See Cheejati v. Blinken*, 106 F.4th 388, 394 (5th Cir. 2024) (8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial review of DOS's and USCIS's retrogression hold policies "which are practical applications of the discretion afforded the Attorney General in § 1255(a)."). A court in this district recently decided in *A.M.S. v. Edlow* that the policy decision to deprioritize humanitarian parole applications for resource constraints was a discretionary decision that fell

24

within § 1252(a)(2)(B)(ii), where the ultimate parole decision was discretionary. --- F. Supp. 3d ---, 2026 WL 850779, at *12 (D.D.C., Mar. 27, 2026). Here, too, to the extent Plaintiffs challenge consequences (delay or potential denials of their adjustment applications) they allege may flow from the Biometrics Policy, their claims ultimately challenge a discretionary decision and are barred from review by 1252(a)(2)(B)(ii).

Section 1252(a)(2)(B)(ii) similarly precludes judicial review of USCIS's discretionary determination under § 1158(b)(3) regarding whether to grant derivative asylum status to a spouse. *Lin v. Heffron*, No. 3:21-cv-647, 2022 WL 820937, at *2 (W.D.N.C. Mar. 17, 2022), *aff'd*, No. 22-1380, 2023 WL 566343 (4th Cir. Jan. 27, 2023). *But see Ortez v. United States Citizenship & Immigr. Servs.*, 169 F.4th 269, 273 (4th Cir. 2026) (holding § 1252(a)(2)(B)(ii) did not bar review of "pure legal question of statutory construction"). Although § 1252(a)(2)(B)(ii) excepts determinations for principal asylum applicants under § 1158(a) from its scope, it does not contain an exception for derivative asylum decisions under § 1158(b)(3). Decisions relating to the processing of applications for this discretionary relief—like the biometrics process—fall under this judicial-review bar. *See Jammu v. USCIS*, 2026 WL 546483, at *5 (E.D. La. Feb. 11, 2026), *report & recommendation adopted*, 2026 WL 540429 (E.D. La. Feb. 26, 2026) (holding § 1252(a)(2)(B)(ii) bars review of pace of adjudication of derivative asylum petitions); *Cayiroglu v. Mullin*, 2026 WL 1146589, at *4 (N.D. Ill. Apr. 28, 2026) (same).

## II.    Plaintiffs' Claims Are Unlikely to Succeed on the Merits.

To the extent any of the Plaintiffs' claims are justiciable and reviewable, however, they fail to state a claim or otherwise lack merit.

### A.    The Biometrics Policy Comports with the Law.

First, the "Biometrics Policy" does not violate any statutory or regulatory provisions, nor does it implicate any constitutional due process concerns.

1.   8 C.F.R. § 1003.47 Applies Only to Applications in Immigration Courts.

Plaintiffs incorrectly contend the Biometrics Policy violates 8 C.F.R. § 1003.47(d). Mem. at 26-28. According to Plaintiffs' reading, the regulation requires DHS to collect biometrics for all detained aliens for every application for immigration benefits. *Id.* But Plaintiffs selectively read the regulation to reach this erroneous conclusion. The regulation is plainly limited to applications pending before immigration courts.

Part 1003 of title 8 of the Code of Federal Regulations contains the regulations governing EOIR, which administers the administrative immigration court system. *See* 8 C.F.R. pt. 1003. And 8 C.F.R §§ 1003.12 to 1003.47 are the regulations governing immigration courts. The scope of these rules are limited: "[e]xcept where specifically stated, the rules in this subpart apply to matters before Immigration Judges[.]" 8 C.F.R. § 1003.12. The regulation's general scope-limiting provision thus limits § 1003.47 to "matters before Immigration Judges," not every type of immigration benefit an alien can apply for. *Id.* As Plaintiffs concede, the immigration benefits they applied for are all within USCIS's sole jurisdiction—not the immigration courts'. Mem. at 3-4. Thus, § 1003.47(d) does not apply to their applications for immigration benefits.

Section 1003.47's text reinforces this conclusion by expressly limiting the regulation's scope. Paragraph (a) provides that the regulation applies "to any application for immigration relief, protection, or restriction on removal that is subject to the conduct of identity, law enforcement, or security investigations or examinations as described in paragraph (b) of this section[.]" 8 C.F.R. § 1003.47(a). Paragraph (b) in turn states that the requirements of the section "apply to the granting of any form of immigration relief *in immigration proceedings* . . . to the extent they are *within the authority of an immigration judge or the Board to grant*." *Id.* § 1003.47(b) (emphases added). The first sentence of paragraph (d) also indicates that it applies "[a]t any *hearing*" before an immigration judge "at which a *respondent* expresses an intention to file or files an application for relief for which identity, law enforcement, or security investigations or examinations are

26

required[.]" *Id.* § 1003.47(d). Repeatedly, § 1003.47's text indicates it is limited to relief adjudicated in immigration-court proceedings.

Plaintiffs contend that the word "any" in the phrase "any alien in detention" in the last sentence of paragraph (d) must be read to mandate a duty on DHS to collect biometrics for all aliens regardless of what agency the benefit is before. Mem. at 26. But reading the term "any" in such a manner would impermissibly contradict the plain meaning of the regulation's express limitations and its context in the regulatory scheme. *Cf. Martin v. Hadix*, 527 U.S. 343, 354 (1999) (the term "any," although broad, could not be read to express clear intent of retroactive effect on all pending actions). Courts apply "all the standard tools of interpretation," including the "text, structure, history, and purpose of the regulation" to interpret a regulation. *Kisor v. Wilkie*, 588 U.S. 558, 573–75 (2019). Courts "do not view [a] provision in isolation. The meaning of a word 'may only become evident when placed in context.'" *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 674-75 (2023) (cleaned up). And "'a [text]'s meaning does not always turn solely on the broadest imaginable definitions of its component words.' Instead, '[l]inguistic and statutory context also matter.' Even in cases where 'the literal language of the statute is neutral' in isolation, reading 'the whole phrase' can point to a more targeted reading." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (citations omitted) (second alteration in original). Here, as noted, the regulatory subpart's scope is limited to "matters before Immigration Judges," 8 C.F.R. § 1003.12, and the text of § 1003.47 reiterates the section's scope is limited to applications for relief made in immigration court and over which the immigration courts have jurisdiction. *See also* 70 Fed. Reg. 4743 (Jan. 31, 2005) (explaining the rule "amends Department [of Justice] regulations governing removal and other proceedings before immigration judges and the Board of Immigration Appeals.").

For the same reasons, the language "not limited to" in § 1003.47(b) does not mandate an expansive reading of the section, as Plaintiffs contend. Mem. at 27. While it is true that "not limited to" indicates a non-exhaustive list, the overall text of the regulation establishes interpretive limits.

27

The list is prefaced by the explanation that it applies to "immigration relief *in immigration proceedings* which permits the alien to reside in the United States." 8 C.F.R. § 1003.47(b) (emphasis added). The preface also clarifies that this includes the listed forms of relief "*to the extent they are within the authority of an immigration judge or the [BIA] to grant.*" *Id.*

Finally, Plaintiffs, in passing, claim that DHS has "long recognized" it had a responsibility under the regulation to collect biometrics for all detained individuals. Mem. at 27. But even assuming USCIS's Policy Manual could reflect an authoritative interpretation of an EOIR regulation (it cannot), the cited Policy Manual text does not claim the regulation requires this outcome. Rather, the previous language in the Policy Manual merely notes that "[p]er intradepartmental agreement, [ICE] is responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS." Doc. 14-11 at 4. Section 1003.47 is not once cited as *requiring* DHS, USCIS, or ICE to collect biometrics.

> 2. <u>The INA and Regulations Governing Immigration Relief Do Not Compel the Taking of Biometrics of Detained Aliens in Removal Proceedings or Subject to Final Orders of Removal</u>.

Plaintiffs also argue that the Biometrics Policy violates statutory or regulatory requirements by allegedly cutting off detainees' ability to be considered for certain benefits. *See* Mem. at 2, 16-26. They argue USCIS is "refus[ing] to consider" or "summarily deny[ing]" applications based on a categorical bar. Mem. at 20, 22, 23. This argument misses the mark for several reasons.

As an initial matter, Plaintiffs overstate the import of the USCIS documents that comprise the "Biometrics Policy." On their face, the Policy Manual update and related documents do not set forth a rule of ineligibility for any form of relief. For this reason, the authority Plaintiffs rely on, which held unlawful a regulation that expressly rendered arriving aliens ineligible for adjustment of status, is inapposite. *See* Mem. at 17-18.[7] Nor do the documents comprising the Biometrics

---

[7] Indeed, courts held that the subsequent regulation, 8 C.F.R. § 1245.2, which vested exclusive

Policy, as a practical matter, dictate that a detained alien will be categorically unable to provide biometrics if he or she pursues relief with USCIS—even if USCIS does not affirmatively go to detention facilities to collect biometrics from detained aliens. *See supra* §§ I.A, I.B. It does not prohibit USCIS from taking biometrics from detained persons who appear at their ASC appointments. Indeed, March 2026 updates to ASC procedures make clear that options exist for collecting biometrics from ICE detainees with applications pending with USCIS. *See* Defs.' Ex. 6. Accordingly, the Policy does not create a categorical bar to potential eligibility for benefits, and Plaintiffs' arguments to the contrary fail on their own terms. *See* Mem. at 20, 22, 23.

Instead, the Biometrics Policy reiterates reasonable USCIS procedures to manage adjudication processes that Congress and DHS have entrusted to USCIS. Regulations provide that USCIS may require biometrics as a preliminary adjudicative step for applications and that USCIS may deny applications for failure to appear at a biometrics appointment. 8 C.F.R. § 103.2(b)(9); 8 C.F.R. § 103.2(b)(13)(ii). Biometrics collection is "essential" to detecting fraud and safeguarding national security and public safety. Doc. 14-3 at 2. And it remains reasonable for USCIS to manage the process of biometrics collection for all applicants through the scheduling of appointments at ASCs rather than sending its employees to criminal or immigration detention facilities to take biometrics from detained or incarcerated individuals.

Next, the underlying premise of Plaintiffs' claim is flawed. Plaintiffs' arguments imply that, for each category of applications at issue here—adjustment of status by arriving aliens (whether under § 1255 or the CAA); derivative asylum status; SIJ; U status; and T status—applicants are entitled to adjudication for purposes of potentially preventing their removal. *See* Mem. at 8-9. There is no such blanket entitlement based on the mere filing of an application; to

---

jurisdiction in such applications with USCIS, was lawful because it did not "exclude[] an entire category of applicants from a form of relief explicitly made available to them by statute." *Gazeli v. Sessions*, 856 F.3d 1101, 1108-09 (6th Cir. 2017).

hold otherwise would be to interfere with the Executive's ability to enforce the immigration laws against aliens who have no present right to be in the United States.

Plaintiffs point to no general entitlement in the INA to have each of these applications for relief or immigrant or nonimmigrant status adjudicated before removal. To the contrary, courts have long held that pending applications for collateral immigration benefits do not entitle aliens to delay deportation proceedings. *See, e.g.*, *Armstrong*, 445 F.2d at 1396 (holding that a pending visa application does not entitle an alien to a stay of deportation to await the issuance of a visa). To the extent courts have held otherwise in particular cases on review from immigration court proceedings, *see* Mem. at 17, those rulings are case-specific and do not establish a blanket rule that could justify the broad claims and relief that Plaintiffs advance here. Instead, aliens in removal proceedings must show good cause to obtain a continuance of those proceedings to pursue applications with USCIS, *Matter of L-A-B-R-*, 27 I. & N. Dec. 405, 411 (2018), and the immigration courts' denial of a continuance may be reviewed for abuse of discretion on a petition for review with the Court of Appeals, *see, e.g.*, *Cabrera v. Garland*, 21 F.4th 878, 883 (4th Cir. 2022). The question of whether or not applications for ancillary benefits can delay or reopen removal proceedings is thus case-specific and entrusted to the immigration courts and the Courts of Appeals on review of those proceedings. *See* 8 U.S.C. § 1252(a)(5), (b)(9) (channeling issues relating to removal proceedings to petitions for review of removal orders).

The mere statutory availability of an immigration benefit, and any duty on the part of USCIS to adjudicate the request for that benefit, does not give rise to a right to prevent removal. And the statutory and regulatory schemes cited negate any such implication. For example, someone who receives SIJ classification remains subject to arrest, detention, and removal from the United States if a final order of removal is entered against him. *Supra* at 3. Similarly, aliens who seek U or T classifications do not receive stays of removal based solely on the filing of an application. *See supra* at 5-6.

Further, Plaintiffs have not pointed to a specific statute or regulation demonstrating an alien is entitled to an adjudication *on the merits* of their application. *See* Mem. at 19, 20. That is, even assuming that, in any particular case, biometrics are not collected and USCIS ultimately denies the application as abandoned, Plaintiffs have not shown that result would be contrary to any duty of USCIS to adjudicate matters before it. USCIS may properly discharge any duty to adjudicate by denying an application for abandonment under the duly promulgated regulation at 8 C.F.R. § 103.2(b)(13)(ii). Plaintiffs do not, and cannot, challenge the legality of that regulation here.

Finally, even if there is a failure to take biometrics in any given case, Plaintiffs certainly cannot show that a failure to take biometrics while the applicant is in detention pending removal is the equivalent of a failure to adjudicate where applicants can still pursue their applications from outside the United States. Contrary to Plaintiffs' assertions, a putative beneficiary of a derivative asylum petition, if removed, can still seek to show eligibility for that relief from abroad. *See* Mem. at 22 (arguing that "the policy prevents asylee relatives" from showing eligibility for asylum); *supra* at 4. Similarly, because applicants for U status can continue to pursue their requests from abroad, *supra* at 6, Plaintiffs' arguments that USCIS fails to adjudicate a U visa petition from a detained person by not retrieving biometrics cannot succeed, *see* Mem. at 24.[8]

### 3. No Constitutional Due Process Rights Are Implicated.

Nor are Plaintiffs able to show that the Biometrics Policy is contrary to constitutional rights under the Fifth Amendment's Due Process Clause. *See* Mem. at 28-30. To demonstrate a procedural due process violation, a plaintiff must establish both the existence of a protected liberty or property interest and that the procedures provided were inadequate. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59-60 (1999). Plaintiffs do not state a claim, because they do not identify

---

[8] Plaintiffs' arguments as to Unaccompanied Children (UACs) with asylum applications before USCIS, *see* Mem. at 6, 22, are irrelevant: no Plaintiff claims to be a UAC, and Plaintiffs have submitted no evidence of UACs being unable to pursue asylum applications before USCIS.

a protected interest and their Due Process claim is, in essence, an *Accardi* claim for an alleged failure to follow procedures that does not arise from the Constitution. *See* Mem. at 28 (citing *Accardi*), 30-31.

First, Plaintiffs fail to identify a protected liberty interest. *See Colindres v. United States Dep't of State,* 71 F.4th 1018, 1022 (D.C. Cir. 2023). The "due process analysis must begin with a careful description of the asserted right." *See Reno v. Flores*, 507 U.S. 292, 302 (1993) (noting that liberty interests are narrowly defined); *Washington v. Glucksberg*, 521 U.S. 703, 720-21 (1997). Plaintiffs contend they "have a liberty interest in not being deported." Mem. at 29. No such liberty interest exists, particularly as Plaintiffs are all seeking initial admission to the United States. *See, e.g., Bowes*, 443 F.2d at 31 (holding that pendency of an application does not entitle an alien to delay in deportation proceedings); *Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024) (noting unadmitted alien has no right of entry to United States as immigrant). Moreover, Plaintiffs are really claiming a liberty interest in obtaining immigration benefits as a means to avoid removal, as they do not challenge here the procedures surrounding their removal proceedings. And Plaintiffs fail to identify a qualifying liberty interest to pursuing applications for collateral relief while detained that could trigger constitutional due process protections. *See, e.g., Bowes*, 443 F.2d at 31 (holding that the pendency of an application does not entitle an alien to a delay in deportation proceedings); *Muñoz*, 602 U.S. at 908 (noting unadmitted alien has no right of entry to United States as an LPR). Plaintiffs have not articulated a right "deeply rooted" in the history and tradition of the nation. *Muñoz,* 602 U.S. at 910. In fact, history and tradition run counter to Plaintiffs' position; "the throughline of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Id.* at 911-12.

Apparently anchoring their Due Process claim in purported property interests, Plaintiffs claim that the statute and regulations governing the benefits they seek create a "legitimate claim of entitlement." *See* Mem. at 30. But Plaintiffs who seek discretionary immigration benefits have

32

no protected interest in those benefits, because they can have no claim of entitlement thereto. *See*, *e.g.*, *Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) (finding no protected liberty or property interest in discretionary 212(c) waiver). This includes SIJ applicants like J.Z., *see* 8 U.S.C. § 1101(a)(27)(J)(iii) (DHS must "consent[] to the grant of special immigrant juvenile status . . ."); *see also Yu v. Brown*, 92 F.Supp2d 1236, 1251 (D.N.M. 2000) (interpreting similar "consent" requirement for pre-DHS version of the statute); asylum and derivative asylum applicants like H.A., 8 U.S.C. § 1158(b)(1)(A) (Attorney General "may grant asylum to an alien who has applied for asylum"); *see also* 8 U.S.C. § 1158(b)(3)(A) (spouse or child of asylee "*may*, if not otherwise eligible for asylum under this section, be granted the same status") (emphasis added); applicants for adjustment of status like Felipe Estrada Trejo, *see* 8 U.S.C. § 1255(a) (status "may be adjusted" to lawful permanent resident); and applicants for adjustment under the Cuban Adjustment Act, like Y.P., *see* CAA, Pub. L. No. 89-723, 80 Stat. 1161 (1966) (status of any native or citizen of Cuba "may be adjusted"). As Plaintiffs J.Z., H.A., Estrada Trejo, and Y.P. lack a constitutionally protected interest in the discretionary benefits they seek, they have no due process rights in procedures governing those applications. And the remaining Plaintiffs have not shown a property interest in the adjudication of their petitions or applications before removal—which is what they ultimately seek—because there is no such entitlement. *See supra* at 29-30. Further, Plaintiffs cite no separate statutory or regulatory entitlement to the collection of biometrics while detained.

Second, Plaintiffs' Due Process claim boils down to an *Accardi* claim that DHS is not following the regulation Plaintiffs contend requires the agency to collect their biometrics. *See* Mem. at 2, 28. *Accardi* claims premised on regulatory violations are not Constitutional claims. *See Wilkinson v. Legal Services Corp.*, 27 F. Supp.2d 32, 35 (D.D.C. 1988) (finding that unless an agency violates an independent constitutional provision, agency violation of its own regulations is not a constitutional violation); *United States v. Calderon-Medina*, 591 F.2d 529, 531 (9th Cir. 1979) ("While courts have generally invalidated adjudicatory actions by federal agencies which

33

violated their own regulations promulgated to give a party a procedural safeguard, the basis for such reversals is not the Due Process Clause, but rather a rule of administrative law.") (cleaned up). Plaintiffs then cannot maintain their Due Process claim on the theory that the agency's alleged failure to follow regulations is a procedural due process violation. Additionally, as shown, there is no violation of applicable regulations. *See supra* §§ II.A.1, II.A.2.

For these reasons, Plaintiffs are not likely to succeed on a Due Process claim.

### B.        The USCIS Biometrics Policy is Not Arbitrary and Capricious.

Plaintiffs also cannot succeed on their claim that the "Biometrics Policy" is arbitrary and capricious. *See* Mem. at 31-36. "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court need only be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

USCIS's update to its Policy Manual and accompanying Policy Alert and Press Release—assuming reviewable under the APA—easily meets this standard. The revisions to the Policy Manual primarily clarify that USCIS will not affirmatively go to any detention facilities to collect biometrics, and correspondingly set forth USCIS's view of DHS's obligations under 8 C.F.R. § 1003.47. Docs. 14-3, 14-4. The revisions also remove language regarding an intradepartmental agreement under which ICE was responsible for collecting biometrics of detained applicants in DHS facilities with applications pending with USCIS. Docs. 14-2–14-4. These clarifications are on their face reasonable, as it is reasonable for USCIS to decline to affirmatively collect biometrics from individuals who are detained and incarcerated and to rely primarily on ASC appointments as

34

the means of collecting biometrics. And any decisions regarding any intradepartmental agreement with ICE reflect at most different agency decisions separate from the Policy Manual revisions. *See supra* §§ I.B, I.C. Moreover, the Court should decline to grant preliminary relief on this claim, where Defendants have not had adequate time to compile and produce the administrative record. *See Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001).[9]

Plaintiffs' arguments are again premised on a misunderstanding of the agency action under review. They argue that "DHS," in making a decision "not to take biometrics or run background checks for detained people who seek relief from USCIS," failed to provide a reasoned explanation for its decision, ignored important aspects of the problem, and ignored reliance interests. *See* Mem. at 32. But the documents they assert comprise this Policy do not prohibit ICE from taking detainees to biometrics appointments. Indeed, in March USCIS updated its procedures to make clear detained persons could provide biometrics to USCIS, including by appearing at appointments. *See* Defs.' Ex. 6. In any event, Plaintiffs have not shown that USCIS's interpretation of 8 C.F.R. § 1003.47 as imposing obligations only with respect to applications within the authority of EOIR departs from any prior understanding of that regulation. *See supra* at 28. The Policy Manual revisions and related documents thus do not themselves effect a substantive or practical change regarding USCIS's role in biometrics collection. Accordingly, given the contours of the revisions to the Policy Manual, USCIS had no need to explain its alleged "departure" from prior policy or an awareness of alleged or potential limitations on the ability of detainees to pursue applications.

Plaintiffs rely primarily on the "change-in-position" doctrine to argue that the Biometrics Policy is facially arbitrary, in particular due to its alleged failure to consider "reliance interests." *See* Mem. at 32, 33-34 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009);

---

[9] Defendants reserve, and do not waive, any and all arguments in defense of the "Biometrics Policy" not raised in this Opposition filed on an emergency basis, including any arguments based on the administrative record.

*Regents*, 591 U.S. at 33; *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). But Plaintiffs cite no authority applying the change-in-position doctrine to an internal policy manual. Moreover, even assuming the Biometrics Policy effected a sufficiently substantive change to USCIS policy through its revisions to the Policy Manual, the Policy Manual itself cannot create any reliance interests. The Manual explains that it "does not create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." *See* Defs.' Ex. 4. Thus, "one of the most important considerations undergirding the change-in-position doctrine — reliance — is of limited applicability here." *A.C.R. v. Noem*, No. 25-CV-3962, 2026 WL 102611, at *4 (E.D.N.Y. Jan. 14, 2026). Because of this disclaimer, Plaintiffs could not have reasonably relied on any statements in the prior Policy Manual. *See id.*

Indeed, Plaintiffs' own declarations—as representatives of a putative class—refute the existence of reliance interests in the availability of immigration benefits that DHS allegedly should have considered. Plaintiffs themselves had no apparent reliance interests in biometrics procedures for detained persons or in their potential eligibility for the immigration benefits they now seek. No Plaintiff asserts that he or she "organized their lives" based on an understanding that they were eligible for any form of immigration status. *See* Mem. at 33. Most Plaintiffs displayed no intention to apply for their requested immigration benefits until *after* they were detained.

Finally, Plaintiffs argue that USCIS failed to adequately explain its rescission of the prior "intradepartmental agreement" between USCIS and ICE referred to in the prior section of the Policy Manual, under which ICE conducted background checks for those incarcerated at DHS facilities. Mem. at 35. This is beside the point. If Plaintiffs are challenging an alleged decision to rescind an agreement whereby ICE conducted the background checks, that is a different decision from the changes to the Policy Manual contained in the Biometrics Policy. *See also supra* § I.D (explaining that an APA challenge must precisely identify the discrete agency action challenged).

36

Nor does it indicate that ICE cannot collect biometrics or facilitate attendance of biometrics appointments. For these reasons, the cited Policy documents are reasonable on their face and are not arbitrary and capricious.

### C. Plaintiffs Cannot Obtain Relief to Compel Agency Action Because Their Claims Do Not Support this Relief.

Finally, regardless of how Plaintiffs frame their request for preliminary relief, if they seek is to compel DHS to take a particular action—the taking of biometrics from certain applicants for immigration benefits—their request for relief is not supported by their APA claims seeking to "set aside" a policy. *See* 5 U.S.C. § 706(2). Notably, Plaintiffs do not here advance their claim under 5 U.S.C. § 706(1)—which allows courts to compel agency action unlawfully withheld or unreasonably delayed. This is likely because Plaintiffs realize such a claim is unlikely to succeed, as they cannot identify a mandatory, nondiscretionary duty to collect biometrics in the particular manner they request. Without such a duty, there is no § 706(1) claim. Under the APA, a claim alleging that an agency has unlawfully withheld action requires that "a plaintiff assert[] that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). As such, courts can only compel agency action "under narrow circumstances" where the agency is required "to perform a non-discretionary duty to act." *EPIC v. IRS,* 910 F.3d 1232, 1244 (D.C. Cir. 2018) (citing *Norton,* at 64) (affirming dismissal of case where statute "gives the IRS discretion to disclose records but under no circumstances requires the IRS to do so").

### III. Plaintiffs Have Not Demonstrated a Likelihood of Imminent Irreparable Harm.

The Court of Appeals "has set a high standard for irreparable injury" in the preliminary injunction context. *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citation omitted). Irreparable harm "must be both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable

relief to prevent irreparable harm." *Id.* (quotations omitted) (emphasis in original). While removal is a "burden for many aliens, it is not categorically irreparable" harm. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs fail to meet this standard.

First, Plaintiffs fail to show a specific and imminent injury will occur, rather than speculate such an injury may occur. Beyond Plaintiffs' conclusory allegations, they provide no evidence of a DHS-wide policy barring all of DHS from collecting biometrics or facilitating biometrics appointments for detained individuals with applications pending before USCIS. *See supra* § I.A. Plaintiffs contend that they fear their applications for collateral relief will be denied because they failed to attend their biometrics appointments, but no Plaintiff claims they were denied the immigration benefits they sought because they were unable to provide biometrics after the change to USCIS's Policy Manual.[10] *See* Docs. 14-5 at ¶ 12; 14-6 at ¶ 9; 14-7 at ¶ 7; 14-8 at ¶ 6; 14-9 at ¶ 6; 14-10 at ¶ 9-10. Plaintiff M.C. even alleges that an officer took her biometrics. Doc. 14-10 at ¶ 10. Given Plaintiffs cite no instances of USCIS denying applications for lack of biometrics under the new Biometrics Policy and because the Policy is not a categorical bar on the collection of biometrics of detained individuals, Plaintiffs' claimed injuries as to themselves and the class they seek to represent is based on speculation regarding individual ICE officers' decision to facilitate biometrics. Courts should reject such allegations of future injury as overly speculative. *See United Transp. Union v. I.C.C.*, 891 F.2d 908, 911-913 (D.C. Cir. 1989) (noting that allegations which are predictions of future events should be rejected). Thus, the injuries they allege as to themselves and on behalf of a putative class are too speculative to be imminent.

Nor is an eventual injury resulting from a failure to take biometrics from a denial of an application irreparable. Plaintiffs or other detainees can seek individual review of a denial of their applications, if they claim a denial is erroneous, or seek to compel agency action unreasonably

---

[10] J.Z. claims his initial SIJ application was denied on December 1, 2025 because he did not appear at this biometrics appointment, Doc. 14-5 at ¶ 3, but this pre-dates the challenged policy.

delayed, if they believe they can demonstrate that the delay is unreasonable. Although Plaintiffs argue that removal will cause irreparable injury, at least half of Plaintiffs—and aliens who have filed similar applications—can pursue immigration benefits even after removal. The ability to obtain the immigration benefit sought even after removal renders an injury not irreparable. *See Nken*, 556 U.S. at 435 (noting removed aliens can continue to pursue petitions for review and, if successful, can reenter the United States). Plaintiffs M.C. and all other U-visa applicants can continue to pursue U-visas from outside the United States. *See supra* at 6. Similarly, H.A. and others who have applied for derivative asylee status can receive a grant of derivative asylum while abroad. *See supra* at 4. And Felipe Estrada Trejo, who seeks lawful permanent resident status, can potentially reenter the country as a lawful permanent resident even after removal. *See, e.g.*, *Muñoz*, 602 U.S. at 922-27 (Sotomayor, J., dissenting) (explaining processes for individuals seeking lawful permanent residence either through adjustment within the United States or consular processing abroad). Because these Plaintiffs, and others who seek these immigration benefits, can continue to pursue the immigration benefits they seek even after removal, they cannot demonstrate their alleged injuries are irreparable.

Notably, Plaintiffs moved for a preliminary injunction more than five months after the "Biometrics Policy" was announced. This significant delay in moving for a preliminary injunction further undercuts Plaintiffs' claims of irreparable harm. Presumably, if the harm from the Biometrics Policy was truly irreparable, Plaintiffs would not have waited so long to seek an injunction. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (reasoning that the decision to deny preliminary injunction was "bolstered by the delay . . . in seeking one" and finding delay of forty-four days "inexcusable"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("[U]nexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (finding delay of two months "militates against a

finding of irreparable harm").

### IV.     The Balance of the Equities Favors the Government.

When the Government is a party, the harm to the Government and the public interest merge. *Nken*, 556 U.S. at 435. The Government suffers irreparable harm any time that an injunction undermines its "law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012).  Further, injunctive relief is disfavored when it would "deeply intrude[] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), such as when it concerns immigration policy, *see United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The federal government possesses broad authority over immigration and the status and presence of aliens. *Arizona v. United States*, 567 U.S. 387, 394 (2012). The injunctive relief sought here would intervene with USCIS's management of its application processes and DHS's management of immigration detention. Thus, the public interest weighs heavily in favor of allowing USCIS and ICE to manage the application process for detainees who have pending requests for immigration benefits without judicial intervention.

### V.     Any Relief Must be Sharply Limited.

Even assuming Plaintiffs could meet their burden to obtain preliminary injunctive relief, such relief should be limited to the named Plaintiffs who can demonstrate standing. Plaintiffs seek (1) a universal stay of the so-called "Biometrics Policy" and (2) an order enjoining all Defendants "from refusing to take biometrics from any noncitizen in DHS custody to the extent that such a biometrics collection is necessary to adjudicate the merits of a pending application for relief from USCIS." Doc. 14-13. Both forms of universal relief are improper absent class certification.

A court cannot issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *Gill v. Whitford*, 585 U.S. 48, 73 (2018). A valid Article III remedy "operate[s] with respect to *specific parties*," not with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021). Further, injunctions, or relief that operates like an injunction, must be

"narrowly tailored to remedy the specific harm shown." *Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006). The Supreme Court recently affirmed that Courts lack equitable authority to grant "relief that extend[s] beyond the parties," rejecting a bid for a universal, nationwide injunction. *Trump v. CASA, Inc.*, 606 U.S. 831, 843 (2025). Plaintiffs' requested injunction and stay would violate these principles, which apply equally to remedies entered in an APA case. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Thus, the authority to order APA relief must be exercised in conformity with equitable principles. *See Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (vacatur a question of the court's remedial "discretion").

First, Plaintiffs cannot obtain a nationwide preliminary injunction. Plaintiffs argue the Court need not certify a class for this relief based on *AARP v. Trump*, which granted temporary injunctive relief to members of a purported class. 605 U.S. 91 (2025) (per curiam); Mem. at 42. Their reliance is misplaced. The narrow exception contemplated by *AARP* is not available here because relief to a putative class is appropriate only where necessary "to preserve [a court's] jurisdiction," 605 U.S. at 97, and where the underlying legal question "is the same" for named plaintiffs and purported class members, *id.* at 98; *see also CASA*, 606 U.S. at 849-50 (holding universal injunctions are improper, in part because they "circumvent Rule 23's procedural protections and allow courts to create de facto class actions at will.").

Neither prerequisite found in *AARP* is present here. Plaintiffs fail to identify any threat to the Court's jurisdiction, and Plaintiffs have not even attempted to show that the putative class could satisfy the requirements of Rule 23. *See Tincher v. Noem,* 164 F.4th 1097, 1099 (8th Cir. 2026) (per curiam) (rejecting reliance on *AARP* where putative class "ha[d] no chance of getting

41

certified"). Plaintiffs' proposed class suffers from a number of defects that preclude class certification. To certify a class under Rule 23(b)(2), Plaintiffs must show (among other things) that class members suffer the "same injury" such that their claims can "be productively litigated all at once," and that the challenged conduct must be "such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50, 360 (2011). A class may be fatally overbroad if it "sweeps within it persons who could not have been injured by the defendant's conduct." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017) (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009)); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints . . . ."). These requirements for class certification are not met here.[11]

Here, as demonstrated by the Plaintiffs' own cases, not every detainee with applications pending before USCIS has the same claim or suffers the same type of legal injury from an alleged failure to take their biometrics. Depending on their particular immigration history and the particular benefits they seek, putative class members' claims to relief may differ. Indeed, some may suffer no injury at all from the purported agency policy. Take, for example, the case of someone who has applied for a U-visa. Applicants can continue to pursue U-visas from outside the United States and provide biometrics at designated locations abroad. *See supra* at 6. Thus, Plaintiff M.C. and other U-visa applicants can continue to pursue U nonimmigrant status from abroad and lack the requisite legal injury from any failure to collect their biometrics while detained. Although Plaintiff M.C. asserts that she is nonetheless injured because she was already once removed and presumably has a reinstated removal order, and that if she is removed again there will be a 20-year bar on her admission, *see* Mem. at 39, Plaintiffs have not shown that this

---

[11] Defendants include a handful of examples to illustrate the impropriety of universal relief, but these examples are by no means exhaustive of the reasons a class cannot be certified here.

particular claim of injury is necessarily common to or typical of detained U-visa applicants, as is required to certify a class. *See* Fed. R. Civ. P. 23(a)(2), (3); *Wal-Mart Stores*, 564 U.S. at 348 ("[A] class representative must . . . possess the same interest and suffer the same injury as the class members."); *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 83 (D.D.C. 2015) (commonality and typicality requirements look to whether the claims of the proposed class are sufficiently inter-related to support class treatment). Other U-visa applicants may opt to take voluntary departure in lieu of a removal order and pursue U status from abroad.

As another example, aliens who lack facial eligibility for the benefits sought are not injured if their biometrics are not taken. If a putative class member filed an individual action to compel the taking of biometrics for a facially frivolous application, the government would have strong defenses to that action based on the alien's ineligibility for the requested benefit. Using classwide relief to compel DHS to take the biometrics of individuals whose request to relief is foreclosed would exceed the bounds of Article III.[12]

For these reasons, the Court cannot grant injunctive relief beyond what is necessary to provide relief to the named Plaintiffs. To obtain broader relief, Plaintiffs should first be required to file a class certification motion and establish the Rule 23 requirements. *See H.C.R. v. Mullin*, 2026 WL 850555, at *10 (M.D. Fla. Mar. 27, 2026) ("[A] district court would be on safest ground if it were to go through the entire Rule 23 analysis prior to granting preliminary relief."); *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 117 n.3 (D.D.C. 2025) (similar).

A universal Section 705 stay of the "Biometrics Policy" is similarly improper to the extent Plaintiffs seek to use it as a means of compelling agency action. To argue otherwise, Plaintiffs rely primarily on the unpublished decision on a motion or stay pending appeal in *Make the Road NY*.

---

[12] Defendants assume the requested stay relief, like the requested injunction, is limited to aliens in DHS custody. *See, e.g.*, Compl. ¶ 104 (defining putative class); Doc. 14-13. The claims of aliens in criminal or other civil custody would further present divergent legal issues.

Mem. at 41 (citing *Make the Road NY v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)). This reliance is misplaced. The reasoning in *Make the Road NY* was premised on the Section 705 stay being a "temporary form of [APA] vacatur," Mem. at. 15, 41-42 (quoting *Make the Road NY*, 2025 WL 3563313, at *16), which operates to "suspend the legal source of authority to act," *Make the Road NY*, 2025 WL 3563313, at *16, 17 (cleaned up; citations omitted). But a "temporary vacatur" of the policy documents at issue here would not assist Plaintiffs. As explained, Plaintiffs define the "policy" at issue as one by which DHS refuses to collect biometric information from detainees with applications pending with USCIS, but that is not what the cited documents say or do. Staying the Policy Manual revisions and related Policy Alert and Press Release—which do not represent a practical departure from the prior "status quo"—would thus do nothing to alter the agencies' authority to act. For this same reason, the identified policy documents are not inflicting "irreparable injury" as required to stay agency action. *See Make the Road NY*, 2025 WL3563313, at *35 ("[C]ourts should stay the effective date only of those portions of the agency action that are inflicting injury."). Essentially, Plaintiffs seek to redefine the "Biometrics Policy" as providing the legal authority to refuse to take biometrics to try to use a Section 705 stay to obtain the equivalent of an injunction compelling agency action. *See supra* § II.C. In other words, their requested "stay" order is not a stay or "temporary vacatur" at all, but instead an injunction that "direct[s] an actor's conduct." *Make the Road NY*, 2025 WL 3563313, at *17. For these reasons, the Court should also decline to stay the "Biometrics Policy."

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion in its entirety. If the Court grants any form of preliminary relief, such relief should be limited to the named Plaintiffs.

//

//

44

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

SAMUEL P. GO
Assistant Director

By: /s/ Katherine J. Shinners
    KATHERINE J. SHINNERS
    Senior Litigation Counsel
    Office of Immigration Litigation
    U.S. Department of Justice, Civil Division
    P.O. Box 878, Ben Franklin Station
    Washington, DC 20044
    Tel: (202) 598-8259
    Email: katherine.j.shinners@usdoj.gov

    MALCOLM MCDERMOND
    JAMES A. HURLEY
    Trial Attorneys


Dated: May 26, 2026                  *Attorneys for Defendants*

45

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2026, I electronically filed the foregoing document with

the Clerk of the Court for the United States Court District Court for the District of Columbia by

using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be

accomplished by the CM/ECF system.


By: */s/ Katherine J. Shinners*
    KATHERINE J. SHINNERS
    Senior Litigation Counsel
    United States Department of Justice
    Civil Division