# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.Z., *et al.*,

       *Plaintiffs*,

v.

 

United States Department of Homeland
Security, *et al.*,

       *Defendants*.

Case No. 1:26-cv-1510-AHA

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY UNDER 5 U.S.C. § 705 AND A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.    Plaintiffs are likely to succeed on the merits..................................................................1

    A.  DHS does not take biometrics for detained people who have applications with USCIS ....1

    B.  Plaintiffs challenge a final agency action ........................................................................5

    C.  Plaintiffs challenge a discrete agency action ..................................................................10

    D.  Plaintiffs have standing ..................................................................................................10

    E.  Section 1252(a)(2)(B) does not preclude Mr. Estrada Trejo or H.A.'s claims..................13

    F.  The Biometrics Policy is contrary to law .......................................................................16

        1.  The Policy conflicts with the INA and its regulations..................................................16

        2.  The Policy conflicts with the biometrics regulation ....................................................19

        3.  The Policy violates the Due Process Clause.................................................................20

    G.  The Biometrics Policy is arbitrary and capricious...........................................................21

II.   Plaintiffs face likely irreparable harm, and the balance of equities favors relief..................24

III.  The Court should issue a stay or classwide preliminary injunction ......................................25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.M.S. v. Edlow,*
No. 25-476, 2026 WL 850779 (D.D.C. Mar. 27, 2026) ......................................................16

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) ...........................................................................................................7

*Abuzeid v. Mayorkas, the D.C. Circuit*,
62 F.4th 578 (D.C. Cir. 2023).............................................................................................15

*Aghakasiri v. Bondi,*
No. 24-cv-2898, 2026 WL 772711 (D.D.C. Mar. 19, 2026).............................................16

*All. To Save Mattaponi v. Army Corps of Eng'rs*,
515 F. Supp. 2d 1 (D.D.C. 2007)........................................................................................25

*Am. Tort Reform Ass'n v. O.S.H.A.*,
738 F.3d 387 (D.C. Cir. 2013).............................................................................................8

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018)....................................................................................15

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon,*
No. 1:25-cv-00999, 2026 WL 523023 (D.D.C. Feb. 25, 2026) ........................................10

*Bennett v. Spear*,
520 U.S. 154 (1997) ...........................................................................................................5

*Biden v. Texas*,
597 U.S. 785 (2022) .........................................................................................................6, 8

*Bridges v. Wixon*,
326 U.S. 135 (1945) ..........................................................................................................21

*C.R.E.W. v. DOJ.*,
No. 24-cv-1497, 2026 WL 865852 (D.D.C. Mar. 30, 2026)...............................................3

*California Communities Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019)............................................................................................7

*Ceta v. Mukasey*,
535 F.3d 639 (7th Cir. 2008) .............................................................................................17

*Cheejati v. Blinken*,
106 F.4th 388 (5th Cir. 2024)................................................................................16

*Cmty. Nutrition Inst. v. Young*,
818 F.2d 943 (D.C. Cir. 1987)................................................................................6

*CropLife Am. v. EPA*,
329 F.3d 876 (D.C. Cir. 2003)..............................................................................2, 6

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026)..............................................................................8, 9

*Ctr. for Biological Diversity v. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025)..............................................................................10

*Delaware Valley Reg'l Ctr., LLC v. DHS*,
106 F.4th 1195 (D.C. Cir. 2024)............................................................................8

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ..............................................................................................22, 24

*Doe v. Trump*,
No. 1:25-cv-13946, 2026 WL 1170971 (D. Mass. Apr. 30, 2026) .......................14, 16, 17

*Duberry v. District of Columbia*,
924 F.3d 570 (D.C. Cir. 2019)...............................................................................11, 12

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .............................................................................................24

*Erika Covarrubias-Ramirez v. Noem*,
No. 26-cv-01230, 2026 WL 1256111 (D. Ariz. May 7, 2026)..............................4

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .............................................................................................22

*Fofana v. Noem*,
163 F.4th 1135 (8th Cir. 2026)..............................................................................16

*Fox Television Stations, Inc. v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002)............................................................................23

*Gutierrez v. Saenz*,
606 U.S. 305 (2025) .............................................................................................9, 11, 12, 13

*Haitian Refugee Ctr. v. Smith*,
676 F.2d 1023 (5th Cir. 1982) ...............................................................................21

*I.N.S. v. Chadha*,
462 U.S. 919 (1983) ...............................................................................................11

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004)..................................................................................8

*J.L. v. Cissna*,
341 F. Supp. 3d 1048 (N.D. Cal. 2018).....................................................................7

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ...............................................................................................14

*Jimenez v. Nielsen*,
334 F. Supp. 3d 370 (D. Mass. 2018)......................................................................21

*Khalid v. Garland,*
No. 21-cv-2307, 2024 WL 1299339 (D.D.C. Mar. 27, 2024)..................................11

*Kisor v. Wilkie*,
588 U.S. 558 (2019) .................................................................................................2

*Kucana v. Holder*,
558 U.S. 233 (2010) ...............................................................................................15

*L.G.M.L. v. Noem*,
800 F. Supp. 3d 100 (D.D.C. 2025)........................................................................25

*L.M.-M. v. Cuccinelli*,
442 F. Supp. 3d 1 (D.D.C. 2020)............................................................................11

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................................................................................25

*Lopez v. Trump*,
No. 25-cv-04826, 2025 WL 3274224 (S.D.N.Y. July 10, 2025) ................................19, 21

*Make the Rd. New York v. Noem,*
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)....................................21

*Make the Rd. New York v. Noem*,
805 F. Supp. 3d 139 (D.D.C. 2025)....................................................................24, 25

*Make The Rd. New York v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020)............................................................13, 14, 15, 16

*Marino v. DEA*,
    685 F.3d 1076 (D.C. Cir. 2012)......................................................................3

*Markum v. Salazar*,
    694 F.3d 123 (D.C. Cir. 2012)....................................................................8, 9

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991) ......................................................................................14

*Mudric v. Attorney General*,
    469 F.3d 94 (3d Cir. 2006) ...........................................................................17

*N.L.R.B. v. SW Gen., Inc.*,
    580 U.S. 288 (2017) ......................................................................................19

*Nakka v. USCIS*,
    111 F.4th 995 (9th Cir. 2024)..........................................................13, 14, 15

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005)...................................................................7, 9

*Natural Resources Defense Council, Inc. v. EPA*,
    25 F.3d 1063 (D.C. Cir. 1994).......................................................................13

*Nken v. Holder*,
    556 U.S. 418 (2019) ......................................................................................14

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................10

*NTCH, Inc. v. F.C.C.*,
    841 F.3d 497 (D.C. Cir. 2016).......................................................................12

*Ohio v. EPA*,
    603 U.S. 279 (2024) ......................................................................................23

*Orangeburg, S.C. v. FERC*,
    862 F.3d 1071 (D.C. Cir. 2017).....................................................................12

*Patel v. Garland*,
    596 U.S. 328 (2022) ......................................................................................15

*RAICES v. Mullin*,
    No. 25-5243, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026) ......................................15, 18

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ................................................................................................9

*S.N.C. v. Sessions,*
    No. 18-cv-7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018) ......................................21

*Saghafi v. Edlow,*
    No. 26-cv-100, 2026 WL 1127468 (D. Md. Apr. 24, 2026) ...............................................7

*Shaiban v. Jaddou*,
    97 F.4th 263 (4th Cir. 2024) ..............................................................................16

*Succar v. Ashcroft*,
    394 F.3d 8 (1st Cir. 2005)...................................................................................18

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .......................................................................................11, 13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ..........................................................................................5, 6

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ...........................................................................................18

*Varniab, v. Edlow*,
    No. 25-cv-10602, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026)................................16, 17

*Walter A. v. Easterwood*,
    No. 26-cv-1393, 2026 WL 836428 (D. Minn. Mar. 26, 2026)...................................3, 4, 6

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .............................................................................................6

*Wilkinson v. Legal Servs. Corp.*,
    27 F. Supp. 2d 32 (D.D.C. 1998)..........................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................24

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...........................................................................................16

**STATUTES**

5 U.S.C. § 551 ..................................................................................................8, 10, 20

6 U.S.C. § 271 ...............................................................................................................2

8 U.S.C. § 1158 ....................................................................................................18, 19

8 U.S.C. § 1252 ....................................................................................................13, 14

**REGULATIONS**

8 C.F.R. § 103.2.................................................................................................6, 18, 20

8 C.F.R. § 1003.12..............................................................................................19

8 C.F.R. § 1003.47..............................................................................................19, 20

**OTHER AUTHORITIES**

Black's Law Dictionary (12th ed. 2024) ......................................................................20

Homepage, USCIS, https://perma.cc/4AHJ-MDQR .......................................................2

Policy Alert, USCIS, PA-2025-29: Photograph Reuse for Identity Documents (Dec.
    12, 2025), https://perma.cc/MC8V-T9JA................................................................4

Press Release, USCIS, USCIS Updates Policy on Biometrics for Detainees,
    https://perma.cc/J8UF-STFT ..............................................................................2

USCIS, Policy Manual, vol. 1, pt. C, Ch. 1, https://perma.cc/TJ83-Q647 .....................4

On December 5, 2025, a component of the Department of Homeland Security ("DHS") announced that "*the Department of Homeland Security* generally will not take biometrics of detained [noncitizens] unless they are in removal proceedings and have a pending application or petition filed" with the immigration courts. Release, Dkt. No. 14-2 (emphasis added). Both USCIS and ICE have followed that policy: USCIS has regularly refused to take biometrics from detained people with applications in its jurisdiction; ICE has regularly refused to transport detained people to biometrics appointments or to take their biometrics and send them to USCIS. And USCIS has not processed biometrics for any of the Plaintiffs.

The record therefore refutes the government's claim that the policy the Release describes does not exist. But even if one ignored the plain language of the Release, Plaintiffs would still be entitled to relief. The government does not dispute that DHS policy provides that (1) USCIS will not collect biometrics from noncitizens in detention who have applications for relief from USCIS, and (2) DHS rescinded a policy that required ICE to collect those applicants' biometrics. Nor does the government claim that ICE will still collect those biometrics now that it lacks an obligation to do it. Under DHS policy, then, detained people cannot provide biometrics to support their applications, and USCIS will deny those applications as abandoned. Indeed, regardless of whether USCIS issues any denial, the Plaintiffs will face deportation, family separation, and violence abroad with no chance for relief from USCIS. The government's suggestions that Plaintiffs nonetheless face no harm thus blink reality. The Court should grant preliminary relief.

## I.    Plaintiffs are likely to succeed on the merits

### A.    DHS does not take biometrics for detained people who have applications with USCIS

Plaintiffs are likely to show that DHS does not take biometrics from detained noncitizens who have applications for immigration benefits pending with USCIS.

1. The government concedes that the second sentence of the Release, stating that "the Department of Homeland Security generally will not take biometrics of detained" noncitizens for USCIS applications, Dkt. No. 14-2, "purport[s] to articulate DHS's position." Opp'n 14, Dkt. No. 17. The government nonetheless asks the Court to disregard this announcement as an "ad hoc" remark that does not "reflect[] the entire Department's views." Opp'n 14. But there is nothing "ad hoc" about the Release: it was not the "speech of a mid-level official" or an "informal memorandum recounting a telephone conversation between employees." *Kisor v. Wilkie*, 588 U.S. 558, 577 (2019) (listing examples of "ad hoc" statements). It was an official statement on "an official website of the U.S. Department of Homeland Security" that announced a new policy to the public at large. Homepage, USCIS, https://perma.cc/4AHJ-MDQR; *see CropLife Am. v. EPA*, 329 F.3d 876, 878-79 (D.C. Cir. 2003) (press release was an authoritative statement of policy and in fact constituted a "binding regulation"). If DHS believed the Release did not correctly describe agency policy, it could have revised the language at any time in the last six months. Yet the statement remains on the website, unaltered, to this day. Press Release, USCIS, USCIS Updates Policy on Biometrics for Detainees, https://perma.cc/J8UF-STFT (archived June 1, 2026).

The government's real objection seems to be that although USCIS is part of DHS, 6 U.S.C. § 271(a)(1), it cannot speak for DHS unless ICE also "endorse[s]" the statement. Opp'n 14. But nothing requires every agency component to co-sign each other's statements about agencywide policies before a Court can credit them. Regardless of whether USCIS policies "bind" ICE, Opp'n 1, USCIS's statements may authoritatively describe *DHS-wide* polices that bind both components. Just as staff memoranda can represent the official position of the agency "even though never approved by the agency head," *Kisor*, 588 U.S. at 577, a statement by one agency component may constitute an "official acknowledgement" of the agency even if not endorsed by every component

2

of the agency. *C.R.E.W. v. DOJ*, No. 24-cv-1497, 2026 WL 865852, at *9–10 (D.D.C. Mar. 30, 2026) (citing *Marino v. DEA*, 685 F.3d 1076, 1082 (D.C. Cir. 2012)).

The Release thus constitutes an official acknowledgment that DHS does not take biometrics for detained USCIS applicants. And even if it were not an authoritative statement of the agency's position, it would still constitute strong evidence that DHS maintains such a policy. It is that DHS-wide policy, not just language in the USCIS Policy Manual, that Plaintiffs challenge.

2. The rest of the record reinforces that DHS, including ICE, has a policy of not taking biometrics for detained people with applications before USCIS. DHS still has not taken Plaintiffs' biometrics for their applications: Either ICE has not collected the biometrics, or USCIS has refused to process the biometrics that ICE collected. Pls.' Mem. 11–15. True, an ICE officer took Plaintiff M.C.'s fingerprints in detention. Opp'n 15. But when M.C.'s representative "called USCIS to confirm, the officer stated USCIS had no record of receiving [her] biometrics from ICE." M.C. Decl. ¶ 10, Dkt. No. 14-10. And USCIS sent all plaintiffs (including M.C.) notices to appear at USCIS offices for biometrics collections, indicating that USCIS did not expect ICE to collect or send their biometrics. *See* Pls.' Mem. 11–15; ASC Appointment Notice for J.Z., Dkt. No. 14-12.

Tellingly, the government does not dispute that ICE regularly refuses to transport detained people to biometrics appointments for USCIS applications. In a recent case where a detained noncitizen requested such transportation, an ICE supervisory officer confirmed that ICE does not "assist" people in obtaining "benefits" from USCIS and that "ICE does not provide transport to USCIS biometric appointments." Ex. L, Hurst Decl. ¶¶ 13, 22. Consistent with that policy, ICE has not transported any of the plaintiffs in this case to any of their biometrics appointments. *See, e.g.*, Y.P. Decl. ¶ 6, Dkt. No. 14-8; R.M. Decl. ¶ 2, Dkt. No. 14-6; Pls.' Mem. 11–15.

ICE's conduct in *Walter A. v. Easterwood* fits this pattern. No. 26-cv-1393, 2026 WL

3

836428 (D. Minn. Mar. 26, 2026). Although ICE ultimately collected the plaintiff's fingerprints and provided them to USCIS, Opp'n 15, it did that only because "the Court ordered [DHS] to transport [the plaintiff] to and from the biometrics appointment," and even then, USCIS did not collect the person's biometrics until the court ordered it. 2026 WL 836428, at *8. As a USCIS supervisor testified, "staff were not permitted to process biometrics appointments for persons in custody" and "lacked the authority to override the policy, absent a court order." *Id.* at *14.[1]

3. The government now says that USCIS has since updated its internal operating procedures to provide two "options for processing detainees in ICE custody for biometrics collection," Opp'n 8, 35: either (1) the detained person can somehow attend their biometrics appointment despite being, well, detained or (2) ICE could collect fingerprints and send them to USCIS. Brown Decl. ¶¶ 7–8 & Exhibit, Dkt. No. 17-6. But those "options" do not help Plaintiffs or members of the proposed class. If ICE will not transport detained people to USCIS appointments—as it regularly refuses to do—the "option" to attend an appointment is no option at all. And even on its face, the second option—which would also leave biometrics collection entirely to ICE's whim—refers only to fingerprints; it does not provide for the collection of other required biometric data, including photographs and signatures. *Compare id. with* USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 1, https://perma.cc/TJ83-Q647 (biometrics "include fingerprints, photographs, and digital signatures"); Policy Alert, USCIS, PA-2025-29: Photograph Reuse for Identity Documents (Dec. 12, 2025) at 1, https://perma.cc/MC8V-T9JA (adjustment of status applications "require the collection of new biometrics, including a new photograph").

---

[1] In the only other case the government cites in which ICE took a USCIS applicant's biometrics and sent them to USCIS, ICE did so only after the plaintiff sued. *See Covarrubias-Ramirez v. Noem*, No. 26-cv-01230, 2026 WL 1256111, at *2 (D. Ariz. May 7, 2026).

In any event, those two "options" appear to apply only to detained people with applications before the immigration courts, not to applications within USCIS's jurisdiction to grant. USCIS typically processes biometrics for both types of applications. *See* Ex. M. But the Policy Manual provides that "USCIS does not collect biometrics from [people] who are detained or incarcerated in any DHS . . . detention facilities [who] have a pending immigration petition or application with USCIS." Policy Alert 2, Dkt. No. 14-3; *see* Policy Manual 4, Dkt. No. 14-4. The internal procedure the government cites is consistent with that policy. It states that "DHS is only responsible for obtaining biometrics" from detained noncitizens when "the benefit requested is within the jurisdiction of [EOIR]." Brown Decl. Ex., Dkt. No. 17-6. This suggests that the collection methods the procedure describes cover only applications before EOIR. Otherwise, the procedures would conflict with the Policy Manual, which "contains the official policies of USCIS" and must "be followed by all USCIS officers . . . ." USCIS, *Policy Manual*, Homepage 1, Dkt. No. 17-4.

Thus, despite USCIS's March update to its internal operating procedures, the evidence shows that the statement in the Release likely remains true: As a rule, DHS is not collecting biometrics for detained people who seek relief from USCIS.

### B.  Plaintiffs challenge a final agency action

The Biometrics Policy is a "final agency action" subject to APA review. An action is final when it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) determines "rights or obligations" "or" has "legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

1. The Biometrics Policy consummated the agency's decisionmaking process because it determined that DHS will not collect biometrics for detained noncitizens with applications before USCIS. Release, Dkt. No. 14-2. Nothing about the policy indicates it is "tentative or interlocutory."

*Hawkes*, 578 U.S. at 597. It was "effective immediately," is "controlling," and "supersedes any related prior guidance." Policy Alert 1, Dkt. No. 14-3. It was DHS's "last word on the matter in question." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (citation modified).

2. The policy meets the second prong for two reasons. First, it determined rights and obligations because it "bound DHS staff." *Biden v. Texas*, 597 U.S. 785, 808 (2022). Before, DHS took biometrics from detained noncitizens with USCIS applications; now, it "will" not do so. Release, Dkt. No. 14-2. The use of word "'will' indicates [a] statement is in fact a binding norm." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987); *see CropLife Am.*, 329 F.3d at 881 (press release saying that agency "will not consider" certain studies was final). And the agency's "own behavior" "belies the claim" that the policy was non-final. *Whitman*, 531 U.S. at 479. As a USCIS supervisor testified in another case, staff are "not permitted to process biometrics appointments for persons in custody," and they "lack[] the authority to override the policy, absent a court order." *Walter A.*, 2026 WL 836428, at *14. The government's claim (at 18) that USCIS policies are not "binding" on ICE is beside the point: Although USCIS announced the policy, it spoke for DHS and made clear that the policy was DHS-wide. *See supra* Part I.A.

Second, the policy has "legal consequences" for detained people with pending USCIS applications. *Hawkes*, 578 U.S. at 597. Because DHS will not take their biometrics, Plaintiffs are stuck. Their applications cannot proceed. USCIS must deny them as "abandoned" when it does not receive biometrics. Opp'n 31; 8 C.F.R. § 103.2(b)(13)(ii). But regardless of whether DHS's failure to take biometrics formally "end[s]" the application process, Opp'n 19, the policy blocks any progress toward an adjudication on the merits while Plaintiffs languish in detention. The government is thus wrong to suggest that the policy only has legal consequences when DHS denies an application. Indeed, even if DHS did not deny the application—or a reviewing court vacated

the denial—Plaintiffs still could not reach an adjudication on the merits of their applications without a biometrics collection. And they are likely to be deported before DHS ever considers their applications on the merits, which would foreclose relief for most of them and expose all of them to irreparable harm. "Courts have regularly determined" that an "indefinite pause" on the processing of applications for immigration benefits has legal consequences for similar reasons. *Saghafi v. Edlow*, No. 26-cv-100, 2026 WL 1127468, at *7 (D. Md. Apr. 24, 2026).

Even if the inevitable denial of Plaintiffs' applications were the only consequence, the fact that DHS has not yet denied the Plaintiffs' applications would not make the policy any less final. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 150 (1967) (rule may be final even if it "would have effect only if and when" the agency applied it in an adjudication); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (listing other examples of policies that were final before agencies invoked them against any applicant); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1066 (N.D. Cal. 2018) (action final even though USCIS had "not issued final decisions on [the plaintiffs'] SIJ petitions" because plaintiffs challenged an unlawful "blanket policy of denying SIJ petitions"); *California Communities Against Toxics v. EPA*, 934 F.3d 627 (D.C. Cir. 2019), does not suggest otherwise. In that case, the challenged interpretation did not bind the agency (it did not "require" anyone "to do anything"), it did not withhold any benefit, and "Congress specifically directed that judicial review shall not be available until the [relevant] permit amendment process reaches a conclusion." *Id.* at 639–40. None of this is true here.

2. Even if one overlooks the evidence of a DHS-wide policy that bars the collection of biometrics for detained people with USCIS applications, DHS plainly did two things: (1) it changed the USCIS Policy Manual to "[p]rovide that USCIS does not collect biometrics" from detained people who "have a pending immigration petition or application with USCIS"; and (2) it

7

rescinded the prior "intradepartmental agreement" that "place[d] the burden on ICE to collect biometrics of [noncitizens] in custody." Policy Alert 1–2, Dkt. No. 14-3; *accord* Opp'n 8, 34.

Even standing alone, these provisions affect the obligations of agency staff. The USCIS Policy Manual must "be followed by all USCIS officers in the performance of their duties." USCIS, *Policy Manual*, Homepage 1, Dkt. No. 17-4. Based on the Policy Manual, USCIS officers may not collect biometrics from people in custody, Policy Manual 4, Dkt. No. 14-4, and they certainly may not go to detention centers to collect those biometrics. Opp'n 34; *see Texas*, 597 U.S. at 808 (memo was final agency action because it "bound agency staff by forbidding them" from acting). And the recission removed a binding obligation on ICE, which is no longer obligated to collect biometrics for detained people with USCIS applications. Policy Alert 2, Dkt. No. 14-2; *see* 5 U.S.C. § 551(12) (repeal, or "denial," of rule is also agency action). As a result, DHS will not process Plaintiffs' biometrics, and they are blocked from pursuing relief from USCIS.

3. The policy (or policies) here is thus distinct from the interpretive rules in the cases the government cites (at 18). The Biometrics Policy does not merely state DHS's (or USCIS's) position "with respect to a matter that [DHS] is not empowered to decide." *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 393 (D.C. Cir. 2013), "*restat[e]* [DHS]'s established interpretation" of a regulation, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004), or reiterate "the normal process for seeking an immigration benefit" "plainly contemplated" in a statute, *Delaware Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1205 (D.C. Cir. 2024). It determines the obligations of DHS staff and blocks plaintiffs from pursuing immigration benefits.

4. The Biometrics Policy is also ripe for review. It is "fit for judicial decision" because "it involve[s] final agency action" and judicial intervention would not "inappropriately interfere with further administrative action." *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 375 (D.C.

8

Cir. 2026). Unlike in *Markum v. Salazar*, the Biometrics Policy is not being administratively appealed. 694 F.3d 123, 129 (D.C. Cir. 2012). DHS made a "definitive statement of [its] position" that it need not—and will not—take biometrics for detained people with USCIS applications. *Ctr. for Biological Diversity*, 171 F.4th at 375. By reviewing the policy, then, the court would not be "prematurely meddling with an agency policy decision that is currently undergoing change." *Id.* A "a purely legal claim" that a rule is "arbitrary and capricious or contrary to law" is "presumptively reviewable," and "no further factual development" is needed to evaluate whether the Biometrics Policy fails those standards. *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282.

The policy also "has direct and immediate effect" on the Plaintiffs because it blocks them from pursuing their applications *now*. *Ctr. for Biological Diversity*, 171 F.4th at 375; *see Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 58-59 (1993) (challenge to rule that "limit[s] access" to a discretionary immigration benefit "ripens" when the plaintiff takes the "affirmative steps that he could take before the [agency] blocked his path" to relief). With each passing day that Plaintiffs remain in detention while DHS refuses to take their biometrics, they lose valuable time during which their applications could have otherwise proceeded toward a decision on the merits. And delaying review would expose them to deportation before DHS ever takes their biometrics.

The government suggests that Plaintiffs' claims may become moot because they "could be independently released from detention." Opp'n 20. But it does not disclose any plans to release the detained Plaintiffs—some of whom have already sat in detention for over a year. *See*, *e.g.*, J.Z. Decl. ¶ 1, Dkt. No. 14-5; M.C. Decl. ¶ 1, Dkt. No. 14-10. And while it suggests their applications "could eventually be denied for other reasons," it does not dispute that Plaintiffs are eligible for the relief they seek. Opp'n 20. That the government "might eventually find another reason" to deny relief does not foreclose judicial review. *Gutierrez v. Saenz*, 606 U.S. 305, 320 (2025).

### C.  Plaintiffs challenge a discrete agency action

Plaintiffs also challenge a "discrete" agency action, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004): the rule that DHS will not collect biometrics for detained noncitizens who apply for relief from USCIS. *See supra* Part I.A; *see* 5 U.S.C. § 551(4) (defining "rule" to include any "agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency"). Even if DHS engaged in two narrower actions—a rule that USCIS cannot collect biometrics from detained noncitizens and the rescission of the agreement that required ICE to collect them—that would not preclude review. Under the APA, "litigants may challenge 'multiple agency actions' at once." *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 1:25-cv-00999, 2026 WL 523023, at *10 (D.D.C. Feb. 25, 2026) (quoting *Ctr. for Biological Diversity v. Dep't of the Interior*, 144 F.4th 296, 310 (D.C. Cir. 2025)). And the government concedes that Plaintiffs challenge the recission of the agreement along with the Policy Manual revisions. Opp'n 22, 36 (acknowledging Plaintiffs' arguments that the recission "causes their injury" and that USCIS "failed to adequately explain [the] rescission" of the agreement).

Although other regulations may contribute to Plaintiffs' injuries—like the requirement that USCIS deny applications as "abandoned" when applicants do not submit to biometrics collections—Plaintiffs do not challenge those regulations, their roles do not defeat standing, *see infra* p. 12, and they do not make the challenged policy or policies any less discrete.

### D.  Plaintiffs have standing

1. Plaintiffs have an injury in fact traceable to the Biometrics Policy. Because DHS "will not take biometrics of detained [noncitizens]" with USCIS applications, Release Dkt. No. 14-2, Plaintiffs will lose the opportunity to pursue lawful immigration status, deferred action, and work

authorization from USCIS and face deportation—an injury in fact. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 20 (D.D.C. 2020) (recognizing Article III "interest in seeking asylum and avoiding the risk of deportation"); *accord I.N.S. v. Chadha*, 462 U.S. 919, 936 (1983) (deportation was cognizable injury). Removal would separate them from family in the United States without consideration of their application, also an "injury in fact." *Trump v. Hawaii*, 585 U.S. 667, 698 (2018). Even if the refusal to take Plaintiffs' biometrics merely delayed their access to an adjudication on the merits, the delay alone would injure them. *See Khalid v. Garland*, No. 21-cv-2307, 2024 WL 1299339, at \*4–5 (D.D.C. Mar. 27, 2024) (courts "routinely" find that an unlawful delay in processing immigration petitions inflicts a "sufficient injury for standing purposes," regardless of "whether [the] delay is in fact unreasonable"), *aff'd*, 172 F.4th 876 (D.C. Cir. 2026).

An order vacating the policy, or enjoining DHS from refusing to collect Plaintiffs' biometrics, would redress those injuries. Although the biometrics collection would not guarantee that DHS would approve Plaintiffs' application before their deportation, it a "necessary first step on a path that could ultimately lead" to that relief, removing "an absolute barrier." *Duberry v. District of Columbia*, 924 F.3d 570, 583 (D.C. Cir. 2019). That is enough for standing. *Id.*; *see Gutierrez*, 606 U.S. at 319 (plaintiff had standing because declaratory judgment "would . . . redress [the plaintiff's] injury by removing the allegedly unconstitutional barrier [that the unlawful procedure] erected" between the plaintiff and the ultimate relief the plaintiff requested).

2. The government's primary response rests on its premise that Plaintiffs "misunderstand" DHS's statement that DHS will not take biometrics for detained people unless they seek relief from EOIR. Release, Dkt. No. 14-2; *see* Opp'n 13. But as explained above, that statement means what it says. *See supra* Part I.A. Because DHS policy eliminates the collection of biometrics from detained people with USCIS applications, it closes the door on the relief Plaintiffs need.

11

3. Even if the government were right that Biometrics Policy does not prohibit DHS as a whole from collecting their biometrics, Opp'n 13, Plaintiffs would still have standing.

The government admits that the revisions to the Policy Manual provide that "USCIS does not collect biometrics from aliens or other persons who are detained or incarcerated in any DHS or non-DHS detention facilities." Opp'n 7; *see* Policy Alert 2, Dkt. No, 14-3; Policy Manual 4, Doc. 14-4. This provision is one reason Plaintiffs have not been able to submit their biometrics: If USCIS would collect biometrics, Plaintiffs' applications could proceed. To satisfy traceability, the challenged conduct need only be "one among multiple causes" of the injury. *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017). The fact that ICE has also refused to collect the biometrics "does not erase [USCIS]'s role" in the harm. *Id.*

Further, if the Court vacated this provision, the Policy Manual would no longer prohibit USCIS from collecting biometrics from detained noncitizens with USCIS applications, removing "an absolute barrier" to relief. *Duberry*, 924 F.3d at 573. That individual USCIS agents might still refuse to collect biometrics—lawfully or unlawfully—would not defeat standing. *See Gutierrez*, 606 U.S. at 318–20; *NTCH, Inc. v. FCC,* 841 F.3d 497, 506 (D.C. Cir. 2016) ("[S]tanding is not defeated by the possibility that an agency might ultimately wield its discretion in a way that does not fix a party's alleged injury."). And of course, an injunction requiring USCIS to take Plaintiffs' biometrics—by going to detention facilities if necessary—would redress their injuries.

To the extent that the rescission of *ICE*'s obligation to collect detained people's biometrics is a distinct agency action, Plaintiffs have standing to challenge that, too. The recission authorizes ICE to refuse to collect biometrics. *See Orangeburg*, 862 F.3d at 1080 ("[T]he causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries . . . ."). And if

12

the Court vacated the rescission, ICE would again have the "burden" to collect Plaintiffs'

biometrics and run their security checks for USCIS applications. Policy Alert 1–2, Dkt. No. 14-3.

That, too, would remove an absolute "barrier" to relief. *Gutierrez*, 606 U.S. at 319.

4. The government also contends that the Court lacks jurisdiction because the Plaintiffs

"have no right to adjudication of [their] pending applications . . . before a removal order is entered."

Opp'n 15. But even if Plaintiffs needed such a right to prevail on the merits (and they do not), it

would be irrelevant to standing. *See Natural Resources Defense Council, Inc. v. EPA*, 25 F.3d

1063, 1067 (D.C. Cir. 1994) (that a party may lack a "right to relief . . . does not mean that they

have not alleged a cognizable injury sufficient to cross the threshold of justiciability").

5. Finally, the government argues that M.C. and H.A. lack standing because they can

pursue their applications abroad. Opp'n 16. But if deported, they will need to await an adjudication

away from their families while exposed to the threat of death in Mexico and Iran. These are

cognizable injuries. *See*, *e.g.*, *Hawaii*, 585 U.S. at 698 (family separation is injury in fact).[2]

**E.   Section 1252(a)(2)(B) does not preclude Mr. Estrada Trejo or H.A.'s claims**

The government argues that two of the plaintiffs' claims are barred by 8 U.S.C.

§ 1252(a)(2)(B) ("Subsection (B)"), entitled "denials of discretionary relief." But the government

lacks the "clear and convincing evidence" necessary to overcome the "strong presumption in favor

of judicial review." *Make The Rd. New York v. Wolf*, 962 F.3d 612, 623–24 (D.C. Cir. 2020).

1. As its title indicates, and as the D.C. Circuit has held, Subsection (B) covers "orders

denying discretionary relief in individual cases"; it does not strip jurisdiction to review "generally

applicable" rules about how an agency processes cases. *Make The Rd.*, 962 F.3d at 630–31; *Nakka*

---

[2] M.C. and H.A.'s removal orders do not affect standing because they can move to reopen or cancel the removal order if granted relief. 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 214.14(c)(5)(i).

*v. USCIS*, 111 F.4th 995, 1003, 1015 (9th Cir. 2024) ("consistent with the D.C. Circuit's" interpretation of the statute, Subsection (B) does not preclude a "collateral challenge to generally applicable agency policy or procedure"). Provisions barring "direct review of individual denials" of immigration applications do not swallow "general collateral challenges to [unlawful] practices and policies." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991).

2. The text of Subsection (B) confirms that conclusion. Subsection (B)(i) limits its scope to "'judgment[s] regarding the granting of'" five specific "discretionary forms of individual relief." *Make The Rd.*, 962 F.3d at 621, 629 (quoting 8 U.S.C. 1252(a)(2)(B)(i)). "[T]hat language is most naturally read to describe 'a single act of granting or denying an individual application for relief,' rather than an agency policy or procedure, which 'would not typically "grant" relief without case-specific adjudication.'" *Doe v. Trump*, No. 1:25-cv-13946, 2026 WL 1170971, at *8 (D. Mass. Apr. 30, 2026) (quoting *Nakka*, 111 F.4th at 1004). The context reinforces that reading. Though neighboring provisions bar review of "procedures and policies," 8 U.S.C. § 1252(a)(2)(A)(4), Congress eschewed that language in Subsection (B). When, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same Act," courts presume it intended "the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2019).

Even if Subsection (B)(i) applied to general policies, it would not cover the cross-cutting rule at issue here. By enumerating only five specific types of decisions to which the review bar applies, Subsection (B)(i) indicates that Congress did not intend it to strip judicial review of rules that restrict access to *every* benefit in USCIS's jurisdiction. *See Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("The expression of one thing implies the exclusion of others."). Otherwise, DHS could cut off access to any path to relief from USCIS—even those that Subsection (B) does not mention—without judicial review, as long as it made sure to sweep in adjustment of status.

14

The cases the government cites (at 23) prove the point. They all involved individualized denials of adjustment applications, not an across-the-board policy that affects forms of relief beyond those enumerated in the statute. In *Patel v. Garland*, the Court held that Subsection (B)(i) covered factual findings that underlay the denial of an individual petition for discretionary relief "under § 1255 and the other provisions enumerated in § 1252(a)(2)(B)(i)." 596 U.S. 328, 347 (2022). And in *Abuzeid v. Mayorkas*, the D.C. Circuit held that a district court could not review USCIS's individualized denial of plaintiff's application for adjustment of status. 62 F.4th 578, 583 (D.C. Cir. 2023). Like *Patel*, "*Abuzeid* is limited to cases where the plaintiff's claim seeks review of an agency's denial of their individual application for relief and does not collaterally challenge agency policy or procedure without relying on that denial." *Nakka*, 111 F.4th at 1015.

3. Subsection (B)(ii) also applies "only" to a limited set of discretionary decisions: those "specified by statute 'to be in the discretion of the Attorney General.'" *Make The Rd.*, 962 F.3d at 629 (quoting *Kucana v. Holder*, 558 U.S. 233, 248 (2010)). Like Subsection (B)(i), it applies solely to "individualized forms of discretionary relief," not to a "generally applicable rulemaking governing . . . *procedures* undertaken by the Secretary . . . ." *Id.* at 630; *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C. 2018) ("[C]ourts have declined to apply [subsection (ii)] to claims challenging the legality of policies and processes governing discretionary decisions."). Moreover, Subsection (B)(ii) applies only to decisions the "statute itself" commits to agency discretion. *Kucana*, 558 U.S. at 244. Although the statute gives the agency discretion to prescribe "regulations" to govern adjustment, 8 U.S.C. § 1255(a), the statute requires the agency to promulgate those "regulations" "through notice and comment rulemaking." *RAICES v. Mullin*, No. 25-5243, 2026 WL 1110616, at *18 (D.C. Cir. Apr. 24, 2026). The statute, therefore, does not give DHS unreviewable discretion to categorically restrict access to relief through sub-regulatory

15

policies that do not pass the rigor of notice-and-comment. *See id.*

Again, the cases the government cites confirm this conclusion. Most involved challenges to individualized denials of applications, *see, e.g.*, *Fofana v. Noem*, 163 F.4th 1135, 1137 (8th Cir. 2026), or delays in processing individual applications, Opp'n 25. Although one case involved a policy that deprioritized certain parole applications, it is not binding, did not discuss *Make The Road*, and predated *RAICES*. *See A.M.S. v. Edlow*, No. 25-476, 2026 WL 850779, at \*12 (D.D.C. Mar. 27, 2026). The remaining (out of circuit) cases involved a regulation that held adjustment applications in abeyance until a "condition precedent" to their granting—an available visa—was met. *Varniab v. Edlow*, No. 25-cv-10602, 2026 WL 485490, at \*7 (N.D. Cal. Feb. 20, 2026) (citing, among other cases, *Cheejati v. Blinken*, 106 F.4th 388, 394 (5th Cir. 2024)). But those cases are contrary to circuit precedent, *see Make The Rd.*, 962 F.3d at 630–31, and their reasoning does not apply here because the Biometrics Policy was "not issued as [a] regulation promulgated by USCIS" and was not "compelled by visa limits set by Congress in the statutory scheme." *Doe*, 2026 WL 1170971, at \*9; *accord Varniab*, 2026 WL 485490, at \*7.

Moreover, Subsection (B)(ii) "does not deprive federal courts of jurisdiction to review pure questions of law," like whether DHS violated a statute or its own regulations, "because those questions do not implicate discretion." *Aghakasiri v. Bondi*, No. 24-cv-2898, 2026 WL 772711, at \*5 (D.D.C. Mar. 19, 2026); *accord Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).

### F. The Biometrics Policy is contrary to law

#### 1. The Policy conflicts with the INA and its regulations

As explained in the opening brief, the INA and its regulations give Plaintiffs the right to pursue an individualized adjudication on the merits of their applications for relief, and DHS cannot block that right by withholding a prerequisite to relief. *See* Pls' Mem. 16–26. The government

16

makes several objections to this claim, none of which have merit.

First, the government says that the Biometrics Policy does not "categorically" block detained people from submitting biometrics for USCIS applications because, in the government's view, the policy does not prohibit ICE from transporting people to their USCIS appointments or taking the biometrics itself and sending them to USCIS. Opp'n 29. As explained above, though, the plain language of the Biometrics Policy reflects that *DHS*—which includes ICE—will not take those biometrics. *See supra* Part I.A. Anyway, the government concedes that the policy prevents USCIS from going to detention centers to collect biometrics, and it submits no evidence that ICE takes biometrics for USCIS applications or transports applicants to their appointments. *See id.*

Second, the government claims that Plaintiffs have "no right to adjudication" of USCIS "benefits that might prevent removal before a removal order is entered." Opp'n 15. But even if that were true, it would not mean that DHS may categorically prevent eligible people from pursuing their applications while they languish in detention. As multiple courts have held, DHS may not categorically refuse to adjudicate USCIS applications indefinitely. *E.g.*, *Doe*, 2026 WL 1170971, at *15; *Varniab*, 2026 WL 485490, at *12 (same).[3]

Even worse than an indefinite hold, the Biometrics Policy dooms detained people's applications to summary denial and forecloses access to relief altogether. As the government admits, by regulation, USCIS must deny applications as "abandon[ed]" when it does not receive

---

[3] The government's argument also fails on its own terms: DHS cannot deport someone with a pending application that the law entitles them to pursue from within the United States without considering that application. *See, e.g.*, *Ceta v. Mukasey*, 535 F.3d 639, 646–47 (7th Cir. 2008) (immigration court could not deny continuance needed for noncitizen to pursue adjustment without "a reason consistent with the [adjustment] statute" because it would "nullify [the] statutory right to apply for adjustment"); *see infra* p. 21 (citing other cases). Only one of the cited appellate cases—*Mudric v. Attorney General*—involved relief people have a right to seek within the United States (asylum and adjustment). 469 F.3d 94, 99 (3d Cir. 2006). But in *Mudric*, the government *did* adjudicate the relevant petitions on their merits prior to removal. *Id.* at 96-97 & n.2.

17

biometrics. Opp'n 6; 8 C.F.R. § 103.2(b)(13)(ii). Contrary to the government's contention, DHS cannot "discharge" its obligations by categorically withholding biometrics collections and then denying applications on that basis. Opp'n 31. When a statute or regulation provides a right to pursue or apply for relief, or directs an agency to adjudicate applications, the agency must allow applicants to "apply and *be considered*" for that relief on an "individualized" basis. *RAICES* 2026 WL 1110616, at *2, 16 (emphasis added). It cannot refuse to consider applications or summarily deny relief based on "categorical" bars. *Id.* at *15; *see*, *e.g.*, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954); *Succar v. Ashcroft*, 394 F.3d 8, 24 (1st Cir. 2005); Pls.' Mem. 17, 18, 20. When DHS withholds a prerequisite to relief "with no consideration of" whether applicants should receive that relief, it forecloses the individualized consideration the law requires. *RAICES*, 2026 WL 1110616, at *15.

The government says that cases like *Succar* are "inapposite" because the Biometrics Policy does not "expressly" make noncitizens "ineligible for adjustment of status." Opp'n 28. In other words, it suggests that DHS could have prevailed in *RAICES*, *Accardi*, and *Succar* if, instead of making the plaintiffs ineligible for relief, it simply forced them to abandon their applications. But those decisions turned on the fact that the challenged policies categorically barred access to relief for people entitled to apply for it, not on the form the bar took. *See* Pls' Mem. 17–18, 20–21.

The government argues that refusing to collect biometrics from detained U visa and derivative asylum applicants does not foreclose their access to relief because they can still pursue those benefits from abroad. Opp'n 31. But since DHS will not collect those applicants' biometrics in detention, those applicants still face automatic denials for "abandon[ment]." *Id.* at 6. Deportation also deprives asylum applicants of the right to apply from within the United States, *see* 8 U.S.C. § 1158(a), and separates them from their family in the United States, undermining the purpose of

18

derivative asylum. *See id.* § 1158(b)(3)(A). And if a U visa applicant is removed, the INA bars reentry for many years, rendering the application "moot." *Lopez v. Trump*, No. 25-cv-04826, 2025 WL 3274224, at *13 (S.D.N.Y. July 10, 2025) (rejecting government argument that deportation did not harm U visa applicant because she could pursue relief abroad).

### 2.   The Policy conflicts with the biometrics regulation

The Biometrics Policy also conflicts with DHS's regulatory duty to take detained people's biometrics. Although Part 1003 generally governs EOIR, the government agrees with Plaintiffs that 8 C.F.R. § 1003.47 also "governs *DHS*'s obligations to collect biometrics" from detained noncitizens. Opp'n 14 (emphasis added); Policy Alert 2, Dkt. No. 14-3; USCIS, *Policy Manual*, vol. 1, pt. C, Ch. 2 at 8 n.23, Dkt. No. 14-4. The government only disagrees about the scope of that obligation: it claims that DHS need only collect biometrics when a detained person requests "immigration benefits before the immigration courts." Opp'n 13. It primarily relies on 8 C.F.R. § 1003.12, which states: "*Except where specifically stated*, the rules in this subpart apply to matters before Immigration Judges[.]" 8 C.F.R. § 1003.12 (emphasis added).

But Section 1003.47 falls squarely within the exception: It contains its own specific statements defining the scope of the regulation. *See*, *e.g.*, *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) ("[T]he specific governs the general."). And those specific provisions both use expansive language to describe the section's scope: They provide that the regulation applies to "any application for immigration relief, protection, or restriction on removal," 8 C.F.R. § 1003.47(a), and to "any form of immigration relief in immigration proceedings which permits the alien to reside in the United States," *id.* § 1003.47(b). The operative provision, paragraph (d), repeats the expansive word "any" a third time: "DHS is responsible for obtaining biometrics and other biographical information with respect to *any* [noncitizen] in detention." *Id.*

19

The government argues that these statements do not mean what they say because, if they did, they would conflict with "express limitations" in the regulation. Opp'n 27. But the government can identify no such limitation. As its chief example, the government rewrites paragraph (b) to say that the regulation's requirements "apply to the granting of any form of immigration relief in immigration proceedings . . . to the extent they are within the authority of an immigration judge or the Board to grant." *Id.* at 26. If that was what the drafters meant, they could have written just that. Instead, they used the non-exhaustive language the government omits. 8 C.F.R. § 1003.47(b) (stating that the regulation applies to "any form of immigration relief in immigration proceedings *including but not limited to*" relief that the immigration courts may grant (emphasis added)). The government's interpretation reads that broadening language out of the regulation.[4]

Nor does paragraph (b)'s reference to "immigration proceedings" impose such a limitation. 8 C.F.R. § 1003.47(b). USCIS adjudications are immigration proceedings. *See*, *e.g.*, 8 C.F.R. §§ 103.2(a)(3), (15), (16) (repeatedly referring to USCIS adjudications as "proceeding[s]"); *see also Proceeding*, Black's Law Dictionary (12th ed. 2024) ("Any procedural means for seeking redress from a tribunal or agency."); 5 U.S.C. § 551(12) (defining "agency proceeding" to include any agency adjudication). If the drafters meant to limit the regulation's scope to "immigration-*court* proceedings," Opp'n 27 (emphasis added), they could have easily said so.

### 3.    The Policy violates the Due Process Clause

Although the Court need not reach the issue to grant relief, the Biometrics Policy also

---

[4]  The government also incorrectly asserts that the first sentence of paragraph (d) indicates that the entire paragraph only applies "[a]t any *hearing*" before an immigration judge. Opp'n 26. That sentence requires DHS to provide a biometrics notice when a noncitizen requests relief at an immigration court hearing. But it does not modify the last sentence of paragraph (d), which states that DHS shall collect biometrics for "any [noncitizen] in detention." 8 C.F.R. § 1003.47(d).

violates the Due Process Clause. Citing decades-old out-of-circuit caselaw, the government claims that none of the plaintiffs have a liberty interest in remaining in the United States that would require procedural protection because they are "seeking. . . admission to the United States." Opp'n 32. As the D.C. Circuit has recognized, that argument lacks merit. *Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *22 (D.C. Cir. Nov. 22, 2025) (a person has a "liberty interest in avoiding a wrongful removal" even when unlawfully present and thus not formally admitted).

Due process of law requires agencies to follow "procedural requirements prescribed for the protection" of noncitizens when their liberty interests are at stake. *Bridges v. Wixon*, 326 U.S. 135, 154 (1945). Even the case relied on by the government held that the "*Accardi* doctrine derives from the Due Process Clause's obligation that government agencies follow the law, even if that 'law' is a procedural regulation by which the agency has gratuitously limited its otherwise unfettered discretion." *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 35 (D.D.C. 1998).

Separately, the applicable statutes and regulations give eligible noncitizens a "'legitimate claim of entitlement'" because they create a "'right to submit and the opportunity to substantiate' their claims," even when the relief is discretionary. Pls.' Mem. 30–31 (quoting *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1037–39 (5th Cir. 1982), and collecting cases). As many courts have held, the government unconstitutionally abrogates that right when it removes people who are eligible and applying for relief that regulations entitle them to pursue from within the United States. *See Jimenez v. Nielsen*, 334 F. Supp. 3d 370, 386–87 (D. Mass. 2018); *S.N.C. v. Sessions*, No. 18-cv-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018); *Lopez*, 2025 WL 3274224, at *11.

### G. The Biometrics Policy is arbitrary and capricious

The Biometrics Policy is arbitrary and capricious. Contrary to the government's premise, the APA does not ask only whether "the agency has acted within a zone of reasonableness" in

21

substance, Opp'n 34; to survive review, the agency action must be "reasonably *explained*." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (emphasis added). DHS provided no "reasoned analysis" to explain the Biometrics Policy, *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020): It failed to justify treating applicants for USCIS benefits differently from EOIR applicants, ignored the policy's effects on detained people eligible for relief from USCIS, and failed to address the reliance interests engendered by the prior policy. Pls' Mem. 31–36.

1. The government does not claim that DHS addressed any of these matters. Its response does not even try to defend the policy as written. Opp'n 34–37. Instead, it claims that the policy did not prohibit *DHS* as a whole from collecting applicants' biometrics, but only provided that "*USCIS* will not affirmatively go to any detention facilities to collect biometrics" and expressed the view that the biometrics regulation does not require it to do so. *Id.* at 34 (emphasis added); Policy Alert 3, Dkt. No. 14-3 ("[p]rovid[ing] that USCIS does not collect biometrics" from detained people who "have a pending immigration petition or application with USCIS").

As explained above, the policy is not so limited. *See supra* Part I.A. But even if it were, the policy would still be arbitrary and capricious for the reasons that Plaintiffs outlined in their opening brief: USCIS offered no reasoned explanation for refusing to collect biometrics from people in detention who have USCIS applications, did not discuss how that policy would cut off relief for many eligible applicants, did not consider reliance interests, and did not discuss any alternatives. *See* Pls' Mem. 31–36. By the time it promulgated the revisions to its Policy Manual, USCIS knew that DHS had rescinded the intradepartmental agreement that required ICE to collect biometrics from detained USCIS applicants. *See* Policy Alert 2, Dkt. No. 14-3. Yet USCIS doubled down on its refusal to "collect biometrics from individuals who are detained" and elected "to rely primarily on [in-person] appointments as the means of collecting biometrics," Opp'n 34–35, even

though ICE regularly refuses to take biometrics for or transport detained people to those appointments. *See supra* Part I.A. USCIS did not explain *why* it believed this refusal was reasonable. That was arbitrary and capricious. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024).

The government says that it did not need to explain USCIS's refusal to collect biometrics because the policy update did not "change" USCIS's "role in biometrics collection." Opp'n 35. But the policy did change the Policy Manual to prohibit USCIS from collecting biometrics from people incarcerated in "DHS detention facilities," as opposed to only "non-DHS" facilities. Opp'n 8 (comparing the old and new versions of the Policy Manual). In any event, an affirmative decision not to change a rule is a final agency action that calls for explanation. *Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1037 (D.C. Cir.) (decision "not to repeal" a rule was a final agency action), *opinion modified on reh'g*, 293 F.3d 537–38 (D.C. Cir. 2002).

2. To the extent it constitutes a distinct agency action, DHS's decision to rescind the intradepartmental agreement that required ICE to collect biometrics was also arbitrary and capricious. *See* Pls' Mem. at 35–36. Although the government acknowledges that "Plaintiffs argue that USCIS failed to adequately explain [the agreement's] recission," it does not attempt to defend that decision. Opp'n 36. Plaintiffs are thus likely to succeed in showing it violated the APA.

3. The government's claim (at 36) that Plaintiffs did not show the prior policy engendered reliance interests is equally off base. The Biometrics Policy applies retroactively to people—including several of the plaintiffs—who filed applications and paid fees before it took effect. Policy Alert 2, Dkt. No. 14-3; J.Z. Decl. ¶ 2, Dkt. No, 14-5; R.M. Decl. ¶ 9, Dkt. No. 14-6. And several courts have held that policies that arbitrarily withhold or deny immigration benefits upset reliance interests. *See* Pls.' Mem. 33-34 (collecting cases). The government ignores all this. It is also wrong to suggest that a policy manual cannot engender reliance interests merely because it

23

disclaims creating enforceable rights. Opp'n 36; *see Regents*, 591 U.S. at 30–31 (holding that policy memo "may have engendered serious reliance interests that must be taken into account" even though it included substantially the same disclaimer); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218, 221–22 (2016) (longstanding "practice" memorialized in opinion letter and agency handbook engendered "significant reliance interests").

## II.    Plaintiffs face likely irreparable harm, and the balance of equities favors relief

The detained plaintiffs are likely to suffer irreparable harm: likely deportation, family separation, and violence abroad without access to the relief they seek. *See* Pls' Mem. 36–40.

True, DHS has not formally denied their applications or deported them yet. But to obtain preliminary relief, a plaintiff need only show that irreparable harm is "*likely*" to occur if the Court does not prevent it, not that it occurred already. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). As explained above, Plaintiffs' claims are not based on "speculation" about what ICE will do: The policy provides that DHS—including ICE—will not collect their biometrics. And even if it merely allows ICE to refuse those collections, the record shows that ICE has refused to collect biometrics for most of the Plaintiffs and that USCIS has refused to accept them when ICE claims to have sent them. *See supra* Part I.A. Even if some Plaintiffs can pursue their applications after removal, they will need to do so away from their families and under threat of violence in their countries of origin, and federal law will bar their re-entry for years. Pls' Mem. 36–40.

The government argues that the timing of this motion negates irreparable harm. Opp'n 39–40. "But the caselaw the Government relies on is inapposite, as it stands only for the proposition that plaintiffs' *unexplained delays* in seeking emergency relief undermine their contention that they will be irreparably harmed." *Make the Rd. New York v. Noem*, 805 F. Supp. 3d 139, 172 (D.D.C. 2025) (quotation marks omitted). One of the plaintiffs was detained only weeks before

24

Plaintiffs filed this lawsuit. *See* Estrada Trejo Decl. ¶ 3–4, Dkt. No. 14-7 (detained in March 2026). Others did not receive confirmation that DHS would not take them to their biometrics appointments until those appointments came and went in March or April 2026. *See* Y.P. Decl. ¶ 6, Dkt. No. 14-8; H.A. Decl. ¶ 6, Dkt. No. 14-9; M.C. Decl. ¶ 10, Dkt. No. 14-10. Plaintiffs also had to find counsel to bring this case, and Plaintiffs' counsel then had to arrange interviews with the Plaintiffs at their detention centers, prepare and translate their declarations, and prepare the "complex" 43-page brief that addressed "several different statutory and regulatory schemes." Dkt. No. 15 at 2. The time Plaintiffs took to give DHS a chance to comply with its obligations—and to prepare the papers when it did not—does not cut against a finding of irreparable harm. *See Make the Rd.*, 805 F. Supp. 3d at 172 (five-month delay did not negate irreparable harm).

Nor would the requested relief harm the public interest. While DHS has discretion to manage its application process, *see* Opp'n 40, the law limits that discretion. As the government does not dispute, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

## III. The Court should issue a stay or classwide preliminary injunction

The government's suggestion that the Court may not grant a classwide stay or injunction "absent class certification," Opp'n 40, is incorrect for the reasons explained in the opening brief. *See* Pls.' Mem. 41, 42.  To "tread the safest ground," however, the Court should grant provisional class certification for the reasons explained in Plaintiffs' motion for class certification. *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 122 n.3 (D.D.C. 2025) (citation modified); *see* Dkt. No. 20-1.[5]

The Court should grant the motion for a stay and preliminary injunction.

---

[5] Any argument that Plaintiffs must satisfy the standards to compel withheld action under 5 U.S.C. § 706(1) fails because the Biometrics Policy is a "consummated 'agency action'" under § 706(2). *All. To Save Mattaponi v. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 10 (D.D.C. 2007).

Dated: June 2, 2026          Respectfully submitted,

*/s/ Sean Ouellette*
Sean Ouellette (DC Bar 1741535)
Alethea Anne Swift (DC Bar No. 1644929)
Jennie L. Kneedler (DC Bar No. 500261)
Paul R.Q. Wolfson (DC Bar No. 414759)
Elena Goldstein (DC Bar No. 90034087)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 322-1959
souellette@democracyforward.org
jkneedler@democracyforward.org
aswift@democracyforward.org
pwolfson@democracyforward.org
egoldstein@democracyforward.org

Mary Georgevich
Keren Zwick (D.D.C. Bar No. IL0055)
Richard Caldarone (DC Bar No. 989575)
Gerardo Romo
Nicole May
**NATIONAL IMMIGRANT JUSTICE CENTER**
111 W. Jackson Blvd. Suite 800
Chicago, IL 60604
Phone: (312) 660-1364 (Zwick)
mgeorgevich@immigrantjustice.org
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
gromo@immigrantjustice.org
nmay@immigrantjustice.org

Michelle N. Mendez
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: 410-929-4720
michelle@nipnlg.org

*Counsel for Plaintiffs*

26