BRETT A. SHUMATE
*Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
SAMUEL P. GO
*Assistant Director*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov
MALCOLM MCDERMOND
JAMES A. HURLEY
AYSHA T. IQBAL
*Trial Attorneys*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| J.Z., *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:26-cv-01510-AHA |
| U.S. Department of Homeland Security, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Doc. 20)**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

I. Legal Background ........................................................................................................ 2

II. Background Concerning Biometrics Collection ............................................................ 6

III. This Lawsuit.................................................................................................................. 9

LEGAL STANDARDS ........................................................................................................12

ARGUMENT .......................................................................................................................13

I. Plaintiffs Do Not Have Any Imminent Injury Traceable to the Challenged Policy. ........ 13

II. Plaintiffs Have Not Established Numerosity. ................................................................ 17

III. Plaintiffs Cannot Establish a Common Question That Would Drive Resolution of the Class Claims................................................................................................................ 18

IV. The Named Plaintiffs' Claims are Not Typical of Claims of the Class........................... 26

V. The Named Plaintiffs Are Not Adequate Representatives. ............................................ 30

VI. The Class Does Not Satisfy Rule 23(b)(2). .................................................................. 31

CONCLUSION.....................................................................................................................33

## INTRODUCTION

The Court should reject Plaintiffs' request to certify a class in this challenge to a "Biometrics Policy," which Plaintiffs incorrectly characterize as a "blanket refusal to collect biometrics for [U.S. Citizenship and Immigration Services (USCIS)] applications" from detained persons. *See* Pls.' Mem. in Support of Mot. for Class Certification (Doc. 20-1) ("Mem.") at 3. Plaintiffs' motion for class certification cannot succeed for many reasons, chief of which is that there is no "blanket rule that cuts off an entire class of people" from pursuing immigration benefits. *See id*. at 1. Although the challenged policy documents re-affirm that USCIS does not go into detention facilities to collect biometrics, they do not preclude U.S. Immigration and Customs Enforcement (ICE)—the entity responsible for immigration detention—from facilitating the collection of biometrics, and they do not preclude USCIS from accepting biometrics from detainees, including detainees who have pending applications before USCIS. Indeed, USCIS is receiving and accepting such biometrics from ICE.

For these reasons, the named Plaintiffs cannot assert claims on behalf of the class because their claimed injuries are not fairly traceable to the "Biometrics Policy" or redressable by relief against the Policy, and they thus lack standing to challenge it. But even assuming that the named Plaintiffs can bypass this threshold hurdle to class certification, their claims as pleaded are not sufficiently ripe to be typical of the class. Indeed, it is unclear whether all of the named Plaintiffs are currently members of the proposed class at all, as the class is defined as those whose biometrics were not "accepted" by USCIS—and not all Plaintiffs specifically assert that they have made attempts to ask ICE to facilitate submission of their biometrics. Regardless of this defect in the named Plaintiffs' claims, however, the class still cannot satisfy Rule 23. As there is no common reason why a detainee's biometrics may not be collected, there is a mismatch between the relief sought and the challenged Policy, such that the class lacks the commonality and cohesiveness required by Rule 23.

Beyond these overarching reasons to deny class certification, there are numerous other commonality and typicality defects with respect to the named Plaintiffs and the class as defined. For example, certain Plaintiffs or subsets of the proposed class are not injured because they could continue to pursue relief from abroad; certain claims are subject to jurisdictional bars to review; and certain Plaintiffs or putative class members are in different positions with respect to constitutional due process protections based on their status in the United States.

Class certification is thus inappropriate here. Putative class members who do have the Biometrics Policy applied to them in a manner that precludes their ability to pursue benefits may bring their claims individually (although Defendants do not concede such claims are meritorious).

## BACKGROUND

### I. Legal Background

Under the Immigration and Nationality Act (INA), aliens who are present in the United States without admission or who otherwise lack documentation sufficient to permit admission to the United States are inadmissible and subject to removal proceedings. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(a)(7), 1225(b)(2)(A), 1229a(a)(2). As relevant here, such aliens may be placed in removal proceedings under 8 U.S.C. § 1229a and detained pending those immigration proceedings. *See* 8 U.S.C. §§ 1225(b)(2)(A), 1226(a), (c). ICE, a component of the Department of Homeland Security (DHS), is responsible for immigration detention. 6 U.S.C. §§ 251, 252.

The lower immigration courts and Board of Immigration Appeals (BIA), which are housed in the Executive Office for Immigration Review (EOIR), may consider applications for relief from removal and certain applications for adjustment of status. 8 U.S.C. § 1229a(c)(4); Doc. 14-1 at 3 n.1 (citing regulations). However, certain requests for immigrant or nonimmigrant status or other immigration benefits may only be filed with USCIS, a DHS component agency. The APA may permit review of USCIS's ultimate decision on those requests, unless the INA otherwise precludes review or the action is committed to agency discretion by law. *See* 5 U.S.C. §§ 701(a), 702. The

immigration benefit requests at issue here are as follows.

*Special Immigrant Juvenile Classification*. The Special Immigrant Juvenile (SIJ) classification is available to aliens under the age of 21 who have been declared dependent on a juvenile court or legally committed to or placed into the custody of an entity or individual, and whose reunification with at least one parent is not viable, if DHS "consents" to the classification. 8 U.S.C. § 1101(a)(27)(J). An alien whose SIJ classification is approved (an "SIJ") is still subject to arrest, detention, and removal from the United States if a final order of removal is entered. *See United States v. Granados-Alvarado*, 350 F. Supp. 3d 355, 357 (D. Md. 2018) ("[A]n SIJ designation does not strip the U.S. government of all removal powers."). "Noncitizens without lawful status who have an approved SIJ petition remain subject to removal" because "SIJ classification does not render a noncitizen lawfully present, does not confer lawful status, and does not result in eligibility to apply for employment authorization." Doc. 17-1 at 2-3. USCIS may consider SIJs for deferred action. *See id.*; Doc. 17-2 (announcing USCIS would no longer "automatically consider" SIJs for deferred action). Deferred action is "an act of administrative convenience to the government which gives some cases lower priority" for removal. 8 C.F.R. § 274a.12(c)(14); *see also Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483-84 (1999). Deferred action does not confer lawful status and may be terminated at DHS's discretion. *See DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 61 (2020) (Thomas, J., concurring in part).

*Derivative Asylum.* Asylum is a discretionary status that provides relief from removal and a pathway to lawful permanent residence; it is potentially available to certain aliens who are present in the United States and who can demonstrate they meet the definition of "refugee" in 8 U.S.C. § 1101(a)(42)(A). *See generally* 8 U.S.C. §§ 1158, 1159. A detained alien in removal proceedings may seek asylum in those proceedings. *See, e.g.*, 8 U.S.C. §§ 1158(a)(1); 8 C.F.R. § 1208.2(b) (providing immigration judges exclusive jurisdiction over asylum applications filed

by aliens in certain immigration-court proceedings, including § 1229a removal proceedings). However, if someone who has been granted asylum seeks discretionary derivative asylum on behalf of an eligible spouse or child under 8 U.S.C. § 1158(b)(3), they would submit an I-730 petition to USCIS. *See* 8 C.F.R. § 208.21(a), (c) ("When a spouse or child of an alien granted asylum is in the United States, but was not included in the asylee's benefit request, the asylee may request accompanying or following-to-join benefits for his or her spouse or child, by filing for each qualifying family member a Request for Refugee/Asylee Relative . . . ."); Doc. 17-3. Asylees may also pursue derivative asylum status for spouses and children located outside the United States. *See* 8 C.F.R. § 208.21(d); Doc. 17-3 ("If the beneficiary is located outside of the United States, USCIS sends the petition through the DOS National Visa Center (NVC) to a USCIS international field office or a DOS embassy or consulate" or to USCIS international field office.). "Granting derivative asylum rests entirely within the discretion of [] USCIS." *Farag v. U.S. Citizenship & Immigr. Servs.*, 531 F. Supp. 2d 602, 608 (S.D.N.Y. 2008); *see also Miljkovic v. Ashcroft*, 366 F.3d 580, 582 (7th Cir. 2004).

*Adjustment of Status for Arriving Aliens.* DHS[1] may, "in [its] discretion and under such regulations as [it] may prescribe," adjust the status of an alien who was admitted or paroled into the United States that of a lawful permanent resident under 8 U.S.C. § 1255(a), if there is an available visa for which the alien has qualified. *See* 8 U.S.C. § 1255(a). The Cuban Adjustment Act (CAA) similarly give the executive branch the discretion, "under such regulations as [it] may prescribe," to adjust the status of a "native or citizen of Cuba . . . who has been inspected and admitted or paroled into the United States and has been physically present in the United States for at least one year." *See* 8 U.S.C. § 1255 note; CAA, Pub. L. No. 89-732, § 1 (1966), *as*

[1] The statute's reference to "Attorney General," is deemed to refer to the Secretary of Homeland Security with respect to functions transferred to the Secretary by the Homeland Security Act. *See* 6 U.S.C. § 557.

*amended by* Pub. L. No. 96-212 (1980). Although immigration judges generally have jurisdiction to adjudicate applications for adjustment of status of aliens in removal proceedings, they do not "have jurisdiction to adjudicate any application for adjustment of status filed by [an] arriving alien" (defined in 8 C.F.R. § 1001.1(q) as an applicant for admission who enters the United States at a port of entry) except in certain limited circumstances. *See* 8 C.F.R. § 1245.2(a)(1).

*T Nonimmigrant Status.* In 2000, Congress amended the INA to create the T nonimmigrant classification (or T Visa), which may provide temporary nonimmigrant status to certain victims of a severe form of trafficking in persons who have assisted with law-enforcement investigations of trafficking and who "would suffer extreme hardship involving unusual and severe harm" if removed from the United States. *See* Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386 § 107(e)(1); 8 U.S.C. § 1101(a)(15)(T)(i). Congress bestowed DHS (and thus USCIS) with the authority to decide applications for T nonimmigrant status. 8 U.S.C. § 1101(a)(15)(T)(i); 8 C.F.R. § 214.204. "The filing of an Application for T Nonimmigrant Status has *no effect* on DHS authority or discretion to execute a final order of removal," although the applicant may request an administrative stay of removal. 8 C.F.R. § 214.204(b)(2)(i) (emphasis added). The INA provides that stays of removal are discretionary, 8 U.S.C. § 1227(d)(1), but by regulation, T status applicants who demonstrate a bona fide application will receive a stay of removal, 8 C.F.R. § 214.204(b)(2)(iii). USCIS may also, in its discretion, grant deferred action to aliens with pending, bona fide T status applications. 8 U.S.C. § 204.205(e).

*U Nonimmigrant Status*. Congress also created the U nonimmigrant status (or U Visa) for certain aliens who "suffered substantial physical or mental abuse" due to being victims of qualifying crimes and who provided assistance to law enforcement. Violence Against Women Act of 2000, Pub. L. No. 106-386, § 1513(a)(2), (b)(3). As with T status, Congress specifically gave DHS—not EOIR—the authority to decide petitions for U status. 8 U.S.C. § 1101(a)(15)(U). U status applicants who are determined to have bona fide applications may receive deferred action.

8 U.S.C. § 1184(p)(6). However, aliens who depart or are removed from the United States can pursue U status from outside the United States and provide biometrics at designated locations abroad. *See* 8 C.F.R. § 214.14(c)(5)(i)(B) (indicating USCIS will notify petitioners residing outside of the United States of approval); New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed. Reg. 53014-01, 53021 (Sept. 17, 2007) ("USCIS has determined that the statutory framework for U nonimmigrant status permits alien victims of qualifying criminal activity to apply for U nonimmigrant status classification from either inside or outside the United States."); 8 C.F.R. § 103.16(b).

## II. Background Concerning Biometrics Collection

USCIS's collection of biometrics for immigration applications is crucial, as it:

> allows USCIS to verify a person's identity, produce secure documents, and facilitate required criminal and national security background checks to protect national security and public safety, as well as to ensure that the person is eligible for the benefit sought. Biometrics collection and security checks enhance national security and protect the integrity of the immigration process by ensuring that USCIS only grants benefits to eligible requestors.

Doc. 17-5; *see* 8 C.F.R. § 103.16. By regulation, if an applicant fails to appear for a required biometrics appointment, "the benefit request shall be considered abandoned and denied unless by the appointment time USCIS has received a change of address or rescheduling request that the agency concludes warrants excusing the failure to appear." 8 C.F.R. § 103.2(b)(13)(ii).

On December 5, 2025, USCIS issued several documents relating to clarifying revisions to the Biometrics Collection section of the USCIS Policy Manual.[2] It issued a Policy Alert (PA-2025-28) titled "Biometrics Collection for Aliens in Custody." Doc. 14-3 at 2 (the "Policy Alert"). That Policy Alert explained that USCIS was revising the part of the "Mobile Biometrics

[2] The USCIS Policy Manual, which "contains the official policies of USCIS," "does not create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." Doc. 17-4.

Collection" section of its Policy Manual that is titled "Persons in Custody" to "clarify USCIS policy on obtaining biometrics for detained aliens in custody with pending benefit requests with USCIS." *Id.* at 2 ("Purpose"), 3 ("Summary of Changes").

The Policy Alert provided background on biometrics collection, explaining that USCIS may require an applicant for an immigration benefit "to attend an Application Support Center (ASC) biometric services appointment for identity verification and to provide biometrics needed to conduct security and background checks," and that, under pre-existing regulations, a failure to attend the ASC appointment could result in USCIS deeming the application, petition, or request abandoned. *See id.* at 2 (citing 8 C.F.R. § 103.2(b)(13)(ii)). The background section also explained that USCIS does not allow USCIS contractors or staff to travel to jails, prisons, or non-DHS detention facilities to collect biometrics, and that "there is no current agreement between USCIS and [ICE] under which ICE has agreed to collect biometrics from individuals with an immigration benefit pending with USCIS." *Id.* Thus, the Policy Manual update, the Policy Alert explained, "removes outdated guidance that places the burden on ICE to collect biometrics of aliens in custody and clarifies guidance on USCIS' biometrics collection for detained aliens in custody in both DHS and non-DHS facilities." *Id.*

The Policy Alert highlighted that the Policy Manual revisions: (1) provide that USCIS does not collect biometrics from aliens or other persons who are detained or incarcerated in any DHS or non-DHS detention facilities; (2) removes obsolete guidance to clarify that there is no agreement between USCIS and ICE regarding the collection of biometrics for aliens in custody with pending requests for benefits with USCIS; and (3) clarifies that "DHS has no obligation to collect biometrics from aliens in detention, unless they are in removal proceedings and have an application for petition in front of" EOIR. *See id.* at 3.

As announced in the Policy Alert, USCIS also revised its Policy Manual's "Mobile Biometrics Collection" section with respect to "Persons in Custody." Those revisions are as

follows, with new language italicized and underlined, and deleted language struck through:

> USCIS does not grant requests to collect biometrics from aliens or other persons in custody at correctional institutions *for immigration petitions or applications under USCIS' exclusive or concurrent jurisdiction. [FN 23: By regulation, DHS is only responsible for obtaining biometrics needed for identity and background checks when an alien is in detention, in removal proceedings, and the benefit requested is within the jurisdiction of the Executive Office for Immigration Review. See 8 CFR 1003.47(d).] This includes requests from unaccompanied alien children, who have a pending asylum application while in removal proceedings, as USCIS has initial jurisdiction over such cases. [FN 24: See INA 208(b)(3)(C).]* USCIS officers and contract staff therefore do not travel to jails, prisons, or similar non-DHS *or DHS* detention facilities to perform biometric collections for any detained or incarcerated aliens or other persons (including applicants, petitioners, beneficiaries, derivatives, sponsors, or other requestors, regardless of their immigration status or country of citizenship). ~~In the case of an incarcerated person,~~ *However,* USCIS officers must continue to follow all applicable regulations and procedures in issuing ASC notices to those whose appearance is required for biometrics collection. ~~Per intradepartmental agreement, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations is responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS~~.
>
> USCIS does not approve requests to reschedule a biometrics appointment for reason of detention or incarceration. The person must follow the procedures listed in the biometrics appointment notice to request his or her appointment be rescheduled. [FN 25: If the person is no longer in custody, and has changed his or her address, he or she must also submit a change of address request on an Alien's Change of Address Card (Form AR-11) for the appointment to be rescheduled at the new address.]

*Compare* Doc. 14-4 at 5 *with* Doc. 14-11 at 5.

USCIS also issued a press release on December 5, 2025, regarding this update to the Policy Manual. *See* Doc. 14-2 at 2 ("Press Release"). The Press Release characterizes the Policy Manual updates as clarifying that DHS "generally will not take biometrics of detained aliens unless they are in removal proceedings and have a pending application or petition filed with" EOIR. *See id.*

On March 24, 2026, USCIS updated its internal operating procedures for ASCs to make clear that there are two options for processing detainees in ICE custody for biometrics collection: the detainee may appear at an ASC for biometrics collection, or ICE may submit fingerprints to a

USCIS location. Doc. 17-6, Declaration of Ian Brown, ¶¶ 5-10.

## III. This Lawsuit

Plaintiffs' lawsuit challenges the so-called "Biometrics Policy," which Plaintiffs define as the December 5, 2025, revisions to the Policy Manual regarding biometrics collection for persons in custody and the accompanying Policy Alert and Press Release. *See* Doc. 14-1 at 10 (defining the challenged policy as comprising these documents); *see also* Mem. at 3. Plaintiffs characterize these documents as setting forth a policy "by which DHS does not collect biometric information from detained noncitizens who have applications for immigration relief pending before [USCIS]." Doc. 14; Doc. 14-13; *see also* Compl. ¶ 62; Mem. at 1, 3.

Plaintiffs assert several legal theories under the Administrative Procedure Act (APA) and the Constitution. Count I of their Complaint asserts that the Biometrics Policy is contrary to the following legal or constitutional provisions in violation of the APA, 5 U.S.C. § 706(2), claiming those provisions entitle them to pursue an adjudication on the merits of their requests for immigration benefits: (1) the statues and regulations governing adjustment of status; (2) the statues and regulations governing SIJ classifications; (3) the statutes and regulations governing T and U nonimmigrant status; (4) the statutes and regulations governing asylum; (5) a regulation governing biometrics collection for immigration courts, 8 C.F.R. § 1003.47(d); and (6) the Fifth Amendment's Due Process Clause. Compl. ¶¶ 108-117. Next, Count II asserts a claim that the Biometrics Policy is arbitrary and capricious in violation of the APA, § 706(2). Compl. ¶¶ 118-122. Count III seeks to compel agency action (biometrics collection and individualized adjudication) under the APA, § 706(1). Compl. ¶¶ 123-127. Count IV asserts that the Biometrics Policy should have undergone notice and comment and thus allegedly violates the APA's requirements at 5 U.S.C. §§ 553 and 706(2)(D). Compl. ¶¶ 128-136. Count V asserts that the Biometrics Policy violates the Due Process Clause by allegedly "depriv[ing] noncitizens of the opportunity to pursue" relief from removal. Compl. ¶¶ 137-141.

Plaintiffs are six aliens who are in various stages of removal or post-removal-order proceedings and who are or were in immigration custody. No Plaintiff alleges he or she was admissible to the United States at the time he or she entered the country. All Plaintiffs allege that, *after* they were placed in immigration custody, they applied for some form of immigration benefit with USCIS. Compl. ¶¶ 11-16; Docs. 14-5–14-10.

Plaintiff J.Z., a 19-year-old citizen of Venezuela, came to the United States at the age of 17 and initially resided with his mother in Chicago. Compl. ¶ 67; Doc. 14-5 ¶¶ 1, 8. J.Z. relocated to Florida in October 2024. Doc. 14-5 ¶ 9. J.Z. served three months in jail in Florida "after pleading guilty to nonviolent resisting arrest," Doc. 14-5 ¶ 9, returned to Chicago, and was subsequently detained at an ICE check-in in February 2025. Doc. 14-5 ¶ 10. While detained, J.Z. filed an initial SIJ application in June 2025 and ICE reportedly submitted his biometrics to USCIS in August 2025, but the application was denied on December 1, 2025, allegedly for failure to appear at a biometrics appointment. Doc. 14-5 ¶¶ 2-3. J.Z. has been in removal proceedings since 2023 and was ordered removed by the Immigration Judge on May 11, 2026. *See* Doc. 17-7.

Plaintiff R.M., a 22-year-old citizen of Mexico, alleges his father brought him to the United States as a child. Doc. 14-6 ¶ 1. R.M. was detained by ICE in June 2025. Doc. 14-6 ¶ 8. R.M. did not apply for a T visa until November 2025. Doc. 14-6 ¶ 9. An Immigration Judge denied R.M's application to terminate his removal proceedings and ordered him removed on April 16, 2026. Doc. 14-6 ¶ 3.

Plaintiff Estrada Trejo, a 45-year-old citizen of Mexico, was paroled into the United States in 2018. Doc. 14-7 ¶¶ 1-2. He married a U.S. citizen in April 2024. Doc. 14-7 ¶ 4. Estrada Trejo's removal proceedings commenced in 2020 and remain pending. *See* Doc. 17-8. On March 2, 2026, Estrada Trejo was detained at an ICE check-in. Doc. 14-7 ¶ 3. He filed an application for adjustment of status in March 2026. *See* Doc. 14-7 ¶ 4.

Plaintiff Y.P., a 49-year-old citizen of Cuba, was paroled into the United States after

entering at a port of entry in August 2024 and placed in removal proceedings. Doc. 14-8 ¶¶ 1–3; Doc. 17-9. He was detained in November 2025. Doc. 14-8 ¶ 3. An Immigration Judge denied Y.P.'s applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") on February 18, 2026, and Y.P. appealed to the BIA. Doc. 14-8 ¶ 5; Doc. 17-9. In March 2026, Y.P. also filed an application for adjustment of status under the Cuban Adjustment Act with USCIS. Doc. 14-8 ¶ 4.

Plaintiff H.A., a 40-year-old citizen of Iran, was detained at the U.S.-Mexico border in January 2025. Doc. 14-9 ¶ 4. At that time, H.A. was traveling with his male partner and his female spouse, to whom he remains legally married. Doc. 14-9 ¶¶ 2-4. H.A. filed his own applications for asylum and protection from removal in his removal proceedings, but an Immigration Judge denied those applications in May 2025. Doc. 14-9 ¶ 4. H.A.'s spouse, however, filed her own asylum application, which was granted in November 2025. Doc. 14-9 ¶ 4. H.A.'s motion to reopen his removal proceedings was denied on December 5, 2025, and H.A.'s appeal to the BIA is pending. *See* Doc. 17-10. H.A.'s wife filed a Form I-730 petition on H.A.'s behalf on January 27, 2026. Doc. 14-9 ¶ 5. H.A. filed a habeas petition and was released from post-removal order detention. *See* Mem. at 4; Doc. 17-10.

Plaintiff M.C., a 43-year-old citizen of Mexico, initially came to the United States in about 2011, was removed, and (presumably illegally) re-entered. *See* Doc. 14-10 ¶¶ 1-2 (asserting it took M.C. "multiple tries to get into the country"); Doc. 14-1 at 39 n.6. Aliens in this situation are generally subject to reinstatement of their removal order without further review and are ineligible for most forms of relief from removal. *See* 8 U.S.C. § 1231(a)(5).[3] After being detained again in

[3] "If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5).

May 2025, M.C. was placed in "withholding only" proceedings before the immigration court. Doc. 14-10 ¶¶ 5-6. In July 2025, M.C. applied for a U Visa, and, although she did not attend her biometrics appointment for that application, an officer at the detention facility told her that "he had to take [her] fingerprints." Doc. 14-10 ¶¶ 7, 10. M.C.'s applications for protection from removal are on appeal with the BIA. Doc. 14-10 ¶ 6.

**LEGAL STANDARDS**

The class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To fall within this narrow exception, Plaintiffs must "affirmatively demonstrate" their compliance with each element of Rule 23—"that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores*, 564 U.S. at 350; *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n. 9 (D.C. Cir. 1984) ("It is the party seeking class certification that bears the burden of establishing the class action requirements."). This is not just a "mere pleading standard." *Wal-Mart Stores*, 564 U.S. at 350. "[A]ctual, not presumed, conformance" with Rule 23 is "indispensable," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982), and certification is proper only if the Court is satisfied "after a rigorous analysis" that Plaintiffs have shown that each requirement of the Rules has been met. *Wal-Mart Stores*, 564 U.S. at 350–51.

Thus, Plaintiffs must demonstrate each element of Rule 23(a) is met: (1) the class is so numerous that joinder is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the Named Plaintiffs are typical of claims or defenses of the class ("typicality"); and (4) the Named Plaintiffs and counsel will fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a). In addition to meeting the requirements set forth in Rule 23(a), the proposed class must

also qualify under Rule 23(b)(1), (2), or (3). *AmChem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the individual nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360.

These standards are no different when a party requests "provisional" class certification for purposes of preliminary relief. "In evaluating whether to provisionally certify a class, the Court must still satisfy itself that the requirements of Rule 23 have been met." *Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 WL 1635392, at *14 (D.D.C. June 9, 2025) (citations and quotations omitted).

## ARGUMENT

### I. Plaintiffs Do Not Have Any Imminent Injury Traceable to the Challenged Policy.

As a threshold matter, the Court should not consider the class certification motion because the Plaintiffs lack Article III standing to bring their claims.

To satisfy the requirements of Article III standing, Plaintiffs "must allege an injury in fact that is fairly traceable to the challenged government action, and it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Doc Society v. Rubio*, 141 F.4th 1273, 1276 (D.C. Cir. 2025) (quotations and citations omitted). Plaintiffs assert they are injured by the Biometrics Policy because it bars them and others from pursuing collateral immigration relief with USCIS that would prevent their deportation. Compl. ¶¶ 2, 3, 6; Doc. 14-1 at 16. Plaintiffs contend that the Policy means DHS will not collect their biometrics and thus they

need an order from the Court requiring the collection of biometrics. Compl. ¶¶ 72, 80, 82, 87-88, 91-92, 97, 99-100; *id.* at 29 (Prayer for Relief).

Plaintiffs' claimed "injury" relies on a misreading of USCIS's Policy Manual and unsupported assumptions about DHS's and ICE's actions writ large. Because Plaintiffs' assumptions are unfounded, they lack an injury fairly traceable to the challenged policy. The updated Policy Manual clarifies that USCIS officers and contractors have no regulatory duty to collect biometrics for detained applicants, and that USCIS employees will not go into detention facilities to do so. Doc. 14-4 at 5; *see also* Doc. 14-3. It clarifies USCIS's view that 8 C.F.R. § 1003.47 only governs DHS's obligations to collect biometrics in relation to requests for immigration benefits before the immigration courts. *See* Doc. 14-4 at 9. What the Policy Manual *does not state* is that USCIS is prohibited from accepting biometrics or that any agency of DHS is prohibited from collecting biometrics for detained individuals. That is, the Policy Manual does not preclude USCIS from taking biometrics for detainees who appear for ASC appointments, and it does not preclude ICE from collecting biometrics or transporting detainees to their biometrics appointments. *Id.* Indeed, since March 1, 2026, ICE has submitted fingerprints to USCIS for scores of applications of detained persons with requests for immigration benefits pending before USCIS, and USCIS accepts those fingerprints. *See* Defs.' Ex. 11, Declaration of Bryan Darling ¶¶ 5–12. Any injury Plaintiffs claim to suffer does not arise directly from the USCIS Biometrics Policy, because the Policy Manual's terms do not prohibit DHS from taking biometrics for detained aliens.

Plaintiffs must do more to establish injury-in-fact and traceability. Plaintiffs have made the conclusory claim that DHS is now uniformly refusing to collect biometrics for detained aliens seeking relief with USCIS. Compl. ¶ 62; Doc. 14-1 at 10-11. To support this claim, Plaintiffs cite to the USCIS Press Release. Compl. ¶ 62; *see also* Doc. 14-2. The Press Release states that DHS "generally will not take biometrics of detained aliens unless they are in removal proceedings and have a pending application or petition filed with the Executive Office for Immigration Review."

Doc. 14-2. While purporting to articulate DHS's position, the announcement is from USCIS's website and purports to explain updates to USCIS's Policy Manual. *See id.* Importantly, the Press Release lacks any mention that this is ICE's position, nor does it contain an endorsement of any ICE official of this articulation of "DHS's position." *See id.* Nor does USCIS purport to have authority over ICE's ability to facilitate biometrics collection, including through facilitating attendance at biometrics appointments if necessary. Because neither ICE—nor any other DHS subcomponent—has endorsed USCIS's statement here, Plaintiffs cannot jump to the conclusion that USCIS's "ad hoc statement" in a press release "reflect[s] the [entire Department's] views." *Kisor v. Wilkie*, 588 U.S. 558, 577 (2019); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 31 (D.D.C. 2020).

Moreover, the language in the Press Release and Policy Alert is not a blanket prohibition on taking biometrics from detained aliens; it is a general statement setting forth USCIS's view of DHS's obligations under existing regulations. *See Generally* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/generally ("as a rule **: USUALLY**") (emphasis in original) (last visited June 10, 2026). Because the challenged Policy does not bar the collection of biometrics, vacating or enjoining this policy would not redress Plaintiffs' alleged injuries. Vacating a policy that does not bar biometrics collection would not ensure DHS collects detained aliens' biometrics. *See California v. Texas*, 593 U.S. 659, 671-72 (2021) (finding no redressability where relief the Court granted had no practical effect); *see also Doc Society*, 141 F.4th at 1277 (explaining that relief sought must "alleviate the particularized injury alleged by the plaintiff"). And to the extent an injunction compelling DHS to collect biometrics would ensure DHS collected biometrics of detained aliens, the logical prerequisite that DHS's policy is to not do so cannot be assumed from the actual language of the Policy Manual at issue—thus the remedy is in search of an injury. *See Doc Society*, 141 F.4th at 1277.

Plaintiffs also cite the declarations of two named Plaintiffs that ICE did not transport them to their biometrics appointments as evidence of a DHS-wide policy barring the collection of biometrics. Doc. 14-1 at 11 (citing declarations of R.M., Doc. 14-6, ¶ 2, and Y.P., Doc. 14-8, ¶ 6). But M.C., one of the named Plaintiffs, states that an officer took her fingerprints while detained. Doc. 14-10, ¶ 10. Even among the named Plaintiffs' declarations, there is an inconsistent picture of whether ICE is collecting biometrics or facilitating their collection. Plaintiffs also cite a district court case where USCIS ASC staff declined to take biometrics of a detained alien transported to the center by ICE. Doc. 14-1 at 11 (citing *Walter A. v. Easterwood*, No. 26-cv-1393, 2026 WL 836428, at *14 (D. Minn. Mar. 26, 2026)). But USCIS has clarified its procedures in this regard. *See* Doc. 17-6. The case also indicates that ICE collected the detainee's fingerprints and provided them to USCIS. *See Walter A.*, 2026 WL 836428, at *8, 24. Plaintiffs thus fail to allege a cohesive, actionable DHS prohibition on collecting biometrics for detained aliens with pending applications before USCIS because the USCIS Policy Manual only clarifies that DHS has no responsibility to collect biometrics for detained individuals unless the application is within EOIR's jurisdiction.

Further, some of the named Plaintiffs lack standing for a separate reason: any ultimate, alleged failure to take biometrics while in detention pending removal will not prevent them from pursuing their requests for immigration benefits. Plaintiffs H.A. and M.C., if removed, would still be able to pursue the immigration benefits they allege the Policy bars them from pursuing. U-visa applicants like Plaintiff M.C. can continue to pursue U-visas from outside the United States and provide biometrics at DHS designated locations abroad *See* Doc. 14-10, ¶ 7; *supra* at 6. Because M.C., and all other U-visa applicants, can continue to pursue U-nonimmigrant status from abroad, the Policy does not bar her from pursuing her application and, thus, she lacks standing to challenge it. Similarly, H.A., who seeks derivative asylee status, lacks standing because his spouse's petition can be adjudicated while he is abroad. *See* 8 C.F.R. § 208.21(d) (establishing process for applications for asylee's spouse or child outside United States); Doc. 17-3 at 4; *supra* at 4. H.A.

and all other derivative asylum applicants could thus still pursue and receive this benefit from abroad. Accordingly, M.C. and H.A. lack standing because their alleged injury of being barred from applying for the immigration benefits by the Policy is, factually, not correct. While Plaintiffs M.C. and H.A. might want adjudications of their applications before they are removed, as noted above, applicants have no right to an adjudication of their applications before removal. *See*, *e.g.*, *Mudric v. Attorney General of the United States*, 469 F.3d 94, 99 (3d Cir. 2006).[4]

## II. Plaintiffs Have Not Established Numerosity.

Even assuming Plaintiffs (or any class members) have standing to challenge the Biometrics Policy, Plaintiffs' proposed class does not mee the requirements of Rule 23.

Plaintiffs bear the burden of showing that the class is "in fact" sufficiently numerous. *See Wal-Mart Stores*, 564 U.S. at 350. Here, Plaintiffs argue they can rely on a "commonsense inference" that the class is sufficiently numerous based on the total number of relevant applications pending with USCIS and the approximately 60,000 aliens in DHS custody. Mem. at 6-7. Yet it is worth noting that the total number of pending applications with USCIS is not instructive as to the number of pending applications filed by aliens who remain in detention and from whom biometrics have been requested by USCIS as of the time this lawsuit was filed on April 30, 2026. Longer times for processing will affect the  the total number of requests pending, and, as shown in the USCIS data cited by Plaintiffs, the most recent posted processing times for the relevant applications range from several months to up to two years (for T status). Defs.' Ex. 12 (cited in Mem. at 7).[5]

[4] As to Plaintiff H.A., to the extent he had standing to begin with, his claim has mooted out due to his release from detention, rendering his claim atypical of the class's claims. *See infra* at 29–30.

[5] "Processing time" is defined "as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. The number of months presented is the median which is the time it took to complete 50% of all the cases processed in the quarter. *See* Defs.' Ex. 12.

More importantly, however, the class is not defined as all detainees who have applications pending with USCIS for whom biometrics is required. It includes only such applicants for whom "USCIS has not accepted" or "will not [in the future] accept" biometrics. Doc. 20 at 1. Plaintiffs do not define what it means to "not accept" biometrics, making it impossible to ascertain or estimate numerosity. As explained in Defendants' prior briefing and below, the Biometrics Policy does not preclude USCIS from "accepting" biometrics. Indeed, USCIS is accepting biometrics from detainees, as evidenced in the attached Declaration. From March 1, 2026, to June 10, 2026, USCIS received 77 fingerprint cards (FD-258s) submitted by ICE on behalf of detainees who have pending requests for immigration benefits with USCIS. *See* Defs.' Ex. 11 at ¶¶ 9-12. Accordingly, Plaintiffs have not shown that the class as defined is sufficiently numerous for purposes of Rule 23(a)(1).[6]

### III. Plaintiffs Cannot Establish a Common Question That Would Drive Resolution of the Class Claims.

Rule 23(a)(2) permits class certification only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement measures the "relatedness of the entire class's claims." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). The commonality

[6] Plaintiffs also rely on the prospective nature of the class in their efforts to demonstrate numerosity. Mem. at 7-8. But a class member does not become a class member until his or her biometrics are not accepted such that they are unable to pursue an application for relief. That is, even if the class is defined prospectively, it only includes those people *if* and *when* they suffer the alleged injury that defines the class, which is speculative here. Defendants also maintain their position, advanced in other litigation, that a class including potential future claimants does not satisfy Article III's requirements because each class member must have standing under *TransUnion LLC v. Ramirez,* 594 U.S. 413 (2021). That is, an alien who is not currently detained and who has not yet applied for any benefits cannot possibly show an imminent injury from the current biometrics policy. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Defendants acknowledge that a divided panel of the D.C. Circuit recently rejected this argument. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 114-17 (D.C. Cir. 2026). But here, including such future applicants in the class is especially problematic, because it is unclear what policies and procedures will impact applicants in the future, and the Court cannot compel the collection of biometrics under future policies that may differ from the one examined here. *See Rahman v. Chertoff*, 530 F.3d 622, 626–27 (7th Cir. 2008); *infra* § VI.

standard is "easy to misread, since any competently crafted class complaint literally raises common 'questions.'" *Wal-Mart Stores*, 564 U.S. at 349 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)). Identifying one or more common questions is not enough. "It is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation" that makes a case appropriate for class treatment. *Wal-Mart Stores*, 564 U.S. at 350 (emphasis in original). Plaintiffs must show that their claims "depend upon a common contention" "capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. In other words, "the class must show that its 'theory can be proved on a classwide basis.'" *Brown v. District of Columbia.*, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (citing *Wal-Mart Stores*, 564 U.S. at 356).

Plaintiffs claim that Defendants have a common policy in the form of the "Biometrics Policy"—defined as the Policy Manual updates with respect to Mobile Biometrics Collection and related Policy Alert and Press Release—and that this alone is sufficient to establish commonality for their proposed class. Mem. at 8-9. But under *Wal-Mart*, "the requested relief must respond, at least in part, to *a common harm* suffered as a result of a policy or practice that *affects each* class member." *D.L. v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013) (emphases added). Here, the Biometrics Policy does not satisfy this rule because it is not a blanket prohibition on biometrics collection from Plaintiffs or other detainees.

The Policy Manual updates explain that, as has always been the case, USCIS employees will not go to detention facilities to collect biometrics concerning applications for benefits within USCIS's jurisdiction. *Compare* Doc. 14-4 at 5 *with* Doc. 14-11 at 5; *see also* Doc. 14-3 at 2. The updates also remove language about an agreement with ICE under which, as the Policy Manual had previously stated, ICE was "responsible for completing background and security checks."

*Compare* Doc. 14-4 at 5 *with* Doc. 14-11 at 5. And the updates clarify that the regulation at 8 C.F.R. § 1003.47(d) only obligates DHS to collect biometrics for applications that are within the immigration courts' jurisdiction. *See* Doc. 14-4 at 5. But the Policy Manual updates and related documents do not preclude USCIS from accepting biometrics for purposes of detainees' requests for immigration benefits from USCIS. They also do not preclude ICE from submitting biometrics, even if there is no agreement under which ICE is responsible for the full background check.[7] Thus, if a detainee is unable to submit biometrics, or if USCIS does not accept biometrics submitted, this is not necessarily due to the "Biometrics Policy" as defined.

For this reason, the challenged "Biometrics Policy," as defined, does not "affect all class members" in the same way. *See* Mem. at 8-9. Here, regardless of the relevant legal theory, each class member's claim hinges on the question of what is the cause of any failure by USCIS to accept biometrics. Assuming detainees' biometrics are not accepted by USCIS, rendering them members of Plaintiffs' proposed class, the question as to *why* that happened would not be susceptible to common proof, because individual failures to collect biometrics are not necessarily attributable to the "Biometrics Policy." *See Brown,* 928 F.3d at 1080 (explaining that a class cannot be certified where "there was no common *proof* leading to a common *answer* to the

[7] Plaintiffs have argued that the Policy Manual updates reflect a rescission of a formal agreement between the two agencies (ICE and USCIS) regarding biometrics collection. *See* Pls.' Reply in Support of Mot. For Preliminary Injunction (Doc. 24) at 8. But nothing in the Policy Manual updates, Policy Alert, or Press Release refers to a rescission. Instead, they refer to the current absence of an agreement under which ICE conducts background checks for detained applicants for benefits with USCIS. *See* Doc. 14-3 at 2 (stating that "there is no current agreement between USCIS and [ICE] under which ICE has agreed to collect biometrics from individuals with an immigration benefit pending with USCIS"), 3 (stating that policy manual update "removes obsolete guidance to clarify that there is no controlling intradepartmental agreement between USCIS and ICE regarding the collection of biometrics for aliens in custody with pending USCIS benefits"); Doc. 14-2 (same); Doc. 17 at 10 (comparing versions of policy manual to demonstrate that updates remove language that says that "per intradepartmental agreement," ICE is "responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS."). Regardless, nothing in the USCIS policy precludes ICE from facilitating biometrics collection by submitting biometrics to USCIS for it to conduct the background and security checks.

common *question at the heart of each plaintiff's claim*") (emphases in original). Some detainees assert that ICE submitted their biometrics and that those biometrics were apparently not accepted (*see, e.g.*, Doc. 14-5 at ¶ 3; Doc. 14-10 at ¶ 10)—but in other cases, biometrics submitted by ICE have been accepted and processed by USCIS, *see* Defs.' Ex. 11 at ¶¶ 5–7. This demonstrates that individual failures to collect biometrics are based on individual rather than universal factors. Indeed, some detainees had difficulties submitting biometrics in 2024, long before the Biometrics Policy was issued. *See Leon Alcazar v. Cantu*, No. 24-cv-03342, 2025 WL 2548698, at *1, 3 (D. Ariz. June 5, 2025) (addressing habeas petition filed by detainee in November 2024 claiming difficulties in completing biometrics appointment and seeking to compel facilitation of biometrics collection); *see also* Doc. 14-5 at ¶ 3 (Plaintiff J.Z. declaration) (asserting that ICE informed him in August 2025 that they shared biometrics data with USCIS but that he received a notice of denial of his SIJ petition for abandonment on December 1, 2025). That is, the fact that the December 5, 2025, policy exists does not mean that any failure to collect biometrics from aliens in detention flows from this Biometrics Policy. Even if there were common legal questions as to whether the Policy documents are arbitrary and capricious or should have been subject to notice and comment, resolving those issues would not necessarily address the question of whether the failure to collect biometrics is due to that allegedly unlawful Policy.

Further, the "common injury" Plaintiffs claim from the Biometrics Policy—the "denial of the opportunity to seek immigration relief from USCIS," Compl. ¶ 105—is not in fact common to the class. The class includes *any detainee* who applies for a benefit with USCIS and whose biometrics are not accepted. But someone who does not meet the statutory requirements for a benefit or is statutorily ineligible for a benefit cannot be said to have been deprived of any "opportunity" to seek that benefit by the Biometrics Policy, regardless of the Policy's terms, and thus are not "facing actual or imminent harm" from the Policy. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 114 (D.C. Cir. 2026) (noting that class of aliens

who Plaintiffs claimed were unlawfully deprived of pre-removal credible-fear screening for asylum, withholding of removal, and other protection was properly limited to protection-seekers who were "not statutorily ineligible" for the relevant forms of relief or protection). And DHS cannot be held liable for failures to collect biometrics in support frivolous or non-meritorious applications—in any individual case, this would be a defense to a claim that USCIS or DHS had a duty to collect biometrics. Nor could the class be re-defined to only include those facially eligible for relief, because that could necessitate an individualized inquiry into eligibility to determine the viability of their claim to relief before determining whether a failure to accept biometrics was actionable.

Moreover, even assuming that the Biometrics Policy affected or injured each class member in the same way, the existence of a common policy still cannot establish commonality for all of Plaintiffs' legal theories or claims. *See Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022) ("Certification may be appropriate as to some of the class's claims but not others."). Class certification is thus improper with respect to the below claims because, regardless of the existence and impact of the Biometrics Policy, the underlying legal "theory [for these claims] can[not] be proved on a classwide basis." *Brown*, 928 F.3d at 1080 (citation omitted).

*First,* Plaintiffs' § 706(1) claim (Count III) to compel agency action, Compl. ¶¶ 123–27, depends on an individualized analysis as to each class member's case. As the Biometrics Policy is not a blanket rule prohibiting biometrics collection, as there are no Congressional or regulatory timelines for biometrics collection, this claim is appropriately analyzed under the fact-specific, multi-factor analysis of *Telecommunication Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("TRAC"), to determine whether agency action has been unreasonably delayed. *See Crowe*, 2025 WL 1635392, at *17 (holding that *TRAC* factor analysis applies in claim seeking to compel agency action even if claim was that agency action had been "withheld"); *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986) (analyzing claim under the *TRAC* factors

governing whether agency action has been unreasonably delayed, even where there was statutory timeline); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999) ("[I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions . . . a court must compel only action that is delayed unreasonably."). In other words, only in cases of unreasonable delay can a Court compel action under § 706(1) even if the agency has a mandatory duty. And an unreasonable-delay claim is governed by the which is not generally susceptible to class treatment. *See Crowe*, 2025 WL 1635392, at *18; *Casa Libre/Freedom House v. Mayorkas*, No. 2:22-cv-01510, 2023 WL 3649589 at *13 (C.D. Cal. May 25, 2023); *LaMarche v. Mayorkas*, No. 23-cv-30029, 2024 WL 2502929, at *6 (D. Mass. May 22, 2024); *Rodriguez v. Bostock*, 349 F.R.D. 333, 358–59 (W.D. Wash. 2025). The TRAC factor analysis does not generate common answers as to each class member; under this framework, each class member's claim will be unique.[8]

*Second*, Plaintiffs' legal theory in Count I that the policy is contrary to various different provisions of Immigration and Nationality Act and implementing regulations lacks commonality on its face. *See* Compl. ¶¶ 111–114. As a threshold problem, this legal theory—that Biometrics Policy deprives eligible noncitizens of their right to seek immigration relief, *see* Mem. at 11 —assumes that each applicant is eligible for relief, which is not the case for every applicant. *See supra* at 21–22. In any event, there is no common thread tying together the various different statutory and regulatory schemes on which Plaintiffs rely. Indeed, those schemes are materially different in various ways. For example, some forms of status—U status and derivative asylum—may be sought abroad. *See supra* at 4, 6. Some are entirely within the Executive Branch's discretion. *See supra* at 4 (explaining that adjustment and derivative asylum are within executive

[8] To the extent any Plaintiff or class member's application is denied for abandonment based on the December 5, 2025 Policy Manual, this would present a different § 706(1) claim than the claims of those whose applications have not been adjudicated, and one that is likewise not susceptible to class treatment, as relief would likely depend on a variety of individualized factors.

discretion). Plaintiffs' own arguments with respect to this claim reveal the commonality defect: Plaintiffs rely on an array of different authorities, statutes, and regulations relating to a variety of different types of applications in an attempt to demonstrate a purported overall "right" to an "individualized" adjudication. *See* Mem. at 11; Doc. 14-1 at 16–25. This is a vast oversimplification. Whatever Plaintiffs argue an "individualized" adjudication entails, the cited regulations and authorities make clear that each category of immigration benefit is subject to a particular adjudication scheme that requires its own evaluation in the context of Plaintiffs' claims. And due to threshold jurisdictional bars, the claims of any class member who is seeking § 1255 adjustment or derivative asylum do not share commonality with those who seek other benefits. *See* Doc. 17 at 22–25; *infra* at 28.[9]

*Third*, Plaintiffs' claims that the Biometrics Policy is "contrary to constitutional right" in violation of the APA or the Due Process Clause of the Fifth Amendment likewise lack commonality. Compl. ¶¶ 116, 137–141. Indeed, Plaintiffs do not rely on this legal theory at all in support of their request to certify a class. *See generally* Mem. at 8–14. As previously argued, to the extent this due process claim is based on an *Accardi* theory of alleged deprivation of procedures set forth in regulation (that is, 8 C.F.R. § 1003.47(b)), this is not a constitutional claim at all, but instead a claim of an alleged regulatory violation. *See* Doc. 17 at 33. However, to the extent Plaintiffs assert a stand-alone procedural due process claim requiring additional procedures, not all aliens can assert the same constitutional protections. Indeed, arriving aliens (like Plaintiff Y.P.), even if temporarily paroled upon arrival, carry the "unique constitutional status of arriving aliens with no ties to the United States," *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1148 (9th Cir. 2022), and have *no* constitutional rights in their entry or admission through adjustment of status to

[9] Anticipating these problems, Plaintiffs propose that the Court could certify subclasses divided by immigration benefit category. Mem. at 12 n.3. Subclasses would not resolve the overarching commonality defects with respect to the class, however.

the United States, *see DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (explaining longstanding rule that aliens "who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border") (cleaned up). Thus, there is no commonality across the class as to this threshold issue as to whether there even exist any constitutional due process rights regarding applications for admission, which is at the heart of each class member's claim. This also means that Y.P.'s claims are not typical of the claims of class members who are not arriving aliens.

But regardless, the *Mathews v. Eldridge* balancing framework that applies to procedural due process claims is similarly not susceptible to generating common answers capable of driving resolution of putative class members' due process claims. That balancing framework considers "the (1) the significance of the private party's protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and the probable value, if any, of additional or substitute procedural safeguards." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (cleaned up). The outcome of that balancing test would vary based on the strength of the individual detainee's (or categories of detainees') interests in the benefits sought—based at minimum on the status of their removal proceedings, their ties to the country, and the statutory and regulatory scheme for the type of benefit sought—and is thus not subject to common answers. *See, e.g.*, *Al-Hela v. Biden*, 66 F.4th 217, 231 (D.C. Cir. 2023) (describing the *Mathews* Due Process Clause framework as "context-dependent"); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 203 (D.D.C. 2020) (citing the Supreme Court's description of due process as a "flexible" concept that "calls for such protections as the particular situation demands") (citation omitted); *Taddonio v. Heckler*, 607 F. Supp. 620, 623 (E.D. Pa. 1985) (finding lack of commonality due to variations in the *Mathews* factors; "the hardship resulting from the prehearing termination may vary considerably among the members of the plaintiff's proposed class").

Finally, to the extent Plaintiffs argue that their due process claim is based on a liberty

interest in avoiding removal (*see* Compl. ¶¶ 116, 139), the assessment of whether any such liberty interest exists likewise depends on the particular class member's status and ties to the United States. In any event, this argument is misplaced in this litigation. It is the procedures afforded in detainees' removal proceedings that are relevant to the interest in avoiding removal—not the procedures governing ancillary requests for immigration benefits that are at issue here. Plaintiffs and other detainees are free to argue in their removal proceedings, like Plaintiff R.M. did (*see* Doc. 14-6 at ¶ 3), that the immigration courts should terminate or continue those proceedings to allow them to pursue immigration benefits from USCIS. But those arguments are not relevant here, where Plaintiffs are largely seeking *admission* to the United States through various types of immigration benefits. Nor are those arguments reviewable in this forum, at minimum because 8 U.S.C. §§ 1252(a)(5) and (b)(9) channel all issues arising from removal proceedings into a petition for review of a removal order. *See Nken v. Chertoff*, 559 F. Supp. 2d 32, 37 (D.D.C. 2008); *Hines Immigr. L., PLLC v. Exec. Off. for Immigr. Rev.*, No. 1:26-cv-01018 (CJN), 2026 WL 969020, at *8 (D.D.C. Apr. 10, 2026).

## IV. The Named Plaintiffs' Claims are Not Typical of Claims of the Class.

The typicality requirement under Rule 23(a)(3) looks to the relatedness of the class representative's individual claims to the claims of the entire proposed class. *Id.* The typicality requirement "is concerned with whether 'the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.'" *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 83 (D.D.C. 2015) (quoting *Wal-Mart Stores*, 564 U.S. at 349). The typicality inquiry "tend[s] to merge" with the commonality inquiry, as both look to whether the claims of the proposed class are sufficiently inter-related to support class treatment. *Wal-Mart Stores*, 564 U.S. at 349 n.5 (quoting *Falcon,* 457 U.S. at 157–158, n. 13, ). Here, the named Plaintiffs are not typical and appropriate representatives of those whose biometrics have not been accepted by USCIS.

First, as explained above, *supra* § I, the named Plaintiffs lack standing to challenge the

Biometrics Policy and thus, if any putative class member can establish standing to challenge the Policy, these Plaintiffs do not share an injury with those putative class members. Even assuming they had standing, however, Plaintiffs claims do not satisfy the typicality requirement because those claims are not ripe for adjudication. *See* Doc. 17 at 20. None of the Plaintiffs asserted in the Complaint that they had received a denial of their applications for abandonment after the December 5, 2025 Policy announcements, and their claims are thus not typical of a detainee whose application was denied based on abandonment and who has thus at least arguably suffered an injury from a failure to take biometrics.[10] If Plaintiffs' applications are ultimately adjudicated on the merits and granted or denied on other grounds, or if, like H.A., they are released from detention such that they can attend their biometrics appointments, they cannot claim injury from the Biometrics Policy. Because Plaintiffs' claims are not based on a concrete application of the Biometrics Policy to them, their claims are not typical of class members whose applications have been or will be denied based on abandonment.

Indeed, many of the named Plaintiffs are arguably not even members of the class they purport to represent because they have not shown that USCIS has not "accepted" their biometrics. A class representative "must be part of the class" he seeks to represent. *Falcon,* 457 U.S. at 156. If a plaintiff is not a member of the defined class, his claim is "a fortiori not typical" of the class's claims. *Machella v. Cardenas*, 653 F.2d 923, 926 (5th Cir. 1981); *see also Est. of Felts v. Genworth Life Ins. Co.*, 250 F.R.D. 512, 524 (W.D. Wash. 2008) (holding that plaintiff is not a typical member of the putative classes if he is "not a member of the classes at all"). Two Plaintiffs—M.C. and J.Z.—assert that their biometrics were submitted by ICE but were either not received or not accepted by USCIS. *See* Doc. 14-5 ¶ 3; Doc. 14-10 ¶ 10. One Plaintiff (Y.P.) claims that ICE

[10] To the extent any Plaintiff's application is subsequently denied for abandonment, however, that is still not fairly traceable to the Biometrics Policy and in any event would present a different claim from the claims of those putative class members whose applications remain pending that is not susceptible to class treatment.

declined to transport him to a biometrics appointment despite a request to do so. *See* Doc. 14-8 ¶ 6 (asserting that his attorney requested that ICE transport him to a biometrics appointment in April 2026). The remainder of the Plaintiffs do not expressly or specifically claim to have asked ICE to facilitate their biometrics collection or that their biometrics were submitted to USCIS and not accepted. Doc. 14-6 ¶ 9 (asserting only that "I was not taken to my biometrics appointment on December 5, 2025"); Doc. 14-7 ¶¶ 6-7 (asserting only that he "did not have access" to the biometrics appointment in March 2026 due to his detention); Doc. 14-9 ¶ 6 (asserting only that he could not attend a biometrics appointment due to detention). These remaining Plaintiffs have not demonstrated attempts to have ICE facilitate their biometrics collection; it is thus unclear whether it can be said that these Plaintiffs' biometrics were not "accepted" by USCIS to render them part of the proposed class as defined.

Further, several of the individual Plaintiffs' claims are not typical of those of the putative class as a whole due either to the specific category of relief they seek or their particular circumstances. Plaintiffs Estrada Trejo's and H.A.'s claims are subject to jurisdictional defenses unique to § 1255 adjustment applications and derivative asylum petitions that are not applicable to other types of applications. *See* Doc. 17 at 22-25. "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000). The presence of this jurisdictional defense renders Plaintiffs Estrada Trejo and H.A.'s claims not typical of those who seek other types of benefits.

Plaintiff H.A. and M.C. likewise are not appropriate class representatives because they can pursue derivative asylum or U nonimmigrant status from abroad, respectively, and they thus do not suffer the same type of legal injury from any failure to collect biometrics while in detention.

*See supra* at 16–17. "Without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003).

Plaintiff M.C. argues that she nonetheless has standing because if she is removed, she will be subject to bars to entry even if granted U nonimmigrant status. *See, e.g.,* Doc. 14-1 at 39; Doc. 24 at 19 (arguing that "if a U visa applicant is removed, the INA bars reentry for many years, rendering the application 'moot'"). But even assuming Plaintiff M.C. or other U Visa applicants have standing to challenge the Biometrics Policy despite their ability to pursue benefits from abroad, Plaintiff M.C.'s claim that she is effectively unable to pursue U status is not necessarily typical of all U Visa applicants. The cited bars to re-entry based on prior removal—which are subject to exception, 8 U.S.C. § 1182(a)(9)(A)(iii) —would not apply to those who do not already have a past removal order (as M.C. does)[11] and who opt for voluntary departure over a removal order in order to pursue benefits from abroad. Accordingly, M.C.'s claim of injury is not typical of all U Visa applicants, or of the class as a whole.

Plaintiff H.A.'s claims are not typical of the proposed class's claims for the additional reason that he was released from post-removal-order detention on May 12, 2026, based on his successful petition for habeas corpus. Mem. at 4; Doc. 17-10. Thus, his claims relying on an alleged inability to attend his biometrics appointment due to his detention are technically moot but also distinct from those of the proposed class or subclass. Plaintiff H.A. is no longer detained and detention cannot prevent him from completing a biometrics appointment at a USCIS Application Support Center. And while Defendants maintain that those in detention are not precluded from

[11] Plaintiff M.C. also concedes that she was once previously removed from the United States, and is thus not in ordinary removal proceedings but instead in proceedings where she has no right to relief from removal, and can only claim protection from removal to her home country under the withholding of removal statute, 8 U.S.C. § 1231(b)(3), or the Convention Against Torture. *See* Doc. 14-1 at 39 n.6; 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 1208.2(c)(2)(i).

satisfying biometrics obligations while detained (Doc. 17-6), H.A. does not share an alleged injury or common characteristics with those who allege they are unable to fulfill biometrics obligations while detained. This constitutes more than a mere "factual variation" because Plaintiff H.A.'s claim is no longer "based on the same allegedly unlawful conduct." *See N.S. v. Hughes*, 335 F.R.D. 337, 354 (D.D.C., 2020). And Plaintiff H.A. does not "have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented." *Daskalea v. Washington Humane Soc*., 275 F.R.D. 346, 358 (D.D.C. 2011).

For these reasons, the Plaintiffs' claims are not reasonably coextensive with the class they seek to represent, and the typicality requirement is not met here.

**V. The Named Plaintiffs Are Not Adequate Representatives.**

To be adequate representatives of their proposed class, the named Plaintiffs "must not have antagonistic or conflicting interests with the unnamed members of the class," and "must appear able to vigorously prosecute the interests of the class through qualified counsel." *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 134 (D.D.C. 2017). The Rule 23(a)(4) "adequacy-of-representation requirement tends to merge with the commonality and typicality requirements of Rule 23(a), which serve as guideposts for determining whether a class action should be maintained and whether the class representative's claim and class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 626 n.20 (1997) (citation omitted). Here, the named Plaintiffs are not adequate representatives because their claims are not typical and they are subject to various standing, jurisdictional, or ripeness defenses, that are not representative of the claims of all class members (to the extent any class member has standing to challenge the Biometrics Policy). *See supra* at 24–25, 26–30. Because the class is overbroad and lacks commonality, the various Plaintiffs, in many different and cross-cutting respects, "do[] not possess the same interest and suffer the same injury" as various other members of the putative class, such that their interests do

not align with the interests of other subsets of the class. *Amchem,* 521 U.S. at 626.

## VI. The Class Does Not Satisfy Rule 23(b)(2).

A class may be maintained under Federal Rule of Civil Procedure 23(b)(2) only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a *single* injunction or declaratory judgment would provide relief to each member of the class." *C.G.B.*, 464 F. Supp. 3d at 206 (quoting *Wal-Mart*, 564 U.S. at 360 (emphasis added)); *see also In re Navy Chaplaincy*, 306 F.R.D. 33, 56 (D.D.C. 2014) (holding class not maintainable under Rule 23(b)(2)). "By virtue of its requirement that the plaintiffs seek to redress a common injury ... Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive." *Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL–CIO,* 216 F.3d 577, 580 (7th Cir. 2000); *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 329 (D.D.C. 2011). As noted, the key to a (b)(2) class is that "the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360. Certification under Rule 23(b)(2) "is generally inappropriate in actions raising significant individual liability or defense issues." *Lightfoot*, 273 F.R.D. at 329.

The Complaint in this case seeks the following class-wide injunctive or declaratory relief: (1) a declaration that the "Biometrics Policy" violates various APA and other provisions; (2) a preliminary stay and vacatur of the Biometrics Policy; (3) an injunction "compelling DHS to collect class members' biometric information to the extent required for a decision on the merits of their applications." Compl. at 29 (Prayer for Relief). In their preliminary-injunction motion and here, Plaintiffs word their injunction slightly differently: they claim to seek an order "enjoining DHS from refusing to collect their biometrics." *See, e.g.*, Mem. at 14. This relief does not support a Rule 23(b)(2) class as defined.

Here, there is no common legal injury arising from the Biometrics Policy such that the class is not "cohesive" for purposes of injunctive or declaratory relief. *See supra* § III, at 20–21. Because the Biometrics Policy does not preclude DHS's collection or acceptance of Biometrics, vacating or enjoining those Policy announcements, or declaring them unlawful, will not provide relief to the class. *See supra* at 15 (discussing redressability). Conversely, an injunction that requires DHS to compel biometric collection "to the extent required for a decision on the merits of their applications," Compl. at 29, is not a "single injunction" at all because it is not tied to the Biometrics Policy, on which Plaintiffs base their commonality assertion. This is true even if framed as an order "enjoining DHS from refusing to collect their biometrics," as Plaintiffs do here and in their motion for preliminary-injunctive relief. Mem. at 14; Doc. 14. If the Court were to certify the proposed class and grant the proposed injunction on the ground that the policy were arbitrary and capricious, that would theoretically enjoin DHS from *ever* refusing to collect biometrics from detained persons who meet the class definition, regardless of the reason or regardless of any future policy governing biometrics collection. This would be improper. *See Reid v. Donelan*, 17 F.4th 1, 11 (1st Cir. 2021) (holding that "a class consisting of some members who might be entitled to a bond hearing and others who are not lacks sufficient cohesiveness to obtain relief regarding the conduct of those hearings" and does not satisfy Rule 23(b)(2)); *Rahman v. Chertoff*, 530 F.3d 622, 626–27 (7th Cir. 2008) (holding that class that encompassed people subject to unspecified practices was overbroad and did not satisfy Rule 23(b)(2)).[12]

That is, unlike vacatur relief, the requested injunctive relief does not focus on the Defendants' allegedly generally-applicable policy, but instead seeks to compel DHS to collect

---

[12] For example, such an injunction could require the biometrics collection of someone who is ineligible for the relief sought, perhaps even in a case where USCIS is poised to deny the application on this ineligibility ground. Indeed, it would be inappropriate to compel the collection of biometrics for an applicant who has not met basic requirements to show eligibility for a benefit—and particularly one who has been unable to obtain a continuance or termination of their removal proceedings on this basis.

biometrics in every individual case. This is not an "indivisible" remedy and cannot support a Rule 23(b)(2) class. *See Wal-Mart Stores*, 564 U.S. at 360.

**CONCLUSION**

For these reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

SAMUEL P. GO
Assistant Director

By: <u>*/s/ Katherine J. Shinners*</u>
KATHERINE J. SHINNERS
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

MALCOLM MCDERMOND
JAMES A. HURLEY
AYSHA T. IQBAL
Trial Attorneys

Dated: June 10, 2026

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice
Civil Division