IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.Z., et al.,

Plaintiffs,

vs.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Civil Action No. 1:26-cv-01510-AHA

June 22, 2026
2:00 p.m.

Washington, D.C.

---

TRANSCRIPT OF THE PROCEEDINGS
BEFORE THE HONORABLE AMIR H. ALI
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Sean Ouellette, Esq.
DEMOCRACY FORWARD
PO Box 34553
Washington, DC 20043

For the Defendants: Malcolm McDermond, Esq.
US ATTORNEYS OFFICE
601 D St. NW
Washington, DC 20530

Court Reporter: Stacy Johns, RPR, RCR
Official Court Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription

**P R O C E E D I N G S**

DEPUTY CLERK: Your Honor, this is Civil Action 26-1510, J.Z. et al. versus United States Department of Homeland Security et al.

Will parties please come forward to the lecturn and identify yourselves for the record, please. We'll start with the plaintiffs first.

MR. OUELLETTE: Good morning, Your Honor. Sean Ouellette for plaintiffs.

THE COURT: All right. Good morning. Would you like to introduce the other folks who are with you at counsel table.

MR. OUELLETTE: I'm here with my colleagues Jennie Kneedler, Paul Wolfson, Richard Caldarone and Gerardo Romo.

THE COURT: Mr. Ouellette, I'm going to let the defendants introduce themselves in a moment. But before we go further, I think you had a pending pro hoc motion. Have you since been admitted to the D.C. Bar?

MR. OUELLETTE: Yes. So that's moot.

THE COURT: And you've been admitted to our court?

MR. OUELLETTE: Yes.

THE COURT: Okay. So I will then deny that as moot, but you'll be able to present argument for your clients.

MR. OUELLETTE: Thank you.

THE COURT: Go ahead.

MR. MCDERMOND: Malcolm McDermond on behalf of the

United States. And with me at counsel's table is Katherine Shinners, Your Honor.

THE COURT: Good afternoon to both of you.

All right. Just give me a moment here.

Okay. We are here on the plaintiff's stay motion under 706 and motion for a preliminary injunction. And I intend to give the parties an opportunity to present oral argument. I'll have questions for each of you.

I don't think there's any other preliminary matters for us to deal with in advance. I suppose there is also a motion for extension that pre-dated the case being assigned to me. I think it was for the opposition here. I'll go ahead and orally grant that motion, or maybe you'll see an order come through on the docket to the extent it's not reflected in the minute entry here.

But otherwise, we'll proceed to oral argument on the merits of the stay and preliminary injunction motion.

Like I said, I'll have some questions for you-all as I try to sort through the many issues in the case. But I will give you the opportunity to -- both of you the opportunity to frame your argument a little bit before I jump in.

So go ahead, Mr. Ouellette.

MR. OUELLETTE: The one thing I did want to point out is that we do have a pending motion for class certification or provisional class certification. I just wanted to make sure

Your Honor was aware of that motion too.

THE COURT: I am, yes. And we may get into that a little bit to the extent you-all are prepared to address it. I think it may be helpful.

MR. OUELLETTE: Certainly.

The U.S. immigration laws open paths to relief for people who face special harm if removed. The family of U.S. citizens and refugees, victims of trafficking and violent crime, and abused and abandoned children.

Time and again, courts have held that the government can't close those paths to people entitled to pursue them. But the challenged policy does exactly that through a bureaucratic back door. It announces that the Department of Homeland Security generally will not take biometrics of detained non-citizens who need them to pursue relief from USCIS.

That policy blocks plaintiffs from going forward with their applications and dooms them and countless others to deportation, separation from their families and violence abroad with no path to relief.

The government denies that policy exists. But the parties agree that DHS has at least two policies.

First, USCIS does not go to detention centers to collect biometrics. And second, ICE is no longer required to take biometrics from people with applications before USCIS.

In other words, even on the government's telling, an

applicant's future depends not on the judgment -- the considered judgment of a trained USCIS adjudicator, but on the whim of any individual ICE agent, who can presumably refuse to take biometrics or drive the person to an appointment whenever he or she feels like it.

Regardless of who's right about the scope of the policy, it's final agency action that's reviewable under the APA and it's, at minimum, arbitrary and capricious. And plaintiffs have standing to challenge them.

So unless Your Honor would like me to start somewhere else, I'll start with standing.

THE COURT: Well, I was just thinking about the wording you used about what you think the parties agree upon. And I'll obviously give the defendants an opportunity to tell me if they disagree. I think you said first that USCIS does not go themselves to collect biometrics from detention facilities. That, I think, may be something that the parties agree upon.

And then you said that ICE is no longer required to take biometrics from people who are detained. Is that something that the parties agree upon? Again, I'll let the defendants clarify their position. I'm trying to sort out exactly what that position is and I'll spend time with them on that.

But it seems to me that one of the things they may be

saying is ICE was never required to do that, and so there really hasn't been a change here. It's just recognizing that they were never required to.

MR. OUELLETTE: I do think they say in their opposition brief that the interdepartmental agreement between USCIS and ICE required ICE to take the biometrics. Whether or not they agree with that, I guess they'll have to say.

THE COURT: Well, let me ask you this. How much does your position depend on what was happening before December 2025?

MR. OUELLETTE: I don't think it necessarily depends on that because I think even if you took the government's suggestion that this doesn't really change anything as a practical matter, we know the decision -- say that the DHS just said -- took a look at this and said we're going to -- they released this policy that said we're going to keep doing what we're doing.

That, too, would be a final agency action under the APA because it would be tantamount to a decision not to repeal a rule, which the D.C. Circuit has held is a final agency action.

But I don't think that that's really what's going on here because the fact of the matter is that in the policy alert, at minimum, the DHS admitted -- I think that's docket number 14-3. DHS said that the prior policy placed the burden

on ICE to collect biometrics from people with USCIS applications.

And the versions of the policy that existed before December 5th that we've submitted in the record both include reference to that intra-departmental agreement, which said that ICE had the responsibility to take those biometrics.

THE COURT: Is that the change in policy that you're challenging here? Is it really just the intra-departmental agreement, or is there anything more than that?

MR. OUELLETTE: No. I think there's three things. One of them is that statement that DHS generally will not take the biometrics of detained non-citizens without applications before EOIR, so in other words, that people with applications before USCIS. That's one rule that's reviewable under the APA.

The second thing is I think that the government agrees -- well, maybe they don't. But it's clear that the policy at least changed the policy manual, so that it now says that USCIS is not allowed to go into detention centers to collect biometrics.

THE COURT: Was USCIS doing that beforehand?

MR. OUELLETTE: I don't know if they were ever doing it, but if you look at the red line of the policy changes on Page 8 of the government's opposition brief, the prior -- that makes clear that the prior version of the policy just said that USCIS does not grant request to collect biometrics from aliens

or other persons in custody at correctional institutions.

And a few lines down it made clear that what that was saying was that USCIS officers and contract staff therefore do not travel to jails, prisons or similar non-DHS detention facilities. And what the policy update did was add DHS detention facilities to that. So that's another change that the policy made.

And the third thing is the rescission of that intra-departmental agreement.

THE COURT: Is the right way to look at this, then, that the first thing you raised, the statement that DHS generally will not collect biometrics from detained people is kind of the policy change, and it's implemented via the second and third? I mean, it's implemented by saying USCIS is not going to those detention facilities and by saying ICE is no longer going to get us the biometrics or get the biometrics to USCIS?

MR. OUELLETTE: I think that is one way to look at it. Our sort of backup argument to that --

THE COURT: I don't mean to -- it's just helpful to understand because -- maybe it depends on which legal theory you're going to pursue or lead with, but I don't think you're saying there's anything in the regulations or the INA that requires ICE to be the one who does it or that requires USCIS to have access to jails.

And so I'm thinking about it in relation to your legal arguments. Doesn't it have to be that the policy you're challenging is the more general one and that just happens to be how it's implemented?

MR. OUELLETTE: I don't think it necessarily -- no, I don't think it matters. In one world you have -- which I think is the world we live in, you have this policy that says ICE generally will not take the biometrics. And then you have these, I guess, provisions that you could think of as implementing that policy that say, well, USCIS isn't going to go do them and we're rescinding the requirement that used to exist that ICE is doing them.

I think in the alternative, the government says that the statement that -- it wants the Court to disregard the statement that DHS generally won't take the biometrics.

And so what we're saying is even if you do that, you still have these two other policy provisions that are both final agency actions that are reviewable. So I don't think it really --

THE COURT: It may be from the final agency action perspective. But if they had a policy saying USCIS is not going to go to DHS facilities, but ICE were delivering the biometrics to USCIS and your clients were having their applications reviewed, would there be a legal problem?

MR. OUELLETTE: That would be fine with us.

THE COURT: Well, I'm not asking if it would be fine with you. Would there be a legal problem under any of your legal theories?

MR. OUELLETTE: So the scenario is that ICE is collecting them but USCIS --

THE COURT: I guess my point is that you don't really have a statute that's setting forth particular mechanisms through which the biometrics have to get from the detention facility to USCIS. You just think that the law requires them to do it in some way.

MR. OUELLETTE: We think the law requires them to do it and that the rescission of the -- the change in policy was arbitrary and capricious, even if the law doesn't require them to do it.

And so the remedy that we're seeking would be staying the policy and eventually vacatur, which would spring that requirement that ICE do it back into --

THE COURT: Well, that comes back to my first question, one of my first questions, which was how much does what was happening before matter? And I think your answer was it doesn't really matter, because at the end of the day, this is a policy and we can challenge the policy.

And fine. Again, if you're only focused on the final agency action portions, I suppose that's a good enough answer. But it does seem to me like you're arguing that a change in

policy is what is arbitrary and capricious now.

MR. OUELLETTE: Well, no. I think if DHS had considered the policy and then refused to change it, I think that that's also arbitrary and capricious because we know that ICE generally often isn't going in and isn't collecting the biometrics.

And so to say we're going to keep using the primary method of scheduling these biometrics appointments, even though we know ICE isn't going to take people to those appointments and isn't going to take the biometrics, that could be arbitrary and capricious. That is arbitrary and capricious.

THE COURT: So what was happening before December 2025?

MR. OUELLETTE: It's my understanding that, in accordance with the prior version of the policy that referenced that intra-departmental agreement, that ICE was collecting the biometrics and sending them to USCIS for processing.

THE COURT: For everybody?

MR. OUELLETTE: For people with USCIS applications as well, yes.

THE COURT: And what is that based on?

MR. OUELLETTE: That's based on, number one, the docket number 14-3, the policy alert that says that the prior policy placed the burden on ICE to take people's biometrics.

THE COURT: So it's the language in the policy manual

that says ICE is responsible for, I think, background checks?

MR. OUELLETTE: And that's the second thing, yeah. ICE is responsible for taking the background checks. And in the government's opposition brief, the government interprets that to mean that ICE was taking the biometrics to run those background checks.

THE COURT: But your understanding that ICE was facilitating this is from the policy manual?

MR. OUELLETTE: From the policy manual. From the policy alert, which contains that language that said the prior policy placed the burden on ICE to collect the -- to run the security checks at least. Or I think it says to collect the biometrics, but in any event that's how the government interprets it in their opposition --

THE COURT: Do you know how it happened as a practical matter? Was somebody who was detained and in the midst of removal proceedings, did they just disclose, hey, I've got this appointment I've got to go to and then ICE facilitated it or did ICE --

MR. OUELLETTE: I'm actually not sure how ICE knew, but this, you know, isn't in the record. But from the people that we've talked to, ICE just sort of did it. It happened. You didn't have to go and request that it be done. ICE would do it.

THE COURT: Okay. But your understanding is that it

happened by virtue of ICE -- were they taking the biometrics in the facility? Were they transporting them? Both?

MR. OUELLETTE: I believe they were taking them in the facility. They weren't -- ICE usually hasn't transported people to biometrics appointments.

THE COURT: They would collect the biometrics while they were in detention and then transport the biometrics to USCIS?

MR. OUELLETTE: Right.

THE COURT: Was USCIS coming to facilities?

MR. OUELLETTE: I don't know that.

THE COURT: Is there evidence on the record on this point? I mean, I know you have evidence in the form of declarations from your plaintiffs about them having applications pending and having their -- not being able to go to their biometrics appointments because of their detention, but is there evidence about what happened before?

MR. OUELLETTE: Well, the evidence on that -- again, I point to the policy alert, which says that ICE had this responsibility to collect them to the policy manual.

THE COURT: Yeah, no, I -- well, I do want to know if there's other bases. I think you've already started walking me through the bases, but this is just a very specific question about did you guys have evidence on that point.

MR. OUELLETTE: I'm not recalling other evidence

besides those statements on that point. I don't -- I'm not really sure. It matters, given that you have this prior rule that required ICE to collect the biometrics. And if Your Honor stays this policy, that would spring back into being.

THE COURT: I do want to be right. In a sense, I'm trying to figure out how to sort through all of this. It may not have mattered for your motion and for the burden that you had in your motion. That's what I'm -- the defendants have come back and, I think, started to suggest that there hasn't really been a change as much as you-all are saying there was, or at least the policy language doesn't mean what you think it means.

And so understanding what is actually happening on the ground, what was happening and what is happening. And quite frankly, I think it could have been, right? When I asked you what is that based on, there's a world in which you could have said it's based on the policy manual, it's based on the alert and it's also based on just our knowledge of what's happening on the ground. Here's, you know, when that all switched over.

MR. OUELLETTE: It is based on our knowledge about what's happening on the ground. There's also other -- in terms of the practical evidence, there is certainly evidence that after the policy change ICE is telling people that they don't take people to biometrics appointments and that they don't assist with benefits. So that, I believe, is docket

number 24-1.

THE COURT: And are they -- does that docket number and the evidence you're referring to specifically cite this policy change as the reason for that?

MR. OUELLETTE: No, it doesn't. There is another piece of evidence on the record from another case in Minnesota, Walter -- the Walter A. case, in which ICE didn't take the person --

THE COURT: I read the testimony you submitted. And that -- my understanding in that case, actually, DHS, ICE, transported the person to USCIS to have biometrics collected there, and as I understand, correct me if I'm wrong, there they said we can't take the biometrics of anyone who's detained, correct?

MR. OUELLETTE: Correct.

THE COURT: And that was based on this policy?

MR. OUELLETTE: Yes.

THE COURT: All right.

MR. OUELLETTE: There is one other piece of evidence that we actually submitted, came across after the briefing closed on this motion but we cited it in our reply regarding class cert motion at Page 4. There's another case, Anh Tuan Lu v. Lyons, where even after this new internal procedure that the government submitted that they say was issued in March, an ICE officer told the detainee that USCIS still does not accept

biometrics for people with USCIS applications. So that's another piece of evidence about what's happening on the ground.

And in addition to that, you have the evidence that we have here. I mean, for example, take plaintiff R.M., for example. He filed his application for a T visa in November of 2025 and ICE scheduled him for a biometrics appointment -- sorry, USCIS scheduled him for a biometrics appointment in December. He was never taken to that and ICE didn't take his biometrics.

Y.P. asked to be transported. They refused that. They didn't take his biometrics or send them.

There's also evidence that even with that internal policy that even when ICE takes the biometrics and sends them to USCIS, often USCIS rejects them. In M.C.'s case, evidently ICE took her biometrics but we just submitted the denial of her application based on abandonment for lack of biometrics. So either ICE didn't send those biometrics --

THE COURT: When did ICE take the biometrics?

MR. OUELLETTE: I'm not sure on that. I think it was after we -- I believe it was after we filed, though.

THE COURT: Okay. It was after December 2025?

MR. OUELLETTE: It was after December 2025, yes.

THE COURT: So ICE did collect the biometrics from M.C., who was detained, but then it was still denied --

MR. OUELLETTE: It was still denied.

THE COURT: -- more recently because the biometrics weren't provided to USCIS?

MR. OUELLETTE: Either they weren't provided or USCIS didn't accept them. We know they were taken, but then we know it was still denied. But I think one thing that's important to remember is that even if you have -- even if maybe ICE isn't applying this rule that DHS generally won't take biometrics for USCIS applications consistently or is maybe making exceptions to it in certain cases, that doesn't change the fact that you have this rule on the books that's reviewable under the APA.

Remember, under the APA a rule is a statement of general applicability or particular applicability that describes an effect agency policy. And so when you have a regulation, for example, the fact that the government might not be consistently applying or making exceptions in certain cases certainly doesn't mean that that rule isn't still reviewable.

And that would be unfair to many of our plaintiffs and many countless others who are affected by this rule to say --

THE COURT: Can I ask you a couple of -- some of these are going to get into some kind of factual, specific stuff. But you mentioned, I think, Y.P., R.M. and M.C. I just want to make sure I have the classification of your plaintiffs. So you've got six plaintiffs; is that right?

MR. OUELLETTE: Yes.

THE COURT: Y.P. is an adjustment of status, based on

the Cuban Adjustment Act?

MR. OUELLETTE: Yes.

THE COURT: R.M. is the T visa and M.C., who you mentioned a moment ago, is to your U visa?

MR. OUELLETTE: Correct.

THE COURT: And I know you've got J.Z., who's the special immigrant juvenile status; is that right?

MR. OUELLETTE: Yes.

THE COURT: And H.A., who's one of the derivative asylee --

MR. OUELLETTE: Correct.

THE COURT: Okay. So the last one I'm left with is Mr. Trejo, and I guess the only reason I was confused and -- my understanding is that he is just an adjustment of status through marriage to a U.S. citizen; is that right?

MR. OUELLETTE: Correct.

THE COURT: The only reason I was confused is the complaint walked through a series of statuses, and there was one -- didn't seem to have one that was adjustment of status for people who are married in walking through it, and it had adjustment of status for refugees and asylees, and I didn't think you had any plaintiff who fits that category. Maybe you can just --

MR. OUELLETTE: Oh, we don't. That's correct. If I could just explain. The adjustment of status for family of

U.S. citizens falls under -- I guess I'd call it the general adjustment provision, Section 8 U.S.C. Section 1255. So that's not specific to the family of U.S. citizens.

But the family of U.S. citizens is one of the groups that qualifies for a waiver of certain admissibility bars, and so it's easier for them to get that adjustment under that general statute.

THE COURT: Okay. And that category adjustment of status for refugees and asylees, do you have a plaintiff who fits within that category?

MR. OUELLETTE: No.

THE COURT: Okay. So why is that discussed? Is it just kind of to know the different types of --

MR. OUELLETTE: That's one of the forms of relief that this policy affects.

THE COURT: Okay. And then, as I understand it, at least for your contrary-to-law arguments, the form of the argument seems to be, in large part, INA provides different statuses. Congress decided that people have the right, ability, to apply for these different statuses and to be considered for them.

And there's case law suggesting that although this government gets to make the individualized determinations and has discretion in how it makes those assessments, it's got to make the determinations and that it is inconsistent with each

of the parts of the INA dealing with the statuses of your plaintiff to just not collect these biometrics.

MR. OUELLETTE: That's correct.

THE COURT: Okay. So if that's the form, I notice your class definition in the relief sought in the PI is not limited to just your plaintiffs but also even to the extent it goes beyond because of the class nature, because of vacatur, it's also not limited to those statuses.

Why is that? Why wouldn't it be limited to the particular types of pending applications that your plaintiffs have?

MR. OUELLETTE: It's not limited to -- I see. I think because the APA arbitrary and capricious claim would apply to everyone who is pursuing relief, regardless of whether it's limited to the statuses that the plaintiffs have.

THE COURT: Well, you just jumped from -- I started with at least as to your contract --

MR. OUELLETTE: Oh, I'm sorry.

THE COURT: But do you agree, then, for contrary to law --

MR. OUELLETTE: I can address the contrary-to-law claim too. I think -- I mean, the reason is that -- so this policy is based -- I think the government admits this is based on this legal assumption that USCIS and ICE, DHS doesn't have the obligation to take these biometrics and can effectively

people block people from going forward.

And because the policy -- because that's inconsistent with so many of these statutes and regulations, the policy is contrary to law, and I think it would be contrary to law with respect to even people that don't fall within those categories.

THE COURT: Why would that be? I mean, you're relying on particular statutory text in the INA to say it's inconsistent with people who -- that the policy adopted is inconsistent with the law Congress has passed as it relates, to use an example, to T visas.

Why would it be that then it's also contrary to law necessarily or that the relief would extend to some other type of pending status application that I don't even know about?

MR. OUELLETTE: Because my understanding of contrary to law is if the government relies on an error of law, especially of this magnitude, I mean, if it -- so what the government has said, the premise of this policy is that we don't have an obligation ever to collect the biometrics. And that's wrong. That's contrary to several different statutes and regulations.

And so because of that, the Court's job is over at that point. The policy should be set aside because it's contrary to law. And when a policy is set aside -- and the D.C. Circuit has been very clear on this -- it's not set aside with respect to particular plaintiffs.

THE COURT: Well, but even if it's not set aside for plaintiffs, wouldn't you set it aside as to the particular context in which it was contrary to the law?

MR. OUELLETTE: I don't think so. I think the D.C. Circuit --

THE COURT: So you find one small -- I'm not saying this is your case. I know you don't think it's one small. But your submission is even if you find one category of pending immigration benefit for which this discretion didn't exist, even if technically they would have had discretion to do this for 99 percent of the people going for benefits, you'd say the whole thing is vacated?

MR. OUELLETTE: I think that is true because it's really up to the government how they're going to frame the legal conclusion that they're based on this policy. I don't know what they've said is we never have the obligation to do this.

Again, as Your Honor noted, though, that certainly isn't this case. At least the vast majority --

THE COURT: What about just as to -- maybe that is your position on vacatur under the APA. What about for the class? Shouldn't the class at least be defined as to the particular plaintiffs here? Not the particular plaintiffs. Obviously, the class. But as to the particular types of statuses they've applied for?

MR. OUELLETTE: As to the contrary-to-law claim, I don't quite see -- I guess I don't quite see why that could be, but I think you could certainly certify a class with respect to that claim that is limited to what the -- the relief --

THE COURT: Well, let me ask you this question. How many other statuses are we talking about here?

MR. OUELLETTE: Let me take that back, actually. Because the contrary-to-law claim, I don't want it to get lost, that it's also based on the biometrics regulation that specifically requires DHS to take biometrics.

THE COURT: That's a fair point. I guess as to the biometrics regulation you point to, which is a different argument from the, hey, here are the INA provisions that are being collected and maybe as to your Fifth Amendment due process claim, those would generalize the contrary-to-law claim beyond any particular type of immigration benefit. That, I get. That makes sense to me. Is that what you were about to say?

MR. OUELLETTE: Yes.

THE COURT: All right. Let me ask you another kind of on-the-ground question. What is the current status of each plaintiff? And as you understand it, is there a risk of them being deported presently?

MR. OUELLETTE: Definitely. Well, they do have -- so all of the plaintiffs, except for Mr. Estrada Trejo, have final

orders of removal. And they've appealed those to the BIA. So it's my understanding they won't be removed until the BIA rules on that, but that will certainly happen before this Court -- or there's at least a very high risk that that's going to happen before this Court would reach final judgment in this case.

And in the meantime, they're facing prolonged detention because, for example, if you take R.M., if DHS were to take his biometrics and process the application, he'd get something called a bona fide determination, which is a determination that his application is complete and properly filed.

That would entitle him to an automatic stay of deportation. And it would also entitle him to -- so it would stay his removal order or he could also get deferred action, which would mean that he could be released from detention. And certainly if he gets that DV as a relief, his removal order should be cancelled and he would be released from detention on that basis.

And that's the case with the other plaintiffs too. If their applications are processed, their removal proceedings could be terminated and they could be released.

And so all of those harms, the risk of deportation before this Court reaches final judgment, the prolonged detention, the separation from their families are threatened irreparable harm.

THE COURT: What can you tell me about the intra-departmental agreement that's referred to in the policy? Do you know what the agreement is?

MR. OUELLETTE: Your Honor, all I know about the agreement is what's in the -- what's referenced in the USCIS policy manual and the policy alert at this point.

I do think that the best evidence that we have on that is the fact that it is the way that DHS describes it, that it was a policy that placed the burden on ICE to take people's biometrics. And so that's -- I haven't seen it. It's not public. That would be something we'd have to get with the administrative record.

THE COURT: Is your understanding that the policy press release and policy alert, the policy that that reflects is what led to the agreement being rescinded?

MR. OUELLETTE: I think the evidence suggests, certainly, that it was part of the same decision that DHS is generally not going to collect these biometrics anymore because, as late as November of 2025, the USCIS policy manual reflected that the intra-departmental agreement was in existence.

And then you have the policy alert coming out in December 5th, which was the first time that the department made public that this agreement was no longer in effect. So I think that suggests that it's all part of the same policy.

But again, I think even if you look at these as separate agency actions, they're still reviewable, they're still arbitrary and capricious, contrary to law, and we're still entitled to relief.

One thing -- Your Honor was asking a lot about the practical evidence. One thing that I didn't mention that I didn't want to get lost is in our reply regarding the class cert brief note 3, we also cite a number of other cases where people in detention with USCIS applications have not been able to get their biometrics taken after the policy came out.

THE COURT: By that, you mean they're in detention and they haven't been able to get ICE to collect them, or they've gotten ICE to collect them and haven't been able to get them considered?

MR. OUELLETTE: Either of them. The cases indicate that the person couldn't submit biometrics. So actually, I don't know the details of each individual -- let's see.

None of the cases reveal that ICE took their biometrics. It just said that they weren't able to submit them in one of their applications. For example, in Guaman v. Sage, USCIS denied the person's SIJS petition because he could not submit the biometrics while in detention. Another court held --

THE COURT: The defendants make an argument -- paraphrasing here -- that they ought to be able to put together

an administrative record. And you just mentioned administrative record a moment ago. Do you want to respond to that argument?

MR. OUELLETTE: Yes. I think that the Court should withhold relief until they produce the administrative record. I mean, they could have -- I guess, I don't know --

THE COURT: You said you think the Court should withhold --

MR. OUELLETTE: No, no. I guess, is that the argument? I think -- they had this one-off line in their brief that they haven't been able to put together an administrative record, but, of course, courts stay policies -- rules all the time before the administrative record is fully complete and certified.

So I guess I just wasn't sure why that would get in the way of preliminary relief here.

And certainly, with respect to the intra-departmental agreement, if we have it wrong and we're reading these documents wrong and maybe -- like there wasn't an intra-departmental agreement, there was no rescission or whatever, they could have submitted that evidence. I guess I don't see why that would have taken a heavy lift for them.

I mean, this motion has been on the docket since May 12th, when we filed in late April, and so I suppose I just don't quite understand that.

THE COURT: Okay. And then speaking to relief for a moment, you say in the proposed order that defendants should be preliminarily enjoined from refusing to take biometrics from any non-citizen in DHS custody, to the extent that such biometrics collection is necessary to adjudicate the merits of a pending application for relief from USCIS.

Is that really the relief you're seeking? Aren't -- is it enough for you to have DHS say they won't refuse -- there's an argument that DHS is making, defendants are making, that they're not refusing to. But aren't you trying to get more than that? Aren't you trying to have them be required to collect the information, not just --

MR. OUELLETTE: That's the final relief we're seeking. We asked for something more modest in this preliminary motion, but the final injunction that we're seeking is an injunction compelling them to take the biometrics.

THE COURT: But why would the preliminary relief you're seeking give you what you want here? I mean, as I understand, it's not enough to get you to address the harm you're talking about to just have USCIS or DHS to be willing to consider biometrics. You actually need someone to come collect them because they're in a cell somewhere.

MR. OUELLETTE: Oh, no. That, I think, is what we're requesting, that they can't -- to say that you can't refuse to take biometrics means that if you get a request or you get an

application, you can't say, we're not going to take -- if you're aware that the biometrics need to be taken, you have to do it. You can't say we're not going to take them.

And you can't say -- I also don't think it would be enough for ICE just to collect them because that also wouldn't, I think, mean that DHS -- ICE to collect them and like not send them to USCIS, for example. I think we have to read this in a commonsense way in light of the claims.

If what's happening is that sometimes ICE might collect them but USCIS still rejects them, I think that constitutes not taking the biometrics.

So I hope that's somewhat helpful in clarifying what we're seeking here. It's not just that DHS tells someone, sure, we'll take them. You know, if they're not actually collecting them, I think that would still be a refusal to collect.

THE COURT: Okay. It's a strangely -- it's a strange wording to order someone to do something to say you're enjoined from refusing to take --

MR. OUELLETTE: You could certainly enjoin them to take the biometrics. I think that relief is warranted for all the reasons that the injunction we requested is warranted.

THE COURT: And where does that obligation come from to have someone go take them? I mean, the ICE part, for example.

It's one thing for you to say that's how it had been working for years. We've got an evidentiary record as to how that's been working for years. It seems to be what everybody accepts, that they were going and taking these, and then they've changed their position, and it's arbitrary and capricious. They didn't explain it.

MR. OUELLETTE: Three reasons. I don't think it's -- number one, we have the policy document that says that they were required to take it before. Right. The policy alert docket number 14-3 says that there was a burden on ICE to collect the biometrics, and you have the language in the policy manual saying they have the responsibility.

Number two, the contrary-to-law claim, that they can't just refuse to take these biometric because it blocks people's applications. And by the time someone's deported, most of these people are going to be ineligible for relief. So it's tantamount to an across-the-board cutoff from relief. And so you have to take the biometrics in order to process the application. That's number two.

Number three is the biometrics regulation requires them to -- requires DHS to collect biometrics from any non-citizen in custody.

THE COURT: That's the regulation, the last point you made?

MR. OUELLETTE: 1,003.47.

THE COURT: Can you address -- are there any -- aside from the need to address the question of class certification, is there any differences from your perspective between proceeding as a 706 stay versus class certification?

MR. OUELLETTE: I think no, not formally. I think that often sometimes an issue in these cases is that DHS custody can be fluid if the Court orders relief. And for example, the named plaintiffs have their biometrics taken, there could be a muteness issue that arises. I don't think that the case would be moot, but we'd have to have that argument.

And I think this policy affects lots of people across the country and the Federal Rules of Civil Procedure urge the Court to decide class certification at an early time in the case. And I think that's certainly warranted here, to at least provisionally certify the class in connection with relief, to ensure the Court retains jurisdiction and to ensure that the stay and injunction are effective.

THE COURT: Okay. I mentioned to you one of the parts of your proposed order enjoining the defendants from refusing to take biometrics. But as insofar as your APA claims are concerned, would you be satisfied with an order that just says the rule is vacated?

MR. OUELLETTE: I would certainly welcome that relief, but I don't think it would be sufficient in this case because

it's unclear from the government's brief whether -- as you said, it seems that in portions of their brief they're saying they don't think this really changed the status quo. In other portions of their brief, they admit that ICE was required to take biometrics before.

And so I think that lack of clarity gives me a little bit of heartburn. That have's why we're requesting an injunction and that's why we think the injunction is required, too, because it's not clear that the government would comply with the prior policy if the Court just --

THE COURT: I agree with you. I'm going to talk to the government, but in light of the government's position that it doesn't mean what you say it means in the first place and not as much has changed as the plaintiffs are saying, these are going to be good questions to ask the government as well.

But it kind of comes back to my issue with you didn't respond to that. Maybe when you first filed your motion you didn't feel like there was any ambiguity here. But you didn't respond to that.

You have some things you pointed me to, like what occurred in the other cases, and you've submitted some evidence on those and you pointed to me to some more a moment ago. But you didn't respond to that with, hey, here's a bunch of evidence showing you what happened before December 2025. And there actually -- there's evidence showing that things on the

ground did change the way you're saying they changed.

MR. OUELLETTE: I suppose I'm not -- one thing I'm struggling with is, I guess, why that evidence would be required, given that you have this indication that ICE had had a rule -- or that DHS had an intra-departmental agreement that required ICE to take the biometrics, and now they've changed that rule. I think everyone agrees that that agreement and that requirement doesn't exist anymore.

So there's standing, certainly, to challenge that change in policy because -- so, I mean, you don't have this requirement anymore. Right? And now ICE, regardless of what was happening before, doesn't have to take the biometrics anymore. Right?

We know from the D.C. Circuit's decision in Orangeburg that when a policy authorizes the harmful conduct, that's enough to satisfy causation. And certainly, if the Court stayed the policy or vacated the policy and revived that requirement that ICE take the biometrics, that would make it more likely that plaintiffs would get their biometrics taken and would get released.

So there's no standing problem there. You have this rule that used to exist, and now it doesn't, and you can revive the rule and revive the requirement.

There's no problem with final agency action because a action rescinding a prior obligation changes the obligations of

the agency and as a final --

THE COURT: Your position, I think it's what I was just saying. Your position is that you can get there just based on the language of the policy alert and press release alone.

MR. OUELLETTE: Yes. I just want to be clear that we do understand that this was happening before. So I just want to make that clear, at least as a representation from counsel.

THE COURT: Okay. Those are all of my questions for you. I'll hear from counsel for the defendants.

MR. OUELLETTE: Thank you.

THE COURT: And as I did for plaintiff's counsel, you should feel free to take a few minutes if you'd like to frame issues or anything at the outset.

MR. MCDERMOND: Great. Just as a preliminary matter, though, Your Honor, to the extent that the Court has any questions about deep dives into class certification and such, my co-counsel would be the one handling that. I'm primarily here to argue the PI.

THE COURT: Okay. That's helpful to know. Thanks.

MR. MCDERMOND: Okay. Let me just briefly get some water.

This District has been flooded with emergency petitions. And while some of these cases might legitimately be emergencies, this case is not.

This case is not an emergency because plaintiffs failed to show all four factors necessary to obtain a PI. Plaintiffs cannot show they're likely to exceed on the merits of their claims. Primarily because, as the Court is seems to understand, they're seeking an affirmative obligation of which they are not citing any authority to establish DHS has that affirmative obligation.

They have not shown a likelihood of irreparable harm. The balance of equities favors the government and an injunction is not in the public interest.

But before considering these four factors, plaintiffs must overcome some threshold defenses, such as lack of standing, failure to challenge discrete final agency action, and the ionized jurisdictional bars for certain plaintiffs.

And even if the Court ultimately does find plaintiffs have met their burden, show all four factors, any relief here must be strictly limited to these plaintiffs, because at this time no class has been certified.

Now, I'm happy to start going through my --

THE COURT: Can I ask you on that last point? I hesitate to take the bait on that. But, you know, there's -- I'm not the first Court to be confronted with the government's argument that APA relief should be plaintiff-specific. And I think you-all have been raising that in courts all over the place, including the United States Supreme Court. And they

haven't, to date, been persuaded by that, as I understand it. Or at least haven't issued a ruling adopting that position and I think have indicated some skepticism towards it.

So is this different than that? I mean APA relief is typically vacatur. I think a 706 stay seems to kind of be a preliminary stay of the rule to restore the status quo or to maintain the status quo. So is this something different or is this kind of same version?

MR. MCDERMOND: So I think this is a bit different and it's different for some of the reasons Your Honor was asking questions about earlier, in that what plaintiffs here are claiming in their seeking is an injunction requiring something. Right? And that would be an injunction requiring something across the board universally for anybody who might be denied -- to whom ICE would say, well, we have no obligation to collect biometrics. And as CASA has held, you know, universal injunctions are no longer kosher.

So that's kind of what plaintiffs today seem to be asking for. And any universal injunction would clearly run afoul of CASA.

THE COURT: Yeah, but I think what plaintiff's counsel might say in response and said to me in asking those questions was, look, at the end of the day, this rule is what did the thing we're challenging. So if you vacate the rule, provided we're all clear on what exactly that means, that takes away the

harm. Right?

It's the rule that says that -- again, part of this is that there seems to be a disagreement about the rule. I want to come to that and probably we should spend some time there and start there.

But if the rule is as plaintiff described it, it's a rule saying, look, USCIS is not going to consider -- receive biometrics information anymore. ICE is no longer going to go get it, even though they were before. Then that's what's doing the harm to them. And if you vacate it, then USCIS will consider the information and ICE will go get it.

MR. MCDERMOND: So again, I think vacating a rule as a remedy here in that instance, plaintiffs still have to be able to cite to the affirmative obligation. Right? That says, USCIS, you have to process these documents when you get them, and to ICE, you have to collect and facilitate the collection of biometrics. And plaintiffs have not cited to any authority for that.

So even when we vacate that rule, there still has to be that requirement of an affirmative obligation. Correct? And so we don't have that here.

THE COURT: Right. So is your point -- let's just kind of simplify it. Obviously, this is not our case, although plaintiff may say it is. You know, if the INA said plaintiffs can apply for adjustment of status -- people can apply for

adjustment of status, U visas, T visas and they're entitled to have those considered, and if they're detained, ICE shall go collect the biometrics, provide it to USCIS and USCIS shall consider it.

Suppose that's the statute. I know that's not what the statute says here.

And then a court concludes -- then you issue the same rule here that says USCIS is not going to consider it, ICE is not going to go get it. Right? So just I'm creating a hypothetical in which it's diametrically inconsistent with the rule. And a court sees that and says, look, that policy is contrary to the INA, which explicitly says ICE has to go get this and USCIS has to consider it. Rule vacated.

Would your answer be different in that context?

MR. MCDERMOND: I think what we have -- my answer would be substantially similar because in that instance then what you have is afterwards you've got that portion of the INA that you can then point to and say, you know, you have a non-discretionary, mandatory duty to do this --

THE COURT: Right. That's a fair point. So your answer would be consistent with your answer right now. Same principle but maybe different result because you would be saying there you have the -- you're kind of saying it proves your point. There you have the mandatory requirements.

Which makes clear that, at least as to the

contrary-of-law piece, it turns on whether the plaintiffs are correct, at least as to their contrary-of-law argument that relies on the various INA provisions as opposed to the regulation and the Fifth Amendment that it turns on whether that does require the government to take biometrics as part of those processes.

MR. MCDERMOND: Correct, Your Honor.

THE COURT: And your point is just it doesn't do that; it's not similar to the hypothetical I gave you?

MR. MCDERMOND: Right.

THE COURT: Sorry. I interrupted you. If there's something else you wanted to frame, go ahead.

MR. MCDERMOND: I have quite a lot that I could frame. I'm also happy to answer the Court's questions.

THE COURT: Yeah, why don't we get to -- I mean, there does seem to be kind of a disagreement about what the policy, at least is, I think. And so maybe you could help me figure that out.

Let me give you something to react to. When I was reading your brief, it at least occurred to me to ask is the government arguing that nothing has changed essentially? Because you use language like it's just confirming or just stating the agency's position. So is your position that nothing has changed?

MR. MCDERMOND: So I think our position would be that

there -- that what the policy manual was referencing when it came to that intra-departmental agreement was USCIS's understanding of the informal practice, where I said facilitated collections of biometrics. Previously, when an alien was detained, it had an application pending before USCIS.

THE COURT: Sorry. I didn't quite catch that.

MR. MCDERMOND: So the intra-departmental agreement, which was referenced in the policy manual, and I think is really what we all here are pointing at, is this is the change, this is the change, it was USCIS's understanding of the prior informal practice, where ICE had facilitated the collection of biometrics when an alien was detained and had an application pending before USCIS.

And what I think the press releases and the change to the policy manual are indicating is just saying that we're going to change that language to make sure it conforms with what the regulations require, or at least what the agency's understanding of the regulations require.

And I think that we, at this point in time, I think it's our understanding that the changes, it was still informally being processed and still informally processed to some extent, even if there might have been breakdowns.

THE COURT: So did anything change?

I mean, you're pausing for a long time and that's kind of the heart of it. I mean, I just -- I understand you want to

say, look, these are a press release and a policy alert and they're just kind of capturing what we view the law as. I understand that's your legal argument. But my question for you is, like, did this change things?

MR. MCDERMOND: I think I would say from my reading and from my -- what I've seen here and trying to investigate this, it -- I don't think there's --

THE COURT: It seems like a question you should be able to answer for me.

MR. MCDERMOND: I know. Can I quickly check notes and confer for a brief moment?

THE COURT: Well, let me ask you this. So you refer to it as informal, and I understand why that helps your legal argument. But the -- and maybe there's a way of describing kind of a press release as informal. It's not like it's like a stamp signed by the secretary policy document. But it presumably reflects things and it's describing things.

So one of the things it describes is an intra-department agreement, which doesn't sound very informal. Right? It sounds kind of of like a formal internal agency thing. Do you grant me that an intra-department agreement is not an informal thing?

MR. MCDERMOND: As described, it doesn't sound terribly informal, but that's my understanding of what --

THE COURT: So when was that rescinded?

MR. MCDERMOND: I don't think rescission is entirely the right term there, and I'm also not entirely sure of --

THE COURT: Okay. Help me understand why that's not -- usually I think of agreements and rescission, but I wasn't trying to make a legal point. I'm just, again, concerned with what is actually happening.

The argument you state in your brief is, look, we were just capturing the reality that that -- I think the word is obsolete. Right? And I can't remember if that might have even been in not just your brief, but some of the --

MR. MCDERMOND: I think that was in one of the --

THE COURT: In one of the policies. Yeah, exactly. Thanks.

So it's obsolete, but like when did it become obsolete and how did it become obsolete?

MR. MCDERMOND: So as to when, that, I do not know. And how it became obsolete, I think that's -- from my understanding, from my reading of how this seems to all fit together, is that when the agency was looking at what the rights required, they're like, oh, we don't have -- there's no affirmative obligation or burden. I think that's what would have made that obsolete. That's my reading and understanding.

THE COURT: Yeah, and that in and of itself is not abnormal. Right? You can find -- I was going to say when there's a change of administration, but frankly, even when

there's not a change of administration, there can be all sorts of circumstances when an agency looks at the law and says, we actually think the law requires something different than what we've been doing or is different from what we've been doing.

But the mere fact that they're taking the position that the law requires something different doesn't mean it's not reviewable by a court. Right? If they're adopting an articulation of the law that is wrong, it's typically reviewable by court. Or if they're adopting a change that is arbitrary and capricious or contrary to law, just the mere fact that they're recognizing what they believe the best interpretation of the law is doesn't mean nothing has changed and that there's nothing reviewable.

What is it about this case that makes it so that nothing is changed and/or nothing is reviewable?

MR. MCDERMOND: Yeah. I mean, I think what we have in the record right now is that there do still seem to be instances where ICE is, to some extent, offering to facilitate biometrics collections. I believe it's Exhibit 11, which is connected to our class certification motion, which provides some data on the fingerprint cards being received by USCIS and collected by ICE. Plaintiffs submitted --

THE COURT: So when are they doing that, I guess, is -- I don't mean to -- you represent the United States here. So when are they collecting fingerprints and when are they not

collecting fingerprints today?

Because my understanding -- you can correct me if I'm wrong -- is they were collecting the biometrics data before December 2025. Right? And today your response to me is, well, we've got some evidence that they're still collecting some stuff sometimes. So when? When today are they collecting fingerprints and when are they not?

MR. MCDERMOND: So I don't have a very specific answer to that right now, Your Honor. But what I've seen from this record and what I've looked at is it seems that, for example, the email plaintiffs have submitted, that's an exchange between an ICE officer that says we can facilitate, let us know when. We are just saying we have no obligation to do so.

And so it does seem to be that ICE officers are facilitating when they --

THE COURT: Want to?

MR. MCDERMOND: Well, when plaintiffs counsel or individuals are asking and requesting facilitation. We see that from that one email exchange that's in the record.

THE COURT: So the idea is if you ask nicely they might or they will? I don't mean to -- this is not a funny topic. Like when are they doing it? Have you asked your client that?

MR. MCDERMOND: We have certainly tried, yeah.

THE COURT: Stepping back for a moment. I don't mean

to put words in your mouth, but is the idea that, look, okay, before December 2025, there was the intra-departmental agreement and they were doing this, and today maybe it looks a little different because they're not -- they're doing it on a more ad hoc basis but they're still doing it and, therefore, it's not kind of a concrete enough change to be changeable -- challenged under the APA. Is that a fair description?

MR. MCDERMOND: I think that is -- I think the way we would say this is that essentially what plaintiffs are citing to as this policy, it's that policy blurb and the change in the policy manual. So that doesn't -- it's not a sea change in what the government's obligations were previously or are now. And so it's not actually -- what plaintiffs seem to be identifying as a change is not a change.

THE COURT: And you said it's not a change in the government's obligations. I just want to understand that. Is it not a change in the government's obligations because the government's position today is that it was never obliged to do that stuff? Or do you mean it's not a change in the government's obligation in some, like, concrete, practical way? Do you understand what I'm saying?

MR. MCDERMOND: I think so.

THE COURT: I just want to make sure that I understand what you mean when you say it's not a change -- it was not a change in the government's obligations.

MR. MCDERMOND: Right. So that's grounded in the regulations and like your hypothetical earlier in that the INA doesn't say this must be done in this way, such that there is a non-discretionary mandatory duty.

THE COURT: Is your position that -- okay. But I think you're taking it at a high level. Again, you're not saying nothing's changed on the ground. You're just saying, at the end of the day, the government never had an obligation to do this in the government's view today. And we just wrote down that the government never had an obligation to do this.

MR. MCDERMOND: Yes, Your Honor.

THE COURT: Okay. I think I follow that.

MR. MCDERMOND: And we're trying to -- trying to get factual development as well at the time.

THE COURT: In speaking with the agency, you mean?

MR. MCDERMOND: Yes, Your Honor.

THE COURT: Yeah, that was one question I had for you. You make mention to the administrative record and having the opportunity to put together an administrative record. Is there an administrative record here?

MR. MCDERMOND: We've told the agency that this is an APA case and they've got to compile an administrative record.

THE COURT: Okay. Do you have a sense of how long it's going to take to compile that?

MR. MCDERMOND: So I don't have that email in front of

me. I was recently switched within the government and I don't have access to my old emails. And I think that was a different email chain, Your Honor.

THE COURT: Okay.

MR. MCDERMOND: I can follow up on that.

THE COURT: That might be helpful if you have an indication of the timeline it would take to get an administrative record together. Obviously, that would be helpful to have but the government would need to be able to put it together here.

Do you want to address the -- there's been a lot of back and forth and I don't mean to make so much of one particular case, but this Walter A. case and exactly what was exactly going on there? Do you have any more information?

MR. MCDERMOND: Right. So when I was looking at Walter A., reading that case, looking at this transcript, what we see there is -- certainly in the transcript, that the individual who was testifying, who was the one who said USCIS will not take biometrics from an individual, well, that person was a contractor who had received guidance via contract company. Right?

And while they were an operating a USCIS service center, I think we can't necessarily extrapolate from that one transcript testimony that USCIS's policy is to refuse to accept biometrics. Especially because what we also have here in the

record is the Brown declaration -- that's Exhibit 6 -- which says this is what the standard operating excerpt is. That's been updated as of March 2026. Which says that ICE can either bring someone for an in-person service center biometrics appointment or they can provide the print cards.

THE COURT: So in other words, in that case, the government's position is that that was just a misunderstanding by the person who was working at the biometrics center?

MR. MCDERMOND: That's why I'm reading that, because it does seem to not comport with what we get from the Brown declaration. And the Brown is higher up within USCIS, who has authority over --

THE COURT: Okay. The other example -- one of the other examples the plaintiffs gives is one of the plaintiffs in this case, I think it was.

MR. MCDERMOND: Are we talking about J.Z., potentially?

THE COURT: Well, if you want to address J.Z., that might be helpful too. What did you have for J.Z.?

MR. MCDERMOND: I think -- I believe it is J.Z., the applicant who was seeking SIJ, did have fingerprints taken previously. Or was it --

THE COURT: I think he might be -- well, go ahead. Tell me what you were going to say about J.Z. and then I'll ask you the question.

MR. MCDERMOND: So there was a denial prior to the alleged policy occurring. So for plaintiffs understanding that the policy shift happened in December of 2025, what we do seem to see with J.Z.'s declaration, I believe, is that there was a prior denial even before the policy kicked in, for lack of biometrics there.

THE COURT: Right. And then he applied again and didn't get biometrics taken. Is that my understanding? He applied again while detained after the policy?

MR. MCDERMOND: If I'm remembering the declaration correctly, he applied again after the policy and stated that ICE was not willing to transport him.

THE COURT: Okay. The one I was going to ask you about was actually M.C., who was this one who I believe had a recent denial for lack of biometrics.

MR. MCDERMOND: Right.

THE COURT: And as plaintiff's counsel described it today, actually ICE had collected the biometrics. And so is this a situation where the policy -- again, can you infer from that that USCIS is just not accepting? What went on in that case? Can you tell me what happened in U.M.'s case?

MR. MCDERMOND: So I do not know the specifics of that one where there was an allegation that ICE collected her prints and then USCIS said we don't have those prints. I'm not entirely clear on those specifics.

THE COURT: Okay. Are you aware one way or the other of a general policy of USCIS that it will not accept biometrics from people who are detained?

MR. MCDERMOND: That is not USCIS's policy.

THE COURT: Okay.

MR. MCDERMOND: So per the Brown declaration, and it is our understanding that USCIS is willing to accept biometrics of detained applicants, it's just via those two methods, whether it be ICE facilitating an in-person appearance at a service center or the FD-258 cards, those print cards, and then sending those to USCIS.

THE COURT: Does that only work for fingerprints? Does that work for all of the biometrics that you've got to get done?

MR. MCDERMOND: I'm not entirely clear on that. But I do think that those are the forms that USCIS says we were accepting these and these are the biometrics forms that we can take.

THE COURT: And your understanding of the implication of that is that somebody who is detained can take care of their own biometrics just by mail -- sending it in? How does that work?

MR. MCDERMOND: I'm not entirely sure on the specific minutia of how that's being done. The prints being taken in, sent by mail by an individual --

THE COURT: But you get the problem here, right?

MR. MCDERMOND: Yes.

THE COURT: It's someone who is detained who may have the right not to just apply but may actually be entitled to a lawful status in this country, and may have had the application pending before they were detained, may have paid all the fees, right, associated with it, and may have had that processed well before any removal decision, who is now detained and unable to have the government collect biometrics, which is required for that thing they've been applying for and, again, may be entitled to.

And so I hear you telling me, essentially, under the current policy, they just need ICE to do them a favor and be willing to take them over. And maybe there's some way for them to mail certain things. Is that right?

I mean, there's no -- I know your position is that there was never an obligation, but I think ICE was doing this and USCIS was considering the information. You're telling me now USCIS will consider it if they get the biometrics, but that middle piece, getting the biometrics to USCIS is basically, you know, you just need ICE to do you a solid?

MR. MCDERMOND: Our position would be that there's -- this articulation of what the policy is is not a bar on ICE collecting those biometrics, but at the same time, plaintiffs aren't citing to any affirmative non-discretionary duty that

requires that. So I understand the way Your Honor is thinking about this question, and that is the government's position.

THE COURT: Got it. Okay. Just give me a moment to see if I've got any other questions for you.

(Pause in the proceedings)

THE COURT: Curious, we talked a little about the plaintiff's INA argument and how, in your view, it's not specific enough to impose a duty here.

What do you make of the fact that Congress also provided that, at least for some of these statuses, it would terminate the removal proceedings? In some cases, as I understand it, it would require the removal proceedings to be terminated, and in others it would at least give some discretion once you have that status to end the removal proceedings.

MR. MCDERMOND: So I think as a categorical, any of the benefits that plaintiffs are seeking are not -- while they might potentially -- in a removal proceeding, people could still be subject to removal even after obtaining some of the benefits.

So SIJ, for example, is an example where once you have that benefit, you can still be subject to removal, even if you have a -- if you obtain a U visa.

THE COURT: Right. You can. But I think a court can -- and maybe this is just in the immigration court because

it comes from the regulations. A court can terminate the proceedings; is that right?

MR. MCDERMOND: I need to double check on that one. I think that might be regulatory.

THE COURT: And then for U visas and T visas, though, I think it's a mandatory end to the removal, right?

MR. MCDERMOND: I would need to double check that one specifically, Your Honor.

THE COURT: All right. There is one thing said in the -- I think it's the press release as to why the action is being taken. It says that it would, quote, deter the filing of frivolous claims and provide operational consistency, end quote.

What does that mean?

MR. MCDERMOND: That's a good question.

THE COURT: Okay. You don't know?

MR. MCDERMOND: I don't have an answer to that right now, Your Honor.

THE COURT: Maybe some -- another reason why you'd want to provide an administrative record at some point.

MR. MCDERMOND: That's a good point.

THE COURT: All right. I think that covers all of my questions for you.

Is there another submission you'd like to make?

MR. MCDERMOND: I think just briefly I need to go back

to what plaintiffs seem to be asking for here today, which is injunctive relief compelling action. And I know we had a bit of an exchange about remedy earlier, and we had quite a bit of an exchange with opposing counsel about remedy. But when we look at just vacatur itself, absent an injunction that would compel any action, I don't think that that would redress the injuries.

And we can look at -- I believe it's documentary society, where they said just vacating something that isn't going to actually change agency or require the agency to make a change is not sufficient for redressability.

And the way it seems the plaintiffs are now articulating their case is there is this affirmative obligation. And they're not pointing to any other type of affirmative obligation for USCIS to go out and collect biometrics for people who might be too remote to attend an ASC service center, someone who might have a disability --

THE COURT: Yeah, I mean -- go ahead.

MR. MCDERMOND: I think that this is essentially where plaintiff's case hinges on, is they have not identified that non-discretionary mandatory duty.

THE COURT: Yeah. So I mean, I think this is one of the challenges with the kind of disconnect between the way the parties are seeing the world. And I'm not going to put words in plaintiff's mouth, but I asked the question of wouldn't

vacatur itself be the remedy here without, as you put it, I think, like it being an injunction compelling certain action.

And as I understood the argument, it was theoretically so and -- but our concern is that the government is telling us that they don't even see a difference between time A and time B. And so if you just vacate the rule, they might not change anything.

And so I take them to be kind of be saying, look, vacatur would be the remedy under the APA, but if you actually view the world as at time A the policy was to not only consider the biometrics from people who are detained but to have ICE go get it and bring it to USCIS, and at time B they're no longer doing it and the policy is to not do that, then, sure, vacatur would be enough because you vacate the rule, they're going to go back to what they were doing beforehand.

But I understand the plaintiff's concern to be if you just vacate the rule, but the government's position is it was all the same, then they're not going to change their behavior. So this isn't exactly how it was articulated but it would be vacate the rule but, in aid of the injunction actually having meaning, you might want to clarify how you see the world.

Do you see it in the time A and time B are different scenario? In which case you should tell them that you're vacating the rule and the prior policy was to do this, so that they -- you have clarity as to what you have to do, because

otherwise it's just kind of left to the eye of the beholder and it seems like seeing the world in two different ways. So I don't know if you can offer me anything helpful there.

But it doesn't seem to be -- it seems to be less that they're seeking a mandatory injunction or compelling action, and more that they're seeking vacatur but they're concerned that the government won't -- I don't know, won't comply or won't know how to comply because the parties are seeing the world differently. Does that make sense to you?

MR. MCDERMOND: It does. And I think the government's position is still that previously there was no regulatory statutory duty to do so. That remains the same today.

THE COURT: But that could be true, right? Like I said, that happens all the time. You could have -- I'm trying to think of -- dangerous for me to think of hypotheticals, but I can do it on this case. Right?

Let's just go to hypothetical land for a moment. Assume that at time A, the policy was to have ICE provide this for everybody who has a pending application to provide the biometrics. Okay? That's the policy.

And then the agency says, oh, we've looked at the law and we don't think we had or ever had an obligation to do that, so we are going to now say that we don't have an obligation to do that. Right?

You can say the exact same thing you said to me just

now. You could say, well, my position is we never had an obligation to do that. But I think you're still changing your policy, which then is reviewable under the APA and requires a court to consider was that change in policy contrary to law or arbitrary and capricious.

And if not, and I vacate the change, you go back to time A, which was the prior policy. Right? You don't get to say, well, sure, you vacated the policy but we don't think we ever had an obligation to do so.

MR. MCDERMOND: So I understand the way the Court's think about it but I think kind of what's inherent in that is this understanding of like what is this policy? Can that even be challenged under the APA?

And what plaintiffs had said today was that they were challenging three different things they thought were the policy that cobbled together seem to injure them. And per Lujan, you can't cobble together a bunch of different agency actions to create a policy you can challenge under the APA. So I do think there are those threshold issues here.

THE COURT: But what about, you know, each of those are their bases to know that there has been a policy change. Right? Again, the idea being that at time A, the government's position and the way they carried it out was that they would collect biometrics and they would consider them, and then we see these three things happen and they're telling us at the

high level they're generally not going to take biometrics from people who are detained and ICE is no longer going to do it.

So I get your point that you can't cobble it together. But there's also, you know, a policy isn't always a agency policy statement signed by the secretary of the agency, right?

All right. Any other submissions?

MR. MCDERMOND: I just think one thing I would note is that it does seem we're really trying to determine what was happening previously, what's currently still happening. And on this posture on this footing with this PI, we just don't have that really in the record. I think that's why we keep asking about it and keep talking about it today, Your Honor.

THE COURT: Okay. Thank you.

MR. OUELLETTE: So I want to reiterate that I don't think it quite matters what the practice was on the ground before right now. I think that what matters is before there was a requirement and now there isn't, at minimum. Because the rule, again, that the Court reviews under the APA is the agency statements of what it's obligated to do and what it's not. But I do want speak as to --

THE COURT: I'm sorry, just give me one.

MR. OUELLETTE: Sure. Sorry.

THE COURT: You said what matters is before there was a requirement and now there isn't. Finish the sentence. A requirement to do what?

MR. OUELLETTE: There was a requirement that ICE would collect biometrics for detained non-citizens who are pursuing applications with USCIS. That's the intra-departmental agreement.

THE COURT: Okay. You're saying what's on the ground doesn't matter or that you don't need it?

MR. OUELLETTE: We don't need it. I think it matters to the extent that you think the policy might have been ambiguous. There's lots of case law saying that you can consider how the agency is applying it.

THE COURT: Okay. I hear you. I just want to understand exactly what you're arguing. So you're saying you don't need it; I get that. And here you don't need to show that what was happening on the ground beforehand. But the reason you don't need it is because you're saying, based on the agency documents you have and some other things that count as evidence, there was a change in policy?

MR. OUELLETTE: Yes. There was a change in the rule.

THE COURT: So you're saying -- what you're saying is what matters is that you have a rule, obviously, that you can challenge under the APA. And I think you reserved the possibility before to say there didn't even have to be a change. Right? And that makes sense for at least some of your arguments, that you don't need to have a change. But you did stand up a moment ago and say there was a requirement and now

there's not.

And your point is -- I think what you're saying is you've got a rule and to the extent a change matters, you don't have to have what happened on the ground. You can see it from the document itself. Is that --

MR. OUELLETTE: Imagine you have a legislative rule, a normal Federal Register rule that says ICE collects biometrics for everyone. But maybe on the ground ICE didn't really do that all the time. Sometimes it broke the rule.

THE COURT: Yeah, I get that. My point in asking about the record and what was happening on the ground is not because that's what gets reviewed under the APA. I know what gets reviewed under the APA as a rule. But it is one thing that might support that there's been a change in policy. Right?

The challenge is you're standing up here and saying that what matters is that there was a requirement before and there's not a requirement now. And the government is standing up and saying, no, you're misreading that. There was never a requirement. We never thought there was an obligation. Right? And so I'm looking for other indicia that support --

MR. OUELLETTE: So that was a preface. That was a preface of my chief position. But I want to speak directly to what was practically happening on the ground.

The one thing is that I think what I heard the

government say when the Court asked about, you know, was there an intra-departmental agreement? You know, what was that? I think they said it was USCIS's understanding of what ICE's practice was, which to me supports that this was actually what ICE was doing.

I think even if you take that response on its face, ICE must have had a practice of doing this because if that's how the government's characterizing it, that that seems to be what happened.

I think what they also said -- number two, if the Court is concerned about this and -- we would be happy to submit a declaration like tomorrow. It would be very easy to get someone to submit a declaration that provides evidence that this was what was happening from an immigration attorney, that this is their experience of what was happening on the ground before ICE changed the policy. That would be no problem.

And so if the Court is concerned about that, we just ask for an opportunity to do that. Because that's just true. That was what was happening before ICE changed this policy.

THE COURT: Yeah, I mean, look, you-all have the burden to show that you're likely to succeed among the other factors. Right? So I'm not going to tell you, you know, what to provide. You have the defendant's arguments. You have the degree of ambiguity here.

Obviously, what matters is whether there's a rule, a

policy to review. And you have an argument that there's a change in policy, but I think I've kind of made my point as to what the relevance is as to what's going on the ground.

MR. OUELLETTE: And the second thing I wanted to address is, I think what I'm hearing from some of the government's arguments in the brief and what they've said here today is that what we're really doing is we're bringing a 7061 claim to compel agency action. And to succeed on that claim, we have to point to a clear statutory requirement. Right? So we're in that framework.

If that were the framework, I think that we still have that, based on the statutes and regulations and the biometrics regulation. But it's clear that that's not what our burden is because here you feel a final agency action. You have this policy change.

And for example, this Court, in the USAID cases, recognized that the government's decision to withhold funding was a final agency action, even though you could characterize that as failing to act. But because they made this affirmative decision, it was a final agency action that didn't require -- and the Court analyzed that separately from the claim of compelling agency action.

And the D.C. Circuit has made this point a number of times, too. Most recently, I think, in National Association of Home Builders. It says that when you have a final agency

action, those requirements that would otherwise apply to a 7061 claim, that's not the land you're in.

And so I do think that the Court can enter the injunction --

THE COURT: Can I ask you a question? Let me ask you this question and then I want to ask you about whether you disagreed with my characterization in my back and forth with counsel for the defendants about your position as it relates to vacatur and a mandatory injunction or compelling action.

But before I get there -- and if that wasn't clear, I'll explain what I mean.

Let's say that up until December 2025, USCIS had not had a practice on the ground of considering applications -- considering biometrics that are received from people who were detained and there was no agreement, intra-agency or otherwise, to have someone from the government collect biometrics and deliver them to USCIS. Okay. So you're living in a world where it just wasn't happening. Okay.

And then in December 2025, the agency issues the same stuff it issued today. Or you could even make it clearer and say, you know -- actually have it be the exact same. You know, USCIS generally will not take biometrics from people who are detained. How is your case different?

MR. OUELLETTE: I think that in one sense it would be the same because -- it would be the same because --

THE COURT: It seems it would be the same as to the preliminary questions. You've got a rule, you've got a policy, final agency action. But on the merits, how would it be different?

MR. OUELLETTE: I still think that they would have had an obligation to justify their decision to stick with a -- I apologize, Your Honor. I don't know if there was a prior policy in place or it was just a practice on the ground.

But in any event, I think even if they weren't -- if they were rescinding a prior policy, regardless of what was happening on the ground, for all the reasons I explained, they'd certainly have to explain the change under DHS v. Regents, et cetera.

Even if they weren't changing the policy, they would have still had to explain why they're keeping that policy in place.

And the case for that would be Fox Television Studios v. FCC, cited on Page 23 of our reply, that the decision not to repeal a rule is also final agency action.

So you have a decision that DHS has made where they say we're going to look at this prior policy. We're going to issue a new policy alert and say, this is how it's going to be going forward. We're going to clarify things. They still have to explain why the rule is reasonable and they have to reasonably explain that and justify it. And in fact --

THE COURT: So is the idea, look, it wouldn't change our contrary-to-law argument at all because you've still got the INA provisions, and whether that's how they've always been doing it or not, there's now a rule reflecting that and we can challenge it and it's contrary to the law.

MR. OUELLETTE: I think that that's certainly the case with contrary to law.

THE COURT: And as to arbitrary and capricious, you would say, okay, maybe it alters the argument because there's less reliance in some way, but you could still bring the challenge and argue that they haven't satisfactorily explained it?

MR. OUELLETTE: Correct. Yes.

THE COURT: All right. And then do you disagree with my characterization of the relief you're seeking? As I articulated it, it seemed to me that, at least as it relates to your APA claims, you're seeking vacatur, which, if you're right on your theory, your understanding of the world, and I understand you believe it is obvious and obviously right, that there was a change in policy here, then vacatur would be enough in and of its own to return you to the prior policy.

But your concern is just in light of the defendant's argument that really the world hasn't changed and that the parties might not be in agreement on that, that the requirements, the further relief is needed in the interest of

clarity and making sure the injunction is followed? I don't want you to say yes if that's not right. I want you to tell me if that --

MR. OUELLETTE: That is correct. Ultimately, we want USCIS to collect and process biometrics so people can get their applications heard on the merits, which we think that the law requires.

And I think, theoretically, vacatur would do that because you had this prior policy that required them to do that. But based on the government's non-responses to the Court and the language of their opposition brief, we're concerned that they're not going to comply with how we read the prior policy. So that's correct.

THE COURT: Okay. Any other responses? Or rebuttal?

MR. OUELLETTE: Oh, here we go. I think just to hammer home on that point, one thing I would like to point the Court to is in the opposition at 44, the government says that staying the policy manual revisions and related policy alert and press release, which do not represent a practical departure from the prior status quo, would thus --

THE COURT: Sorry, you're reading a little too fast for me to pick up, which may mean you're reading too fast for it to be transcribed as well.

MR. OUELLETTE: I probably am. I'm sorry.

THE COURT: Just slow down and read it so I can digest

it.

MR. OUELLETTE: The government says that staying the policy manual of revisions and related policy alert and press release, which do not represent a practical departure from the prior status quo, would thus do nothing to alter the agency's authority to act.

We disagree with that because, again, we think the prior policy required them to take the biometrics, but given the government's representations, we're concerned that that's not what they think. And so they wouldn't comply with the policy, even if the Court stayed it.

THE COURT: Got it. Maybe the more charitable way to put it is they just need clarity so they would know how to comply. It's less that they wouldn't comply.

And I think part of that might be it's not entirely clear to me whether that's because the government's position is that there hasn't been a change because it was always voluntary. In other words, there was never a policy of doing it in the first place. Or if it's because, well, we're still kind of doing it ad hoc. And so even if we were doing it a little bit more and now we're doing it a little bit less or facilitating it less and on a more ad hoc basis, that there hasn't been a significant enough change.

That's not a question for you necessarily, but it does seem to me like it could be either of those two theories. And

that would justify greater clarity.

MR. OUELLETTE: I think that does segue into the last point that I do want to make, because I think I heard some suggestion that -- I'm not sure if the -- from the government that maybe -- let me say this. I don't think that the Court should wait to grant preliminary relief until the government produces an administrative record, because they've had a long time to submit, for example, an intra-departmental agreement, or submit whatever evidence that they want that maybe ICE hasn't changed its practice.

They haven't submitted anything from ICE. They could have submitted a declaration from ICE. They could have submitted the agreement. They had plenty of time to submit evidence.

And in the meantime, if the Court were to withhold preliminary relief until an administrative record is produced, and I just heard that we're not really sure when that would ever happen, with each day, the plaintiffs are ticking closer and closer to threatened deportation because their cases are still going. They're still on detention, when they could be released if they got their biometrics processed and got relief -- yes, got relief.

And so I really urge the Court not to wait for the government to produce the administrative record at an indefinite time because the plaintiffs would suffer irreparable

harm and we're likely to succeed on the merits.

THE COURT: Understood. And I agree that they've had an opportunity to ask in a more formal way, if they wanted time to do that, then than they have. And the government's free to let me know if they can prepare an administrative record for this case. And if so, propose a timeline that would possibly match the concerns on the other side that you've just mentioned.

MR. OUELLETTE: Thank you.

THE COURT: I'm going to let -- it looks like Mr. McDermond has one more point to make. And I'll let you make it.

MR. MCDERMOND: Thank you, Your Honor. So as to the administrative record, it does seem like maybe the contours are changing. So we might just ask a slight indulgence for a little bit more time for that. But we are going to go back to the agency and try and get that as soon as we can.

I think, also, I just need to note two things. One, in response to your earlier question, I think the government's position is this, is that vacatur cannot revive an ICE requirement if there was no previous requirement.

So I understand Your Honor was asking questions earlier about, well, let's vacate this and then everything will go back to the way it was. The government's position, to be absolutely clear on the record here, is that vacatur would not

revive a requirement that did not exist at that time.

THE COURT: Okay. Understood. I think that still just boils down to the same question of whether there was a different policy, because I agree with you, in the hypothetical I gave to plaintiff's counsel a moment ago, if there never was a prior policy and then you issued an interpretation on the law, vacating that wouldn't revive any prior policy because there wasn't one.

And so I think this, again, just boils down to the disagreement between the parties as to whether there was a prior policy that required certain things that have now been changed. And I understand your position on that.

MR. MCDERMOND: And I think one last thing, and this was my error because I forgot to mention it previously. As we start to address the irreparable harm -- and I noticed this was not in our briefing, but I think we also need to look at what is abandonment of an application.

And per 8 CFR 1032(b)(15), abandonment for not having biometrics does not foreclose someone from reapplying again. They could still apply for it and the prior application or abandonment itself, as the regulation says, shall not itself affect the new application.

And so when we look at the issue of irreparable harm there, what plaintiffs seem to be saying is their applications being deemed abandoned is an irreparable harm that cannot be

fixed or remedied. Under the regulations, they can always reapply.

THE COURT: But I think the point is that they might get that status now while they're detained and, therefore, not be removed from the country. Right? I mean, you have people, including the plaintiffs, who were humans who were trafficked, who were victims of domestic violence, otherwise abused, and who have lawful rights to get status in this country that prevents them from being removed.

And they're detained seeking that status that they at a minimum, have a right to apply for and may well be entitled to under the law. And they've pursued that and can't -- are going to be deemed to have abandoned it simply because they're detained and can't submit biometrics because they're in custody.

And so to say they could refile and still be detained and they wouldn't -- I understand you're making an argument that perhaps a nicer ICE officer will say yes and deliver the biometrics. Right?

But how does the fact that they can reapply if they continue to be detained and continue maybe to not get the nicer ICE officer or otherwise will just be removed to the place they were human trafficked from or potentially the place that they were abused -- how does that address the irreparable harm?

MR. MCDERMOND: I think the Supreme Court has held

that, you know, removal itself is not irreparable harm. And if the irreparable harm, as the plaintiffs seem to say, that we cannot apply for a benefit that is collateral to removal proceedings before we rightfully go through removal proceedings -- none of the plaintiffs are contesting their removal proceedings or removability here. They're not claiming they're improperly in removal proceedings.

There's authority from the Ninth, the Seventh and the Third that says there's no entitlement to that type of collateral immigration benefit while those removal proceedings are proceeding. And I think I understand plaintiffs say we really want this because this would, in effect, stop our removal. Again, removal itself is not an irreparable harm.

And certainly, for those who have applications that can continue to pursue abroad, like U visas, derivative asylum, that it would not be irreparable because they can still obtain that even after removal.

THE COURT: Okay. All right. I think I have your point on that. I appreciate it.

MR. MCDERMOND: Thank you for your indulgence there. I just realized that that slipped my mind while I was --

THE COURT: I appreciate your submissions, Mr. McDermond and co-counsel, Mr. Ouellette. Appreciate your submissions today. And to the co-counsel at plaintiff's table as well. I will take this under advisement and issue an

opinion on the motion and we can adjourn. Thank you.

(Proceedings concluded at 3:46 p.m.)

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

/s/ Stacy Johns Date: June 25, 2026

Stacy Johns, RPR, RCR
Official Court Reporter