**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J. Z., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-01510 (AHA) |

**Memorandum Opinion and Order**

The plaintiffs, people who have applied for immigration status and have been detained by Immigrations and Customs Enforcement, sue federal agencies and officials, challenging their adoption of a policy to stop collecting biometric information required to process their immigration applications. The plaintiffs assert this policy violates the Administrative Procedure Act and ask the court to stay and preliminarily enjoin the policy. The court grants the plaintiffs' motion in part and denies it in part, concluding, at least on the record at this early stage, that the plaintiffs have satisfied their burden for a stay but have not shown the need for a preliminary injunction in addition.

## I. Background[1]

The plaintiffs have pending applications with U.S. Citizenship and Immigration Services ("USCIS"), part of the Department of Homeland Security ("DHS"), for some type of immigration status. This includes applications for permanent residency; special immigrant juvenile status for

---

[1] The facts here reflect the court's findings based on the stay and preliminary injunction record.

abused, abandoned, and neglected children; T visas for human trafficking survivors; U visas for survivors of other serious crimes; and asylum to join a spouse or parent who has already been granted asylum. ECF No. 1 ¶¶ 11–16. USCIS may require applicants to submit various kinds of biometric information, including fingerprints, photographs, and signatures. *See* 8 C.F.R. § 103.2(b)(9) (authorizing USCIS to require applicants to appear for biometric collection). It is undisputed USCIS requires biometric information to be collected as part of the application process for the statuses at issue here. *See, e.g.*, 8 C.F.R. § 214.204(k) (T visa applicants); *id.* § 214.14(c)(3) (U visa applicants); *see also* ECF No. 17 at 6–7 (government explaining that "USCIS's collection of biometrics for immigration applications is crucial"). After someone applies, USCIS schedules a biometrics appointment at a USCIS office, and if the person misses that appointment, their application is "considered abandoned and denied" unless USCIS accepts their reason for missing the appointment. 8 C.F.R. § 103.2(b)(13)(ii); *see* ECF No. 14-4 at 1. According to USCIS policy, USCIS "does not approve requests to reschedule a biometrics appointment for reason of detention or incarceration." ECF No. 14-4 at 4.

Immigration and Customs Enforcement ("ICE"), also part of DHS, detained the plaintiffs, pending proceedings over whether they can be deported. *See* ECF No. 14-5 ¶¶ 1, 4; ECF No. 14-6 ¶¶ 1, 3; ECF No. 14-7 ¶ 1; ECF No. 14-8 ¶¶ 1, 5; ECF No. 14-9 ¶¶ 1, 4; ECF No. 14-10 ¶¶ 1, 6. It is undisputed that most of the plaintiffs could not be detained and would not be deported if USCIS determines they are entitled to the immigration statuses they have applied for. *See* 8 C.F.R. § 1003.18(d)(1)(i)(D)(1), (3), (4). It is also undisputed that for some plaintiffs, the submission of a complete application and satisfactory completion of background checks, which requires the collection of biometrics, can itself be enough to stay deportation or allow deferred action—even before USCIS's adjudication of their application. *See id.* § 214.204(b)(2)(iii) (providing that if

USCIS determines a T visa application is "bona fide," any final order of removal is automatically stayed); *id.* § 214.205 (providing that a bona fide determination requires completion of background and security checks); USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 6, https://perma.cc/WX2M-WGXG (recognizing that completion of background and security checks for the T visa bona fide determination process requires biometrics and leads to consideration for deferred action); USCIS, *Policy Manual*, vol. 3, pt. C, Ch. 5, https://perma.cc/7NHW-8XZQ (recognizing that completion of background and security checks for the U visa bona fide determination process requires biometrics and leads to consideration for deferred action); 8 C.F.R. § 1003.18(d)(1)(ii)(C) (recognizing that deferred action may lead to termination of removal proceedings).

In December 2025, USCIS announced that DHS would stop collecting biometrics related to USCIS immigration applications for people in its custody. ECF No. 14-2; ECF No. 14-3 at 2–3. In its press release, USCIS said that going forward DHS "generally will not take biometrics of detained aliens unless they are in removal proceedings and have a pending application or petition filed with the Executive Office for Immigration Review." ECF No. 14-2. That means DHS would continue to collect biometrics only for certain applications for relief, including those that can be made to immigration courts (which fall within the Executive Office for Immigration Review), but not for applications for many kinds of immigration status, including the plaintiffs' applications (which must be submitted to and determined by USCIS). *See* 8 C.F.R. § 245.2(a)(1) (adjustment of status); *id.* § 204.11(g)(1) (special immigrant juvenile status); *id.* § 214.204(a), (b)(1)(i) (T visas); *id.* § 214.14(c) (U visas); *id.* § 208.21(c) (asylum for relative of asylee). USCIS also issued an accompanying policy alert saying that, in addition to prohibiting USCIS staff or contractors from traveling to detention facilities to collect biometrics, DHS was removing guidance that had assigned ICE the responsibility to collect biometrics of USCIS applicants in custody. ECF No. 14-

3. To implement this policy, DHS rescinded an intradepartmental agreement that required ICE to collect biometrics for detained people with USCIS applications. *See* ECF No. 14-2 (press release describing removal of "obsolete guidance to clarify that there is no controlling intradepartmental agreement between USCIS and Immigration and Customs Enforcement regarding the collection of biometrics for aliens in custody with pending USCIS benefit requests"); ECF No. 14-3 at 1 (policy alert describing removal of "outdated guidance that places the burden on ICE to collect biometrics of aliens in custody"); *compare* ECF No. 14-4 at 4, *with* ECF No. 14-11 at 4 (revising policy manual to delete a sentence stating that "[p]er intradepartmental agreement, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations is responsible for completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS."). Under this policy, ICE has stopped transporting detained people to their biometrics appointments, as it previously had done, except in some ad hoc, unexplained instances. *See* ECF No. 24-1 ¶ 22; ECF No. 37-1 ¶¶ 6–8; ECF No. 37-2 ¶ 7; ECF No. 37-3 ¶¶ 7–9; ECF No. 38; ECF No. 40 at 43. For example, after the court's preliminary injunction hearing, DHS collected biometrics for one plaintiff, J.Z., after he asked for reconsideration of his application. ECF No. 43 ¶¶ 1, 9. But the government has not provided any explanation for the circumstances in which ICE would or would not agree to collect biometrics. *See* ECF No. 40 at 43–44.[2]

The plaintiffs sued, asserting that the defendants' new policy to stop collecting biometrics from detained people with pending USCIS immigration applications is contrary to the Immigration

---

[2] Two plaintiffs, J.Z. and H.A., have successfully submitted biometrics, and have either been released from detention or been granted immigration status. ECF No. 14-1 at 14; ECF No. 42 ¶ 6; ECF No. 43 ¶¶ 1, 6. The parties appear to agree their claims are moot, and the court does not consider their claims. *See* ECF No. 14-1 at 14; ECF No. 33 at 17 n.4; ECF No. 43 ¶ 9.

and Nationality Act ("INA") and its implementing regulations; is arbitrary and capricious, unlawfully withholds agency action, and failed to go through notice-and-comment rulemaking procedures, all in violation of the Administrative Procedure Act ("APA"); and violates due process. The plaintiffs move to stay the biometrics policy pending the resolution of this case under section 705 of the APA. They also move for a preliminary injunction on behalf of a putative class of people detained by ICE with pending USCIS immigration applications that need biometrics.

## II. Discussion

Section 705 of the APA permits courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Relief under section 705 is a temporary version of the APA's usual remedy of vacatur and is governed by the same factors that courts consider for a preliminary injunction. *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 26-5006, 2026 WL 2635380, at *14 (D.C. Cir. Sept. 8, 2026) (explaining that section 705 "allows a district court to preliminarily 'postpone the effective date of an agency action' when 'necessary to prevent irreparable injury'" by "operat[ing] on the legal source of authority for an agency to act at all" (quoting 5 U.S.C. § 705)); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (collecting cases); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012). A plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The court finds that the plaintiffs have satisfied their burden for preliminary relief. But the record at this stage only supports issuance of a section 705 stay of the biometrics policy and DHS's rescission of the intradepartmental agreement requiring ICE to collect biometrics from detained

people with pending USCIS applications, restoring the status quo in which DHS collected such biometrics, pending litigation of this case.

### A. The Plaintiffs Are Likely To Show The Defendants' Biometrics Policy Violates The APA

Based on the record at this stage, the plaintiffs will likely succeed on their claim that the biometrics policy must be vacated as arbitrary and capricious in violation of the APA because the defendants adopted it without reasoned explanation and did not consider important aspects of the problem. *See* 5 U.S.C. § 706 (requiring courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). The court starts with the defendants' threshold arguments that the plaintiffs' claims will likely fail because they do not have standing, and that the biometrics policy cannot be reviewed under the APA because the policy is not a final and discrete agency action.

#### *1. The Plaintiffs Have Shown A Substantial Likelihood They Have Standing To Challenge The Defendants' Biometrics Policy*

A "party who seeks a preliminary injunction must show a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quotation marks omitted). "To establish Article III standing, the plaintiff must have 'suffered an injury in fact' that 'is fairly traceable to the challenged action of the defendant' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C. Cir. 2017) (quoting *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000)). And parties seeking prospective injunctive relief must "establish an ongoing or future injury that is 'certainly impending.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Here, the plaintiffs have satisfied their burden to show a concrete and impending injury that is caused by the biometrics policy and redressable by the court—namely, that the defendants'

policy is preventing them from pursuing immigration applications that, if granted, would preclude their detention and deportation. The court finds, at least based on the evidence in the preliminary record that, since the defendants adopted the new policy, the plaintiffs cannot submit the biometrics information required for their USCIS applications. *See* ECF No. 14-6 ¶¶ 1–3, 8–9; ECF No. 14-7 ¶¶ 1, 3–7; ECF No. 14-8 ¶¶ 1, 3–6; ECF No. 14-10 ¶¶ 1, 5–10; ECF No. 42 ¶¶ 1–2, 4–5; ECF No. 43 ¶¶ 2–5. And because the policy prevents the plaintiffs from appearing at their biometrics appointments, it leads to the inevitable denial of their applications, unless USCIS accepts their reasons for missing the appointments. *See* 8 C.F.R. § 103.2(b)(13)(ii). The policy has therefore injured the plaintiffs' ability to obtain immigration relief that they may be entitled to receive, while also creating a concrete and imminent risk of continued detention and eventual deportation. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 20 (D.D.C. 2020) (concluding plaintiffs had shown cognizable injury from allegedly unlawful procedures that harmed their "interest in seeking asylum and avoiding the risk of deportation"); *Rossville Convenience & Gas, Inc. v. Garland*, No. 20-cv-2218, 2021 WL 5865446, at *7 (D.D.C. Dec. 10, 2021) (concluding the plaintiff showed a concrete injury in fact from the loss of a "significant opportunity to receive an immigrant visa"). At least based on the preliminary record, the plaintiffs have shown those injuries are fairly traceable to the defendants' biometrics policy because the policy ended DHS's practice of collecting biometrics from people detained by ICE, including rescinding the intradepartmental agreement that required ICE to collect the plaintiffs' biometrics. *See* ECF No. 14-2 (announcing there is no longer an agreement between USCIS and ICE "regarding the collection of biometrics for aliens in custody with pending USCIS benefit requests"); ECF No. 14-3 at 1 (announcing that ICE no longer has "the burden . . . to collect biometrics of aliens in custody"); ECF No. 17 at 8 (showing the removal of language from USCIS's policy manual that said ICE "is responsible for

completing background and security checks for those who are incarcerated at DHS facilities and applying for benefits with USCIS"). And they have shown a substantial likelihood that vacatur of the new policy satisfies the redressability requirement, which would restore the prior status quo in which ICE was required to collect biometrics from detained people with pending USCIS applications. *See* ECF No. 14-2; ECF No. 14-3 at 1; ECF No. 17 at 8; ECF No. 37-1 ¶¶ 6–8; ECF No. 37-2 ¶ 7; ECF No. 37-3 ¶¶ 7–9. Restoring this obligation would enable the plaintiffs to submit their biometrics and pursue their immigration status applications and is thus a "necessary first step on a path that could ultimately lead to relief fully redressing" the plaintiffs' injuries. *Duberry v. District of Columbia*, 924 F.3d 570, 583 (D.C. Cir. 2019).[3]

The defendants challenge the plaintiffs' standing on two grounds but neither works. First, they say their biometrics policy does not prohibit the plaintiffs' biometrics from being collected and therefore has not caused the plaintiffs' injury. ECF No. 17 at 13. According to the defendants, this is so because the policy does not prohibit the plaintiffs from either (1) showing up at their USCIS biometrics appointments, or (2) asking ICE officers to voluntarily collect their biometrics

---

[3] The defendants say there has been no "rescission" of the agreement obligating ICE to collect biometrics and that the agency documents simply reflect the "current absence" of that agreement. ECF No. 33 at 20 n.7. It's not clear what that means. The defendants do not dispute that, under the current policy, ICE is no longer obligated to collect biometric information from detained people with pending USCIS applications. And the court finds, at least based on the preliminary record before it, that ICE was collecting biometric information from detained people with pending USCIS applications before the policy and is not doing so after the policy. *See* ECF No. 14-2; ECF No. 14-3 at 1; ECF No. 17 at 8; ECF No. 37-1 ¶¶ 6–8; ECF No. 37-2 ¶ 7; ECF No. 37-3 ¶¶ 7–9.

The defendants also say that USCIS's policy announcement "lacks any mention that this is ICE's position" and may not reflect "the entire Department's views." ECF No. 17 at 14 (alterations omitted). That also makes little sense. The policy was explicitly announced as a DHS-wide policy, and ICE is a component of DHS. *See* ECF No. 14-2 (announcing that "the Department of Homeland Security generally will not take biometrics of detained aliens"). The defendants' attempt to raise questions about ICE's position also conflicts with the court's finding that ICE was collecting biometric information from detained people with pending USCIS applications before the policy and is not doing so after the policy.

or take them to their biometrics appointments, even though ICE is no longer required to do so. *Id.*; *see also* ECF No. 40 at 43 (defendants' counsel representing that "there do still seem to be instances where ICE is, to some extent, offering to facilitate biometrics collections"). But this argument makes little sense—the plaintiffs are detained, so they cannot just go to their biometrics appointments. And, while the record indicates there have been some instances in which ICE has collected some biometrics from detained people with pending USCIS applications, the defendants were not able to articulate when ICE would or would not agree to collect biometrics. *Id.* at 43–44. (defendants' counsel stating he could not give "a very specific answer" on this and has "certainly tried" to get the information from his clients). At least some of the instances the defendants point to involve circumstances where ICE collected biometrics in response to litigation or a court order. *See* ECF No. 17 at 15, 19 (discussing *Walter A. v. Easterwood*, No. 26-cv-1393, 2026 WL 836428, at *8, 24 (D. Minn. Mar. 26, 2026)); *Covarrubias-Ramirez v. Noem*, No. 26-cv-1230, 2026 WL 1256111, at *2 (D. Ariz. May 7, 2026)); *see also* ECF No. 38 (email broadcast recognizing "where ongoing legal activity may necessitate the timely collection of fingerprints" of detained people in removal proceedings "ICE will initiate the fingerprinting process upon the request from the attorney of record"). And more to the point, the court finds ICE has not collected the plaintiffs' biometrics as required for their USCIS applications even though it previously would have been required to do so. *See* ECF No. 14-6 ¶¶ 2, 9; ECF No. 14-7 ¶¶ 5–7; ECF No. 14-8 ¶ 6; ECF No. 14-10 ¶¶ 9–10; ECF No. 42 ¶¶ 1–2, 4–5; ECF No. 43 ¶¶ 2–5.[4]

---

[4] The defendants' evidence indicates ICE has, in ad hoc instances, collected fingerprints for detained people with USCIS applications. The defendants do not argue that collecting fingerprints alone is sufficient to satisfy USCIS's biometric requirements. *See* ECF No. 14-4 at 5–6 (USCIS policy manual listing fingerprints, photographs, and signatures as biometrics collected for USCIS applications). And the court finds, at least on the preliminary record, that these ad hoc instances of fingerprint collection have not impacted the plaintiffs' ability to pursue their USCIS applications.

Second, the defendants argue that the plaintiffs do not suffer injury even if the biometrics policy means they will be deported before resolution of their USCIS applications because the plaintiffs have no right to have their applications adjudicated before deportation, and some plaintiffs would be able to pursue their applications after being deported. ECF No. 17 at 15–16. But the plaintiffs have shown injury from the policy, which acts as a de facto denial of their applications, substantially injuring their ability to obtain the immigration statuses they may be entitled to receive and leading to ongoing detention and the concrete risk of deportation that could not occur under law if their applications are granted. *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 43–44 (D.D.C. 2017); *Rossville Convenience & Gas, Inc.*, 2021 WL 5865446, at *7. While it may be true that some plaintiffs could continue to pursue their applications upon deportation, deportation itself is plainly injury in fact. Indeed, in addition to the concrete injury of being removed from the country, the record contains evidence that some plaintiffs face threats to their lives in their home countries. *See* ECF No. 14-8 ¶¶ 2, 7; ECF No. 14-10 ¶¶ 2, 6, 13.

*2. The Plaintiffs Are Likely To Show The Biometrics Policy Is Final Agency Action*

The defendants argue the plaintiffs are not likely to show the biometrics policy is "final agency action" reviewable under the APA. 5 U.S.C. § 704; *see* ECF No. 17 at 17–20. Agency action is final if it (1) "marks the consummation of the agency's decisionmaking process and is not of a merely tentative or interlocutory nature," and (2) "it is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (cleaned up) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). At least on the record at this stage, both are present.

---

The record indicates, for instance, that ICE collected fingerprints from two plaintiffs but did not collect other required biometrics. ECF No. 42 ¶¶ 4–5; ECF No. 43 ¶¶ 4–5.

The record before the court indicates that DHS's decision to stop collecting biometrics from detained people with pending USCIS applications is not tentative or interlocutory. The defendants have publicly announced the decision on their website, updated their policy manual to reflect it, and implemented it by rescinding an agreement that required ICE to collect the biometrics. *See* ECF No. 14-2; ECF No. 14-3 at 1; *compare* ECF No. 14-4 at 4, *with* ECF No. 14-11 at 4 (policy manual revisions). The press release and policy alert make clear the policy is "effective immediately" and "supersedes any related prior guidance." ECF No. 14-2; ECF No. 14-3 at 1. The decision plainly determines rights and obligations and has legal consequences—as the court has found, it means the plaintiffs cannot pursue their USCIS applications for immigration status. The legal consequence is that USCIS will deny the plaintiffs' applications for failing to show up for their biometrics appointments. *See* 8 C.F.R. § 103.2(b)(13)(ii); ECF No. 14-4 at 4 (USCIS policy manual stating that the agency "does not approve requests to reschedule a biometrics appointment for reason of detention or incarceration").

The defendants' two arguments are unpersuasive. First, they say the plaintiffs will not be able to show any final decision with legal consequence until USCIS denies, or otherwise resolves, the plaintiffs' immigration applications. ECF No. 17 at 17. That argument might have logic if the plaintiffs were challenging the grant or denial of their USCIS applications. But they aren't—they challenge the defendants' decision that they will not collect biometrics from detained people with pending USCIS applications. That decision is separate from any grant or denial of the applications themselves.[5]

[5] The defendants suggest in passing that the plaintiffs' APA claim may be prudentially unripe, for the same reasons. ECF No. 17 at 20 (citing *Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012)). But, as explained, the biometrics policy is a final agency decision, so there is no concern review will "inappropriately interfere with further administrative action," and the policy's injury

The defendants, second, say the policy that they announced just clarified "USCIS's view of DHS's obligations" as it relates to biometrics collection. ECF No. 17 at 17–19. It is, of course, true that when an agency "merely clarifies existing duties under a statute," there is no final agency action. *Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 106 F.4th 1195, 1204 (D.C. Cir. 2024) (cleaned up). But, at least on the present record, the court finds that characterization of what the agency did here is not credible. The plaintiffs have proffered credible evidence that the policy changed the status quo, in which ICE collected biometric information, generally by taking detained people to their biometrics appointments. ECF No. 37-1 ¶¶ 6–8; ECF No. 37-2 ¶ 7; ECF No. 37-3 ¶¶ 7–9. Indeed, the plaintiffs have presented evidence that USCIS will reject biometrics from detained people brought to appointments or who otherwise submit their biometrics. *See* ECF No. 14-1 at 11 (citing *Walter A.*, 2026 WL 836428, at *14 (explaining that a USCIS supervisor invoked the revised USCIS policy manual to decline to process biometrics for a detained person who was brought to his appointment by ICE under a court order)); ECF No. 35 at 4 (citing *Vu v. Lyons*, No. 26-cv-2930, 2026 WL 1722908, at *4 (C.D. Cal. June 11, 2026) (explaining that an ICE officer told Plaintiff's counsel that "USCIS will not accept biometrics from persons who are in detention unless it is for the purpose of a benefit filed with EOIR")). And contrary to the defendants' characterization of the policy, the press release and accompanying policy alert (both odd vehicles to say that nothing has changed) describe a change, saying USCIS is "updating" policy, that the policy is "effective immediately," and that it "supersedes any prior guidance on the topic." ECF No. 14-2; ECF No. 14-3 at 1. And, as discussed, the updated policy rescinds the agreement that required ICE to collect biometrics from detained people with USCIS applications.

---

of preventing the plaintiffs from submitting biometrics essential to their applications is "sufficiently direct and immediate as to render the issue appropriate for judicial review." *Marcum*, 694 F.3d at 129.

*See* ECF No. 14-2; ECF No. 14-3 at 1; *compare* ECF No. 14-4 at 4, *with* ECF No. 14-11 at 4. While the press release also uses words like "clarifies," "reiterates," and "affirms," an agency's label does not control whether its action is final agency action. *See PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 10–11 (D.D.C. 2004) (explaining that "how an agency characterizes its actions does not determine whether they are final," because otherwise an agency could avoid judicial review because it "refused to frankly acknowledge their finality" (citing *N.Y. Stock Exch. v. Bloom*, 562 F.2d 736, 740 (D.C. Cir. 1997))); *Natural Res. Def. Council v. EPA*, 22 F.3d 1125, 1132–33 (D.C. Cir. 1994))). Nor does the defendants' characterization of the biometrics policy as an "interpretative" statement, ECF No. 17 at 18, get them far. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) (explaining that "interpretive rules can be final" and "the test for finality is independent of the analysis for whether an agency action is a legislative rule rather than an interpretive rule"). Indeed, when asked whether their position is that there has been no practical change in their policies, the defendants would not commit to that position and could not explain whether there has been any policy change. *See* ECF No. 40 at 39–41.

Based on the preliminary record, the plaintiffs are likely to show the biometrics policy was a final decision of concrete practical and legal consequence and is therefore final agency action under the APA.

*3. The Plaintiffs Are Likely To Show The Biometrics Policy Is Discrete Agency Action*

The defendants argue that their decision to stop collecting biometrics from detained people with pending USCIS applications is not reviewable under the APA because it is made up of several different agency actions. ECF No. 17 at 20–22. According to the defendants, this runs afoul of the APA's requirement to identify and challenge "discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). This is not a sound argument. It is, of course, true that the APA is not a vehicle to "seek *wholesale* improvement" of a government program and, rather,

requires a plaintiff to challenge "some particular agency action." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990) (quotation marks omitted). This case is not at all like cases challenging programs at large—the plaintiffs identify a specific policy DHS has adopted that has been implemented by its subcomponents. That's a challenge to "particular agency action" reviewable under the APA. *Id.* (quotation marks omitted).

The defendants' argument that their multiple actions taken to recognize the policy (like the press release and policy alert) and to implement the policy (like the policy manual revisions and rescission of the intradepartmental agreement) somehow preclude review of DHS's policy to stop collecting biometrics from detained people with pending USCIS applications, has no support in the cases they cite. To the contrary, the clear and repeated recognition of the policy and the implementation of the policy through particular actions reinforce that the plaintiffs challenge final and discrete agency action, as the APA requires. *See Biden v. Texas*, 597 U.S. 785, 808–10 (2022) (explaining that memoranda that "bound DHS staff by forbidding them to continue the [challenged] program in any way" were themselves "operative agency actions, each of them an 'agency statement . . . designed to implement, interpret, or prescribe law or policy'" and therefore subject to APA review (quoting 5 U.S.C. § 551(4))); *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *7 ("When an agency implements a policy choice, putting it into motion in a way that leads to concrete results and prescribes consequences, it takes final agency action."). Perhaps recognizing that, the defendants try to characterize the plaintiffs' case as mounting a broader challenge to the immigration regime that includes other regulations, like the one that requires USCIS to deny immigration applications when applicants fail to attend their biometrics appointments. *See* ECF No. 17 at 21–22. But the plaintiffs don't challenge that regulation or any broader immigration regime. To the contrary, their argument is premised on the validity of that regulation—that the

defendants' policy to stop collecting biometrics will lead USCIS to deny their applications under the regulation. The plaintiffs' challenge is thus focused on DHS's discrete decision that it "generally will not take biometrics of detained aliens" with pending USCIS applications. ECF No. 14-2.[6]

*4. The Plaintiffs Are Likely To Show The Biometrics Policy Is Arbitrary And Capricious*

The APA requires courts to "hold unlawful and set aside" agency action that is arbitrary or capricious. 5 U.S.C. § 706(2)(A). The scope of this review is "narrow," and it is not a mechanism for a court "to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court instead "must confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43). An agency falls short of fulfilling that duty if it "has relied on factors which

---

[6] The defendants argue that the INA precludes APA review for one plaintiff, Luis Felipe Estrada Trejo, who has applied for adjustment of status based on his marriage to a U.S. citizen. ECF No. 17 at 22–25; *see* ECF No. 14-7. They point to 8 U.S.C. § 1252(a)(2)(B)(i)–(ii), which provides that courts do not have jurisdiction to review "any judgment regarding the granting of relief" of several kinds of immigration status, including adjustment of status, or any "decision or action" that "is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(i)–(ii). But Estrada Trejo does not challenge the denial of an application for adjustment of status, or any findings made in support of a denial; he challenges the defendants' policy of generally not collecting biometrics for detained people with pending USCIS applications. The defendants' arguments that these provisions preclude review of that policy is not persuasive. *See Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1004 (9th Cir. 2024) (explaining that the language of 8 U.S.C. § 1252(a)(2)(B)(i) refers to "a single act of granting or denying an individual application for relief," not a general "policy or procedure"); *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 629–30 (D.C. Cir. 2020) (explaining that 8 U.S.C. § 1252(a)(2)(B)(ii) may preclude review of agency decisions on "individualized forms of discretionary relief from removal or exclusion," but does not preclude review of "generally applicable rulemaking governing [] *procedures*"). And in any event, the defendants do not argue that the INA precludes APA review for the other plaintiffs whose claims are not moot.

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. (quoting *State Farm*, 463 U.S. at 43).

The court concludes, at least on the preliminary record before it, that the plaintiffs are likely to show the defendants entirely failed to consider important aspects of the problem and to articulate a satisfactory explanation when they adopted their policy to stop collecting biometrics from detained people with pending USCIS applications. Perhaps most fundamentally, the present record before the court indicates that the defendants adopted this policy without any indication that they considered that it would preclude detained people from pursuing pending USCIS applications for immigration status, let alone articulated "a satisfactory explanation" for that direct consequence of their decision. *Ark Initiative*, 816 F.3d at 127. The defendants therefore "failed to consider an important aspect of the problem." *Id*. Their decision is further arbitrary and capricious because it, without any explanation, effectively denies immigration relief to a whole category of people irrespective of their eligibility for the status they have applied for under the criteria Congress adopted. *See Judulang v. Holder*, 565 U.S. 42, 55 (2011) (holding that a "method for disfavoring deportable aliens" that is unrelated "to an alien's fitness to remain in the country" is arbitrary and capricious).

The defendants' policy is also arbitrary and capricious because it lacks a "rational connection between the facts found and the choice made." *Ark Initiative*, 816 F.3d at 127. The sole explanation provided for the policy is that it is intended to "deter the filing of frivolous claims and provide operational consistency." ECF No. 14-2. But that makes little sense. The defendants' policy is not limited to frivolous claims; it would refuse biometrics collection and lead to the denial

of immigration status for people who have valid claims, including those who can show they are eligible as victims of child abuse, domestic violence, or human trafficking. *See* 8 U.S.C. § 1101(a)(15)(T), (a)(15)(U), (a)(27)(J). And the very purpose of biometrics collection, according to USCIS's policy manual, is to support the integrity of applications and the immigration process—to "verify a person's identity," facilitate "background checks," and "ensure that the person is eligible for the benefit sought," all of which would seem to help in sorting out frivolous claims. ECF No. 17-5 at 1. That biometrics are required by USCIS during the application process makes it difficult to understand how "operational consistency" is served by refusing to collect them for people who have applied. And that justification is contradicted by the policy itself, which treats applicants seeking immigration status from USCIS differently from those seeking relief from immigration courts without any explanation for that inconsistency. *See Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005) ("An agency must provide an adequate explanation to justify treating similarly situated parties differently."). The court is not alone in its inability to see a rational connection—at the preliminary injunction and stay hearing in this case, the court asked how this policy would "deter the filing of frivolous claims and provide operational consistency," and defendants' counsel responded: "That's a good question . . . . I don't have an answer to that right now." ECF No. 40 at 53.[7]

---

[7] Short of an explanation, most of the defendants' remaining arguments run away from the policy they adopted, repeating arguments that the biometrics policy does not prohibit collection of the plaintiffs' biometrics, was just clarifying existing obligations, and should be viewed as a series of distinct actions. *See* ECF No. 17 at 34–37. For the reasons stated, these are not credible arguments. Even if the defendants adopted the policy believing that detained people could still somehow submit, and the defendants would still somehow collect, biometrics, they have not explained how this works.

In their briefing and at the court's preliminary injunction and stay hearing, the defendants also argued they should be given more time to compile and produce an administrative record. ECF No. 17 at 35; ECF No. 40 at 46–47, 69. The court invited the defendants to follow up with a timeline

The court accordingly concludes the plaintiffs are likely to show the biometrics policy is arbitrary and capricious. Because the plaintiffs need only show a likelihood of success on one of their claims to be entitled to a stay, the court need not consider whether they are also likely to show the biometrics policy is contrary to the INA and its regulations and violates the Fifth Amendment.

**B. The Plaintiffs Have Shown Irreparable Harm**

The irreparable harm inquiry to obtain an APA stay or preliminary injunction is onerous. The plaintiffs must show injury that is "certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And that injury must be one that is "beyond remediation." *Id*. As the D.C. Circuit has explained:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id*. at 297–98.

The plaintiffs have satisfied that heavy burden here. As the court has found, the practical consequence of the defendants' policy is that the plaintiffs cannot submit biometrics in support of their USCIS applications, leaving them vulnerable to detention and deportation. It is undisputed that the defendants' policy does not depend or in any way account for the plaintiffs' eligibility for immigration status—in other words, it has the effect of exposing the plaintiffs to deportation

---

for producing the administrative record to the extent one would assist. ECF No. 40 at 69. Despite asking for "a slight indulgence for a little bit more time for that" and committing to "go back to the agency and try and get that as soon as we can," the defendants never sought to produce any further administrative record before this court. *Id*. The court therefore finds that, for the purposes of this preliminary posture, the defendants have forfeited any argument that an administrative record would support a different result.

irrespective of whether they are eligible as permanent residents; as people who were abused, abandoned, or neglected as children; or as survivors of human trafficking or other serious crimes. Each day the policy risks denying them adjudication of that status, in favor of further detention and risk of deportation. *See* ECF No. 40 at 23–24. And several of the plaintiffs proffer evidence that deportation would lead to their separation from family or to suffering violence in their home countries. *See* ECF No. 14-6 ¶ 10; ECF No. 14-7 ¶ 8; ECF No. 14-8 ¶ 6; ECF No. 14-10 ¶¶ 2, 6, 11–12; *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 131 (D.D.C. 2025) (finding that removal of plaintiffs "prior to receiving the protections that the immigration laws provide" is irreparable harm (cleaned up)); *Miot v. Trump*, 818 F. Supp. 3d 126, 182 (D.D.C. 2026) (finding that removal would constitute irreparable harm where it would result in "forced family separation" and where "it may not be possible to restore Plaintiffs to the status quo"), *rev'd on other grounds sub nom. Mullin v. Doe*, 146 S. Ct. 2121 (2026).

The defendants argue this is not irreparable harm because some of the plaintiffs could continue to pursue immigration status from outside the country. ECF No. 17 at 39. In particular, the government says that applicants for U visas and adjustment of status can pursue relief abroad. *Id*. This argument is unsatisfactory for many reasons. As an initial matter, it does not apply to all the plaintiffs. *See, e.g.*, ECF No. 1 ¶ 75. And, while it may be true that some people can apply for adjustment of status outside of the country, it is not clear these plaintiffs would be able to continue their applications if deported. *See Kalilu v. Mukasey*, 548 F.3d 1215, 1218 (9th Cir. 2008) ("If an alien is removed, his adjustment application is deemed abandoned" and he "cannot reapply for adjustment of status until he has reentered the United States." (citing 8 C.F.R. §§ 245.1(a), 245.2(a)(4)(ii)(A))). And even if that subset of applicants could seek relief outside the U.S., deportation would mean they are barred from reentering the country for at least 5 years, and in

some cases 10 or 20 years. *See* 8 U.S.C. § 1182(a)(9)(A). And, on top of all that, the defendants' argument does not address the harm to plaintiffs of being separated from their families or returned to violence in their home countries—in some instances, the very same countries in which they faced abuse that may qualify them for immigration status. *See* ECF No. 14-5 ¶¶ 1, 13.[8]

**C. The Balance Of Equities And The Public Interest Favor The Plaintiffs**

The balance of equities and public interest factors merge here because the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiffs have satisfied these factors. The plaintiffs seek to have their biometrics processed so that USCIS can evaluate their eligibility for immigration status and they may avoid detention and risk of deportation. The defendants have not contested that collecting biometrics is feasible, and, as discussed, have not offered a rational explanation for changing their biometrics policy. The court has found the plaintiffs are likely to succeed in showing that the biometrics policy violates the APA, and, as the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. (quotation marks omitted).

---

[8] The defendants argue that the plaintiffs' irreparable harm showing is undermined by the fact that they moved for preliminary relief five months after the biometrics policy was announced. ECF No. 17 at 39. But the plaintiffs have explained that this time was needed to develop a record that the defendants would not collect biometrics or facilitate transport for biometrics appointments, secure counsel, and arrange witness interviews. ECF No. 24 at 24–25. The court finds this explanation credible, and in light of the evidentiary record, the time that passed does not undermine the credibility of the plaintiffs' irreparable harm. *See Make the Rd. N.Y. v. Noem*, 805 F. Supp. 3d 139, 172 (D.D.C. 2025) (explaining that only "*unexplained delays* in seeking emergency relief undermine" an irreparable harm showing); *see also Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (stating that "a delay in filing is not a proper basis for denial of a preliminary injunction").

**D. Scope Of Relief**

The plaintiffs move for both a stay of the biometrics policy under section 705 of the APA and a preliminary injunction "prohibiting DHS from refusing to take biometrics from noncitizens in DHS custody to the extent necessary to adjudicate the merits of their applications for relief from USCIS." ECF No. 14-1 at 41–42. The court's conclusion that the plaintiffs are likely to show the biometrics policy violated the APA and also satisfied their burden under the remaining factors warrants a stay under section 705 to restore the status quo before the unlawful agency action took place, pending litigation. *See Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *14 (explaining that section 705 "allows a district court to preliminarily 'postpone the effective date of an agency action' when 'necessary to prevent irreparable injury'" (quoting 5 U.S.C. § 705)); *District of Columbia*, 444 F. Supp. 3d at 15 (explaining that the "factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay" (collecting cases)).

While the plaintiffs point out that they have satisfied the typical preliminary injunction factors, and that the APA or class action provisions may authorize broader relief, *see* ECF No. 14-1 at 42–43, the plaintiffs have not shown that additional relief is necessary on the current record. The court finds that a section 705 stay—which does not "simply insulate certain parties from enforcement measures" but acts as a temporary form of vacatur, "operat[ing] on the legal source of authority for an agency to act at all"—is sufficient to restore the status quo before the biometrics policy was implemented, in which DHS collected biometrics from detained people with pending USCIS applications. *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *14; *see Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (statement of Millett and Childs, JJ.). The court therefore sets aside the biometrics policy, including the agency press release and policy alert, and implementing agency actions, including the policy manual revisions and rescission of the intradepartmental agreement requiring ICE to collect biometrics from

detained people with pending USCIS applications. *See* ECF No. 14-2; ECF No. 14-3; ECF No. 14-4.

The defendants argue that setting aside agency action pending litigation under APA section 705 should apply only to the parties before the court, pointing to the Supreme Court's ruling in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). *See* ECF No. 17 at 41. But the D.C. Circuit has expressly acknowledged that "*CASA* does not control the scope of relief available under 5 U.S.C. § 705." *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *14 (quotation marks omitted) (rejecting the government's argument that "the district court erred by entering relief that extended beyond the parties"); *see CASA, Inc.*, 606 U.S. at 847 n.10 (limiting relief based on the authority conferred by the Judiciary Act of 1789 but leaving open "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action"); *id.* at 873 (Kavanaugh, J., concurring) (explaining that, even after *CASA*, district courts may grant "the functional equivalent of a universal injunction" by "preliminarily setting aside . . . an agency rule under the APA"); *see also Make the Rd. N.Y.*, 2025 WL 3563313, at *36 (statement of Millett and Childs, JJ.) (explaining that the Supreme Court has applied section 705 to stay agency actions "*in toto* pending judicial review without narrowing its relief to the parties at hand" (citing *NFIB v. OSHA*, 595 U.S. 109 (2022); *West Virginia v. EPA*, 577 U.S. 1126 (2016))).

## III. Conclusion

For these reasons, the court grants in part and denies in part the plaintiffs' motion for a stay under 5 U.S.C. § 705 and preliminary injunction, ECF No. 14. The court grants a stay of the biometrics policy and its implementation under section 705 of the APA and denies a preliminary injunction. The court therefore orders:

- The defendants' policy that they "generally will not take biometrics of detained aliens" with pending applications to USCIS for immigration status, ECF No. 14-2; December 2025

press release, *id*.; December 2025 policy alert, ECF No. 14-3; and implementation of the policy, including policy manual revisions, ECF No. 14-4, and rescission of ICE's obligation to collect biometrics, *see* ECF Nos. 14-2, 14-3, are stayed under 5 U.S.C. § 705 pending resolution of this action, restoring the status quo in which DHS collected biometrics for detained people with pending USCIS applications.

- The defendants shall file a status report by October 21, 2026, apprising the court of compliance with this order.

AMIR H. ALI
United States District Judge

Date: October 7, 2026